| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------x<br>In re:<br><br>ERBO PROPERTIES, LLC, et al.,<br><br>                                    Debtors.<br>------------------------------------------------------------x | Hearing Date and Time:<br>March 16, 2023 at 10:00 a.m.<br><br>Chapter 11<br><br>Case No. 23-10210 (LGB)<br><br>(Jointly Administered) |

**HIGHER GROUND 541 LLC'S OPPOSITION TO THE DEBTOR'S MOTION
TO REJECT DEVELOPMENT MANAGEMENT AGREEMENT**

      Higher Ground 541 LLC ("Higher Ground"), by and through its attorneys, Goldberg Weprin Finkel Goldstein LLP, hereby submits this Opposition to the motion (the "Motion") of Erbo Properties LLC (the "Debtor") authorizing the rejection of Higher Ground's Development Management Agreement dated October 8, 2018 (the "DMA").

**Preliminary Statement**

      1.     For all of the reasons set forth below, the Motion brings into play a number of operating and financial factors (reviewed below) that must be considered in evaluating whether the Debtor's estate is truly benefited by the proposed rejection of the DMA. Accordingly, the Motion should be denied without a proper evidentiary showing that rejection of the DMA, in fact, constitutes a proper exercise of the Debtor's business judgment to advance the overall interests of creditors in this Chapter 11 case. On this point, the voice of creditors (particularly the Senior Lender) should hold the greatest sway in terms of evaluating whether the dramatic change in direction for the Project as proposed by the Debtor is truly advantageous.

**A.    There is no Actual Evidence That Rejection of the DMA Will Benefit Creditors**

      2.     While a debtor-in-possession retains wide latitude in bankruptcy to reject burdensome executory contracts, the decision must still benefit the Debtor's creditors and not simply serve the interests of equity holders. Here, other than a perfunctory reference to the

1

business judgment standard under 11 U.S.C. §365, the Motion offers no meaningful analysis as to precisely how the Debtor's estate is actually benefited by rejection the DMA, both in terms of financial terms and operating efficiencies.

3. According to the Motion, the proposed new construction manager/general contractor – referenced only as Irving Oak Management without any information as to the firm's credentials, expertise or disinterestedness – has allegedly "toured the Property, reviewed plans and the current status of the Project and advised Erbo a temporary certificate of occupancy can be obtained within three to six months at a cost of less than $500,000.00." [Motion, ¶31].

4. No other support is provided for this statement, which completely ignores that in order to obtain a temporary certificate of occupancy ("TCO"), the existing trades, which previously left the Project last August, must certify and sign-off on their respective work as part of the TCO process. It is highly unlikely that a new management firm – literally walking in off the street – can remobilize the trades to obtain the required sign-offs, particularly when millions of dollars are owed to the subcontractors. By comparison, given its long involvement with the Project over the last four-plus years, Higher Ground is far better positioned to obtain a TCO (replete with the necessary sign-offs from the trades) due to its relationships and intimate knowledge of the workings of the building.

5. The task at hand would be daunting for any new construction management firm, but there in nothing in the Motion even suggesting that Irving Oak Management has the requisite knowledge and experience to even begin the process. The firm is not known in the industry as construction managers, and a Google search indicates that the Company was organized in 2017 apparently to manage residential apartments with a small office at 670 Willoughby Street in

2

Brooklyn.  At any rate, the Motion provides cold comfort that Irving Oak Management is up for the task at hand.

**B.      Higher Ground Was Not the Cause of the Delays**

6.    The Motion is fundamentally based on a false narrative that improperly scapegoats Higher Ground for the delays in completing construction of the Debtor's development project at 541-545 West 21st Street, New York, NY (the "Property").  The taint is completely unwarranted and self-serving.  As part of this Opposition, it is important to correct the record as to root causes of the delays which, in reality, lie at the doorstep of the Bodek family as Property owners (the "Owners").  While the Owners acknowledge in their petition that they are inexperienced, they must also acknowledge that they left the Project undercapitalized virtually from the outset.

7.    Higher Ground performed admirably throughout their tenure, which spanned the last four-and-one-half years.  Despite not being paid during the last two years and seven months, Higher Ground labored to bring the Project to the brink of obtaining a TCO.  The Project, which involves redevelopment of the Property into a modern office building (the "Project"), was 95% complete as of August 2022 when all work stopped because of the Owner's inability and refusal to meet the capital requirements of G-4 18190, LLC (the "Senior Lender").  The stoppage was triggered by the Owners' failings and there is no basis to support the reckless accusation in the Motion that Higher Ground "disengaged" [*Motion*, ¶¶ 15 and 30].

8.    Higher Ground retains significant clams in this bankruptcy case, including (i) a justly earned Developer's fee of $800,000; (ii) claims for unpaid services accruing since August 2022 totaling $297,500; and (iii) unpaid reimbursable expenses in the sum of $97,815.32.  Higher Ground is prepared to fully substantiate all aspects of its claims during the Chapter 11 case and will vigorously defend against any objections that may be lodged.  A copy of the DMA is annexed

3

hereto as <u>Exhibit</u> "A", which sets forth a comprehensive list of services that Higher Ground has provided on the Project.

9. That the Project is even near completion is a testament to the diligence of Higher Ground and its principals, Peter Cecora and his brother, Raymond Cecora. Peter is a design architect and has experience in a variety of matters relating to building construction. Raymond's role under the DMA was to facilitate financing options and execute the Project's business plan, which included pre-leasing of offices during construction. The Project was conceived in 2018 when the office leasing market was much better than today, and pre-leasing was a fundamental goal for a successful development.

10. Even after the start of the pandemic, it was still the recommendation of the Debtor's leasing team to pre-build floors to aid leasing efforts. The Owners, however, did not follow these recommendations and lost opportunities to enter into two significant leases procured by Raymond Cecora with local galleries, Paula Cooper Galleries which signed a term sheet for two floors (25% of the building) and Berry Campbell, which offered lease the first floor. Both proposed leases met underwriting criteria and would have jump-started occupancy of the building. Unfortunately, through inaction by the Owners, these potential leases were not finalized to the detriment of the Project.

11. The real culprits for the delays are the Owners, who never paid bills on time and failed to meet the capital requirements of the Senior Lender. In fact, almost no payments were ever made to contractors and service providers within industry terms of sixty days, while a substantial number of payments to subcontractors were made over 120 days after invoicing. The Owners' failure to make timely payments was not only a default under the DMA (Section

VIII.1(b)) but created a negative atmosphere as trade creditors were reluctant to work on the Project (particularly during Covid-19 when a premium was placed on labor and materials).

12. To be sure, construction was adversely impacted by the intervening Covid-19 pandemic and Higher Ground was called upon to maximize financial resources during extremely trying and unprecedented circumstances. The building was partially demolished at the start of Covid when Executive Orders were issued to cease workplace activities. Materials and equipment suffered delays and individual trade creditors established their own policies as to work hours and days.

13. Exacerbating matters, the Owners were consistently late in making payments throughout the pandemic, forcing Higher Ground to also take on a role of peacekeeper, bridging disputes between ownership and the trades. Higher Ground averted a complete demobilization of the Project on multiple occasions. Even at that, however, there were two work stoppages due to the Owners' failure to pay its creditors, one in January 2021 and the most recently last August, which continues to this day.

14. Besides overseeing construction, Higher Ground also provided much needed financial assistance for the Project in various forms, including payment of time-sensitive Project related expenses of more than $800,000 during the period 2019 through 2022. Higher Ground is owed a balance of $97,815.52 for reimbursement of its prior advances for expenses.

15. Moreover, Higher Ground made a significant concession to help the Owners meet targeted goals with its Senior Lender. In early 2021, the Senior Lender required the Debtor to "rebalance" its loan to compensate for many out-of-balance expense items. The rebalancing was helped by a reallocation of Higher Ground's $800,000 Developer Fee, which was ultimately deferred to the end of the Project, thereby, freeing the Owners to address other out of balance line

items. At the time of the deferral, there was a clear commitment that the Developer Fees were properly owed and due recognition by the Owners that a deferral represented an important contribution to the Project.

16. In September of 2021, the Senior Lender's loan matured. Higher Ground arranged/facilitated a mezzanine loan with SME Capital for $4,750,000 to pay for the Debtor's financial obligations and extend the loan with the Senior Lender. Higher Ground also negotiated to obtain the extension without posting a full year of interest reserve (which was otherwise required under the existing loan agreement). Higher Ground arranged a projected $68 million refinancing from SME Capital, only to see the Owners decline to pursue it.

17. In view of the foregoing, Higher Ground has a vested interest in completion of the Project and is deeply disturbed by both the tenor and the motivations behind the Motion. With the Project already 95% completed, there is certainly no clear economic or operating efficiency in replacing Higher Ground, except perhaps to avoid payment of arrears, or to create an alternate reality in which the Owners attempt to pawn-off their failures on others. Even under the liberal standards of 11 U.S.C. 365, the Debtor does not have carte blanche authority to reject the DMA at the expense of the interests of creditors.

**Legal Argument**

**A.    Rejection Of The DMA Is Not A Proper Exercise Of The Debtor's Business Judgment**

18. Section 365(a) of the Bankruptcy Code provides that a "trustee, subject to the court's approval, may assume or reject any executory contract."[1] 11 U.S.C. § 365(a). This decision

---

[1] Executory contracts are not defined in the Bankruptcy Code, but under the classic Countryman formulation, an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *In re AMR Corp.*, 730 F.3d 88, 106 (2d Cir. 2013). By comparison, here, the Debtor's main obligation remaining under

6

is subject to the business judgment rule, which provides that "[a]s long as assumption [or rejection] . . . appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). *See, In re Avianca Holdings S.A.*, 618 B.R. 684, 696 (2020) ("Courts are inclined to 'approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.'", *citing In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984).

19. For purposes of this Motion, application of the business standard should be done through the lens of the Debtor's creditors, and particularly its Senior Lender whose collateral is directly implicated. Higher Ground understands that the Senior Lender does not support the Motion and intends to complete the Project with the DMA in place. The notion that the Debtor can obtain a priming DIP loan under 11 U.S.C. §364(d) presents great challenges in and of itself and would only be exacerbated by operating inefficiencies and transition uncertainties caused by the displacement of Higher Ground in favor of the unknown Irving Oak Management.

20. Besides the impracticalities of a rejection, the decision would trigger the filing of a mechanic's lien by Higher Ground for its unpaid claims. *Old Post Rd. Assocs., LLC v. LRC Constr., LLC*, 177 A.D.3d 658, 659 (2d Dep't 2019) ("a contractor who performs labor or furnishes

---

the DMA is the payment of money, so that the DMA may not even qualify as an executory contract. *See, In re Waste Systems Intern., Inc.*, 280 B.R. 824, 827 (2002), *citing In re Roth American, Inc.*, 107 B.R. 44, 46 (Bankr. M.D.Pa. 1989) ("a contract is not executory if the only remaining obligation is the payment of money by the debtor.").

7

materials for the improvement of real property with the consent or at the request of the owner thereof . . . shall have a lien for the principal and interest, of the value, or the agreed price, of such labor . . . or materials upon the real property improved or to be improved"). In the event of a rejection, Higher Ground would no longer be bound by the provisions of Section IX.17 of the DMA waiving its lien rights, although this provision is against public policy and is likely unenforceable in any event under Section 34 of the Lien Law, which provides in relevant portion that "any contract, agreement or understanding whereby the right to file or enforce any lien created under article two is waived, shall be void as against public policy and wholly unenforceable".

21. Since Higher Ground retains a lien claim in the event of a rejection, and the Debtor will still have to pay any new Project manager, be it Irving Oak Management or someone else, there is little or no immediate financial benefit to be gained from rejecting the DMA.

22. Moreover, without an experienced replacement for Higher Grounds (suitable to creditors) prepared to step in immediately, with all of the necessary disclosures and approvals for its employment under Section 327 of the Bankruptcy Code, the Debtor has not and cannot establish that it has made a considered and well-reasoned decision under the business judgment rule in seeking to reject the DMA.

WHEREFORE, Higher Ground 541 LLC respectfully submits that the Motion should be denied as the Debtor has failed to meet its burden of establishing that rejection of the DMA is in the best interests of creditors, or otherwise constitutes a proper exercise of its business judgment.

Dated: New York, New York
March 9, 2023

                                              GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Counsel for Higher Ground 541 LLC*
125 Park Avenue, 12th Floor
New York, New York 10017
Tel. (212) 221-5700
knash@gwfglaw.com

By:   /s/ Kevin J. Nash
        Kevin J. Nash, Esq.