| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------x<br>In re:<br><br>ERBO PROPERTIES, LLC, et al.,<br><br>                                  Debtors.<br>------------------------------------------------------------x | Hearing Date and Time:<br>May 10, 2023 at 10 a.m.<br><br>Chapter 11<br><br>Case No. 23-10210 (LGB)<br><br>(Jointly Administered) |

**DIRECT TESTIMONY OF PETER CECORA IN SUPPORT OF HIGHER GROUND
541 LLC'S OPPOSITION TO THE DEBTORS' MOTIONS TO REJECT THE
DEVELOPMENT MANAGEMENT AGREEMENT AND EXECUTE AGREEMENTS
WITH A NEW OWNER'S REPRESENTATIVE AND GENERAL CONTRACTOR**

      Peter Cecora declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

      1.      I am a principal of Higher Ground 541 LLC ("Higher Ground") and a real estate development professional and AIA associate, with direct, firsthand knowledge of the development project owned by Erbo Properties LLC, Kova 521 LLC and Gold Mezz LLC (collectively, the "Debtors") at 541-545 West 21st Street, New York, NY (the "Project").

      2.      Higher Ground was retained as the Development Manager in 2018 to manage, arrange, supervise and coordinate design, construction and planning services for the Project on behalf of the Debtors pursuant to a Development Management Agreement dated October 8, 2018 (the "DMA"), a copy of which is attached as Exhibit "A" to Higher Ground's original objection [ECF 34].

      3.      Essentially, the DMA provided for Higher Ground to act as the fee developer for the Project, which entails services beyond those of an owner's representative, since we facilitated the Project's construction financing. Thus, we are well-acquainted with the existing lenders at the Project.

4.      Heretofore, Higher Ground submitted opposition [ECF No. 34] to the Debtor's motion to reject the DMA [ECF No. 13] (the "Rejection Motion"), which I helped to formulate from a factual perspective. In conjunction with the upcoming evidentiary hearing relating to the Rejection Motion and the Debtors' separate motion to enter into new contracts to retain Irving Oak Management ("Irving Oak") as the owner's representative and project manager, and Mabe Group Inc. ("Mabe") as the general contractor (collectively, Irving Oak ad Mabe are the "New Contractors") [ECF No. 57] (the "Retention Motion") I am submitting this Declaration of lieu of direct testimony in further support of Higher Ground's opposition.[1]

**Higher Ground Never Abandoned the Project and Cannot Easily be Replaced**

5.      I have extensive design, construction and project management experience since obtaining Bachelor of Architecture (professional degree) from New York Institute of Technology. I am an AIA Associate (American Institute of Architects) and have been engaged in real estate development over the past 11 years. In fact, I participated in the design of the building with Mancini Duffy (the Architect of Record) and arranged and coordinated the daily construction efforts throughout my tenure as Development Manager. I have multiple texts and emails from the Debtors and even their counsel, Scott Markowitz, Esq., conveying their appreciation for our efforts. (*See,* emails and texts collectively attached as Exhibit "A"). The Debtors' negative attitude towards us only changed after we said we could not continue to work without compensation. I do not believe that this constitutes an "abandonment" as alleged by the Debtors and, if anything, we felt abandoned by the Debtors who disengaged after we could no longer work "for free" following more than two years of loyal service despite non-payment.

---

[1] Pursuant to agreement with counsel, Higher Ground's time to oppose the Retention Motion was extended until today. As such, this Declaration should also be considered written opposition thereto.

6. As I understand it, the issue at hand relates to whether the Debtor's business decision to substitute Higher Ground and the current construction manager, Cauldwell-Wingate Company LLC ("Cauldwell") is sound and advances the overall interests of the Project and the rights of creditors. On that topic, I am submitting this Declaration to provide insight into the complexities involved in the proposed substitutions from a project management and construction point of view.

7. The Project fundamentally involves the development of a 67,000 sq. ft. Class-A Office Building in West Chelsea Manhattan and is 95% complete. When evaluating the proposed substitution, it is important to appreciate the caliber of the asset involved and to compare the relative experience of the proposed alternative contractors. I do not believe that either Irving Oak or Mabe stack up favorably to Higher Ground or Cauldwell, which is a highly regarded general contractor whose reputation speaks for itself.

8. At this late stage, it is imprudent to switch project management since the New Contractors cannot possibly have the same degree of knowledge and expertise as to what needs to be completed, even if they were sufficiently experienced to perform the required services.

9. Yet, it cannot be genuinely disputed that the New Contractors have little experience with Manhattan office buildings generally and no experience with this Project specifically. Site visits do not constitute familiarity with the Project or knowledge of the inner workings of the scope of prior renovation which is extensive, as depicted in the drawings and photographs showing the evolution of the Project, attached hereto as Exhibit "B".

10. Moreover, there is a high potential for incompatibility between the means and methods one contractor uses versus another, notably access to the proprietary software that operates all mechanical and life safety equipment. Simply put, without access to the software,

the New Contractors cannot even cool or heat the building. Additionally, all permits, inspections and pending sign offs are in the possession of the current design and construction team. Switching to the New Contractors would cause significant delay and potentially substantial additional fees and costs.

### Nuances Relating to the TCOs

11. One of the most concrete examples of problems with transition involves the TCOs. As is clear from the Debtors' motions, the immediate focus at the Project is the need to obtain temporary certificates of occupancy, or TCOs. In fact, nine (9) TCOs are required, one for each of the eight (8) office floors, and one for the lobby and common areas. Moreover, as it relates to the Project, the TCOs are not expected to be obtained all at once, but in phases since prudent developers build offices to meet the specific requirement of each future tenant before submitting a TCO application. Without tenants, applications for TCOs are not a common practice, as the TCO usually corresponds to the tenant's desired fit-out and occupancy. At this point, there are no prospective tenants, so having TCOs does not mean the building is stabilized or will be income producing.

12. Moreover, one does not obtain a TCO by simply filing papers with the City. In order to obtain TCOs, the contactors need cooperation from Mancini Duffy (project Architect) to sign off all active permits and confirm the "as-builts" reflect the Approved Plans. It is not clear that Mancini Duffy is willing to participate with Irving Oak and Mabe, or has even been contacted by them on a preliminary basis.

13. Second, the contractors need cooperation from all of the Project's Building Design Engineers including Structural, Mechanical, Plumbing, Electrical, Fire Suppression and Fire Alarm. I have been in contact with each of the engineers and know that no efforts have been

made on behalf of the Debtors to settle outstanding claims or to otherwise coordinate with any of them.

14. Third, and perhaps most importantly, the New Contractors must obtain third-party inspection reports to be submitted to the Building Department. The inspections are done by licensed private companies and are predicated on prior work performed and materials supplied by Cauldwell and its subcontractors. Higher Ground is better positioned to obtain the respective inspection reports than anyone else. Without inspection reports, TCO issuance is impossible.

15. For example, to obtain a TCO the Master Plumber must certify that the work they did reflects the approved drawings. The associated approvals and inspections for this are maintained by the Master Plumber, who is a subcontractor engaged by Cauldwell. If Cauldwell is replaced, it could decline to turnover the paperwork, because Cauldwell will not want to be liable for any potential future claims. This could require that the new general contractor re-do the work and have its own master plumber certify that the work is correct. All uncertainty over inspections is eliminated if the current team remains in place.

### The New Contractors Lack Experience

16. The Debtors' Retention Motion fails to establish that either Irving Oak or Mabe has the necessary experience to perform the required tasks. A review of the Debtors' motions shows that Irving Oak's experience to date is in servicing small projects, mostly located in Brooklyn and Queens with no direct experience working on (much less completing) a Class A office building in Manhattan. Most troubling is that while Irving Oak purports to offer a construction service contract, it is not a licensed General Contractor.

17. In Exhibit "A" to the Retention Motion, Irving Oak provides a spreadsheet showing past and current projects it has handled. This chart is incomplete (if not misleading) as

5

there are no addresses for any of the properties, no tangible information as to the level of participation (on nine of the projects, Irving Oak states that its role was limited to just "Management"), or quality of work performed, or the status of completion. The only two projects identified as located in Manhattan total 8,500 sq. ft. – the equivalent to little more than one floor at the subject Project.

18.     Among the steps Irving Oak claims to have taken is the retention of an "experienced expeditor – "BAC Group". According to the NY Secretary of State, BAC Developers Group Inc. was formed on January 9, 2023 (*See*, Department of State listing annexed hereto as Exhibit "C").

19.     Exhibit "D" to the Retention Motion is the proposed contract between Irving Oak and the Debtor. It provides, among other things, that "Irving Oak Management Desires to provide Construction Services"; "Irving Oak Management will provide all services, materials and labor for the construction of Commercial . . . This includes building and construction materials, necessary labor and site security… needed for completion of construction"; "Irving Oak Management is responsible for furnishing any building improvements related to construction of the structure". In fact, since Irving Oak is not a licensed general contractor, it is not qualified to handle any of these tasks.

20.     Not to be petty, but it is certainly worth noting that Irving Oak has installed a security system at the project by means of an extension cord with duct tape on the outside of the building as depicted in the photograph annexed hereto as Exhibit "D". This not only creates a violation based on exposed wiring, but if the extension cord is pulled out from the street the entire "security system" is inoperable.

21. Mabe is similarly unqualified to perform the services for which the Debtors seek to retain it. The Active Permit log provided by Mabe in Exhibit E to the Retention Motion makes clear that Mabe has even less applicable experience than Irving Oak. The list contains only residential projects with none in Manhattan (except one small apartment renovation), and the largest being only approximately 20,000 sq. ft.

22. Furthermore, the budget provided in Exhibit D to the Retention Motion is incomplete. There are several expensive items that are omitted, misleading or labeled "TBD". For example, electric costs are shown as $48,000, which is one-third of the actual cost. The fire curtain and the HVAC costs (although significant) are left blank. In fact, on last check, the fire curtain has a six-month time lag for delivery which indicates that the New Contractors' proposed timeline for obtaining TCO's is not achievable. Conversely, Higher Ground has alternative methods to proceed in a shorter time frame even awaiting the fire curtain.

23. The budget leaves open the cost of the canopy, noting that a "revision is in progress". A canopy was custom-made for the building and is currently being stored at the vendor's warehouse. The cost was approximately $200,000, of which all but approximately $75,000 has been paid. There is no explanation given as to why a redesign is necessary.

**Higher Ground is Not Responsible for Delays**

24. The Debtors' criticism of Higher Ground is unwarranted. Thus, I am responding to the more salient attacks. As stressed in Higher Ground's initial Objection the cause of the delays were multifaceted, beginning with the Covid-19 pandemic and ending with the Debtors' failure to make payments on time, which demoralized the trades.

25. Most projects that started construction during the same time period suffered the same types of issues (covid/leasing). This is not reflective of Higher Ground or Cauldwell's

performance. In fact, Cauldwell has been in business for over 100 years and, to my knowledge, never failed to complete a project and has constructed some of New York City's most recognizable structures (*See,* Cauldwell-wingate.com/about). While Higher Ground does not have the same track record, our performance was on par with comparable owner representatives and fee developers and it is worth noting that Cauldwell has indicated that they want Higher Ground to remain on the Project as we have an excellent working relationship.

26. The increase in costs are mostly attributable to increased construction costs due to supply and manpower shortages. This was exacerbated here by the lack of payments to the trades. In fact, we are now nine (9) months into the most recent construction shutdown due to non-payment.

27. Despite the lack of payment, Higher Ground continued to provide services post-demobilization, as I reported to the site on a daily basis all the way into February 2023 when the Debtors changed the locks on the doors. On several occasions I responded to emergency situations at the building including the prevention of flood waters crossing active electrical wiring in the fall of 2022. In December 2022, Higher Ground paid more than $8,000 for temporary heating infrastructure that was installed at the Project. (*See,* email confirmation annexed hereto as Exhibit "E").

28. This was in keeping with our prior efforts to provide financial support to the Debtors, as when we agreed in 2021 to convert $800,000 in development fees owed to Higher Ground by the Debtors into a loan to keep the Project funded. (*See,* email confirmation annexed hereto as Exhibit "F").

29. Finally, we had many meetings, discussions and strategic negotiations on behalf of the Debtors after August 2022 and made several attempts to reorganize the jobsite under the

assumption that the Debtors would somehow find a financing solution. Thus, it is inaccurate and unwarranted for the Debtors to claim that Higher Ground disengaged or somehow abandoned the Project.

30. Based upon all of the above, I submit that neither Irving Oak nor Mabe is qualified to perform the services which Higher Ground and Cauldwell have provided to the Debtors and are willing to continue to provide.

Dated: New York, NY
      May 5, 2023

Peter Cecora