HEARING DATE: MAY 10, 2023
HEARING TIME: 10:00 A.M.

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for ERBO Properties LLC, KOVA 521, LLC and Gold Mezz LLC*
*Debtors and Debtors-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
smarkowitz@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                      :
                                                            :    Chapter 11
                                                            :
ERBO PROPERTIES LLC, et al.[1]                              :    Case No.: 23-10210 (LGB)
                                                            :    (Jointly Administered)
                            Debtors.                        :
-----------------------------------------------------------x

# DEBTOR ERBO PROPERTIES LLC'S OMNIBUS REPLY TO (I) 541 W 21 SME LLC'S OBJECTION TO MOTION TO ENTER INTO AGREEMENTS WITH IRVING OAK MANAGEMENT AND MABE GROUP INC. TO COMPLETE CONSTRUCTION OF THE DEBTOR'S PROJECT LOCATED AT 541 WEST 21ST STREET, NEW YORK, NY, (II) CAULDWELL-WINGATE COMPANY, LLC'S OBJECTION, (III) G-4 18190, LL'S OBJECTION AND (IV) HIGHER GROUND 541 LLC'S OPPOSITION

Erbo Properties LLC, the above-captioned debtor and debtor-in-possession (the "Debtor" or "Erbo"), hereby submits this Omnibus Reply ("Reply") to: (i) 541 W 21 SME LLC's Objection to Motion to Enter Into Agreements with Irving Oak Management and Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West

---

[1] The Debtors are ERBO Properties LLC (EIN x9179), Case No.: 23-10210, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; KOVA 521, LLC (EIN x9972), Case No.: 23-10211, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; and Gold Mezz LLC (EIN x4741), Case No.: 23-10212, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211.

21st Street, New York, NY [ECF Dkt. No. 71] (the "SME Objection"), (ii) Cauldwell-Wingate Company, LLC's Objection to Debtor Erbo Properties LLC's Motion to Enter into Agreements with Irving Oak Management and Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY [ECF Dkt. No. 74] (the "Cauldwell Objection"), (iii) the G-4 18190, LLC's Objection to Motion to Enter into Agreements with Irving Oak Management and Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY [ECF Dkt. No. 75] (the "G-4 Objection"), and (iv) Direct Testimony of Peter Cecora in Support of Higher Ground 541 LLC's Opposition to the Debtor's Motion to Reject the DMA and Execute Agreements with a New Owner's Representative and General Contractor (the "Higher Ground Objection") [ECF Dkt No. 81] (collectively, the "Objections"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      As the SME Objection makes crystal clear, SME is anxious to take over ownership of the Debtor's real property in order to reap a windfall and wipe out the equity position of Erbo's owners. In short, as with many single asset real estate Chapter 11 cases, the fight is over the equity in the property. None of the Objections take issue with Erbo's game plan to finish construction and obtain at least a partial TCO for Erbo's building. The Objections assert Erbo has made little progress in its Chapter 11 case. The lack of progress is easily explained as SME (mezz lender) and G-4 (the fee lender) as well as the counter parties to contracts with Erbo have objected to Erbo's rational business decision (to replace

the professionals who were unable to complete the Project[2] and by their own admission have essentially abandoned the Project) with professionals of Erbo's choice.

2. The Objections do not dispute the well established law that Bankruptcy Courts should not generally interfere with a debtor's business decision absent a showing of "bad faith, self-interest or gross negligence" See ¶ 23 of SME Objection. Here, based upon the substantial delays, cost overruns, and strained relations, the Debtor submits it has met the deferential business judgment standard.

3. With respect to Cauldwell Objection, Erbo submits the Court should view the Cauldwell Objection with skepticism. Cauldwell has obviously been in contact with SME regarding SME's intention to settle the alleged unpaid requisitions and utilize Cauldwell to complete the Project if it is successful in wrestling control of Erbo. Approximately two months ago, Cauldwell in its response to Erbo's motion to reject Cauldwell's CMA, Cauldwell stated as follows:

> Now, Cauldwell's work at the Project has been suspended for over eight months, since July 29, 2022, and Cauldwell is owed at least $2,202,185.04 for work completed, $1,465,971.17 of which is owed to subcontractors that performed work under Subcontractor Agreements with Cauldwell. Inasmuch as Cauldwell has not been paid, does not have any present intention to return to the Project and is unaware of any plans for work to resume. **Cauldwell does not object to the termination of the CMA** while reserving its rights to pursue all available remedies to recover the past due balance.

4. The Higher Ground Objection should be viewed in similar vein as the Cauldwell Objection.

---

[2] All capitalized terms not defined herein, shall have the meaning ascribed to such terms in the Debtor's Motion to Enter into Agreements with Irving Oak Management and Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY (the "Motion") filed under ECF Dkt. No. 57.

## REPLY TO OBJECTIONS

A.     **The SME Objection**

5.     The SME Objection questions Erbo's business judgment in rejecting the DMA and the CMA and seeking to hire Irving and Mabe. In the last sentence of its preliminary statement, SME asks why, then, would such an extreme change in course be necessary? The answer is quite simple. Under Higher Ground and Cauldwell's stewardship, the Project has been delayed approximately two years and incurred approximately 9 million dollars in cost overruns. Erbo filed Chapter 11 in attempt to rectify the situation and in exercise of its business judgment has elected to hire new professionals to finish the Project so the building can either be leased or sold to an end user.[3]

6.     The SME Objection asserts Erbo lacks the funding to complete the work necessary to obtain the TCO. Erbo's management has personally deposited $400,000 into Erbo's bankruptcy counsel's trust account which monies will be made available to pay for the cost to complete the Project and obtain a partial TCO assuming the Court permits Erbo to implement its business plan.

7.     SME questions why Irving's estimate is substantially less than Cauldwell's estimate. The simple answer is Cauldwell is quoting its fee at $80,000 per month versus Irving's fee of $8,000 per month. In addition, Cauldwell is charging approximately $40,000 per month for security while Irving replaced security with an effective 24 hour

---

[3] The Objections all question why Erbo has not filed an application to retain a leasing broker. In view of the current market for office space in Manhattan, and the building's far west location, Erbo's management has been advised that finishing the building and potentially selling the building to an end user or as commercial condos may be more prudent than entering into leases at less than desirable prices.

surveillance for less than $3,000 per month.

8.   As the evidence at the hearing will demonstrate, Erbo's selected professionals have extensive experience and are now fully familiar with what needs to be done to obtain the TCO.

### B.   The Cauldwell Objection

9.   The Cauldwell Objection is inconsistent with its prior response filed under ECF Dkt. No. 35.  The only rational explanation for this change in position is Cauldwell and SME have been in discussions regarding SME's intention to utilize Cauldwell to finish the Project and settle the unpaid requisitions if SME obtains stay relief and can take control of Erbo. Paragraph 4 of the Cauldwell Objection makes this clear. Paragraph 5 of the Cauldwell Objection states Cauldwell remains ready, willing and able to resume and complete work on the Project **provided** it receives payment for past requisitions. Payment of a pre-petition claim should not be in condition to performing post-petition services.

10.   Based upon Cauldwell's past cost overruns, inability to complete the Project and inconsistent estimates of the cost to complete (in one filing Cauldwell estimated it would cost between $400,000 and $450,000 to obtain the TCO and 4 weeks later estimated $915,000), and the fact Cauldwell states in the Cauldwell Objection their estimate does not cover all items required to get a TCO, Erbo has simply lost confidence in Cauldwell and in the exercise of its business judgment seeks to replace Cauldwell.

11.   In paragraph 17 of the Cauldwell Objection, Cauldwell asserts Irving's $48,000 budget for its electrical subcontractor is too low. The evidence at the hearing will demonstrate Irving's basis for this estimate.  Irving received a quote for this amount from Sigmond Fried at Fried Electric, an experienced and licensed electrical contractor. It is

worth nothing that Cauldwell's electrical contractor, Nova Electric, essentially abandoned the Project and failed to show up for a scheduled inspection. See **Exhibit "A."**

    C.    <u>**The G-4 Objection**</u>

12.    Similar to the SME Objection, the G-4 Objection questions Erbo's business judgment. In paragraph 2 of the G-4 Objection, G-4 states the paramount issues in this case are how the Project will be completed and the Project's future after construction is complete. Erbo agrees with its statement and is attempting to implement its game plan of completing the Project in a cost-effective way. However, progress must be measured in various steps. Everyone understands it will cost money and take some time to finish the Project and properly market and sell the Property to maximize value. The Debtor should not be required at this stage to decide every aspect of its business plan as the real estate market is subject to substantial fluctuations. The Debtor's Plan which will be filed shortly will address these issues. In the meantime, SME has been paying the non-default interest to G-4. G-4 is adequately protected based upon its first mortgage on the Property and in fact is receiving monthly interest payments on its loan at the non-default rate.

13.    In paragraph 6 of the G-4 Objection, G-4 asserts the Project was over budget by 20% and seriously delayed. This is precisely why after filing its Chapter 11 case, Erbo elected to promptly move forward with new professionals to complete the Project.

14.    In paragraph 22 of the G-4 Objection, G-4 asserts that it funded a requisition in the amount $1,816,000 on April 11, 2022 and has no record of receiving any further requisitions other than two informal requests for modest amounts. Erbo submits this alone shows why Erbo's business decision in replacing Higher Ground and Cauldwell is a prudent decision. Why did Higher Ground or Cauldwell not submit any requisitions to G-4

between April 11, 2022 and July 2022 when they disengaged from the Project?

15.     In paragraph 27 of the G-4 Objection, G-4 asserts Erbo has failed to negotiate in good faith. Erbo hotly disputes this claim and simply notes that it has made several settlement proposals in an effort to reach a path forward.

### D.    The Higher Ground Objection

16.     Erbo submits the Higher Ground Objection should be viewed similar to the Cauldwell Objection. First, Peter Cecora ("Cecora") questions Irving and Mabe's credentials as well as BAC Group's credentials. This Court will hear evidence on these issues. BAC Group is an entity formed by Hershey Fekete ("Fekete"). Fekete is one of the New York City's most sought after expeditors. Fekete and his staff have filed and approved, permitted, inspected and signed off thousands of applications/buildings, ranging from multi family projects, waterfront towers, commercial and industrial as well as a number of institutional buildings.

17.     Higher Ground essentially admits in paragraph 25 of the Higher Ground Objection, Higher Ground has modest experience in developing office buildings in New York City. In fact, this Project may very well be Higher Ground's first re-development of a property into a class A office building.

18.     Higher Ground asserts in paragraph 12 of the Cecora declaration any replacement contractor will need the cooperation of the architect of record Mancini Duffy. The testimony will indicate Irving is in possession of all plans and drawings and will seek Mancini Duffy's cooperation or a replacement architect.

19.     The evidence will also show Irving has reached out to most of the subcontractors and while some are not cooperating, others have. As can be seen from

**Exhibit "A,"** while under Cauldwell and Higher Ground's stewardship, subcontractors were replaced. If a particular subcontractor such as a plumber refuses to cooperate, Irving will obtain a qualified replacement plumber to complete the Project, the same way Higher Ground and Cauldwell replaced Nova Electric and Perdomo National Wrecking mid Project.

20. In paragraph 22 of the Higher Ground Objection, Cecora asserts the fire curtain has a six month lag time for delivery. As the evidence will show, Irving has a work around for this alleged problem similar to the work around Higher Ground appears to have (see final sentence of Paragraph 22 of Cecora declaration).

21. Finally, in paragraph 23 of his declaration, Cecora raises issues regarding the canopy. As the evidence will show, a canopy is not required to obtain the TCO and Irving will file a post approval amendment to the original building plan to reflect this change.

## RESERVATION OF RIGHTS

22. Erbo reserves the right to supplement this Reply via testimony at the hearing.

23. Erbo submits the legal analysis set forth in the Motion, this Reply and/or oral arguments as well as evidentiary record comprised of the declarations, testimony and exhibits demonstrate the Motion should be approved as a valid exercise of Erbo's business judgment.

**WHEREFORE**, for the reasons stated above as well as in the Motion, Erbo requests the Court grant the Motion, overrule the Objections and grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
May 8, 2023

                                      **TARTER KRINSKY & DROGIN LLP**
*Attorneys for Erbo Properties LLC, Kova 521, LLC and Gold Mezz LLC*
*Debtors and Debtors-in-Possession*

By:  /s/ Scott S. Markowitz
      Scott S. Markowitz, Esq.
      1350 Broadway, 11th Floor
      New York, New York 10018
      (212) 216-8000
      smarkowitz@tarterkrinsky.com

**EXHIBIT A**

Pg 11 of 13

 Gmail                                    lazzar Bodek <couldbereached@gmail.com>

## 541W21_Nova Issues 7.11.22

**Peter Cecora** <peter@541w21.com>                         Mon, Jul 11, 2022 at 10:39 PM
To: Erno Bodek <victoriasales2@aol.com>, Rachel Bodek <rachelmazel@gmail.com>, Lazzar Bodek <lazzar@541w21.com>, COULDBEREACHED <couldbereached@gmail.com>
Cc: Ray Cecora <ray@541w21.com>

Hi Erno Rachel and Lazzar

I'm writing to inform you that Nova Electric has abandoned their responsibilities as our project's electrical contractor.

As of today (July 11 2022) they have pulled all of their workers offsite and have given no indication of returning.

Cauldwell Wingate as their 'prime' is trying to convince Nova to return and finish their contractual obligations but the situation is not looking good.

Cauldwell has also arranged for alternative electrical contractors to visit the site and provide bids towards finishing Nova's scope. If an alternative electrical contractor is selected, Cauldwell will be responsible for managing the litigation between Nova.

I will continue to keep you informed as we find a solution. In the meantime, I've provided a more detailed explanation of the "nova nightmare" below.

Peter


---

Before I begin, please keep the following points in mind....

- Remaining Owed to Nova: $175,000.00

- Electrical Contract Scope Includes:
    - Main Line Voltage: Power to all mechanical equipment and elevators.

- Low Voltage: Power to Lights, Plumbing Fixtures, Smaller Mechanical Devices.
- Fire Alarm: Power to Strobes, Sirens, Fire Alarm Devices, Fire Command Stations.
- Security: Power to Cameras, Key swipes and Control Board.
- BMS: Control wiring to mechanical, plumbing and electrical equipment*.
    *subcontractor to US Energy Group who is a subcontractor to Alpine Mechanical our mechanical sub under CW

<u>- The Electrical Scope is one way or another involved with almost all of the inspections for TCO.</u>
- Plumbing inspections require electricity and control wiring to work the pumps.
- Fuel Oil Inspection requires the fuel pump in the basement to work.
- Fire Alarm Inspection requires all related mechanical and FA equipment to be powered and calibrated.
- The Lobby "Final Inspection" cant be scheduled until the permanent lighting fixtures are installed.
- Boiler inspection is otherwise ready except we're missing an emergency switch that is provided by the electrician.

Latest Chapter of the story…

The primary reason we failed our Fire Alarm inspection on May 27 was due to the lack of Permanent Power being established.

Immediately after the 5/27 date, I informed Cauldwell's CEO that we would need to schedule the next available Fire Alarm inspection but in the meantime, to continue working full speed so we reach the level of "completeness" ahead of whatever date we receive from the FDNY. He then scheduled an all-hands meeting with the relevant parties including: Nova (electrical), Alpine (Mechanical) and, USEG (BMS).

During that meeting, tempers grew and the representatives from Nova and Alpine got into an altercation. The result of that altercation was Nova said they would no longer do the BMS scope. This was a hit towards Alpine since they technically hold the BMS contract. By Nova refusing to finish their obligations to the BMS scope, Alpine is now responsible to find a different contractor and cover whatever increased costs.

Nova had continued to provide regular 6-10 men crews every day following that meeting but only focused on their contract work with Cauldwell. Alpine and USEG have been meeting with alternative electricians to finish the BMS scope and we hope to have

someone signed up in the next week or so. It will take that electrician 3-4 weeks to complete the BMS Scope.

At this point, although Nova had abandoned their contractual obligations to USEG (Alpine) for to the BMS scope, they seemed to have made considerable progress in regards to their other responsibilities. We commissioned our emergency generator, our fire pump and about 50% of the air-handler units located on the office floors. We were also told that the Fire Alarm system was almost complete (if not done). The Fire Alarm team (nova) had been absent from the site for about 3 weeks.

We then received notice from the FDNY that an earlier date became available and we'd be inspected on July 7 2022. All relevant parties were made aware and we prioritized fire alarm-related tasks during the days leading up to 7/7. Nova's FA team still was not showing up so we assumed it was a matter of the system's status of completeness. We had also made several attempts to schedule a 'Fire Alarm Pre-Test' with Nova and our Fire Alarm Expeditor prior to the inspection but Nova pushed off those requests.

When July 7th came, no one from Nova showed up to the inspection. They told all their guys to report to a different job site. We made many attempts to contact the owners of Nova or their senior staff but were unsuccessful. Cauldwell's CEO, Rob Palumbo was also made aware immediately.

Since July 7 we've made little-to-no progress towards getting Nova to cooperate. Cauldwell's lawyer sent a legal letter to Nova on Friday 7/8/22 and spoke with Nova's owner this morning. I don't believe a "reason" has been shared from Nova as to why they are abandoning the job.

CW is requesting other electrical contractors bid the remainder of the incomplete items as I believe they are losing faith in Nova as well. If Nova is replaced, it will be Cauldwell's responsibility to back charge / sue Nova for the costs to complete their work.

I'm anxious to request the next available FA inspection date from the FDNY immediately but have been advised to hold off until we know what electrician is finishing the job. Keep in mind, we can't submit our TCO application until all requirements are met including this Fire Alarm inspection. It takes the FDNY 6-8 weeks to schedule their inspections.