**Hearing Date and Time: June 28, 2023 at 10:00 a.m. (ET)**
**Objection Deadline: June 21, 2021, at 5:00 p.m. (ET)**

**DUANE MORRIS LLP**
Morris S. Bauer, Esq.
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone: (973) 424-2037
Fax: (973) 452-3404
Email: MSBauer@duanemorris.com

*Counsel to 541 W 21 SME LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ERBO PROPERTIES, LLC, *et al.*,[1] | Case No. 23-10210 (LGB) |
| Debtors. | Jointly Administered |
| | Related to Dkt. No. 86 |

**541 W 21 SME LLC'S OBJECTION TO THE DEBTORS' DISCLOSURE STATEMENT TO ACCOMPANY THEIR JOINT CONSOLIDATED PLAN OF REORGANIZATION DATED MAY 15, 2023**

541 W 21 SME LLC ("SME") by and through its counsel, hereby submits this objection (the "Objection") to the approval of the *Debtors' Disclosure Statement to Accompany Their Joint Consolidated Plan of Reorganization Dated May 15, 2023* (the "Disclosure Statement")[2] filed by the Debtors in furtherance of their Plan pursuant to section 1125 of the Bankruptcy Code. In support of this Objection, SME respectfully states as follows:

---

[1] The Debtors are ERBO Properties LLC (EIN x9179), Case No.: 23-10210, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; KOVA 521, LLC (EIN x9972), Case No.: 23-10211, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; and Gold Mezz LLC (EIN x4741), Case No.: 23-10212, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211.

[2] Capitalized terms used but not otherwise described herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan.

## PRELIMINARY STATEMENT

1.      The Court should not approve the Disclosure Statement because it remains the same document that the Court expressly deemed inadequate at the June 6, 2023, hearing (the "June 6 Hearing") on SME's motion for stay relief (the "Motion").[3]  As the Court advised the Debtors at that hearing, "[I]f you think I'm going to approve a disclosure statement that doesn't have projections, that doesn't have a liquidation analysis, that doesn't have a commitment for financing, it's not going anywhere."[4]

2.      Despite this explicit directive, the Disclosure Statement stands untouched without amendment or supplementation of any kind *15 days later* upon its objection deadline.  The Debtors' failure to take any action at all is particularly egregious in light of their representation to the Court that they had an appraisal in hand as of the June 6 Hearing but "didn't have time to put it in evidence," instead promising to "amend [their] [D]isclosure [S]tatement . . . to lay out [the] appraisal."[5]  SME has further received zero production or testimony under the deposition notices it served on the Debtors and subpoenas it served on the Bodek Family *33 days ago* on May 19, 2023.

3.      This transparent attempt to extend exclusivity through protracted Disclosure Statement proceedings, forcing creditors to object and only then addressing deficiencies with

---

[3] Mot. of 541 SME LLC for an Order Terminating the Automatic Stay Pursuant to 11 U.S.C. § 362 & Other Related Relief, Dkt. No. 54 [hereinafter Mot.].

[4] Tr. of Hr'g Before the Hon. Lisa G. Beckerman on June 6, 2023, at 10:00 a.m. at 121 ll. 3–7 [hereinafter Stay Relief Tr.].  A true and correct copy of the Stay Relief Tr. is attached as **Exhibit 1** to the certification of Morris S. Bauer attached hereto as **Exhibit A**.

[5] *Id.* 116 ll. 6–10.

DM3\9742105.1

information already in hand, comes directly at the expense of creditors. The Debtors seek to buy time they cannot afford with procedural games, given an inch but taking a mile.

4.      The Court has made clear that this Disclosure Statement is dead on arrival for inadequate information. In the interests of fairness and equity to all parties, the Court should bar any 11th-hour attempt by the Debtors to supplement the record. At the very least, the Court should outright deny the Debtors from proceeding with this Disclosure Statement, cut short their plans to preserve the otherwise expired exclusivity, require the Debtors start anew with a filing if they intend on proceeding with any plan of reorganization and allow other parties, such as SME to file a plan as a result of exclusivity having expired.

5.      As filed and as already acknowledged by this Court, a host of crippling legal issues render the Plan described in the Disclosure Statement fatally flawed and patently unconfirmable.

## **BACKGROUND**

6.      SME incorporates by reference as if fully set forth herein (a) the facts set forth in ¶¶ 4–31 of the Motion; (b) the entirety of SME's objection[6] to the Debtors' motion to reject certain management agreements with Higher Ground and Cauldwell[7]; (c) ¶¶ 1–9 of SME's objection[8] to the Debtors' motion to enter into new management agreements with Irving and

---

[6] Obj. of 541 SME LLC to Debtors' Mot. for Entry of an Order (I) Rejecting: (A) Development Management Agreement with Higher Ground 541 LLC, & (B) Construction Management Agreement with Cauldwell Wingate Company, LLC; (II) Fixing a Bar Date for Claims of Counterparties to the Rejected Contracts; & (III) Granting Related Relief, Dkt. No. 37.

[7] Debtors' Mot. for Entry of an Order (I) Rejecting: (A) Development Management Agreement with Higher Ground 541 LLC, & (B) Construction Management Agreement with Cauldwell Wingate Company, LLC; (II) Fixing a Bar Date for Claims of Counterparties to the Rejected Contracts; & (III) Granting Related Relief, Dkt. No. 13.

[8] Obj. of 541 SME LLC to Debtor's Mot. to Enter into Agreements with Irving Oak Management & Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY, Dkt. No. 71.

DM3\9742105.1

Mabe[9]; (d) the entirety of Eran Silverberg's declaration in support of the Motion and the

foregoing objections[10]; (e) the facts set forth in ¶¶ 1–8 of SME's supplement to the Motion (the

"Supplement")[11]; (f) the entirety of Mr. Silverberg's declaration in support of the Stay Relief

Supplement[12]; (g) the entirety of Raymond T. Cirz's declaration in support of the appraisal of the

Property by Newmark Group, Inc. ("Newmark") attached thereto (the "Original Newmark

Appraisal")[13]; (h) the entirety of Morris S. Bauer's declaration in support of the Stay Relief

Supplement together with the exhibits attached thereto[14]; (i) the entirety of Onika McLean's

affidavit of service together with the exhibits attached thereto[15]; (j) the facts set forth in ¶¶ 1–17

of SME's reply (the "Reply")[16] to the Debtors' objection to the Stay Relief Supplement[17]; (k) the

entirety of Mr. Bauer's declaration in support of the Reply together with the exhibits attached

---

[9] Debtors' Mot. to Enter into Agreements with Irving Oak Management & Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY, Dkt. No. 57.

[10] Decl. of Eran Silverberg on Behalf of 541 W 21 SME LLC in Support of SME's Obj. to the Debtor's Mot. for Entry of an Order (I) Rejecting: (A) Development Management Agreement with Higher Ground 541 LLC, & (B) Construction Management Agreement with Cauldwell Wingate Company, LLC; (II) Fixing a Bar Date for Claims of Counterparties to the Rejected Contracts; & (III) Granting Related Relief & SME's Obj. to Debtor's Mot. to Enter into Agreements with Irving Oak Management & Mabe Group Inc. to Complete Construction of the Debtors' Project Located at 541 West 21st Street, New York, NY, Dkt. No. 79.

[11] Supp. to Mot. of 541 SME LLC for an Order Terminating the Automatic Stay Pursuant to 11 U.S.C. § 362 & Other Related Relief, Dkt. No. 89.

[12] Decl. of Eran Silverberg on Behalf of 541 W 21 SME LLC in Support of Supp. to Mot. of 541 SME LLC for an Order Terminating the Automatic Stay Pursuant to 11 U.S.C. § 362 & Other Related Relief, Dkt. No. 90.

[13] Decl. of Raymond T. Cirz in Support of Appraisal by Newmark Group, Inc., Dkt. No. 89-1.

[14] Decl. of Morris S. Bauer in Support of Supp. to Mot. of 541 SME LLC for an Order Terminating the Automatic Stay Pursuant to 11 U.S.C. § 362 & Other Related Relief, Dkt. No. 89-2.

[15] Affidavit of Personal and Substitute Service, Dkt. No. 95.

[16] Reply to Debtors' Obj. to 541 W 21 SME LLC's Supp. to Mot. for an Order Terminating the Stay & Related Relief, Dkt. No. 96.

[17] Debtors' Obj. to 541 W 21 SME LLC's Supp. to Mot. for an Order Terminating the Stay & Related Relief, Dkt. No. 93.

4

thereto[18]; and (l) the entirety of Mr. Cirz's supplemental declaration in support of the amended appraisal of the Property by Newmark attached thereto (the "Newmark Appraisal").[19]  SME highlights and supplements such facts as follows:

7.      On the Petition Date, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committees have been appointed.

8.      In its petition, Erbo designated its business as single asset real estate ("SARE") under section 101(51B) of the Bankruptcy Code.[20]  The designation is quite literal in these Bankruptcy Cases—Erbo has no assets other than the Property.[21]  Gold Mezz likewise has no assets other than its 100% Equity Interests in Kova,[22] and Kova has no assets other than its 100% Equity Interests in Erbo.[23]

9.      Prior to the Petition Date, SME extended to Gold Mezz the Mezzanine Loan in the original principal amount of $4,750,000 in connection with Erbo's efforts to redevelop the Property (the "Project").[24]  The Debtors acknowledge that "[i]n connection with the Mezzanine

---

[18] Decl. of Morris S. Bauer in Support of Reply to Debtors' Obj. to 541 W 21 SME LLC's Supp. to Mot. for an Order Terminating the Stay & Related Relief, Dkt. No. 96-1.

[19] Supplemental Decl. of Raymond T. Cirz in Support of Appraisal by Newmark Group, Inc., Dkt. No. 96-2.

[20] Voluntary Pet. for Non-Individuals Filing for Bankruptcy § 7, Dkt. No. 1 [hereinafter Erbo Pet.].

[21] Sched. A/B: Assets - Real & Personal Property §§ 81–92, Dkt. No. 3 [hereinafter Erbo Sched. A/B].

[22] Sched. A/B: Assets - Real & Personal Property § 15.1, *In re Gold Mezz LLC*, Case No. 23-10212 (Bankr. S.D.N.Y.), Dkt. No. 3 [hereinafter Gold Mezz Sched. A/B].

[23] Sched. A/B: Assets - Real & Personal Property § 15.1, *In re Kova 521, LLC*, Case No. 23-10211 (Bankr. S.D.N.Y.), Dkt. No. 3 [hereinafter Kova Sched. A/B].

[24] Disclosure Statement Art. III.C.

DM3\9742105.1

Loan, Gold Mezz and Kova were created. These two entities had no business operations other than the ownership interests in Erbo."[25]

10.    Gold Mezz pledged its 100% Equity Interests in Kova (the "Pledged Interests") to secure the Mezzanine Loan. As a result of prepetition defaults by Gold Mezz with respect to the Mezzanine Loan, SME scheduled the UCC Sale for February 14, 2023, to foreclose on the Pledged Interests. The Debtors commenced their Bankruptcy Cases one day prior to prevent the UCC Sale from occurring.[26]

11.    On April 18, 2023, SME filed the Motion, seeking to terminate the automatic stay to continue its foreclosure of the Pledged Interests through the UCC Sale, thereby taking control of Kova and Erbo, filing a plan that will pay allowed claims in full, and completing the Project.

12.    On May 15, 2023, the Debtors filed the Disclosure Statement, which provides:

> The Plan will be funded primarily via the Sale of the Property. Pending the Sale of the Property, the Bodek Family shall either contribute the monies necessary to pay for the remaining construction costs and carrying costs on the Property pending the stabilization and Sale or seek to obtain exit financing in the nature of debtor-in-possession loan to fund these costs.[27]

13.    The Debtors included no financial commitments, bank statements, credit agreements, or other evidence establishing the availability of exit financing from the Bodek Family or any third party with the Disclosure Statement. Both the Debtors and the Bodek Family stonewalled SME's efforts to obtain this information in advance of the June 6 Hearing through discovery, though they filed no objections to such efforts.

---

[25] *Id.* Art. III.D.

[26] *See id.*

[27] *Id.* Art. V.C.2.

DM3\9742105.1

14.     On June 6, 2023, the Court conducted the June 6 Hearing.  The Court summed up its position on the Debtors' glaring informational deficits by citing the following passage from *In re Diplomat Elecs. Corp.*:

> The Court should not be left to speculate about important elements and key issues relating to the likelihood of an effective reorganization.  The debtors' hopes and aspirations for reorganization, although well-intended, have not been supplemented by any showing that a reorganization is possible, let alone reasonably likely within a reasonable period of time.[28]

15.     The Court also noted that "there's no way that somebody is going to provide exit financing here that is anybody other than the Bodeks or the existing lenders.  Its's just not going to be possible."[29]

16.     In light of the Debtors' lack of equity in the Property and their failure to demonstrate that they had a reasonable prospect of success to confirm their Plan within a reasonable amount of time, the Court granted the Motion in part to allow SME to notice the UCC Sale but required SME to return for further hearing on July 10, 2023, for an order authorizing the transfer of the Pledged Interests.[30]

17.     Nothing has changed since the June 6 Hearing occurred over two weeks ago.  The Debtors have neither supplemented nor amended their Disclosure Statement, and SME has received no productions or testimony in response to its pending discovery requests issued in mid-May.  In addition to facing the same inadequate disclosure issues that existed as of the June 6

---

[28] Stay Relief Tr. at 139 ll. 4–12 (quoting *In re Diplomat Elecs. Corp.*, 82 B.R. 688, 698 (Bankr. S.D.N.Y. 1988)) (internal citation omitted).

[29] *Id.* at 119 ll. 4–8.

[30] Order Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362 & Continuing the Hearing on the Motion of 541 W 21 SME LLC for an Order Terminating the Automatic Stay Pursuant to 11 U.S.C. § 362 and Other Related Relief, Dkt. No. 98.

Hearing, which is an independent basis to deny the approval of the Disclosure Statement, the same legal issues previewed to the Court render the Plan patently unconfirmable.

## ARGUMENT

### A.    The Disclosure Statement Remains Devoid of Adequate Information.

18.    A "disclosure statement is a solicitation document approved by a bankruptcy court as containing adequate information so that an informed determination can be made whether to accept or reject a reorganization plan."[31]  Section 1125(b) of the Bankruptcy Code provides that a debtor may not solicit votes on its plan without first having "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  Under the statute:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.[32]

19.    Courts often consider the following 10 factors to determine whether information in a disclosure statement is adequate:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated

---

[31] *In re 266 Wash. Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992).

[32] 11 U.S.C. § 1125(a)(1).

8

administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.[33]

20.      At the June 6 Hearing, the Court identified several disclosures that Debtors had failed to provide:

- Projections of income and expenses for the two years prior to the Sale.[34]

- Evidence of the ability of the Debtors or Bodek Family to pay for the carrying costs of the Property up to two years after confirmation,[35] which costs include the TRO, leasing agent, fit-up, utilities, security, insurance, and a $455,000 property tax obligation to be paid by July 1, 2023.[36]  The Newmark Appraisal projects these costs to be $15 million.[37]

- Evidence that the Debtors can obtain sufficient exit financing in the near term to pay for such costs,[38] including a commitment for financing.[39]

- A liquidation analysis.[40]

21.      The Debtors also failed to provide any evidence of value for the Property, instead premising their Plan "on an unsupported and self-serving valuation and a speculative sale,"[41]

---

[33] *In re Ashley River Consulting, LLC*, No. 14–13406, 2015 WL 6848113, at *8 (Bankr. S.D.N.Y. Nov. 6, 2015) (internal quotation marks and citation omitted).

[34] Stay Relief Tr. at 138 ll. 5–7.

[35] *Id.* at ll. 7–11.

[36] *Id.* at 118 ll. 9–13.

[37] [37] Newmark Appraisal at 101.

[38] Stay Relief Tr. at ll. 11–14.

[39] *Id.* at 121 ll. 6–7.

[40] *Id.* at ll. 5–6.

DM3\9742105.1

asserting an as-is value of $55 million[42] and providing zero information about the terms or prospects of such a sale. The conspicuous absence of any valuation by the Debtors implies that they drafted the Plan without one, deferring feasibility to some future appraisal they hope will justify their two-year gambit. The Debtors knew or should have known since the outset of these cases that an appraisal would be necessary.

22.    Rather than provide this information, the Debtors represented to the Court, "The [D]isclosure [S]tatement we can amend to whatever."[43]

**B.    The Plan Remains Patently Unconfirmable.**

23.    Courts additionally decline "to approve a disclosure statement that describes a 'patently unconfirmable' plan, that is, a plan that is incapable of confirmation as a matter of law."[44] Because approving such a disclosure statement "would subject the estate to the expense of the vote solicitation and plan confirmation process" with no hope of confirmation, "it is incumbent upon the [c]ourt to decline approval of the disclosure statement and prevent diminution of the estate."[45]

24.    The Plan is patently unconfirmable—and thus not reasonably feasible—for several reasons: (a) the negative amortization of secured claims is not fair and equitable, (b) substantive consolidation is inappropriate; (c) no plausible source of funding is available; d) the

---

(Continued…)

[41] *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

[42] Disclosure Statement at Ex. B.

[43] Stay Relief Tr. at 116 l. 23.

[44] *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) (internal quotation marks and citation omitted).

[45] *Id.* (internal quotation marks and citation omitted).

DM3\9742105.1

continued management of the Reorganized Debtors by Erno Bodek (the "Current Manager")
would not be in the interests of creditors or other equity holders; and (e) the proposed  treatment
of the Pledged Interests violates the absolute priority rule.

**1.    The Plan provides for negative amortization but does not meet the exception
to allow for confirmation.**

25.    The negative amortization treatment afforded to the secured claim holders is not
fair and equitable within the meaning of section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code,
which requires "that each holder of a claim of such class receive on account of such claim
deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the
effective date of the plan, of at least the value of such holder's interest in the estate's interest in
such property."[46]  Negative amortization occurs in a plan where "part or all of the interest on a
secured claim is not paid currently but instead is deferred and allowed to accrue to be paid when
income has presumably increased."[47]   The concept "applies as well to the nonpayment of
principal."[48]

26.    Although negative amortization provisions are not *per se* invalid, courts
determine whether they are confirmable by considering "the degree of risk of the exposure
created for the secured lender which is being required to enter in that position by the Plan."[49]

---

[46] 11 U.S.C. § 1129(b)(2)(A)(i)(II).

[47] *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 736 (Bankr. E.D.N.Y. 1994) (internal quotation marks and citation
omitted).

[48] *In re Sunflower Racing, Inc.*, 219 B.R. 587, 604 (Bankr. D. Kans. 1998).

[49] *8315 Fourth Ave.*, 172 B.R. at 736.

11

27.    At the June 6 Hearing, the Court advised that it would apply the following 10-factor test to assess whether the Plan was confirmable despite providing for negative amortization:[50]

> 1. Does the plan offer a market rate of interest and present value of the deferred payments;
>
> 2. Is the amount and length of the proposed deferral reasonable;
>
> 3. Is the ratio of debt to value satisfactory throughout the plan;
>
> 4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;
>
> 5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;
>
> 6. Are the risks unduly shifted to the creditor;
>
> 7. Are the risks borne by one secured creditor or class of secured creditors;
>
> 8. Does the plan preclude the secured creditor's foreclosure;
>
> 9. Did the original loan terms provide for negative amortization; and
>
> 10. Are there adequate safeguards to protect the secured creditor against plan failure.[51]

28.    Virtually all the factors weigh against the Debtors. They have not established that secured claims would accrue at a market rate of interest or that deferring payments for two years is fair and reasonable. In fact, SME has not found any instances where a court confirmed a plan

---

[50] Stay Relief Tr. 135 at ll. 12–15.

[51] *In re Apple Tree Partners, LP*, 131 B.R. 380, 381 (Bankr. W.D. Ten. 1991); *see also Great W. Bank v. Sierra Woods Grp.*, 953 F.2d 1174, 1178 (5th Cir. Jan. 13, 1992).

DM3\9742105.1

providing for zero payments and 100% accrual over two years. The Mezzanine Loan likewise provides for no negative amortization.

29.    The Debtors likewise have no financial projections and have not established that their Plan is feasible, as they have no valuation or financing commitment. All the risks are born by secured creditors, while the Debtors engage in real estate speculation.

30.    Of the two examples cited by the Debtors, one court held that a negative amortization plan could not be confirmed because it deferred payments for 15 years, depended on the Texas real estate market substantially improving, and effectively attempted to force the secured creditor to make a post-confirmation loan to the debtor.[52]   Here, the Debtors are attempting to force the secured creditors to defer payments for two years with no projections or valuation. The Debtors cannot show that they have the means to pay substantial real estate taxes that continue to accrue, priming the liens of other secured creditors. To the contrary, the Debtors cannot even provide $400,000 in funding necessary to procure the TCO without taking it back as soon as the relevant hearing has concluded.

31.    As evidenced by SME's proofs of claim, SME paid $2,510,056.95 in protective advances to the Senior Lender as of the Petition Date and had paid an additional $2,825,365.93 as of the date the claims were filed.[53]   As established in the Supplement, the Senior Loan continues to accrue *per diem* in the amount of **$33,716.13** at the default rate, which the Senior Lender asserts is in effect, or **$14,027.31** if the contract rate is in effect.

---

[52] *In re D&F Constr. Inc.*, 865 F.2d 673, 676 (5th Cir. 1989).

[53] *See* Claim No. 2 filed against Gold Mezz, Claim No. 2 filed against Kova, and Claim No. 17 filed against Erbo.

DM3\9742105.1

32.    The Plan provides for four secured classes: (a) Class 1 comprises an allowed secured real property tax claim filed by New York City Department of Finance in the amount of $821,792.61; (b) Class 2 comprises the allowed secured mortgage claim filed by the Senior Lender in the amount of $56,787,700.04, which the Debtors propose will accrue 7% interest per annum until payment in full; (c) Class 3 comprises allowed mechanics' lien claims; and (d) Class 4 comprises SME's claim secured by the Pledged Interests, which the Debtors propose will accrue 10% interest per annum until payment in full.[54]   All such claim holders would receive payment solely from the proceeds of any sale of the Property within two years after the effective date, and the Debtors would make no interim principal or interest payments on account of such claims before then.[55]

33.    Because the Debtors have no apparent means of paying principal or interest from cash on hand until the Property is sold and the Plan provides for no payments absent a sale, secured creditors "bear the major risk of the plan failing within its first two years."[56] Additionally, the Debtors have failed to show that the proposed interest rates, discounted by up to a two-year deferral, would establish payment of the present value of the secured claims as of the effective date.[57]  "Accordingly, the Plan is not fair and equitable to the extent that it does not provide [the secured creditors] with the market rate of interest in the long run," even presuming that either proposed rate is market.[58]

---

[54] Plan Art. IV.A.

[55] *Id.*

[56] *Sunflower*, 219 B.R. at 604.

[57] *See 8315 Fourth Ave.*, 172 B.R. at 736–37.

[58] *Id.* at 736.

DM3\9742105.1

34.     Notably, the proposed interest rates are less than the interest rates agreed to by the Debtors when entering into the loans in 2019 and 2021, respectively.  Notably, interest rates have increased since the making of both loans.

**2.     The Debtors cannot transfer the Pledged Interests without violating the absolute priority rule.**

35.     The Debtors propose to transfer the Pledged Interests under section 1123(a)(5)(D) of the Bankruptcy Code[59] and issue replacement liens in violation of the absolute priority rule. SME's claim is secured by the Pledged Interests, while the Bodek Family holds the equity interests in Gold Mezz.  If the Debtors are substantively consolidated as the Plan contemplates, the Bodek Family would receive equity interests in the Reorganized Debtors (if all allowed claims were paid in full), and SME would receive replacement liens on these newly issued equity interests.  This means that the Bodek Family would improve its position with respect to SME, whose security interest would then encumber their equity interests directly.  Additionally, the Plan provides for no interest paid to any mechanics lien in Class 3, and the Senior Lender and SME are impaired with reduced interest and no payment for up to two years, while the Bodek Family would receive equity in the Reorganized Debtors without contributing new value.

36.     The Debtors argue that these replacement liens would constitute "indubitably equivalent value" rendering the Plan confirmable under section 1129(b)(2)(A) of the Bankruptcy Code.   Indubitably equivalent value "requires that there be no doubt that replacement recoveries are equal to existing security interests."[60]  "[T]here [must be] no reasonable doubt that [the subject creditor] will receive the full value of what it bargained

---

[59] Plan Art. VI.B.

[60] *In re LightSquared Inc.*, 513 B.R. 56, 94 (Bankr. S.D.N.Y. 2014) (internal quotation marks omitted).

DM3\9742105.1

for."[61]    The Debtors offer no authority showing how replacement liens in *different collateral* behind the Bodek Family could equal the full value of SME's bargain, reducing both its position and its rights of control.    Additionally, a transfer to the Bodek Family without permitting SME to bid for its interest cannot meet the requirements of section 1129(b)(2)(A).[62]

37.    Accordingly, the Plan is patently unconfirmable because the Debtors propose to transfer the Pledged Interests and issue replacement liens in violation of the absolute priority rule and without authority under section 1129(b)(2)(A).

**3.    Substantive consolidation is unavailable.**

38.    The Plan depends on the substantive consolidation of the Debtors,[63] but they have no reasonable prospect of showing that they are entitled to this treatment.    "Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor," the Second Circuit has "stressed that substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights to be used sparingly."[64]    Whether substantive consolidation is available depends "on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."[65]

---

[61] *In re Salem Suede, Inc.,* 219 B.R. 922, 935 (Bankr. D. Mass. 1998).

[62] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2074 (2012).

[63] Plan Art. VI.C.

[64] *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (internal quotation marks and citation omitted).

[65] *Id.* (internal quotation marks and citation omitted).

16

39.    With respect to the first factor, "lenders' expectations are central to the calculation of interest rates and other terms of loans, and fulfilling those expectations is therefore important to the efficiency of credit markets.  Such efficiency will be undermined by imposing substantive consolidation in circumstances in which creditors believed they were dealing with separate entities."[66]  Here, SME undeniably relied on the structure of the separate Debtor entities when extending credit to Gold Mezz, secured by the Pledged Interests in Kova.  For example, in the Mezzanine Loan Agreement, Gold Mezz expressly covenanted that it is a single-purpose entity that shall not, *inter alia*, "commingle funds or assets with those of any Affiliate," "fail to maintain an arm's length relationship with any Affiliate," "fail to hold itself out as an entity separate and distinct from any Affiliate," or "merge into or consolidate with any other person or entity, or, to the fullest extent permitted by law, dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure" without SME's prior written consent while the Debt is outstanding.[67]  The Pledge Agreement further provides that Kova's pledge of the Pledged Interests is a "condition precedent" to SME's extension of the Mezzanine Loan to Gold Mezz,[68]

40.    Substantive consolidation under the second factor is only available for "cases in which there has been a commingling of two firms' assets and business functions," and the remedy "should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets."[69]  In these situations,

---

[66] *Id.* at 519.

[67] Mezzanine Loan Agreement §§ 4.1.22(d, i, o, x).

[68] Pledge Agreement at Recitals.

[69] *Augie/Restivo*, 860 F.2d at 519.

DM3\9742105.1

23-10210-lgb    Doc 104    Filed 06/21/23    Entered 06/21/23 16:41:22    Main Document
Pg 18 of 22

"[c]ommingling . . . can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble [the assets is] so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible."[70]

41.    Here, the Debtors will be unable to show that SME did not rely on their organization structure to extend the Mezzanine Loan or that their assets are hopelessly entangled, so there is no reasonable prospect of achieving the substantive consolidation on which their Plan depends.

42.    Without substantive consolidation, Gold Mezz cannot confirm a plan because SME would control the voting under a Gold Mezz proposed plan (unless the Bodek Family paid the SME claim in full, which does not appear reasonably possible).  Accordingly, this fact alone should lead to SME obtaining stay relief so that it may proceed to conclusion with the UCC Sale of the Pledged Interests, in turn placing SME in a position of controlling the Erbo debtor and Kova debtor's plan of reorganization process.

**4.    The Plan is not feasible.**

43.    The Debtors cannot establish feasibility under section 1129(a)(11) of the Bankruptcy Code, which requires them to show that "the Plan is workable and has a reasonable likelihood of success."[71]  The Debtors allege that Plan funding will come from the sale of the Property "and any monies contributed from the Bodek family or from exit financing," but they

---

[70] *Id.* (internal quotation marks and citations omitted).

[71] *In re WorldCom, Inc.,* No. 02-13533, 2003 Bankr. LEXIS 1401, at *168 (Bankr. S.D.N.Y. 2003).

DM3\9742105.1

provide zero details showing that either additional source of funding exists.[72]    A plan is not reasonably feasible if it "fancifully provides that additional 'limited funding' will be provided" but lacks "evidence that convincingly supports the availability or sufficiency of such funding."[73] The Debtors provided no evidence that they are able to obtain exit financing, no proposed terms, no commitment from any Bodek Family member to provide funding, and no evidence that any Bodek Family member possesses funds to contribute.    There is no evidence that the Debtors would have even a present ability to pay administrative claims, no liquidation analysis suggesting what those claims might be, no projections, no waterfall showing potential distributions to creditors, and no basis to believe that any real funds are available.[74]

44.    More troubling is the fact that the Debtors' primary source of funding depends on the sale of the Property, which they suggest could be accomplished in ***two years***.    A plan is not reasonably feasible where it "comes down to nothing more than a speculation on the future values of . . . real estate—a speculation in which all the risk will be borne by the [creditors], to finance the debtor's hope of recouping equity if the market rises significantly in the years to come."[75]    Moreover, a plan is not reasonably feasible if the debtors seek to use the stay simply "to forestall foreclosure so that the property can be sold on the market" where they lack "funds

---

[72] Plan Art. VI.A.

[73] *Bleecker*, 156 B.R. at 411.

[74] *See In re MDM Golf of Gillette Ridge, LLC*, 2014 WL 7359077, at *6 ("Nor did the Debtor present any credible evidence of its ability to obtain post-petition or post-confirmation financing.").

[75] *Id.*; *see also In re Pegasus Agency, Inc.*, 186 B.R. 597, 603 (Bankr. S.D.N.Y. 1995) (finding a plan to be patently unconfirmable where the debtor principal's "conclusory and unsubstantiated expressions of optimism and intention to proceed with development [we]re belied by his own evidence and d[id] not provide grounds for denying the secured creditor's motion to lift the stay"); *In re State St. Assocs., L.P.*, 342 B.R. 32, 44 (Bankr. N.D.N.Y. 2005) (finding a plan to be patently unconfirmable where it "ask[ed] that the creditors rely on what can only be called 'pie in the sky'" rent increases, decoupling procedures, and litigation outcomes).

DM3\9742105.1

to service the debt."[76]  Here, the Debtors are seeking to pursue their speculative investment in the Property shielded from foreclosure but with no reasonable prospect of reorganization.

**5.    Current management is not in the interests of creditors.**

45.    The Reorganized Debtors will continue to be managed by the Current Manager under the Plan,[77] but the Debtors cannot meet their burden to show that the Current Manager continuing in this role would be "consistent with the interests of creditors and equity security holders and with public policy" under section 1129(a)(5)(A)(ii) of the Bankruptcy Code.

46.    As SME previously pointed out in its Motion, the Debtors have admitted that the Current Manager has no experience redeveloping commercial property in Manhattan, which is why he originally contracted with Higher Ground.[78]  SME further lacks faith in the Current Manager's ability to direct the Reorganized Debtors based on his performance in these bankruptcy cases.  The Current Manager has attended no settlement conferences and did not attend the hearings on the Debtors' motion to reject the agreements with Higher Ground and Cauldwell Wingate Company, LLC [Dkt. No. 38] or the Debtors' motion to enter into agreements with Irving Oak Management and Mabe Group Inc. [Dkt. No. 57].  Additionally, the Mezzanine Loan was originally issued to fund the completion of the Property and tenant fit-ups,[79] but the Current Manager caused Gold Mezz to seek and obtain permission to use part of

---

[76] *In re Park Timbers, Inc.*, 58 B.R. 647, 651 (Bankr. D. Del. 1985); *cf. In re 234-6 W. 22d St. Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) ("[A] debtor shows bad faith when it uses bankruptcy protection for risk-free speculation in the single asset."); *In re 652 W. 160th LLC*, 330 B.R. 455, 467 (Bankr. S.D.N.Y. 2005) ("Further, a bankruptcy filing is not in good faith if the debtor seeks in effect to obtain time during which to speculate that the market value will increase and make its investment worthwhile.").

[77] Plan Art. VI.E.

[78] Mot. ¶ 46.

[79] *See* Mezzanine Loan Agreement §§ 2.1.4, 2.6, Schedule I.

the Second Tranche to fund and pay certain amounts and expenses associated with the Senior

Loan, avoid a maturity default under the Senior Loan, and fund interest reserves for the Senior

Loan for the benefit of Senior Lender.[80]

47.    The Current Manager has done nothing to inspire confidence in his ability to

manage the Reorganized Debtors, and the Debtors cannot show that his continuation in that role

would benefit creditors or equity holders.    The only beneficiary of the Plan is the Current

Manager and the Bodek family to the creditors' detriment.[81]

48.    All the above reasons establish that the Debtors have failed to meet their burden

to show that they require the Property to reorganize because they have proposed a patently

unconfirmable Plan with no reasonable prospect of confirmation.[82]

## CONCLUSION

**WHEREFORE**, SME respectfully submits these arguments in opposition to the approval

of the Disclosure Statement.

---

[80] Mot. ¶ 15.

[81] *See, e.g.*, *MDM*, 2014 WL 7359077, at *6 ("Furthermore, even should [the manager] continue to participate in managing the Golf Course Property, his past oversight, and his failure to generate cumulative profit since he began operating the course, is not a factor that weighs in favor of the Debtor." (internal footnote omitted)).

[82] SME notes that where, as here, "[a]n imposed restructuring is unattainable because forced confirmation via a cram down cannot be invoked," the Court also has the authority under sections 1112(b) and 105(a) of the Bankruptcy Code to dismiss the cases *sua sponte*. *266 Wash.*, 141 B.R. at 288–89.

DM3\9742105.1

Dated: New York, New York
June 21, 2023

**DUANE MORRIS LLP**

*/s/ Morris S. Bauer*
Morris S. Bauer
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone: (973) 424-2037

-and-

1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Email: MSBauer@duanemorris.com

*Counsel to 541 W 21 SME LLC*

22