# EXHIBIT A

**Hearing Date and Time: June 28, 2023 at 10:00 a.m. (ET)**
**Objection Deadline: June 21, 2021, at 5:00 p.m. (ET)**

**DUANE MORRIS LLP**
Morris S. Bauer, Esq.
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone: (973) 424-2037
Fax: (973) 452-3404
Email: MSBauer@duanemorris.com
*Counsel to 541 W 21 SME LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ERBO PROPERTIES, LLC, *et al.*,[1] | Case No. 23-10210 (LGB) |
| Debtors. | Jointly Administered |

**DECLARATION OF MORRIS S. BAUER IN SUPPORT OF 541 W 21
SME LLC'S OBJECTION TO THE DEBTORS' DISCLOSURE
STATEMENT TO ACCOMPANY THEIR JOINT CONSOLIDATED
PLAN OF REORGANIZATION DATED MAY 15, 2023**

I, Morris S. Bauer, being of full age, declare, pursuant to section 1746 of title 28 of the

United States Code, that:

1.      I am a partner with the law firm of Duane Morris LLP, counsel for the movant,

541 SME W 21 LLC ("SME"), a creditor in the above-captioned bankruptcy cases.  I am fully

familiar with the facts set forth herein.

---

[1] The Debtors are ERBO Properties LLC (EIN x9179), Case No.: 23-10210, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; KOVA 521, LLC (EIN x9972), Case No.: 23-10211, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211; and Gold Mezz LLC (EIN x4741), Case No.: 23-10212, with a mailing address at 551 Bedford Avenue, Brooklyn, NY 11211.

2.      I submit this declaration in support of *541 W 21 SME LLC's Objection to the
Debtors' Disclosure Statement to Accompany Their Joint Consolidated Plan of Reorganization
Dated May 15, 2023* (the "Objection").[2]

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the Transcript of the
Hearing Before the Hon. Lisa G. Beckerman on June 6, 2023, at 10:00 a.m.

Executed this 21st day of June, 2023

                                        /s/ Morris S. Bauer
                                        Morris S. Bauer, Esq.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the
Objection.

DM3\9742325.1

# EXHIBIT 1

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10210-lgb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    ERBO PROPERTIES LLC,

8

9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY  10004

14

15                    June 6, 2023

16                    10:00 AM

17

18

19

20

21    B E F O R E :

22    HON LISA G. BECKERMAN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  JONATHAN

Page 2

1   HEARING re Motion for Relief from Stay filed by Morris S.

2   Bauer on behalf of 541 W 21 SME LLC

3

4   HEARING re EVIDENTIARY HEARING- Motion to Reject Notice of

5   Motion and Debtor Erbo Properties LLCs Motion for Entry of

6   an Order (i) Rejecting: (A) Development Management Agreement

7   with Higher Ground 541 LLC, and (B) Construction Management

8   Agreement with Cauldwell Wingate Company, LLC; (ii) Fixing a

9   Bar Date for Claims of Counterparties to the Rejected

10  Contracts; and (iii) Granting Related Relief

11

12  HEARING re Motion to Authorize Notice of Motion and Debtors

13  Motion to Enter Into Agreements with Irving Oak Management

14  and Mabe Group Inc. to Complete Construction of the Debtors

15  Project Located at 541 West 21st Street, New York, NY

16  (related document(s)13)

17

18  HEARING re Motion to Reject Notice of Motion and Debtor Erbo

19  Properties LLCs Motion for Entry of an Order (i) Rejecting:

20  (A) Development Management Agreement with Higher Ground 541

21  LLC, and (B) Construction Management Agreement with

22  Cauldwell Wingate Company, LLC; (ii) Fixing a Bar Date for

23  Claims of Counterparties to the Rejected Contracts; and

24  (iii) Granting Related Relief

25

Page 3

1    HEARING re Objection Debtors Objection to 541 W 21 SME LLCs

2    Supplement to Motion for an Order Terminating the Automatic

3    Stay and Related Relief (related document(s)89)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

```
 1    A P P E A R A N C E S :

 2

 3    TARTER KRINSKY & DROGAN LLP

 4         Attorneys for the Debtors

 5         1350 Broadway, 11th Floor

 6         New York, NY 10018

 7

 8    BY:  SCOTT MARKOWITZ

 9

10    HERRICK FEINSTEIN LLP

11         Attorneys for G4 18190, LLC

12         2 Park Avenue

13         New York, NY 11249

14

15    BY:  STEPHEN SELBST

16

17    DUANE MORRIS LLP

18         Attorneys for 541 W 21 SME LLC

19         One Riverfront Plaza

20         1037 Raymond Boulevard, Suite 1800

21         Newark, NJ 07102

22

23    BY:  MORRIS BAUER

24

25
```

1    INGRAM YUZEK GAINEN CARROLL BERTOLOTTI LLP

2         Attorneys for Cauldwell Wingate

3         150 East 42nd Street, 19th Floor

4         New York, NY 10017

5

6    BY:  JENNIFER B. ZOURIGUI

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for the U.S. Trustee

10        Alexander Hamilton Custom House

11        One Bowling Green, Room 534

12        New York, NY 10004

13

14   BY:  TARA TIANTIAN

15

16   ALSO PRESENT:

17   KEVIN NASH

18   ELIEZER FRIED

19   CHRISTOPHER HALM

20   ERIC KHAYUT

21   HERSHEL KLEIN

22   MAX BELINSKY

23   RAYMOND CECORA

24   PETER CECORA

25   UDAY GORREPATI

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Good morning, this is Judge Beckerman.

 3    The Court is now in session.  I'm going to go ahead and call

 4    the case, but when I do, I'll ask the attorneys to please

 5    put their appearances on the record, and then I will also

 6    ask the attorneys that when they're speaking, they identify

 7    themselves again for the record.

 8            Case Number 23-10210, ERBO Properties LLC.  Now

 9    the appearances of counsel, please.

10            MR. MARKOWITZ:  Good morning, Judge Beckerman.

11    Scott Markowitz, Tarter Krinsky and Drogan, counsel for the

12    Debtors and Debtors in possession.

13            THE COURT:  Thank you, Mr. Markowitz.

14            MR. SELBST:  Good morning, Your Honor.  Stephen

15    Selbst, Herrick Feinstein LLP for G (indiscernible) 190 LLC,

16    the construction and mortgage lender.

17            THE COURT:  Thank you, Mr. Selbst.  Good morning.

18            MR. BAUER:  Good morning, Your Honor.  Mo Bauer,

19    Duane Morris for 541 W 21 SME LLC, commonly referred to as

20    the mezzanine lender.

21            THE COURT:  Thank you, Mr. Bauer.  Good morning.

22            MR. BAUER:  Thank you, Your Honor.  Good morning.

23            MR. NASH:  Good morning, Your Honor.  Kevin Nash

24    for Higher Ground.

25            THE COURT:  Thank you, Mr. Nash.  Good morning.
```

Page 7

1          MS. ZOURIGUI:  Good morning, Your Honor.  Jennifer

2     Zourigui of Ingram Yuzek for Cauldwell Wingate.

3          THE COURT:  Good morning, Ms. Zouri.

4          Okay, I know that Ms. Tiantian had indicated that

5     she was going to be a bit late for this hearing, but I'll

6     ask if there are any other appearances.

7          Okay, all right, we have two matters on for today.

8     One was -- well, actually, it's three.  Two were the

9     adjourned motions that I had heard at you know, two prior

10    days of testimony and argument and was prepared to rule on

11    but had adjourned to today.

12         So Mr. Markowitz, I guess I wanted to ask about

13    those motions and where do things stand with respect to

14    them.

15         MR. MARKOWITZ:  Thank you, Your Honor.  Well, as

16    we did meet on Friday, unfortunately, we didn't meet in the

17    courthouse because everyone couldn't make it to the

18    courthouse.  I know that was hopefully the idea, but we met,

19    and we -- what happened in that meeting was it kind of

20    turned into -- we talked about the issues on the rejection

21    motion and the motion to Higher Ground -- to hire the new

22    contractor, Irving Oak, but it sort of delved into a global

23    settlement meeting because the mezzanine lender was there.

24    The fee lender was there, and we broke out into separate

25    rooms.

1    And we made substantial progress, and they made a

2    proposal.  It was our global deal, which we were close to a

3    settlement, very close, and it has seemed to have fallen

4    apart in the last day, so we didn't really get into the

5    nitty gritty too much on the -- you know, the rejection

6    motion, because the global deal would have kind of resolved

7    that.

8    We did talk a little bit.  Mr. Cecora was there

9    with representatives from Cauldwell Wingate, and they were

10    going through some numbers, and there's really no agreement

11    on the actual cost to get the building in a white box shape

12    with a temporary C of O.  We still seem to have -- there

13    seems to be a dispute among the parties, but that wasn't

14    really, in my view, the major focus of the meeting.

15    We spent most of the time trying to reach a global

16    deal, which we made substantial progress on, but we still

17    weren't able to finalize it.  Sundown went Friday, and they

18    made a deadline of sundown.  We spoke some yesterday.  We

19    tried to get it done, but we weren't able to do it, so as of

20    now, we have no settlement.  I'm sure Your Honor doesn't

21    want to hear the great details of that because that's not

22    really you know, why Your Honor is here --

23    THE COURT:  No, (indiscernible), I had an issue

24    with --

25    MR. MARKOWITZ:  -- so you're calling balls and

1    strikes.  I got it.

2         THE COURT:  I --

3         MR. MARKOWITZ:  So I just -- I mean, that's the

4    status where it is, and as far as today goes, I'd like to be

5    heard on that a little bit when the time comes, obviously,

6    to see exactly what Your Honor had in mind for today, but

7    that's what --

8         THE COURT:  Okay, well, we can go onto that next.

9    What I had in mind for the day is, Mr. Bauer has a motion.

10   I scheduled a final hearing on the motion.  I had an initial

11   hearing on the motion.  I'm going to go forward with the

12   hearing -- the final hearing on the motion today unless Mr.

13   Bauer has another opinion about that.

14         Mr. Bauer submitted two declarations for, I guess,

15   parties in support of the motion.  One of them, I see, Mr.

16   Cirz -- I hope I'm saying that right -- is here.  And this

17   is supposed to be an evidentiary hearing where we're moving

18   forward to the final hearing --

19         MS. ZOURIGUI:  Okay.

20         THE COURT:  -- and this was all scheduled.

21         MR. MARKOWITZ:  I'm ready for that.

22         THE COURT:  So I have nothing else on my calendar

23   today for that reason, and so my assumption was that we were

24   going to proceed with Mr. Bauer's motion, and obviously, you

25   would have an opportunity to cross-examine these witnesses.

1   You chose not to put in any declarations for your own

2   witnesses, so that's where we are.  That's the you know,

3   going to be the evidentiary record, and I'll hear arguments,

4   and I'll be prepared to rule.  That's where I am.  I

5   (indiscernible) few questions but --

6            MS. ZOURIGUI:  Okay.

7            THE COURT:  -- I've read everything.  I'm prepared

8   to move forward today as was scheduled.  And I guess my

9   question, though, is again, Mr. Markowitz, with respect to

10  your motions, I you know, my options are rule or adjourn.

11  So you can think about it.

12           MR. MARKOWITZ:  Okay, well, I guess, depending

13  upon how you rule today, I mean, I have arguments on -- for

14  today, so I guess depending upon how you rule on the lift

15  stay motion.  I mean, that, we're talking about --

16           THE COURT:  I mean, I mean, I'm not -- I

17  understand that there's some, obviously some connection, but

18  obviously, I -- you know, I -- our evidentiary record was

19  closed on the other motion.  I was prepared to rule.  You

20  asked for an adjournment.  I gave you an adjournment.  I had

21  my ruling.  I'm prepared to give it.  I --

22           MR. MARKOWITZ:  Okay.

23           THE COURT:  -- you know, but I'll let you decide.

24  We'll go forward, Mr. Bauer's motion first, and at the end

25  of that, you can decide if you want me to rule or you want

1   to request a further adjournment.  I mean, that's really up

2   to you.

3             MR. MARKOWITZ:  Okay.

4             THE COURT:  Okay?

5             All right, Mr. Bauer, I'm going to turn the

6   virtual podium over to you, as it's your motion.

7             MR. BAUER:  Thank you, Your Honor.  I appreciate

8   it.  Mo Bauer, Duane Morris on behalf of the mezzanine

9   lender 541 W 21 SME.  This is the mezzanine lender's motion

10  for stay relief, as Your Honor is aware, as set forth in the

11  declaration of Aaron Silverberg in -- Eran Silverberg in

12  support of the motion for stay relief, which the declaration

13  adopts everything that's in the actual motion, the

14  supplement of the motion, and also our responsive papers to

15  the prior motions that Your Honor had heard with regard to

16  the rejection, the Debtors proposed rejection of the Higher

17  Ground and Cauldwell agreements and the Debtor's motion

18  seeking to retain Irving Oak and Mabe.

19            But for purposes of the stay relief, really what I

20  want to focus on is that, one, the SME has a secured claim

21  by way of a pledge of the ownership interest in KOVA, which

22  is one of the Debtors.  KOVA happens to own 100 percent of

23  ERBO properties, which ERBO Properties owns the subject

24  property that is at issue.  Gold Mezz is the owner of KOVA.

25  SME has a claim against Gold Mezz, which is secured by the

1    pledge of the KOVA interests.

2            The claim -- we filed a proof of claim on behalf

3    of SME, which references that SME as of the petition date

4    was owed $7.5 million by Gomez.  We filed a proof of claim

5    also in the KOVA case for the same amount, as well as the

6    ERBO case, because of overtures made by Mr. Markowitz that

7    he wants to kind of make succotash of all three entities.

8            Gold Mezz is the only entity that is owned by the

9    Bodeks; which the Bodeks are Erno Bodek, who's the managing

10   member of all three entities, Laser Bodek, and Rachel Bodek.

11   Laser Bodek, I believe, is the son of Erno Bodek, and Rachel

12   Bodek is the wife of Erno Bodek.

13           What we have submitted to Your Honor, we submitted

14   a finder with, I think, 41 exhibits.  As we proceed, we'll

15   probably -- we will seek to have all 41 admitted into

16   evidence for purposes of this hearing.  One of the exhibits

17   is -- or actually, I should say two of the exhibits, one of

18   them being an original restricted appraisal report by

19   Newmark Group, and then a corrected restricted appraisal

20   report by Newmark Group.  Both were attached to a

21   declaration submitted by Raymond Cirz, who is on the Zoom

22   call with us and will be our first witness.

23           Mr. Cirz is a licensed appraiser with Newmark, but

24   the appraisal, the corrected appraisal, valued the property

25   as is at approximately $49 million, and the -- and if the

1   property were to be completed, with -- which -- with what

2   everyone envisions to be the partial TCO, getting it to that

3   point, Mr. Cirz values the property at $52 million.

4          The secured debt of ERBO, G4 submitted a proof of

5   claim in the approximate amount of $57 million.  New York

6   City for real estate taxes filed a proof of claim that's

7   secured by the property in the amount of $800 -- in the

8   approximate amount of $822,000.  G4's claim is also secured

9   by the property.  I should have referenced that earlier.

10  Cauldwell Wingate filed a mechanic's lien claim secured by

11  the property in the approximate amount of $2.2 million.

12  Higher Ground filed a -- an approximate secured mechanic's

13  lien claim in the amount of $1.2 million.

14         We attached as one of our exhibits, namely Exhibit

15  Number 41, a claims analysis that I actually prepared in an

16  Excel spreadsheet that goes through all the proofs of

17  claims.  The proofs of claims that hold themselves out at

18  being -- as being secured by the property aggregate $61

19  million.  The total unsecured claims against ERBO aggregate

20  approximately $63.5 million, and the import of the total

21  unsecured claims, if you look at $63.5 million --

22         MS. ZOURIGUI:  You mean total claims -- sorry, Mr.

23  Bauer.  You mean total claims, right, not total unsecured

24  claims?

25         MR. BAUER:  Total claims, yes, I mean total

Page 14

1    claims.  Excuse me.  The total claims aggregate -- against

2    ERBO Properties aggregate $63.5 million.  The import of that

3    is, if you take $63.5 million minus either the $52 million

4    number or the $49 million number, which is the property

5    value as is today, you have a negative equity, which means

6    the pledged interest to my client is negative in value,

7    which means there's no equity in our lien, which under 362,

8    that would shift the burden over to the Debtors to show that

9    they have a plan that has a reasonable possibility of being

10   confirmed within a reasonable time period.

11          And when we get to after we hear the testimony of

12   Mr. Cirz, when we get to Part B, it's really -- the plan

13   that the Debtor filed doesn't have a reasonable possibility

14   of being confirmed.  Wee submit that it doesn't.  We think

15   that, Your Honor, there's cause to give stay relief under

16   362(d)(1) as well as (d)(2), as I just outlined.  And also

17   in our motion, which we've briefed, is, SME is looking for

18   the exclusivity period to be terminated so that we would be

19   in a position to file a plan of our own in this case.

20          I will also bring to Your Honor's attention, if

21   you recall on May 4th, I kind of pushed the envelope to try

22   getting stay relief to go down the path of us being able --

23   us being SME -- being able to conduct a -- the UCC sale of

24   the pledged interest, which is one of the reliefs that we

25   would get if we got stay relief today.  And I advised the

Page 15

1    Court that my understanding was that it would take 60 days

2    to do that process.

3          Well, I'm going to stand corrected.  The UCC

4    doesn't really provide a timeline for how long you have to

5    notice a sale.  I will tell you that prior to the filing

6    date, we noticed it.  It went for approximately 59 days

7    before the Debtor filed its Chapter 11.  There were no

8    offers during that 59-day period.  The terminology in the

9    UCC is commercially a reasonable amount of time.

10         Theoretically, we could put that pledge out for

11   sale for ten, 15, 20 days.  We're going to be looking to

12   move as quickly as possible if we obtain stay relief, not

13   looking to get the -- go 60 days out, but that'll be for

14   Your Honor to determine at the conclusion.  So with that,

15   I'd like to move to putting our appraisal of the value of

16   the property and put Mr. Cirz on the stand, if my I may,

17   unless Your Honor has any questions before that.

18         THE COURT:  No, I don't.

19         Okay, all right, Mr. Cirz, I'm going to have to

20   ask you for a couple things.  First, you're going to have to

21   take off your mute so I can hear you.

22         MR. CIRZ:  That's much better, Your Honor.

23         THE COURT:  Okay, great.  Okay, so first thing I

24   have to ask you to do, Mr. Cirz, is would you please take

25   your camera and pan around your whole room?  I need to see

1    that there are no other people in the room with you.

2            MR. CIRZ:  I can do that to a degree, Your Honor.

3    I have a laptop, so it's got some limitation --

4            THE COURT:  Yeah, you might have to move it

5    around.  I understand.  Do your best.

6            MR. CIRZ:  Yep, you can tell me --

7            THE COURT:  Okay, that's good.  Okay, back on the

8    other side now.  Okay, keep going.  Sorry, in that

9    direction.

10           MR. CIRZ:  Uh, Mr. Bauer is --

11           THE COURT:  That one you were just doing, sorry.

12    The other -- yes, keep going, going, going.  I just haven't

13    seen what's on the other side.  Okay, pick a window or door.

14    Okay, fine.  All right, and may I ask you what you have in

15    front of you, Mr. Cirz, in terms of documents?  You can sit

16    back down, sorry.

17           MR. CIRZ:  Okay.  If I get that in the right spot,

18    Your Honor.

19           THE COURT:  Okay, no problem.

20           MR. CIRZ:  And then -- so what -- I have a pad in

21    front of me with notes report --

22           THE COURT:  Okay, can't have those.

23           MR. CIRZ:  (Indiscernible).  Okay.

24           THE COURT:  Those have to go -- put it in a drawer

25    and shut the drawer so I can hear you do it.  Do you have a

Page 17

1    drawer at your desk?

2              MR. CIRZ:  (Indiscernible)?

3              THE COURT:  Do you have a drawer in your desk?

4              MR. CIRZ:  Yes, yes.

5              THE COURT:  Okay, open the drawer.

6              MR. CIRZ:  (Indiscernible).

7              THE COURT:  Put the pad in and shut it so we can

8    all hear it.

9              Okay, fine.  Next.  Sorry.

10             MR. BAUER:  Mr. -- Mr. Cirz, the only documents

11   you're allowed to have in front of you are the declaration

12   and supplemental declaration that you executed.  The

13   original appraisal that you -- that Newmark prepared, and

14   the corrected appraisal that Newmark prepared.

15             MR. CIRZ:  I have (indiscernible).

16             MR. BAUER:  Those are the only documents that you

17   have?

18             MR. CIRZ:  I have all four.  They're on my --

19   they're electronic on my screen, PDFs.

20             THE COURT:  Okay, that's fine.  Do you have

21   anything else on your screen?

22             MR. BAUER:  I knew that question was coming.

23             MR. CIRZ:  No other documents, Your Honor, other

24   than looking at everybody today on Zoom.

25             THE COURT:  Okay, all right, I'm going to accept

1    that because I can't be in the room with you, Mr. Cirz, so

2    that's the best I can do here.  All right, so may I ask you

3    to raise your right hand, please?

4            Okay, Mr. Cirz, do you swear to tell the truth,

5    the whole truth, and nothing but the truth?

6            MR. CIRZ:  I do.

7            THE COURT:  Okay, all right, Mr. Bauer, I'll turn

8    him over to you for your -- moving his declaration.  So ask

9    him questions about that, and moving it into evidence.

10           MR. BAUER:  Great, thank you, Your Honor.  And I

11   will supplement some of the items that are in the

12   declaration, if I may, but it'll still be a truncated direct

13   testimony.

14                   VOIR DIRE OF RAYMOND CIRZ

15   BY MR. BAUER:

16   Q    Mr. Cirz, do you have the declaration that you executed

17   and the supplemental declaration that you also executed?

18   A    I do.

19   Q    Okay, and are both the -- and the initial declaration

20   that you filed had attached to it an appraisal.  Is that

21   correct?

22   A    That's correct.

23           THE COURT:  Mr. Bauer, just give me one second.

24   I'm going to pull out my binder, so I have one more thing I

25   have to get that's across my office also, so my apologies

1    for a second here.

2              MR. BAUER:  That's fine, Your Honor.

3              THE COURT:  Yeah, I should have done it before.

4    All right, okay, sorry.  The binder with the reports --

5              MR. BAUER:  Right.

6    BY MR. BAUER:

7    Q    The original appraisal, Mr. Cirz, and for the Court and

8    every -- and all other parties, that's Exhibit 1 of our

9    binder.  That original appraisal is dated May 21st, 2023,

10   correct?

11   A    I believe so.  In my notes, I have all these dates, so

12   --

13   Q    (Indiscernible) --

14             THE COURT:  So Mr. Cirz, what I'm going to suggest

15   you do, sorry, is open up your original appraisal.  Take a

16   look at it, and then answer the question about the date.

17   Okay?

18             THE WITNESS:  Yes, Your Honor.  May 21st, 2023,

19   that's correct.

20   BY MR. BAUER:

21   Q    And that original appraisal was attached to your

22   initial declaration.  Is that correct?

23   A    Yes.

24   Q    Okay, and then your supplemental declaration, that had

25   attached to it a corrected appraisal dated June 2nd, 2023,

1    is that correct?

2    A    Yes.

3    Q    Okay, which for purposes of this hearing was Exhibit 2

4    in the binder that I've provided everybody.  I'm going to

5    focus on the corrected appraisal, Mr. Cirz.

6    A    Okay.

7    Q    I'm going to turn you to your CV, which actually may

8    not have a page number on the version you're looking at on

9    the computer, but for everybody on this call, it is actually

10   Page 142 of 147, which was the PDF file up at the top.

11   A    You -- excuse me, you didn't deliver a binder to me,

12   correct?

13   Q    It would have been emailed to you.  You would have

14   gotten every exhibit with a -- in a file of its standalone

15   in an email.

16   A    Okay --

17   Q    There would have been like, four emails that got sent

18   to you.  But it says "corrected appraisal" if you have that,

19   which is dated June 2nd, which was attached to his

20   declaration -- his supplemental declaration.  Mr. Cirz, did

21   you see your CV?

22   A    I do.

23   Q    And does this CV summarize all of your qualifications,

24   your educational background, and your professional

25   affiliations?

Page 21

1    A    It does.

2    Q    Okay, and what you pointed out to me yesterday, it also

3    has your license, which of note, expires in two days,

4    correct?

5    A    That's correct.

6    Q    And what is this license?

7    A    This is the license from the date of New York as a

8    general certified real estate appraiser.

9    Q    Okay, and has this license been renewed?

10   A    Yes, I have my new license in hand.

11   Q    Great, and how long do these licenses typically run

12   for?

13   A    Two years.

14   Q    Okay, great.

15        MR. BAUER:  For all parties and Your Honor, I'd

16   like to move Mr. Cirz, based on his CV and his shortened

17   testimony, as an expert in valuation.

18        THE COURT:  Of real property?

19        MR. BAUER:  Of real property, that's correct.

20        THE COURT:  All right, any objections?

21        UNIDENTIFIED MALE:  No.

22        THE COURT:  Okay, all right, Mr. Cirz, you are

23   qualified as an expert witness for real property valuation.

24        (Raymond Cirz was qualified as an expert witness

25   for real property evaluation.)

1              THE WITNESS:  Thank you.

2              DIRECT EXAMINATION OF RAYMOND CIRZ

3    BY MR. BAUER:

4    Q    Mr. Cirz, could you tell the Court what was your

5    opinion as to the value of the subject property as of today?

6    A    In the current news report, in a letter of transmittal,

7    it'll describe the values that I came up with.  So the as-is

8    value means just as the -- as it appears as of June 1st of

9    this year is $49 million.

10   Q    And you have two other values in -- that you have

11   opined on.  Can you state what those values are and what

12   they mean?

13   A    Yeah, the second value is as of June 1st, 2027, and

14   that's the date we say that the property is stabilized.

15   Once the property has been you know, physically finished,

16   has been leased, and is on a stabilized basis as far as

17   rent, and that estimate is $82 million.

18        The third estimate is, we're asked to give a -- an

19   estimate of value upon an issuance of a temporary

20   certificate of occupancy.  And the assumption there is it

21   would take one year to get that, and that was -- so that

22   would make it June 1st, 2024, and the estimate there is

23   $52,600,000.

24   Q    Okay, you heard me reference earlier, and it's -- your

25   supplemental attaches -- supplemental declaration attaches a

1    corrected appraisal from the original appraisal that you

2    guys prepared or Newmark prepared in May, on May -- dated

3    May 21st, 2023.  Why the correction?

4    A    What I did was I was looking through the report, and

5    what I did is I spotted a couple minor things on this second

6    page of the letter of transmittal on the second paragraph.

7    There was a number in there that was incorrect.  It didn't

8    relate to anything.  It was talking about -- we assumed, in

9    order to build out the office space, you would spend $120 a

10   square foot times 64,000 square feet of office space.  And

11   we referenced a number that didn't match with that number,

12   so what I did, was to avoid the confusion, I just deleted

13   that number.  But --

14   Q    All right --

15   A    -- our analysis stays -- remains unchanged.

16   Q    Okay, so when I try to -- so that everybody understands

17   this testimony, it's Exhibit 1.  It is -- of the PDF it's

18   Page 8 of 147 of the original appraisal dated May 21, 2023.

19   And Mr. Cirz's testimony referenced Page 2.  Are you there,

20   Mr. Cirz?

21   A    Yes.

22   Q    Okay, what number are you pointing to that -- or what

23   change are you referencing in -- on that page that was made

24   so that everyone understands it and sees it?

25   A    If we go to the second paragraph, the third line,

1    you'll see that we're just giving information in the letter

2    of transmittal about our analysis.  And it says we used $120

3    per square foot to lease up 62,000 square feet of office

4    space, and you'll see the number in there is some strange

5    number.  It's $6,000,360.

6         And if you do the math, you won't get that number, so I

7    have no idea how we got that number, so I deleted that

8    number.  And basically, the new report is accurate, saying

9    $120 per square foot was applied to 62,000,000 square feet

10   of office space to be leased.

11   Q    Great, thank you.  The original report has a market

12   value as-is number of $48 million, and the new report has a

13   market value as is of 49 -- of $49 million.  Why did that

14   dollar amount change?

15   A    Again, as I looked at the report, typically, when you

16   value real estate, you're analyzing a property on a

17   stabilized basis over a ten-year period, and so what's

18   atypical about the subject property is that it's vacant.  So

19   we have to allow for enough time to finish any kind of

20   physical details that need to be done, you know, get the CO,

21   find tenants, lease it up.

22        And so if you look at our cash flow that we had on Page

23   -- of the original report, Page 96, what happened was we

24   should have allowed four years of un-stabilized income, plus

25   ten years of stabilized income would equal a 14-year holding

1    period.  And if you look at Page 96, we did a 15-year

2    holding period.  Not a big deal, but when I saw that, I said

3    "You know what?  We really should use a shorter holding

4    period."  We should use four years of lease up; ten years,

5    make it 15.  And you see originally we did 16.

6        It resulted in a very minor change overall.  It was

7    about $300,000 difference between the two scenarios, and the

8    first time we rounded to the nearest -- well, we always

9    rounded to the nearest million dollars, and so what happened

10   was we rounded to $48 million the first time.  For the

11   second time, we did it and shortened the cash flow by one

12   year.  We rounded up to $49 million.

13           MR. BAUER:  All right, Your Honor, for the record,

14   when Mr. Cirz was referencing Page 96, that would have been

15   in the original appraisal, Page 101 of 147 of the PDF.  And

16   then for real ease, if you were to look at the new

17   appraisal, that same cash flow projection is also Page 96,

18   but it's Page 101 of 147 of that.  It's also the same PDF

19   page, 101 of 147.  So if you were to compare those two

20   documents, you would see Mr. Cirz's testimony of reducing

21   the period from 16 to 15 years, as he just testified to.

22           THE COURT:  Okay, just give me one second.  I -- I

23   looked at the first.  I need to look at the second.

24           MR. BAUER:  Mr. Cirz, is my statement correct in

25   that regard?

1              THE WITNESS:  Yes.

2              MR. BAUER:  Thank you.

3              THE COURT:  Sorry, thank you.

4              MR. BAUER:  Great.

5    BY MR. BAUER:

6    Q    Mr. Cirz, I note in your appraisal that Newmark used

7    the three methodologies, or at least described the three

8    common appraising methodologies; income approach, sales

9    approach, and cost approach, and that your appraisal only

10   used the income approach.  Why was that?

11   A    Because we thought that was the most appropriate method

12   to use, and the reason being is that's how any typical

13   investor would approach valuing the property and determining

14   what they would pay for the property in its current

15   condition.

16   Q    And how would you describe its current condition?

17   A    Well, you know, it's over 100-year old former

18   industrial building that's been convert -- that's being

19   converted into quality office space.  But the property is

20   totally vacant as of today, as of the date of value, and

21   that somebody would reflect the risk associated with leasing

22   up that -- the space.  So there would be market risk

23   associated with it.

24        So the -- so the appropriate method to value the

25   property would be the income approach and a discounted cash

1   flow analysis, because that's how any typical buyer would

2   approach their analysis in determining what they would pay

3   for the property.

4   Q    You just referenced in your testimony discounted cash

5   flow analysis.  Why would you use a -- is there another

6   alternative analysis, I think, direct capitalization

7   analysis that could have been used?

8   A    Yes, that's true.

9   Q    Why would you use discounted cash flow over direct

10  capitalization analysis?

11  A    Because you -- basically, you would use a direct cap

12  analysis if the property was stabilized.  So if the property

13  was performing at market levels, you had a steady income

14  stream, you have capitalization as a great way to go.  The

15  problem is the property is not stabilized.  It's several

16  years away from being stabilized, and so any particular

17  investor would buy this property in its current condition,

18  they have to assume the risk of finding tenants.  They have

19  to go to the expense and -- of securing tenants, paying

20  leasing commissions.

21       Physically, the space is not in a condition that you

22  can -- a tenant could occupy, so you're going to have tenant

23  installation allowances that are significant, and so any

24  investor would anticipate that there's going to be

25  significant risk and significant capital expenditures in

1    order to get it to a stabilized level.

2        They would also assume over a reasonable time period

3    how long it would take to secure tenants.  So all those

4    things go into the analysis and show that we're several

5    years -- we're five years away from stabilization, based on

6    our estimates.  So you can't really capitalize.  You have

7    zero income today, so there is nothing to capitalize, so

8    that's why the DCF is the most appropriate way to approach

9    the valuation of the property.

10   Q    So I'm going to turn you to Page -- what you refer to

11   as Page 96, which I prefer to -- for everybody else on this

12   call as Page 101 of 147 of the PDF, if they were to look at

13   it at the top of the page, which is your discounted cash

14   flow analysis.

15   A    I'm there.

16   Q    And I think it's your testimony that was the driver for

17   the -- for the $49 million valuation?  Am I correct?

18   A    Yes, any -- this -- anybody buying the property is

19   going to address the different issues that appear within

20   this cash flow.

21   Q    Okay, so can I -- I'd like to ask you some questions

22   about the numbers, where they were derived from in this

23   discounted cash flow.  Your base rental revenues, where was

24   that?  How did you -- how did Newmark and you pick those

25   numbers?

Page 29

1    A    I'm going to try and reference a prior page that'll

2    summarize all the key assumptions that went into the

3    valuation.  That, I think, would be helpful to the Court.

4    Q    Great.

5    A    And I'm not going to peek at my notes to know what page

6    that's on, so it might take a minute.

7                THE COURT:  That's okay.  Take your time.

8                THE WITNESS:  The -- if we go to Page 92, Page 92

9    summarizes key assumptions that were built into the cash

10   flow model.  You can see what we did was, our start date of

11   the analysis is June 1st of this year, which coincides with

12   the valuation date.  We did a cash flow.  You can see we did

13   a -- an as-is cash flow of 15 years.  It's on the left-hand

14   side.  And anybody stop me when -- you know, if you need me

15   to point out something.

16        But if we go down on the lefthand side, we can see MLAs

17   or market leasing assumptions.  So these are key to the

18   valuation.  This is what we're thinking that is achievable

19   in today's market.  So we have some basement retail space.

20   We have retail ground floor space, and then we have office

21   space.  If you add all that up, that'll be 74,000 square

22   feet, which is the rentable area of the building.

23                Next, if we move over to the left -- to the right,

24   it says "market rent per square foot."  And here, we came up

25   with estimates of what is achievable in today's market for

1    this different space, so we're saying the basement would be

2    $20 a square foot.  The retail space would be $125 per

3    square foot, and office space would range between $80 and

4    $90 per square foot on a modified gross basis, depending on

5    what floor you're on.  As you get higher up in the floors,

6    you get a higher rent.

7         Now, where did we come up with these assumptions?

8    They're based on our knowledge of the market.  Newmark has

9    the most active office building valuation team in the city

10   that I'm aware of.  We do over 100 office buildings per

11   year, so we're constantly in the market.  We have a huge

12   database that -- from those 100 properties that we appraise,

13   we gather all information regarding recent leases.  We talk

14   to the leasing agents.  We go to our Newmark leasing

15   brokers, because they're very active in the market, and they

16   help guide us as to what their thinking is as to what the

17   market is.

18        Also in this case, we also had a BOV, which is a

19   broker's opinion of value.  That was prepared by Jones Lang

20   LaSalle or JLL, and they're a major commercial brokerage

21   firm in New York City.  And we were looking at what they

22   did.  They did a broker's opinion back in October of 2022,

23   and their estimates were pretty much in line with what we

24   have, so it gave us a pretty good confidence level --

25             MR. MARKOWITZ:  Object -- I object to that

1   testimony because I think that's hearsay, Your Honor.

2          THE COURT:  Okay, well, it wouldn't be hearsay if

3   he actually provided what he was talking about, but I'm

4   going to sustain your objection.

5          I know what you're talking about, Mr. Cirz, but we

6   don't have the documents in front of us.  You aren't -- the

7   document hasn't been admitted into evidence.  There isn't

8   somebody test -- explaining how it was prepared, so we're --

9   that's why I'm striking your testimony.  I'm just letting

10  you know.

11         THE WITNESS:  Okay, if we continue on that chart,

12  Your Honor, you'll see we made certain assumptions.  Free

13  rent is common in the market.  You've got to give free rent

14  to get tenants, so let me concentrate on the office, because

15  that's where the value is.

16         So an office space, we assumed that somebody would

17  sign a ten-year lease and would get 12 months free rent.  We

18  also assumed the buildout.  We assumed $120 per square foot

19  to build out the office space in order so that we can get

20  $80 to $90 per square foot rents.  So those were the key

21  elements that went into the cash flow that appears on -- and

22  I forgot the page number, 90 -- was it --

23         MR. BAUER:  Ninety-six.

24         THE WITNESS:  Ninety-six, so if we want to go back

25  to 96, I can explain the cash flow.

1          THE COURT:  Okay.

2          THE WITNESS:  And here, on the cash flow, I'm just

3    going to enlarge it so I can read it.  You can see like, in

4    the beginning, the first year, we have no revenue coming in,

5    and we have to pay certain expenses.  We calibrated the --

6    oh, just for operating expenses, we have operating

7    statements for hundreds of buildings in New York City.  We

8    know what it costs to operate, so we estimated the typical

9    operating expenses for this particular building.

10          But for the first year, we're going to have some

11   of -- we're not going to incur full expenses, because for

12   example, cleaning -- you know, we have no tenants, so

13   there's going to be a limited cleaning expense, but there's

14   certain other expenses that you can't avoid, such as real

15   estate taxes that you know, the city wants taxes, no matter

16   if the building's leased or unleased, so we incurred

17   expenses.  Insurance is another example.  You have to insure

18   the property, and the insurance company doesn't care if it's

19   vacant or not.  You have to pay -- insure it for the

20   construction cost of the building.

21          So what we did was we modified our operating

22   expenses as we assumed the building would lease up, and this

23   is what any investor would do in New York City.  So you can

24   see in year two, we start to generate some revenue.  Year

25   three, we're generating some more.  And year five, the base

1    revenue is up to $6.3 million, which is really a stabilized

2    level.  However, we still have this overhang from free rent,

3    and that prevents us from having a stabilized income stream

4    in year four, and so it's finally in year five is when it's

5    stabilized, and we're at $4.9 million in net income

6    stabilized.

7           And you can see subsequently, you know, it starts

8    to grow, but year five is our first year of stabilization,

9    so we have an income stream that a typical investor would

10   anticipate in buying the property.  So next, what you have

11   to do, is come up with a discount rate and a reversion

12   capitalization rate in order to convert that into a value.

13   The -- so the reversion cap rate is what some -- what we can

14   resell the property for at the end of our holding period, so

15   we're going to -- we're going to sell it to a third party.

16          And our assumption was that we could sell it at a

17   5.5 capitalization rate.  Where do we get the 5.5?  Again,

18   we have a wealth of data to support other properties that

19   have been purchased.  We also confer with the brokers.  We

20   also confer with investors.  Many lenders, too, are clients.

21   I also included sales in the addenda of the report that help

22   support all our assumptions that went into the cash flow.

23          So we use the 5.5 percent terminal capitalization

24   rate, and lastly, we have a discount rate that needs to be

25   applied.  In the bottom chart in the center, you'll see a

1   blue line, and that coincides with a value of $48,385,000.

2   And again, this is based on the first report, so the cash

3   flows haven't changed, but I'm referring to the -- this is

4   the -- this is the first report that we did, so it's not the

5   corrected --

6   BY MR. BAUER:

7   Q    I -- if I can get you to look at the corrected report -

8   -

9   A    Go to --

10  Q    -- that -- I mean, the pages are the same, but that's

11  the report that's really in effect today, is your corrected

12  one, because you -- your amount actually came in a little

13  bit higher, but you -- that's where you made an adjustment,

14  so if I can get you to pull that up.

15  A    Yeah.

16  Q    You still have a blue box there.  The number happens to

17  be a little higher on Page 96.

18  A    Yep.

19  Q    You see it?

20  A    (Indiscernible) as is, yep.  Page 96.  I just need to

21  blow it up so I can read it.

22          THE COURT:  I have it gridlocked.

23          MR. BAUER:  That's exactly what I intend to do.

24          THE COURT:  I understand.  I haven't pulled out my

25  magnifying glass just yet, Mr. Cirz, but it's in the desk.

1          THE WITNESS:  Hopefully, you don't need it.

2          MR. BAUER:  We all have one.

3          THE WITNESS:  So on the corrected report, you'll

4    see the value's $48,728,000, which now rounds up to $49

5    million.  And so that's at a discount rate of 7.25 percent.

6    And again, where do we get the 7.25 percent?  You know, we

7    have a lot of information.  We know about all the

8    transactions that are occurring.  In the addenda of my

9    report are, I believe, eight different sales, some of which

10   are very, very current, which support the assumptions that

11   went into the analysis.

12   BY MR. BAUER:

13   Q    Can I stop you there?  Because you did not do a sales

14   comparison approach, but you did do an addendum that has the

15   sales that you just referenced.  Why did you include that

16   addendum if you didn't do a sales comparison report --

17   (indiscernible)?

18   A    Well -- yeah, first of all, like a sales comparison

19   approach didn't -- wasn't required in order to come up with

20   a credible value, the reason being is that we're using what

21   the market does.  The market would do a DCF.  The market

22   would then turn around and say, okay, you know, we value

23   this thing at $49 million, which is about $660 a square

24   foot.  The market participants would go out and look at

25   recent transactions to say, how does that stack up with the

1    value that we came up with?  And so we included the

2    transaction data, which shows that the assumptions that we

3    used were all market-oriented.

4    Q    Okay, and those sales comparisons, looking at the

5    corrected appraisal, I think it's Addendum B, which is Page

6    123 of 147 on the PDF, you don't have a page number, Mr.

7    Cirz, on it, but are you at that addendum?

8    A    I'm at -- almost.  Yeah, I'm there, Addendum B.

9    Q    All right, and then the next page after that is, I

10   guess, you tell me, is that your first -- your -- are those

11   your sales comparisons?

12   A    Yeah, there'll be eight different sales that are

13   summarized here.

14   Q    Okay, and briefly, can you kind of run through those

15   and how they were utilized in this appraisal?

16   A    Yes, it should be -- you got to realize the market is

17   distressed right now.  Vacancy levels are very high.  We're

18   in the Chelsea submarket.  Vacancy is even higher in the

19   Chelsea submarket.  Rent levels have been distressed, so

20   there's very few transactions.  However, we do so many

21   appraisals for so many either acquisitions, the lender,

22   pension funds that own the property, so we have great data.

23           Here, we have a May 23 property transaction.  It's

24   under contract.  It hasn't closed yet, but it's under

25   contract, and so it's a property located in the Diamond

1    District.  It's a property that has some distress to it, so

2    if the subject property is distressed, we're vacant.  Right?

3    We have a lot of problems with vacancy.

4         So here, this is a confidential transaction.  It sold

5    with an adjusted capitalization rate of 5.5 percent, a

6    discount rate of 7.5 percent.  It was 55-percent leased, so

7    it had 55 percent, so it had a lot of vacancy.  It's got

8    some risk, and the discount rate used there was 7 1/2.  We

9    used the 7 1/4 on us.  This particular property, I believe,

10   has some significant rollover occurring, where you can have

11   -- while we're 55-percent leased, we're also going to have

12   tenants vacating -- or not vacating, but leases expiring.

13        So also look at the price per square foot, $543 a

14   square foot.  We're at six -- about $660 a square foot.  So

15   I think it was pretty helpful in having knowledge of this

16   sale.  If you would like, do you want me to take you through

17   some other sales?

18   Q    I -- yeah -- well, when you characterize the other

19   sales that follow -- yeah, go ahead.  Take us through the

20   next one.  That'll be helpful.

21   A    The second sale is Park Avenue Tower.  And so this is

22   April of 2023, so this is current information.  Oh, by the

23   way, there's eight sales presented here.  We did the

24   appraisal on seven of the eight, so we knew about the

25   transaction.  We talked to the investor.  We had current

1   information about their thinking -- the thought processing

2   that went into their decisions as to what to pay for these

3   properties.

4       So we -- sale number two is Park Avenue Tower, April of

5   '23, so it's very current.  This property had 83-percent

6   lease, so it had some vacancy, not horrible.  But I believe

7   this one's going to have significant rollover as well

8   occurring.  Yeah, so the remaining lease term on existing

9   leases is only 3.3 years, so this property is perceived as

10  having significant risk, exposure to the market because of

11  the short-term leases that are in place.

12      The discount rate on this one was 7 percent that was

13  used by the investor, so again, we're at a 7 1/4, reflecting

14  a vacant building.  This one has significant risk.  It's --

15  it's 83-percent leased, but a lot of turnover coming up.

16  They used the 7-percent discount rate.  Sale number one

17  problems, a 7 1/2 was used there, so I know my 7 1/4 is in

18  the right neighborhood.  If you look at the sale price per

19  square foot, it sold for $600 a square foot.  We're at $660

20  a square foot, so we know we're in the right neighborhood

21  based on two very, very current transactions.

22      Sale number three is of interest because that's pretty

23  darn current.  So that's a building, 149 Madison Avenue.  It

24  was a February of 2023 sale.  And I'd like to just back up,

25  because the more current, the better, because interest rates

1    -- everybody knows the Federal Reserve has been raising

2    interest rates for the last year.  They're up over 5

3    percent.  It's had an impact on investor requirements, so

4    investors have gotten -- need higher rates of return to

5    reflect higher interest rates, higher borrowing costs.  So

6    we want to stay with transactions as close to the valuation

7    date as possible.  Just bringing that up because some of

8    these are a little bit more dated.  You know, you get a year

9    from now, and it's -- you know, it's a different market.

10        So this sale, February of '23, so very current, this

11   building was bought vacant, so it's the same as us.  It's

12   bought vacant.  It sold for $647 a square foot

13   (indiscernible) $660 a square foot, so again, very helpful.

14   Helps tell us that you know what, we're right in the right

15   ballpark for the valuation of our property.

16           Then after this, is it 22 -- no, okay, next sale

17   is January of '23.  So it's not too far off from the

18   valuation date.  This one sold 84-percent leased.  It sold

19   with a 6 1/4 discount rate, and so this property is much

20   safer overall.  The income stream is much safer than we are,

21   which we're vacant.  So it sold for $1,000 a square foot,

22   84-percent leased, a 6 1/4 discount rate.

23           This one is very helpful in determining our

24   stabilized value, because our stabilized value was right

25   around $1,000 a square foot, and I believe we used a 6 1/2

1    discount rate on the stabilized value.  So this tells us

2    that our stabilized value is in the right ballpark.

3    Q    And when you say "stabilized," what -- what do you

4    characterize stabilized as being?

5    A    That's year five, when we're assuming the property is

6    leased up to a market level.  The free rent's been burned

7    off.  There's no more tenant installation allowances.

8    There's no more tenant rollover occurring, so the property

9    is in a -- you know, has a stabilized income stream.

10   Q    Thank you.  You may continue with your -- with the

11   sales counts.

12   A    The next sale is 79 Fifth Avenue, so now this is

13   getting older.  It's June of '22.  The Fed started raising

14   rates, but nobody knew how high they were going to go.  This

15   particular property is helpful.  It was 100-percent leased.

16   It had good quality tenants.  Ernst -- I believe Ernst and

17   Young had two floors that they leased in this building.  It

18   had good quality retail tenants.  The retail tenants

19   included Coach, Free People, and a Citibank -- a Citibank

20   bank branch.  And so we had high-quality tenants in the

21   building.

22       The New School was the anchor tenant in the building.

23   And I'm trying to go from memory.  Yeah -- it's in the

24   report, so New School leased over 200,000 square feet in

25   this building, so this is a very desirable property, located

1   in a good location, and it was 100-percent leased, and it

2   sold for $800 per square foot, so again, this is telling us

3   we're at $1,000 a square foot stabilized.  This is telling

4   us that this is pretty representative of a stabilized

5   building.  With the market change happening in the market,

6   it probably wouldn't go for $800 in today's market, just

7   because it's -- the cap rates have increased.

8        So after this, the other sales are getting a little

9   more stale, January of '22, but you can see we have cap

10  rates.  We have discount rates for them from stabilized

11  buildings or riskier buildings, and I think they're all

12  helpful in supporting that our assumptions are reasonable

13  and market-oriented.

14  Q    Right, and you're -- the as-is value for the subject

15  property, what did you find it to be?

16  A    $49 million.

17  Q    Great.

18            MR. BAUER:  Your Honor, I have nothing more to add

19  to Mr. Cirz's testimony.  I gladly hand him over for cross.

20            THE COURT:  Okay, I assume you want me to admit

21  his two declarations into evidence?

22            MR. BAUER:  Yes.  Yes, I would -- yes, Your Honor.

23  I --

24            THE COURT:  Okay, any objection to my admitting

25  the two declarations into evidence?

1            MR. MARKOWITZ:  No, Your Honor.

2            THE COURT:  Okay.

3            MR. MARKOWITZ:  And that includes the

4     (indiscernible).

5            (Raymond Cirz's two declarations were admitted

6     into evidence.)

7            THE COURT:  So those will be admitted into

8     evidence, and that assumes also that we are also admitting

9     Exhibits 1 and Exhibits 2, which were attached to the

10    declarations, also into evidence, the appraisals.  Is there

11    any objection to that?

12           MR. MARKOWITZ:  No.

13           THE COURT:  Okay.

14           (Exhibits 1 and 2 were admitted into evidence.)

15           THE COURT:  All right, then Mr. Markowitz, you may

16    proceed with cross-examination.

17           MR. MARKOWITZ:  Okay.  Good morning, Your Honor.

18    Good afternoon?  Good morning?

19           Good morning, Mr. Cirz --

20           THE COURT:  Good morning.

21           MR. MARKOWITZ:  It's still -- I look at my

22    (indiscernible).

23           THE COURT:  It's only 10:57.  It hasn't been that

24    long.

25           MR. MARKOWITZ:  Okay, it only seems that way.

Page 43

1    Okay.

2                    CROSS-EXAMINATION OF RAYMOND CIRZ

3    BY MR. MARKOWITZ:

4    Q    Mr. Cirz, my name is -- am I pronouncing your name

5    correctly?

6    A    That's Cirz, yes.

7    Q    Cirz.  My name's Scott Markowitz, and I represent the

8    Debtor.  I'm going to ask you some cross-examination

9    questions.  One, first -- did -- who -- did you prepare this

10   appraisal?

11   A    Yes.

12   Q    Okay.  You didn't go see the property, though, did you?

13   A    I did not.

14   Q    Okay.  Is it typical when you appraise a building that

15   you go in and walk around the building, see the -- you know,

16   the quality level of the building and things of that nature?

17   Is that typical?

18   A    Yes.

19   Q    I want to -- I want to refer to your old appraisal.  I

20   unfortunately don't have your whole new appraisal printed

21   out, but you're -- they're substantially similar.  Your old

22   -- your first appraisal, I want to turn to Page 90.  Can you

23   go to that?  That's the appraisal that you initially

24   submitted.

25   A    Okay, I'll be there in a minute.

1    Q    Thank you.

2              THE COURT:  Mr. Markowitz, when you say "90," are

3    you saying on PDF --

4              MR. MARKOWITZ:  It's on Page 90 of the appraisal -

5    - hold on, let me show --

6              THE WITNESS:  Your Honor, (indiscernible) --

7              MR. MARKOWITZ:  -- on Page 90 of the appraisal on

8    the ECF, because I do have the -- on what I -- on my

9    document version --

10             THE COURT:  Ninety-five.

11             MR. MARKOWITZ:  Yeah, it's 95 of 147 on what was

12   filed, I think --

13             THE COURT:  Okay.

14             MR. MARKOWITZ:  -- according to what I have

15   printed out here.

16             THE WITNESS:  So am I on Page 90 of the PDF?

17             MR. MARKOWITZ:  It's Page 90 of the appraisal

18   where it talks about rent roll tenant overview.  It's at the

19   bottom.  It's Page 90 of your initial appraisal under --

20   Page 95 of 147 on what was filed with the Court, I believe.

21             THE WITNESS:  I'm there.

22             MR. MARKOWITZ:  Okay.

23   BY MR. MARKOWITZ:

24   Q    And you see it says "rent roll tenant overview."  You

25   see that?

1   A    Yes.

2   Q    And it says "The revenue to be received is derived from

3   various tenant types.  The estimated rental revenue

4   estimated has been based on new market view of the rent roll

5   and the leases provided by the owner as of the date of this

6   appraisal."  What lease did -- what leases did the owner

7   provide you the day of the appraisal?

8   A    You know, that's obviously a mistake.  The property is

9   vacant.  There is no leases in place.

10  Q    Okay, so you -- so the owner didn't provide you with

11  anything.  Right, is that correct?

12  A    That's -- to my knowledge, yes.

13  Q    Okay.  Did you -- when you got information regarding

14  the building, who did you get it from?

15  A    Actually, associates of mine requested the information,

16  and they've got information from the mezz lender.

17  Q    But no one contacted the owner to seek information.  Is

18  that correct?

19  A    To my knowledge, no.

20  Q    Okay.  Okay, when -- your original appraisal had the

21  stabilization date of June 1st, 2028, and then you moved it

22  back a year.  Why did you say it would be stabilized a year

23  earlier on your amended appraisal?

24  A    If we go to -- is it Page 96 of the first appraisal?

25  There's a cash flow, and I can point that out to you.

1   Q     Okay.  Okay, looking at that.  It's page 101 of 147, I

2   believe, on the docket.

3   A     Okay, so -- yeah, so this -- so the first appraisal, we

4   -- and if you look at the top, you'll see different years,

5   so the first appraisal used year six as a stabilized year.

6   And when you look at the cash flow, it's really -- it's

7   really year five, so go down about halfway on the lefthand

8   side.  You're going to see net operating income.  And you

9   can see it's a --

10  Q     Got it.

11  A     -- it's a negative million dollars in the first year.

12  Q     Right.

13  A     And it starts to increase.  So if we look at it, year

14  five, ending May of '28, is $4 million rounded, $4.9

15  million, and the next year, it's $4.9 million, and it

16  becomes $5.1 million and starts to grow.  So you can see,

17  $4.9 million is the first stabilized year.  It's much less

18  in each of the other four years.

19  Q     Okay, so why did you -- so it's your testimony that the

20  building, in your opinion, won't be stabilized until June of

21  2027, correct?

22  A     (Indiscernible).

23  Q     You used June of 2027 as a stabilized date, correct?

24  A     Yes, I believe so.

25  Q     Okay, and if the building, for example, was completed

1   quicker and stabilized quicker, would that change the value?

2   A    It probably would have some impact on the value, just

3   because even -- because you would have a shorter holding

4   period, and between the two appraisals, I shortened it, and

5   it made about a $300,000 difference.

6   Q    So that would increase it, correct?

7   A    Yes.

8   Q    Okay, with -- you used a buildout cost for the tenant -

9   - to get tenants at $120 per foot, correct?

10  A    For office space, yes.

11  Q    Right, and let's say it was $100 a foot.  Would that

12  change the value?

13  A    Yes, that would probably -- that would increase the

14  value.

15  Q    Okay.  So your appraisal date is as of June 1st, 2023,

16  correct?

17  A    Yes.

18  Q    Can you form an opinion as to the value of the property

19  as of February 13th, 2023?

20  A    I wasn't requested to do that.

21  Q    Well -- okay, but would -- do you think the property --

22  I mean, based on your experience, that's the only

23  (indiscernible) market able to make three or four months,

24  right?

25  A    Yep.

1    Q    Do you think the property was worth less than that on

2    February than the $49 million or more or the same?

3    A    I would think about the same.

4    Q    So do you think the property is increased -- is

5    decreasing in value at -- right now?

6    A    I estimated $49 million.  I don't understand --

7    Q    Right, but I'm saying, do -- and that $49 million, then

8    you estimated that if you get the partial TCO, that it'll be

9    $52 million, right?

10   A    Yes.

11   Q    And did you form an opinion as to the cost of getting

12   the partial PCO?

13   A    I don't believe so.

14   Q    So when you used the June 1st, 2024 date, which

15   approximately one year from now, you get the partial TCO.

16   How did you come out with -- come up with that?  Did

17   somebody tell you it would take a year?  Did you do your own

18   research on it?  How did you come up with that date?

19   A    I believe it was provided by the client.

20   Q    So you took that as a given?

21   A    Yes.

22   Q    Okay.  So my -- go back to my question.  Sitting here

23   today, you think the property as is, in its current

24   condition, is worth approximately $49 million, correct?

25   A    Yes.

1    Q    And then in a year from now, if you spend some money,

2    you get the TCO, it'll be $52 million?

3    A    Yes.

4    Q    And then over time, as you spend some more money to get

5    tenants, it would be worth $82 million.  Is that correct?

6    A    Once it's stabilized, yes.

7    Q    Okay.  Did you do any analysis to determine whether it

8    would be feasible, in view of the current market, to convert

9    some of the floors of the building to residential?

10   A    I did not.

11   Q    Have you ever been asked to do something like that?

12   A    Yes.

13   Q    But you weren't asked to do that here?

14   A    Correct.

15   Q    But go back to my other question.  Sitting here today,

16   you don't believe the property is declining in value between

17   now and a year from now, do you?

18   A     It's not anticipated, no, based on today's knowledge of

19   the market.

20   Q    Okay, okay.  When you're considering the value based

21   upon the income approach, you use the discounted cash flow

22   method, right?

23   A    Yes.

24   Q    Okay.  Would -- if an end -- if an end user potentially

25   wanted to buy the building to use the whole building, would

1    that change your potential valuation?

2    A    If there was a user in the market, they might pay

3    something different than what an investor would pay?

4    Q    And you looking at it strictly from a -- an investor's

5    standpoint, right?

6    A    Yes, for a reason.

7    Q    Okay.  Okay.  Oh, you -- I don't see it.  Oh, yeah, now

8    -- okay.  Somehow you were bigger in my box, and now you're

9    smaller.  Okay, no problem.  So I have another question for

10   you.  If you were the owner of this building, in this

11   current market, what would you do with it?

12   A    What would I do with it?  I --

13   Q    No, would you sell it now?  Would you put the money

14   into it to fix it up and hold it for a few years?  What do

15   you think was the most prudent thing to do in this

16   environment?

17   A    I don't know the circumstances surrounding the

18   property.  The appraisal assumes, the property is exposed to

19   the market in today's condition, what would a typical buyer

20   pay for it?  And I think all our data shows like, you had

21   eight sales.  They're all investment sales.  There was no

22   user sale.  A user may pay a premium for it, depending on

23   the motivation of the user, but we had no user sales out

24   there.

25        So what would I do with the property?  I think -- I'm

1    putting myself in the shoes of a typical buyer.  Typical

2    buyer would anticipate completing construction, building out

3    the space, leasing up the building.

4    Q    When you say "typical buyer" -- but let's say you were

5    the owner.  Is that what you would do?  You own it.  I'm

6    putting you in the shoes of the owner.  You're -- it's a

7    hypothetical question.  You're an expert.  What -- what do

8    you think is the best thing to do with this property right

9    now?

10   A    I wouldn't have gotten involved in it in the first

11   place.

12   Q    Okay.  All right, well, hindsight's 20/20, as we all

13   know.  But I'm asking you, you know, kind of in all

14   seriousness, right now, in the current environment we're in,

15   considering the building, I know you haven't seen the build

16   -- have you seen the building?

17   A    I -- I've been by the building.

18   Q    Okay, but you've never been inside it?

19   A    I haven't been -- I haven't been inside.

20   Q    You don't know the level of the finishes, the quality

21   of construction.  You don't know any of that, correct?

22   A    We have photographs that are in the report that were

23   provided by the client.

24   Q    Okay, did you form an opinion based on those

25   photographs as to the level of the quality of the

1   construction, the renovation?

2   A    Yes.

3   Q    And what -- what's your opinion?

4   A    I think if we go to the physical description, it's --

5   it -- you know, it's a renovated building.  It's an old

6   industrial building that's being renovated into a good

7   quality office space property, but it's not built out yet to

8   tenant specifications.

9   Q    All right, but is that customary to -- when you

10  renovate a building to not build it out with tenant

11  specifications because you don't know exactly what kind of

12  tenants you're going to have?

13  A    Not necessarily.  I mean, you build out to class A

14  quality office space.  You could do pre-builds and it'll be

15  acceptable to most tenants in the market.

16           MR. MARKOWITZ:  Okay, I have no other cross-

17  examination questions.

18           THE COURT:  Okay.

19           All right, Mr. Cirz, I have one or two questions

20  for you.  Let me just find the right piece of paper here,

21  page here, in your second report.  Okay, so I'm looking at

22  your -- I believe it's on your page, Page 100 of the Exhibit

23  2.  That's the -- I guess the cash flow analysis, the income

24  capitalization approach.

25           THE WITNESS:  Okay, just a minute.  I believe

1    that's 69 in my PDF.

2            THE COURT:  On mine, it's a 105 of a 147, unless

3    I'm looking at the wrong page.

4            THE WITNESS:  Okay.

5            THE COURT:  In the second document.  Oh, this is -

6    - sorry, this is the stabilized approach, sorry.  Let me

7    find the -- I had a question for you about the other.

8    Sorry, give me one second here.  I think I'm not on the

9    right page.  Okay, this is -- whoops, this (indiscernible).

10   I just have to find your other cash flow for a second.  Just

11   give me one more second here.  The first one to compare this

12   to -- just a second.  There we go again.

13           Okay, so on Page 101 of '47, this is the June 1st,

14   2023, the as-is.  So my question for you here was, I guess,

15   the net cash flow amounts that you have in here -- I think

16   this is following up on a question Mr. Markowitz had asked

17   you -- this obviously takes into account cost of the

18   building and maintaining it in year one, for example, which

19   as you pointed out, you have no tenants, so less cleaning

20   and all those things.  But it's also got capital expenditure

21   amounts here.  I think it's a little over $2.5 million, if

22   my reading is correct, $2,553,629 in year one for capital

23   expenditures.  Is that -- does that assume -- you know, what

24   does that assume, I guess, is my question.

25           THE WITNESS:  Yeah, we were provided with a

Page 54

1  capital budget, and in the capital budget was like, the

2  total construction cost, like what it was going to take to

3  renovate the building, and that was the amount in our data

4  that we had that showed what was not spent yet, so we're --

5  you know, based on information we're provided by the client,

6  there were still approximately $2.5 million of capital

7  expenditures that needed to be incurred.

8          THE COURT:  Okay, all right.  And is that -- and

9  does that include the cost then for the tenant improvements

10  that you mentioned to build out the tenant space?

11          THE WITNESS:  It does not, Your Honor.  Those

12  costs occur a few lines higher.  It says "tenant

13  improvements."

14          THE COURT:  Right, that's what I thought.

15          THE WITNESS:  And you can -- yep, and so that's

16  occurring in year two and three, when we're anticipating

17  that tenants start taking space.

18          THE COURT:  Okay, understood, okay.  I understand.

19  Okay, all right, give me one second here.  All right, I

20  think that answers my questions.  Thank you.

21          THE WITNESS:  You're welcome.

22          THE COURT:  Anyone else have any questions for the

23  witness?

24          MR. SELBST:  I -- Your Honor, I do.

25          THE COURT:  Okay, Mr. Selbst.

1                 CROSS-EXAMINATION OF RAYMOND CIRZ

2       BY MR. SELBST:

3       Q     Good morning, Mr. Cirz.  My name is Stephen Selbst.  I

4       represent G4, which is the mortgage lender on this property.

5       In your direct testimony, you talked about the impact of

6       rising interest rates in the last year.  Now, I'm going to

7       pose another hypothetical to you, as Mr. Markowitz did.  If

8       interest rates continue to rise, would that have a negative

9       impact on the value of the property, in your opinion?

10      A     If interest rates continue to rise, I think it's going

11      to have a negative impact on commercial real estate in

12      general, so the property would be included.

13      Q     Okay, so in other words, if interest rates rose, and

14      the value of the property declined, that risk would be born

15      by the -- by all the parties in the case, correct?

16      A     I couldn't hear the first part of your question.

17      Q     I'm sorry.  I'm sorry, the -- I apologize.  I'm moving

18      the mic closer to my -- to me.  So if the interest rate

19      rose, and the property were diminished in value over the

20      next year, then that risk would be born by everybody in the

21      case, correct?

22      A     Yes.

23      Q     Okay.  And I want to direct your attention to something

24      that you briefly talked about in your direct testimony.  You

25      talked about the -- the vacancy rate in the Chelsea

1     submarket.  What is the current availability of both prime

2     space and subleased space in the Chelsea submarket?

3     A    It's in my report, and it might take me a minute to

4     find it.  I think it was 18.8 percent, but if you give me a

5     minute --

6                THE COURT:  You may go ahead -- please go ahead

7     and look, Mr. Cirz.

8                THE WITNESS:  Unfortunately, we have too much

9     information in my reports.

10               MR. SELBST:  Actually, Mr. Cirz, it's Stephen

11    Selbst for G4.  I thought your report was extremely

12    informative, particularly the analysis of the leasing

13    submarkets.

14               THE WITNESS:  Okay, so I'm at the beginning of the

15    market overview.  I'll find it.

16               MR. SELBST:  I think Page 86 or Page 91 of 147,

17    it's your conclusion of the Chelsea office submarket

18    analysis that's (indiscernible).

19               THE WITNESS:  Page -- yeah, Page 56, I can see --

20               MR. SELBST:  Correct.

21               THE WITNESS:  -- yeah, my numbers were a little

22    bit off, but if we get to Page 56 of the PDF, the Chelsea

23    market vacancy as of the first quarter of 2023 is 18.2

24    percent.  Midtown overall -- Midtown South overall is 18.8.

25    So you can see how dramatically the increase in vacancy

Page 57

1    occurred in the last year.  It went from 9.2 percent to 18.2

2    percent.

3    BY MR. SELBST:

4    Q    So wouldn't you -- wouldn't that lead one to conclude

5    that in fact that anybody's who's renting space as an owner

6    or landlord will be fighting with tenant -- fighting for

7    tenants with the rest of the market?  Is that correct?

8    A    Well, sure.

9    Q    Okay, and just following up on the other point, doesn't

10   your report also say that there's actually been negative

11   absorption of class A office space in Manhattan for the last

12   eight years?

13   A    It may -- I'm not sure if I can find that in the

14   report, but --

15   Q    I'm sorry, I did not note the page.  I'll represent to

16   you that that's in there.  And you do have general knowledge

17   of the market.  There's been a fair amount of space that's

18   come onto the Manhattan market in the last few years.  Isn't

19   that correct?

20   A    Yes.

21   Q    Okay, and would you agree with me that the -- well,

22   never mind.  I'm going to withdraw that question.

23           MR. SELBST:  I don't think I have any further

24   questions.  Thank you, Your Honor.

25           THE COURT:  Okay.

1           Does anyone else have any further questions for

2      Mr. Cirz?

3           Okay, Mr. Bauer, any redirect?

4           MR. BAUER:  Yes, Your Honor, real quick.

5           RE-DIRECT EXAMINATION OF RAYMOND CIRZ

6      BY MR. BAUER:

7      Q    Mr. Cirz, I'd turn you to Page 6 of your report, the

8      corrected report.  And I point you to Paragraph 13.

9      A    Okay, I'm there.

10     Q    Okay, who's Doug Larson and Charles Looney?

11     A    They're both appraisers with Newmark, both very

12     experienced.  Doug runs the office valuation team.

13     Q    Okay, and both of these gentlemen's CVs are included in

14     this -- in the Newmark appraisal.  Is that correct?

15     A    Yes.

16     Q    And you reported to both of them with respect to this

17     Newmark appraisal, this appraisal?

18     A    Could you say that again?

19     Q    You spoke to both of them with respect to this

20     appraisal?

21     A    Yes.

22     Q    Okay, and it states in the 13 that both of them

23     inspected the exterior of the property?

24     A    Correct.

25     Q    Mr. Markowitz asked you a question about buildout costs

1    and -- that our appraisal -- or I should say the Newmark

2    appraisal at $120 a square foot, and then if it were reduced

3    to $100 a square foot, that it would change the value.  Do

4    you recall him asking you that question?

5    A    Yes.

6    Q    Why did you choose -- why did -- where did your $120

7    per square foot amount come from for the buildout?

8    A    Well, that's our estimate of market, and that's based

9    on leasing activity.  We have sale -- or leases that support

10   that.  We talked to our brokers.  We appraise, again, over

11   100 office buildings a year.  There's even information in my

12   report, I think, that helps support that as well.  I'm just

13   looking for it.  Under -- I don't know why, but my cursor's

14   not working right now.  There it goes.  If you go to Page

15   48, I think that this was talking about the overall market

16   in Manhattan, and there's a chart in here about tenant

17   installation allowances.  My PDF's not cooperating with me.

18   I've got to hold my cursor down in order to keep the page.

19   Did I give you a page number?  I --

20   Q    Yeah, you did.

21   A    -- every time I go to --

22   Q    You gave me Page 48.

23   A    Okay.  Like, every time I go to look for a page number,

24   it switches to the next page.  So on Page 48, is there a

25   chart there on the lefthand side that says "tenant

1    installation allowances?"

2    Q    It actually says -- what I'm looking at says

3    "concessions allowance -- analysis."

4    A    Okay, concession allowances, oh, but it says -- so

5    tenant work allowances --

6    Q    Yep.

7    A    -- went up 33 percent, and on the lefthand axis, you'll

8    see what typical work allowances are, and it's like getting

9    close to $140 a square foot.  So that's midtown.  So we're

10   in Midtown South, and what's the work allowance there?  It's

11   just over $130 per square foot.  So if you were to offer

12   something significantly less, let's say, $100 a square foot,

13   you're not going to get the same rent.  You know, your

14   tenant's going to want some kind of discount because they're

15   not getting their full amount of buildout.

16   Q    And is it fair to say, based on this analysis, that

17   work allowances are increasing and -- per square foot as

18   time passes?

19   A    Yeah, the chart shows you that, yes.

20            MR. BAUER:  Your Honor, I have no further

21   questions of Mr. Cirz.

22            THE COURT:  Okay.

23            Any re-cross, Mr. Markowitz?

24            MR. MARKOWITZ:  Only one question.

25            THE COURT:  Okay.

Page 61

1              **RE-CROSS EXAMINATION OF RAYMOND CIRZ**

2      BY MR. MARKOWITZ:

3      Q    Mr. Cirz, did any of the appraisers from your Newmark

4      go inside the building and look around the building, look at

5      the quality of the construction, look at what was put into

6      the building and things of that nature?  Or was it all just

7      exterior view?

8      A    Correct.

9              MR. MARKOWITZ:  Okay, I have no other questions.

10             THE COURT:  Okay, all right, thank you very much,

11     Mr. Cirz, for coming today, and I appreciate it.  And you --

12     I appreciate you coming to testify, and you can step down,

13     which I guess means you can either leave or turn off your

14     camera as Mr. Bauer sees fit.

15             THE WITNESS:  Okay, all right, thank you, Your

16     Honor.

17             (Witness excused).

18             THE COURT:  All right.

19             Okay, Mr. Bauer, do you have any other witnesses

20     you're intending on calling?

21             MR. BAUER:  Yeah, I was intending on calling Mr.

22     Silverberg, but I'm not seeing him on the screen --

23             THE COURT:  Yeah, I'm not, either.

24             MR. BAUER:  -- to admit his declaration and just

25     to free him up for cross.

1          THE COURT:  Yes.

2          MR. BAUER:  But I'm not seeing him.  I see

3     (indiscernible) --

4          THE COURT:  Do you need to take a break to reach

5     out to him?

6          MR. BAUER:  Yes, if I may, that would be great.

7          THE COURT:  Okay, how long a break would you like?

8          MR. BAUER:  Mr. Belinsky is from his office and

9     happens to be on and has been.  And I know Mr. Silverberg's

10    still in Israel, so if you can give me -- it's 25 after 11.

11    I guess maybe I can report back in 20 minutes.  That'll take

12    us to (indiscernible) 12 --

13         THE COURT:  It -- that'll be helpful.  That's

14    fine.  Okay, so we'll adjourn for 20 minutes and go back on

15    the record at 11:45.  Just to remind everybody, obviously,

16    that -- we still have -- even when recording stops, there's

17    still voice, so you might want to turn off your camera and

18    put yourself on mute if you're intending on talking.  Thank

19    you.

20         MR. BAUER:  Thank you, Your Honor.

21         (A brief recess was called.)

22         THE COURT:  Okay, we're back on the record.  I

23    don't see Mr. Bauer yet.  Hi, Mr. Bauer.

24         MR. BAUER:  Hi, I'm back, Your Honor.

25         THE COURT:  Okay.

1          MR. BAUER:  I am still not -- I know that -- I saw

2    Mr. Belinsky reach out to Mr. Silverberg, but I'm not seeing

3    Mr. Silverberg appearing on the screen.  I know that he can

4    only dial in.

5          THE COURT:  What does that mean?  Sorry.

6          MR. BAUER:  He has no access to Zoom, much like

7    the last time, and I believe he's trying to dial into this

8    Zoom call, but I'm not seeing --

9          THE COURT:  Mmm.

10         MR. BAUER:  -- his number appearing.

11         THE COURT:  All right.

12         MR. BAUER:  I've sent a text to Mr. Belinsky.

13   He's dialing in now is what I'm getting back.

14         THE COURT:  All right.

15         MR. BAUER:  I believe I see a number in the lower

16   righthand corner of my screen, which is Mr. Silverberg's

17   cell phone number, so I believe he is on.

18         MR. SILVERBERG:  That's me.  I'm here.

19         THE COURT:  All right.  All right, Mr. Silverberg,

20   I guess I have to ask you some questions that aren't as

21   easy.  What do you have in front of you?

22         MR. SILVERBERG:  Just my cell phone.

23         THE COURT:  Okay, any documents with you?

24         MR. SILVERBERG:  No, none.

25         THE COURT:  Okay.  Anyone in the room with you?

1          MR. SILVERBERG:  I'm actually outdoors, but

2      there's nobody around me.

3          THE COURT:  Okay, outdoors, okay.  It's

4      surprisingly quiet for outdoors.  At least here it wouldn't

5      be quiet.

6          MR. SILVERBERG:  Huh.

7          THE COURT:  Okay, all right, Mr. Silverberg, I'm

8      going to -- I would normally be asking you to raise your

9      right hand, so I guess I'm asking you to do it even though I

10     can't see you.  So I'm going to ask you --

11         MR. SILVERBERG:  (Indiscernible).

12         THE COURT:  -- to -- you're placed under oath.  Do

13     you swear to tell the truth, the whole truth, and nothing

14     but the truth?

15         MR. SILVERBERG:  Yes.

16         MR. BAUER:  Great.  I may proceed, Your Honor?

17         THE COURT:  Yes.

18         MR. BAUER:  Thank you.

19         DIRECT EXAMINATION OF ERAN SILVERBERG

20     BY MR. BAUER:

21     Q   Mr. Silverberg, this is Mo Bauer, S -- your counsel,

22     SME's counsel.  This is the motion for stay relief that SME

23     filed.  On May 22, 2023, we submitted on your behalf a

24     declaration of Eran Silverberg on behalf of 541 W 21 SME,

25     LLC in support of supplement to motion of 541 W 21 SME, LLC

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 69 of 209

Page 65

1    for an order terminating the automatic stay pursuant to 11

2    USC Section 362 and other related relief.  Are you familiar

3    with this document?

4    A    Yes, I am.

5    Q    And did you execute this document?

6    A    Yes, I did.

7    Q    And if you were to testify -- or strike that.  Is this

8    document representative of your testimony that would be

9    given today if direct examination were to proceed?

10   A    It is.  Yes.

11   Q    And I note that this declaration sets forth paragraphs

12   that also reference your prior declaration submitted in

13   opposition to a motion filed by the Debtors to reject the

14   agreements with Higher Ground and the agreement with

15   Cauldwell, as well as in opposition to the Debtor's motion

16   to retain Irving Oak and (indiscernible).  Does this

17   declaration, and is it your testimony, include the items set

18   forth in that prior declaration?

19   A    Yes, it does.

20   Q    Mr. Silverberg, I noted as part of the motion and your

21   declaration, they reference a series of loan documents

22   entered -- executed by the Debtor's representative, Erno

23   Bodek, in favor of SME, which documents -- loan documents

24   were dated November 19, 2021 and include a mezzanine loan

25   agreement, membership interest, pledge and security

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 66

1    agreement, joint and consent of the issuer, mezzanine loan

2    note, non-recourse carve-out guarantee, guarantee of

3    completion, and carry guarantee.  Are you familiar with

4    these documents?

5    A    Yes, I am.  All of them.

6    Q    And these are the loan documents that were executed by

7    the Debtors in favor of SME?

8    A    Yes, they are.  That's correct.

9    Q    And these are the documents in which SME relied on in

10   asserting a claim against the Debtors?

11   A    Yes.

12   Q    Okay.  I note that there is also a first amendment to

13   mezzanine loan agreement dated June 28, 2022.  Did SME enter

14   into a loan amendment with the Debtors?

15   A    Yes, we did.

16   Q    Okay.  And did there come a time in which SME issued a

17   default letter to the Debtors?

18   A    Yes, we did.

19   Q    And was it -- was there a letter issued dated October

20   13, 2022?

21   A    Yes, there was.

22   Q    And was that default letter in part based on a default

23   letter issued by G4 to the Debtors?

24   A    Yes, in part.

25   Q    Okay.  And the -- and the SME loan, is that secured by

1    a pledge of interest of KOVA?

2    A    It was, yes, 100 percent pledged to the membership

3    interest.

4    Q    Okay.  And did -- and to your knowledge, did they --

5    did SME record a UCC financing statement as evidence of the

6    pledge of the interest?

7    A    We did.  Yes.

8    Q    Did SME file a proof of claim in the -- in these

9    Chapter 11 cases?

10   A    We did.  Yes.

11   Q    And they filed a proof of claim against each of the

12   Debtors?

13   A    Yes, we did.

14   Q    And you executed the proof of claim on -- each of those

15   proof of claims on behalf of the Debtors?

16   A    Yes.

17   Q    And those proofs of claims set for the dollar amount

18   you believe was due and owing to SME as of the petition

19   date?

20   A    Yes, that's correct.

21   Q    And is SME -- has SME been paying G4 each month?

22   A    We have.  Yes.

23   Q    And approximately how much per month is -- is being

24   paid to G4?

25   A    Approximately $400,000 in advance on a -- on a, you

1    know, three to four-month cycle, potentially even more.

2    Q    Has -- is it your understanding that Erno Bodek is the

3    managing member of each of the Debtors?

4    A    That's my understanding.  Yes, that's correct.

5    Q    Have you had any conversations with Erno Bodek in the

6    past month regarding this case -- these cases?

7    A    I have -- I have not.  No, I haven't had a conversation

8    with him since before the -- the petition to file.

9    Q    And as you understand, there was a meeting on Friday,

10    June 2nd, at Ms. Zourigui's offices.  Were you in attendance

11    at that meeting?

12    A    I was via -- via teleconference.

13    Q    Okay.  Did Erno Bodek attend that meeting?

14    A    He did not attend that meeting nor any other settlement

15    meeting that the court suggested.

16          MR. BAUER: Your Honor, I'd like to move into

17    evidence items -- the three proofs of claims that were filed

18    by SME, which are Claim No. 17 -- claim number -- in the

19    Erbo case, Claim No. 2 in the KOVA case, Claim No. 2 in the

20    Gold Mezz case.

21          THE COURT:  I'm going to stop there for a second.

22    Let's not do this -- we're going to do this in bits.

23          MR. BAUER:  Okay.

24          THE COURT:  Mr. Markowitz, do you have any

25    objection to moving in the three proofs of claim filed by

1    SME against each of the Debtors?

2              MR. MARKOWITZ:  No, Your Honor.

3              THE COURT:  Okay.  So, those are admitted into

4    evidence.  Those are Documents No. 19, 20, and 21, my

5    binder.

6              (Documents 19 to 21 entered into evidence.)

7              MR. BAUER:  And then the next series of documents,

8    Your Honor, we'll gladly take them one by one, but they're

9    Items 22 through 29, which are the mezzanine loan agreement,

10   the first amendment to the mezzanine loan agreement, the

11   membership interest pledge and security agreement, the joint

12   -- joinder and consent of the issuer, mezzanine loan note,

13   the non-recourse carve-out guarantee, the guarantee of

14   completion, and the carry guarantee.  I'd like to move those

15   into evidence, which are essentially the loan documents with

16   SME.

17             THE COURT:  Okay.  Mr. Markowitz, do you have any

18   objection to those --

19             MR. MARKOWITZ:  No, Your Honor.

20             THE COURT:  -- documents (indiscernible).  Okay.

21   All right.  So, Documents No. 22 through 29 are admitted

22   into evidence.

23             (Documents 22 to 29 entered into evidence.)

24             MR. BAUER:  Your Honor, we'd like to move Document

25   31 into evidence, which is the UCC financing statement that

Page 70

1    was filed with I believe New York state.

2              THE COURT:  Mr. Markowitz, any objection to --

3              MR. MARKOWITZ:  No, Your Honor.

4              THE COURT:  Okay.

5              MR. BAUER:  And then I'd like to move No. 30 into

6    evidence, which is the default letter issued by SME, which

7    included as Exhibit A the default letter issued by G4.

8              THE COURT:  Okay.  Any objections to admission of

9    the default letter?

10             MR. MARKOWITZ:  No.

11             THE COURT:  So, Exhibits 30 and 31 are admitted

12   into evidence.

13             (Exhibits 30 and 31 entered into evidence.)

14             MR. BAUER:  Great.  Thank you, Your Honor.

15             Your Honor, I can turn the witness over for cross-

16   examination.

17             THE COURT:  All right.  Mr. Markowitz, any cross-

18   examination?

19             MR. MARKOWITZ:  Yeah, I do, Your Honor.

20               CROSS-EXAMINATION OF ERAN SILVERBERG

21   BY MR. MARKOWITZ:

22   Q   Mr. Silverberg, Scott Markowitz.  Good evening.  I

23   guess it's evening there or getting close to it or

24   afternoon.  I represent ERBO, as you know.  I'm going to

25   have a few questions for you.  My first question is you

1   filed a proof of -- you filed proof of claim against ERBO.

2   Did SME make a loan to ERBO?

3           THE COURT:  Mr. Silverberg, can you hear the

4   question?

5   BY MR. MARKOWITZ:

6   A    We did not directly make a loan to ERBO, no.

7   Q    And your proof of claim asserts an amount of

8   approximately 7,582,000 as of the filing date, correct?  The

9   petition date, February 13, 2023, right?

10  A    That's right.

11  Q    And the original amount of your loan was 4,500,000 that

12  was made to Gold Mezz, correct?

13  A    It was actually -- no, that's incorrect.  It was

14  4,750,000.

15  Q    Okay.  And so, why is the principal balance only 4

16  million 533 in your proof of claim?

17  A    Because that's the amount that we advanced under the

18  $4.75 million facility.

19  Q    Oh, so you haven't advanced the full amount of the

20  loan?

21  A    The balance of the payments were protective advances

22  under the loan documents.

23  Q    Okay.  When you say protective --

24  A    So, they're not --

25  Q    I'm sorry, go ahead.

1    A    It's -- they're not -- it's not classified -- the

2    limited scope of dollars advanced as principal is that 4.3 -

3    - sorry, 4.5 and change million dollar number, and the

4    balance are protective advances that are -- you know, that

5    we made as of right based on the loan documents.

6    Q    When you say based upon the loan documents, are the

7    protective advances, are those payments to G4, the first

8    mortgage holder on the real property?

9    A    Amongst other things, yes.

10   Q    How much money have you paid G4?

11   A    I mean, I can tell you exactly if you want to hang on a

12   -- I don't know.  I mean, pre-petition or post-petition?

13   Q    Oh, let's separate it out.  Let's separate it out.

14   Pre-petition, how much?

15   A    Okay.  One --

16            MR. BAUER:  Mr. Silverberg, you can't be checking

17   any of your information if you have access to it.  You can

18   only go with what you know when you're asked the question

19   off the top of your head.

20   BY MR. MARKOWITZ:

21   A    Okay.  Well, I -- I can't give you an exact number then

22   off the top of my head because it's --

23   Q    Give me a rough number.

24   A    -- millions upon -- it's millions upon millions of

25   dollars.  So, after we advanced the initial 2.75 million,

1    the loan amendment that Mr. Bauer had previously mentioned,

2    that allowed us to advance more money under the facility to

3    replenish the interest reserve that's being held by G4.  So,

4    just there, we advanced an additional, you know, million

5    five.  That's before the default, and after the default I

6    want to say we advanced another $5 million give or take.

7    Q    Okay.  I don't -- I don't really understand the

8    numbers.  Let's see if we could parse into that.  You

9    testified that --

10   A    Okay.  We initially -- we closed and we disbursed to

11   the borrower $2.75 million, okay?  The balance of the $2

12   million facility was supposed to be used for tenant

13   improvement costs right after -- after the borrower was able

14   to procure leases for the property in excess of $85 per

15   square foot per floor, and that's what that $2 million

16   allocation was originally designated for.

17             However, the borrower, you know, back at -- at

18   this point had -- you know, needed to carry the loan

19   further.  They needed to replenish the interest reserve.

20   They needed to pay the G4 extension fees, amongst other

21   costs, because they didn't want to be in default.  So, they

22   asked me if I'd be willing to reallocate the $2 million

23   towards the -- towards the hard -- the tenant improvement

24   cost to replenish their interest reserve and extend their

25   loan -- their senior loan with G4, and I agreed to do so.

1          So, the million five, right, in connection with

2     the loan amendment -- in connection with the loan amendment

3     was disbursed to replenish the G4 interest reserve, and I

4     believe at the time it gave them an additional six months.

5     Q    But that's included in the 4 million 5 number, right?

6     A    That is included in the 4 million 5.  Yes, that's

7     right.  But -- but after that -- after the default, we paid

8     G4 another let's call it, you know, in excess of $5 million.

9     Q    But why does protective advances only say 2.5 million

10    on your proof of claim if you paid them five million?  I'm -

11    - it's a big spread.  I'm trying to understand.

12    A    Because they --

13    Q    How much (indiscernible)?

14    A    -- that was when -- that was when we filed the proof of

15    claim.  After the proof of claim, we paid them another few

16    million dollars, which takes us to in excess of $10 million

17    today.

18    Q    So, how much money are you paying to G4 every month?

19    A    About four -- I'm not paying it monthly.  If you

20    listened more carefully, I mentioned that I'm paying it

21    incrementally in advance in three to four-month installments

22    ahead of time before the payments are due.  So, today that -

23    - that number that I mentioned in excess of $10 million pays

24    G4 through -- through, I don't know, the end of the third

25    quarter of 2023.

1    Q    Okay.  So, do you have an agreement with G4 to extend

2    their loan if you get control of the -- of the Debtor?

3    A    I don't.  No, I don't.

4    Q    Okay.  Is there an inter-creditor agreement between you

5    and G4?

6    A    There is.  Yes.

7    Q    And does the inter-creditor agreement require you to

8    make payments to them?

9    A    Yes.

10   Q    And does -- and did you see the valuation of the

11   property that you're -- that you put into evidence today

12   that valued the real property at 48 -- 49 million as of

13   today?

14   A    I did.  Yes.

15   Q    Do you think that's the right value as of today?

16   A    As of today, if there is a buyer, that's what they

17   would pay for the property.  However, I'm not -- I'm unsure

18   of whether or not there's actually a buyer for the property

19   today.  And therefore, I can't tell you what the liquidated

20   value today would be.

21   Q    So, why -- if the property is only worth $48 million

22   and you're owed -- now you say you're owed eight or $9

23   million, why are you -- why are you still -- why are you

24   paying the senior lender every month?  Aren't you risking

25   that money?  Isn't it like an unsecured lien?

1    A    Because -- I'm not going to write off the $5 million,

2    right?  I can -- I can assess, you know, as a -- as a

3    sophisticated real estate investor that, you know, if I do

4    spend the money to complete the property, to carry the debt

5    service throughout the time that I'm able to stabilize the

6    property and lease the entire property, I believe it'll be

7    worth at least, you know, the money that I put in, and I've

8    assessed that analysis time and time again.

9    Q    Are you factoring in that you're going to pay G4 at the

10   non-default rate, correct?  Not the default rate under their

11   loan, right?

12   A    That's correct.

13   Q    Did you have any discussion --

14   A    That's (indiscernible) I'm paying them on time every --

15   I'm paying them on time every month.

16   Q    But the loans mature, right?  So, they would be

17   entitled to assert the default rate arguably?

18   A    Arguably.  Yes.

19   Q    But you have an agreement with them, some sort of

20   gentleman's agreement that you're just going to pay them the

21   contract rate?

22   A    No, it's not a gentleman's agreement.  It's an

23   agreement in writing.

24   Q    I asked you earlier.  You said you didn't have an

25   agreement.  So, there is an agreement in writing?

1   A    You didn't ask me that.  You didn't ask me that.  You

2   asked me if I had an agreement with G4 to continue paying

3   them, and you asked me then if in the inter-creditor I'm

4   required to pay them on time to avoid any default interest,

5   right?

6   Q    Okay.  So I just want to make sure.  I'm not trying --

7   A    There's no aha moment.  We had an inter-creditor from

8   November of 2021.  So, let's not -- let's not get things

9   confused here.

10  Q    I know.  I don't want to get things confused.  I just

11  want to understand.

12  A    Then don't, because you asked me if I had an ICA with

13  G4 and I answered yes.

14  Q    Okay.

15  A    So, that's my agreement in writing with G4.

16  Q    So, you have an agreement in writing with G4.  I just

17  want to understand this.  So, you --

18  A    Correct.  That's called an ICA.

19  Q    If I understand it, that if you pay them the non-

20  default interest under their loan, which is approximately,

21  what, 9 percent right now?

22  A    It's not an indefinite agreement to continuously pay

23  them for the next 10 years, okay?

24  Q    Okay.  Let me ask you another question.  You said --

25          MR. BAUER:  Your Honor -- Your Honor, I'm going to

1   object.  I mean, I gave Mr. Markowitz latitude, but this is

2   our --

3             THE COURT:  Hold on.

4             MR. BAUER:  -- this is our stay relief motion

5   regarding, one, whether there's equity in the property,

6   which we put our appraiser on to show that there's not, and

7   then the second part of the stay relief motion is cause for

8   stay relief and the feasibility of the plan that they have -

9   - that they, being the Debtors, have proposed.  It has

10  nothing to do with this hearing.  It has nothing to do with

11  the deal that Mr. Silverberg may have with G4, and I see Mr.

12  Selbst would like to chime in.

13            MR. SELBST:  I was -- I was also -- excuse me,

14  Stephen Selbst, Herrick Feinstein for G4.  I was also being

15  deferential to Mr. -- to Mr. Markowitz, but the issue of the

16  payments made by SME to G4, I agree with Mr. Bauer that

17  they're simply not germane to this hearing and I object to

18  the continuing line of question respectfully.

19            THE COURT:  All right.  I note, Mr. Bauer, that

20  you do raise in your pleadings the fact that there -- you

21  know, there are -- there's issues about adequate protection.

22  If you're not going to -- if you want me not to consider the

23  fact that there's payments being made by your client at all

24  to Mr. Selbst in my analysis, that's fine.  I'm happy to not

25  -- to allow this to not go on, but I just note it is part of

1    your cause argument.

2              THE WITNESS:  I think it's -- I think it's

3    actually important to hear out Mr. Markowitz and Mr. Bauer

4    and Mr. Selbst.  I apologize, but I think the Court needs to

5    understand that there is no formal agreement in writing and

6    I'm continuously making these payments, right, and I'm

7    hoping that G4 just doesn't decide to, you know, go forward

8    and wipe out my position, right?  So, I think that's

9    extremely relevant to the motion that's being heard today.

10             THE COURT:  All right.  Well, Mr. Bauer, I'm going

11   to let Mr. Markowitz keep asking his questions then, because

12   your own client has now said it's relevant.  So --

13             MR. MARKOWITZ:  Okay, I only -- I only have a few

14   more questions honestly, Your Honor.

15             THE COURT:  All right.

16             MR. MARKOWITZ:  Okay.

17   BY MR. MARKOWITZ:

18   Q   Mr. Silverberg, you say in your -- you stay in your

19   declaration, I wanted to read from it, it's in Paragraph 7,

20   it says SME has the funds to prepare and execute a strategy

21   to successfully progress the instant proceedings towards the

22   end beneficial not only to SME but other creditors as well.

23   And then it says specifically should the requested relief be

24   granted -- be granted, SME intends to propose to proceed to

25   fund completion of the project, obtain a TCO, seek tenants

1    for the property, provide necessary tenant fit-up funds,

2    negotiate a plan of reorganization with all creditors

3    including payment of all our claims, and sell the project to

4    pay the senior lender -- lender and recover the full amount

5    of monies SME loaned prior to the petition date and/or pay

6    future loans.  Is that -- is that -- is that your testament?

7    That's what you intend to do if you get control of the

8    Debtor?

9    A    That's what I intend to do, yes.

10   Q    You intend to put in a reorganization plan, correct?

11   A    That's right.

12   Q    And will your --

13   A    A peaceable reorganization plan.

14   Q    -- reorganization -- and will -- and will your

15   reorganization plan provide -- strike that.  Do you -- do

16   you have an estimate of when do you think you would -- the

17   optimum time to sell the building would be?

18   A    I think maybe if we could have -- if we can loop in the

19   Federal Reserve to this conversation, perhaps that -- that

20   would assist me in my analysis.  But I don't -- I don't have

21   an exact --

22   Q    Fair enough.

23   A    -- an exact timeline for you.

24   Q    Okay.  Let me -- let me ask in a different way.  Do you

25   expect to sell it in the next year?

1    A    No, I don't.

2    Q    Do you expect to sell it in the next two years?

3    A    I'd say it's approximately closer to 30 to 40 months.

4    Q    Okay.

5    A    We're not quite getting the audience to fulfill a

6    70,000 square foot office building at the moment.

7    Q    No, we understand it's a challenging situation.  That's

8    why we're in bankruptcy court.  Generally, that's what

9    happens in bankruptcy court, challenging situations.

10   A    Right.

11   Q    So -- okay.  And if you didn't pay G4 every month, do

12   you have an understanding of what G4 could do in view of the

13   Chapter 11 case?

14   A    I do, yes.

15   Q    What could G4 do if you -- they didn't get paid?

16   A    I think they have an array of different options, but

17   the reason why I'm paying them is to maintain my position

18   and not to just write off $10 million plus.

19             MR. MARKOWITZ:  Okay.  I have no other questions,

20   Your Honor.

21             THE COURT:  All right.  Anyone else have any

22   questions for Mr. Silverberg?  All right.

23             Mr. Silverberg, I just have really one question

24   for you.

25             THE WITNESS:  Absolutely.

1              THE COURT:  I guess -- I guess my question for you

2      is you mentioned that you have the funds for completing

3      this, and I presume you understand and have taken into

4      account the fact that that would mean, first of all, funding

5      the cost to complete the, you know, the TCO, the work to get

6      the TCO that we've been having discussion in these other

7      motions about, right?

8              THE WITNESS:  Absolutely.  Yes.

9              THE COURT:  Okay.  And then --

10             THE WITNESS:  First and foremost.

11             THE COURT:  Right.  And then obviously, there'd

12     also be the process of trying to go out to the market and

13     see about whether there was a possibility of leasing up the

14     space.  So, there'd be work potentially, at least Mr. Cirz,

15     you know, was commenting on tenant improvement requirements

16     and then leasing agents, leasing costs relating to that.

17     You'd have those costs, right?

18             THE WITNESS:  That's right.  So, in connection

19     with, you know, attempting to lease the space, we've been --

20     we've been advised by I think, you know, a few of the top

21     tier leasing brokerages based in Manhattan that we should

22     build out the spaces to attract the tenants on a more

23     expeditious -- on a more expedient basis, I guess.

24             So, I fully understand the tenant improvement

25     costs associated with the entire building, and we've taken

Page 83

1    into consideration having to pre-build the spaces as well to

2    attract the audience that we're looking for.

3              THE COURT:  Okay.  And then you'd also have to pay

4    the cost of carrying the building during that time, which I

5    think everybody acknowledges there would be other costs like

6    taxes, insurance, electricity, all the things that, you

7    know, would be normally out there for building regardless,

8    even before you had tenants.  There'd be some of that.

9              THE WITNESS:  Absolutely.  And -- you know, in

10   addition to that, and I think, you know, one of the more

11   important factors is the G4 debt service to add to the real

12   estate taxes, insurance, you know, common utilities, and the

13   balance that you mentioned.

14             THE COURT:  Yeah.  Well, I was going to get to

15   that.  Sorry, I hadn't gotten that far.  I was just getting

16   to the basics first.  So, in connection with that --

17             THE WITNESS:  Absolutely.

18             THE COURT:  -- obviously, if you were going to

19   propose a plan, you would have to come up with a plan that

20   either could be -- was acceptable to parties or could be

21   approved over objections, and that would presumably have to

22   deal with coming up with some kind of arrangement with G4

23   that was either acceptable to G4 or could be confirmed under

24   the Bankruptcy Code otherwise, right?

25             THE WITNESS:  That's right.  Yes.

1          THE COURT:  Okay.  And I presume that probably

2     you're assuming that that would probably involve some level

3     of cost that you'd have to expend relating to that, you

4     know, for some level of payments if you had a plan that was

5     confirmed, at least for some period of time before you could

6     sell the building, right?

7          THE WITNESS:  That's right.  Yes.

8          THE COURT:  And then there are other creditors

9     that we're talking about.  We have mechanics lien creditors,

10    taxing authorities, unsecured creditors that would

11    technically be ahead of you because of the fact that they're

12    at the property level, some of them.

13         THE WITNESS:  At the ERBO level, right.

14         THE COURT:  Yeah.  Okay.  And so, you understand

15    that all that would require additional cash.  So, when

16    you've given this testimony, you're really saying that you

17    have the funds to accomplish all of that?

18         THE WITNESS:  Yes, that's correct.

19         THE COURT:  Okay.  All right.  That's my question.

20         THE WITNESS:  Yes, we fully -- we've fully

21    analyzed on numerous occasions the cost to complete.  And I

22    think most importantly, I have a committee that I -- that I

23    report to that essentially makes the investment decisions

24    for the fund, and I can only advise, and we've invested the

25    -- the 10-plus million dollars, you know, to a transaction

1    that we were -- that we committed $4.7 million to, just

2    because we understand what it would cost to complete, and if

3    we did need to carry, you know, this project to the finish

4    line, you know, they -- they're in agreement and they did

5    invest -- there was multiple million dollars beyond, you

6    know, the initial -- the initial negotiated facility because

7    they understand what it'll take.  And you know, we're fully

8    confident with our ability to, you know, to pay for

9    everything, maybe twice over.

10              THE COURT:  Okay.  Understood.  All right.  Thank

11   you for answering my questions.

12              All right.  Mr. Bauer, any redirect?

13              THE WITNESS:  Thank you.

14              MR. BAUER:  I do not have any redirect, Your

15   Honor.

16              THE COURT:  All right.  Okay.  Thank you, Mr.

17   Bauer.  Before we leave Mr. Silverberg, I think what we

18   didn't do yet is that we -- I don't know that we actually

19   admitted his declaration into evidence.  I don't recall

20   that.

21              MR. BAUER:  Yes, Your Honor.  I would like to --

22   we did not.  I would like to admit his declaration, which is

23   Docket No. 90, into evidence if I may.

24              THE COURT:  Okay.  Any objection?

25              MR. MARKOWITZ:  No objection, Your Honor.

1            THE COURT:  Okay.  All right.  So, Mr.

2    Silverberg's decoration is admitted into evidence.

3            (Docket No. 90 entered into evidence.)

4            THE COURT:  All right.  Mr. Bauer, I'm -- Mr.

5    Silverberg, thank you for coming and being here today, and

6    obviously --

7            THE WITNESS:  Absolutely.  Thank you for having

8    me.

9            THE COURT:  Okay.  And I appreciate your

10   testimony, and you may -- as far as I'm concerned, you can

11   be excused, but that's up to Mr. Bauer.

12           MR. BAUER:  It's up to Mr. Silverberg if he wants

13   to stay on and listen.

14           THE COURT:  Okay.  All right.

15           THE WITNESS:  I'll await direction from Mr. Bauer.

16   If he needs anything further, I'm happy to be here.

17           MR. BAUER:  Right.  Well, let's see what -- I

18   mean, Your Honor, I have no other witnesses.  I did have a

19   full-blown exhibit list and kind of like to go over and make

20   sure what's in evidence and what's not.  I mean, some of the

21   things I think Your Honor can take some judicial notice of.

22           THE COURT:  Sure.

23           MR. BAUER:  Namely the three Chapter 11 petitions,

24   the three -- which are Items 3 through 5, the bankruptcy

25   schedules which are Items 6 through 8, the Statement of

1   Financial Affairs which are Items 9 through 11, the Debtor's

2   joint consolidated plan and joint disclosure statement,

3   which are items 12 to 13.

4          Speckled throughout this list are claims that were

5   filed by different parties, and I didn't list every -- I

6   didn't provide every claim on this list, but I did provide

7   G4's claim, Cauldwell Wingate's claim, the New York City

8   Department of Finance real estate tax claim.  Those items

9   are 14, 16 and 17.

10          THE COURT:  Why don't you stop there for a second

11   just so I ask Mr. Markowitz, is there any objection to my

12   admitting these into evidence?  They're obviously in the

13   record.

14          MR. MARKOWITZ:  No.

15          THE COURT:  Okay.  All right.

16          MR. BAUER:  And I actually included, although it

17   ended up at the tail end of the list because I overlooked,

18   it was claim number -- Item No. 4, which is Claim No. 13 of

19   Higher Ground.

20          THE COURT:  All right.  So, those are all admitted

21   into evidence.  So, for my record, that's -- sorry, just for

22   the record, that's Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

23   13, 14, 16, 17 and then 40?

24          MR. BAUER:  Correct.

25          THE COURT:  Okay.

1          (Exhibits 3 through 14, 16, 17, and 40 entered

2     into evidence.)

3          MR. BAUER:  Item 18 is the New York City

4     Department of Finance Notice of Property Value, property tax

5     bill, quarterly statements, invoices and payment history.

6     This was downloaded from the New York City Department of

7     Finance website.  I think we can take judicial notice of it.

8     I'd like to have it admitted in evidence.  It does show that

9     a tax bill was -- should be issued in June for the upcoming

10    year.

11          THE COURT:  Okay.  Any objection, Mr. Markowitz,

12    to --

13          MR. MARKOWITZ:  No, Your Honor, (indiscernible).

14          THE COURT:  All right.  That's admitted into

15    evidence.

16          (Item 18 entered into evidence.)

17          MR. BAUER:  Your Honor, Items No. 33, 34, 36, 37,

18    and 38 were e-mails between myself and Mr. Markowitz.  The -

19    - 33 and 34 relate to my efforts to try taking the

20    depositions of the Bodeks in preparation for this hearing,

21    and items 36, 37, and 38 relate to the $400,000 that was

22    paid to or was deposited with Mr. Markowitz's firm relating

23    to the construction, finalizing construction of the

24    building, the rejection motion, and the retention motion.

25          THE COURT:  Okay.  I guess Mr. Markowitz, I'd ask

1    if there was any objections to these.

2              MR. MARKOWITZ:  No, I have no objection to anybody

3    putting in any of my e-mails in any case.

4              (Items 33, 34, and 36 to 38 entered into

5    evidence.)

6              MR. MARKOWITZ:  I stand by them.

7              THE COURT:  Okay.  Good to know that.

8              MR. BAUER:  Item 39 is an affidavit of an Unika

9    McClain, which was her efforts in trying to serve the Bodeks

10   with the subpoenas that we issued to the individuals.

11             MR. MARKOWITZ:  I object to those because I don't

12   -- that's an affidavit of service without the process server

13   here, so I do object to those.

14             THE COURT:  Okay.

15             MR. BAUER:  You object to the affidavit of the --

16   of the process server?

17             MR. MARKOWITZ:  Yeah, you need to bring -- produce

18   a process server just like any other affidavit.

19             THE COURT:  I mean, he's right.  You do need to

20   produce the process server if you want to put it in.

21             MR. BAUER:  That's fine, Your Honor.  Item 41 is

22   actually an Excel spreadsheet prepared by myself which

23   summarizes the claims as scheduled and the claims as filed.

24             MR. MARKOWITZ:  I have no objection to that, Your

25   honor.  I mean, our disclosure statement list the claims.

1    There's a claims register.  There's a bar date.  I don't --

2    I don't have an objection to it.

3              THE COURT:  Okay.  All right.  So, that can be

4    admitted.

5              (Item 41 entered into evidence.)

6              THE COURT:  Okay.  I don't -- Mr. Bauer, I'm not

7    sure about what happened to my question for you about 35 and

8    15?

9              MR. BAUER:  35 are the transcripts from the three

10   attempted depositions of the Bodeks, because I did appear

11   and I put the -- I put statements on the records.  Then it

12   reflects that they did not appear.  So, I'd like to move

13   those into -- into evidence.

14             THE COURT:  Any objection to that, Mr. --

15             MR. MARKOWITZ:  No objection, Your Honor, although

16   again, we can argue about it as to why they didn't appear,

17   but that -- they didn't appear.  That's a fact.

18             THE COURT:  Okay.

19             (Item 35 entered into evidence.)

20             MR. BAUER:  Item 15 is the e-mail from Mr. Selbst

21   to my associate, George Fitting, advising of what the per

22   diem interest is at the contract rate and at the default

23   rate with -- for the G4 loan.

24             THE COURT:  Do you have any objections to that,

25   Mr. Markowitz?

1              MR. MARKOWITZ:  No, I don't.

2              THE COURT:  Mr. Selbst appears.  I think he could

3      authenticate his own e-mail.

4              MR. MARKOWITZ:  I have no objection to it, Your

5      Honor.

6              MR. SELBST:  I can.  Stephen Selbst, Your Honor.

7      I join Mr. Markowitz.  My e-mails stand for themselves --

8      speak for themselves.

9              (Item 15 entered into evidence.)

10             MR. BAUER:  And Item 32 I don't think I alluded

11     to, which was the e-mail from my partner to Mr. Markowitz

12     sending him the notices of deposition to the Debtors and the

13     subpoenas.  I --

14             THE COURT:  Okay.  Any objection to admission of

15     that?

16             MR. MARKOWITZ:  No.  Nope.

17             THE COURT:  All right.

18             (Item 31 entered into evidence.)

19             MR. BAUER:  And then I think that's everything,

20     Your Honor.

21             THE COURT:  It is.  Okay.  All right.  Okay.  All

22     right.

23             MR. BAUER:  I rest.

24             THE COURT:  I guess, Mr. Bauer, that's your

25     evidentiary record, right?

1           MR. BAUER:  That's correct, Your Honor.

2           THE COURT:  Okay.  Mr. Markowitz, do you have

3     anything else that you want to add on the evidentiary record

4     side?

5           MR. MARKOWITZ:  Not on the evidentiary record side

6     right now.

7           THE COURT:  Okay.  No, now.

8           MR. MARKOWITZ:  No.  No, not now.

9           THE COURT:  Okay.  All right.  Okay.

10          All right.  So, that's fine.  Then I guess we're

11    going to move into argument with respect to the motion, and

12    obviously Mr. Bauer, you're going to go first.

13          MR. BAUER:  Your Honor, we weighed out a lot of

14    the arguments in the written submission, so I'm not going to

15    be redundant.  We heard the -- we heard the evidence.

16          First and foremost, we -- we've laid out what the

17    amount is of -- and remember, there's three entities here,

18    there's ERBO, there's KOVA, and there's Gold Mezz.  We're a

19    creditor -- we, being SME, is a creditor of Gold Mezz with

20    the pledge of the KOVA assets, which KOVA has 100 percent.

21          So, obviously, if we're able -- if we obtained

22    stay relief, if SME obtained stay relief, it would have to

23    exercise its UCC rights to acquire the pledged assets of

24    KOVA, which would then give it control in -- of KOVA and

25    indirectly control of ERBO Properties which owns the subject

1   property.

2        We set forth the amount of the claim as of the

3   petition date, approximately $7.5 million against Gold Mezz,

4   which has a pledge of the asset in KOVA.  Neither -- with

5   that claim, neither KOVA nor Gold Mezz could confirm a

6   standalone plan of reorganization.  The -- we have shared

7   with the court a filed UCC statement that shows that we're -

8   - we're perfected by the pledge of the interest, properly

9   perfected.

10        And then the question becomes does the Debtors

11   have a lack of equity, and what we have showed to the Court

12   -- and there's no other competing appraisal, competing

13   submission.  Mr. Cirz testified and I think he's very

14   credible, presented a lot of in-depth information, and

15   today, as of this hearing, the value of the property that

16   Mr. Cirz opined is $49 million.

17        The claims against the ERBO Debtor, which all

18   would have to be satisfied before KOVA received any money,

19   aggregate per the claims analysis that we submitted in our

20   exhibit, the total claims aggregate is 63 million.  The

21   secured claims as filed against the ERBO Property is 61

22   million.

23        So, both -- ERBO has no equity in its property.

24   KOVA has no equity, basically has a negative value, which

25   means the pledge of the interest of KOVA to SME has negative

1    value, which means there's no equity in the interest that

2    SME has in the property in KOVA.  And so, the burden then

3    shifts.  Since there's no -- we've showed that there's no

4    equity, the burden now shifts to the Debtor to show that

5    they have a plan that is confirmable and -- or reasonably

6    confirmable.

7              I mean, at this stage, they don't have to hit

8    every nail on the head of confirmation.  But Your Honor

9    needs to look at -- at the plan that they proposed, and with

10   that -- and that plan as submitted -- and mind you, what

11   happened here, the Debtors -- it's a single asset -- the

12   ERBO Debtor is a single asset real estate case.  It had 90

13   days to file a plan, and what it chose to do on the 89th day

14   is file a plan that -- and disclosure statement that have

15   really no information other than saying the Bodek family

16   will fund any future required payments.

17             It also said that -- it also says that at some

18   point in the future, two years down the road, the plan --

19   the property will be sold, and it has no projections.  It

20   shows no funding commitment.  It shows no property

21   valuation.  They -- they've submitted nothing with the plan

22   and the disclosure statement.

23             And I think they -- and I think what they're

24   betting on here is that Your Honor is going to kick the can

25   down the road to a disclosure statement hearing, which is on

1    for June 28th, is going to try -- and hold us hostage.  They

2    are going to try amending their disclosure statement and

3    then hopefully be able to put it out maintaining exclusivity

4    and putting it out to vote and keep dragging this case on

5    and on.

6              You heard testimony that -- from Mr. Silverberg

7    that the carry of G4 alone is 400,000.  You've heard -- you

8    know that the real estate taxes are coming due July 1st.  If

9    you look at the New York City submissions, I think that tax

10   bill is going to be in the range of 400,000 to 455,000.  You

11   look at the schedule submitted by the Debtors at the outset

12   of this case, the bank account has no money.  The monthly

13   reports show that there's no money in the bank account.

14             The irony of the schedules is that it shows a bank

15   account that was closed I think a year before the filing of

16   the bankruptcy case.  The Debtor's plan is a negative

17   amortization plan.  It -- it provides no payments to anyone

18   until the day comes that it sells the property, gives no

19   indication if the property gets sold a year, two years down

20   the road for more than what all the creditors are owed.  It

21   kind of throws in the towel 30 months down the road or two

22   years down the road.  It throws -- it throws the towel in,

23   and we're all just standing on the sidelines waiting, and I

24   don't think that's -- it's almost as if the Debtor is saying

25   to Your Honor maybe we don't file a plan and you just let us

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 100 of 209

Page 96

1     hang around for two years and see what happens.

2          The -- I noticed up the depositions of the Bodeks,

3     and if you look at the notice of depositions and then really

4     the subpoenas that I served on the Bodeks, first the

5     subpoenas on the Bodeks, it wasn't asking for tax returns

6     but was asking for bank account information, asking for --

7     to find out do they have -- because it says the Bodek family

8     is going to fund it.  Do they have the wherewithal to fund

9     this plan?

10         They produced no documents and they didn't show up

11    for the deposition to even ask those questions.  They didn't

12    attach anything to their disclosure statement that would

13    give any indication that they would be able to fund this --

14    fund this plan.

15         I also asked for what efforts were made to obtain

16    exit financing, money that would have -- inevitably have to

17    come in behind G4 and the other -- maybe the other

18    lienholders to carry this property.  That didn't happen.

19         What was -- also, we asked for financial

20    information relating to the Debtors going back in time,

21    which Mr. Markowitz actually had said to me offline was

22    irrelevant, but it is relevant, and it wasn't produced.  And

23    that is Erno Bodek is supposed to be the managing member

24    post-confirmation under their plan, and we kind of need to

25    look under the hood as to where the money went when it came

Page 97

1    in if it didn't all go to continue the construction.  Where

2    did the money go over the last three, four years?  And also

3    need to take Mr. Bodek's deposition to find out that.  He

4    was a no-show.  No information was provided.  How do we have

5    faith in that on the buttress of certifications that Mr.

6    Bodek submitted saying he's unsophisticated, never ventured

7    down this path?  So, this is the guy that we would be riding

8    for two years under their plan.

9           Also, the other reason looking under the hood is

10   Mr. Silverberg testified to he lent 4.75 million -- 4.55

11   million to the Debtors or to KOVA that got put into the

12   Debtors.  Well, the first 2.75 million was to cure arrears

13   to G4 and under the loan documents finish up the project,

14   and then the next $2 million was to do tenant fit-up, which

15   would have been nice for this building, because it would

16   have moved it in the direction of stabilization.

17          The 2 million, Mr. Bodek ended up asking for it to

18   be used to pay G4.  I have no idea why it didn't get used to

19   finish the building.  No -- no testimony.  I couldn't ask

20   him any kind of questions in that regard.

21          With regard -- when I referenced the negative

22   amortization earlier, no, it's not per se impermissible as

23   Mr. Markowitz pointed out in his submissions, but it -- the

24   one plan that got confirmed with it ultimately that Mr.

25   Markowitz cited got reversed by the 5th Circuit.  District

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 102 of 209

Page 98

1    Court affirmed it.  The 5th Circuit reversed it and sent it

2    back.  It was not a fair and equitable treatment of the

3    secured creditor in that case and sent it back.

4           The other case that was cited by Mr. Markowitz,

5    Great Western, confirmation was denied.  One of those two

6    cases cited by Mr. Markowitz said that with -- that it found

7    with the exception of one case there, every negative

8    amortization was denied.  Confirmation of every negative

9    amortization plan was denied.  In that one case, the lender

10   had a written agreement already agreeing to it.

11          And mind you, the cases that Mr. Markowitz pointed

12   out to you, all of them are 30-plus years old.  I couldn't

13   locate a confirming negative amortization case in the recent

14   past, and that's what this plan is.

15          And you know, I -- the one case that we cited, and

16   albeit, it's from 1993, which was the 160 Bleecker Street

17   case, the judge in that case basically said that, Your

18   Honor, at this stage of the case, part of a stay relief

19   motion should be looking at the feasibility of the plan.

20   And it said -- and in that case that we -- there are quotes

21   that were thrown out here, "What is clear is that this plan

22   comes down to nothing more than a speculation on the future

23   values of New York residential real estate."  That was a

24   residential real estate case.  "A speculation which all the

25   risk will be borne by the secured creditor," cooperative in

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 103 of 209

Page 99

1    that case, "to finance the Debtor's hope of recouping equity

2    if the market rises significantly in the years to come."

3          It also pointed out in that case the plan

4    fancifully provides that additional "limited funding" will

5    be provided by an unnamed "third party."  There is no

6    evidence that convincingly supports the availability or

7    sufficiency of such funding.

8          You have that here.  And what really creates pause

9    on the funding is what we stumbled across in the last

10   several days.  And when you had the rejection motion and the

11   motion to retain the new construction person and they

12   submitted to Your Honor $400,000 will be in the -- in Mr.

13   Markowitz's trust account, well, the $400,000 went in the

14   day before the hearing, went in on May 3rd to Mr.

15   Markowitz's trust account.  It went -- then we had the

16   hearing on May 4th.  Mr. Markowitz made a quick statement

17   somewhere in there that he has the money, and then it went

18   out a couple of days after.  It went back to the funding

19   source.  And then as we approached the continued hearing on

20   May 22nd, the money came back in, and Mr. Klein, Herschel

21   Klein, the new VP of the Debtors who somehow has no equity

22   interest in the Debtors and has taken over control of it

23   said that we have the money.  Well, the money went in

24   literally a day or so before the May 22nd hearing that we

25   had before Your Honor and then it went out again on May 26th

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 104 of 209

Page 100

1   and then back in again on May 30th as we approached this

2   hearing.

3           So -- and there's no -- and as Mr. Klein testified

4   in that hearing, there's no written commitment of -- he

5   stated where the money came from, Flexocraft, but when you

6   look at the sheet, it's Laser Master International, so it

7   didn't come from Flexocraft unless they're the same entity.

8           And he -- he said there's no written commitment.

9   It was a loan to his father-in-law, Erno Bodek.  But it's

10  got to create pause because they can put the money in, pull

11  it out at any time they see fit.  So, they're asking --

12  they're asking this -- all the creditors who have a vested

13  interest in this property to stand on the sidelines and wait

14  and see, and wait and see for two years.  I don't see how

15  that plan is feasible as of today.

16          And then you -- and when you hear -- heard the

17  testimony of Mr. Silverberg about his alternative proposal

18  of how he's drilled down, looked at the property, has money,

19  and has put money into this effort, he's prepared to go

20  forward with a plan.  So, we think -- we think that we don't

21  need to go past today.  I think stay relief should be

22  granted to my client so it can notice up the sale of the

23  pledged interest.  And remember, I made the comment at the

24  outset, it's not necessarily 60 days.  It's commercially

25  reasonable.  And I also think exclusivity needs to be

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 105 of 209

Page 101

1    terminated so that we can propose a plan immediately and

2    work in that direction and negotiate with each of the

3    creditors on a consensual plan, which is something I haven't

4    heard that the Debtors have done here.

5            So, for those reasons, we would request that we be

6    granted stay relief as well as the termination of

7    exclusivity.

8            THE COURT:  Mr. Bauer, I just note that your

9    motion technically was moving to terminate exclusivity under

10   1125.  And so, I'm not really sure, you know, how that's

11   something I can just decide to grant you.

12           You know, I realize you asked for it in your

13   motion, but you don't cite to -- you know, you don't move

14   under the appropriate section of the code.  You don't cite

15   to case law on it.  You don't cite to cases where that's

16   permissible or not.  And I -- I don't see how I'm going to

17   grant that today.

18           I expect I'm going to get a motion to extend

19   exclusivity based on the dates, because we're talking about

20   like February to March, March to April, April to May, May to

21   June.  So, in what -- today's the 6th?  I guess -- I'm not

22   sure, but I would guess it's about another couple days, less

23   than a week, the exclusivity period is going to run unless

24   there's a motion to extend it, and I'm going to have to hear

25   that at that point.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 106 of 209

Page 102

1           And then I think the issue is there, you know,

2    will make sense or you'll, you know, if I grant this motion,

3    you might be in control of the Debtor by that point.  Maybe

4    you won't even want that.  So, I don't know, but I'm just

5    saying to you, I'm not going to grant relief that's not

6    properly articulated in the motion.

7           So, I guess I'll ask does anybody else want to be

8    heard with respect to support of the motion?

9           MR. SELBST:  Your Honor, Stephen Selbst, Herrick

10   Feinstein.  I'd like to speak briefly in support of the

11   motion.

12          THE COURT:  That's fine, Mr. Selbst.

13          MR. SELBST:  Thank you, Your Honor.  Again, for

14   the record Stephen Selbst, Herrick Feinstein for G4 18190,

15   LLC.

16          Your Honor, I want to take a step back and talk

17   about the posture of this case.  We're four months in.

18   We've got a plan filed, and I'm going to come back to the

19   plan, but Mr. Bauer has said the plan is not confirmable, a

20   view that my client shares.

21          We have a fight over the completion of the

22   building where the creditors unanimously opposed the choices

23   of the Debtors to complete the building.  From our

24   perspective -- and my client has the biggest financial stake

25   in this case.  It filed a proof of claim for $56.8 million.

Page 103

1   They obviously want the project to succeed.  But from our

2   perspective, there is no meaningful progress in this case.

3           Yes, we've had a fair amount of Your Honor's time

4   and we're grateful and respectful of that time, but we don't

5   have a deal and we don't have a meaningful plan.

6           G4 believed in this project, Your Honor, and they

7   backed their claim -- they backed their belief with money

8   and they were patient in '21 and '22, even as this project

9   went further and further behind.  They extended the loan,

10  they extended the maturity date, until finally the patience

11  is running out.

12          But we no longer -- G4 no longer has patience --

13  has confidence in the Debtor.  It certainly does not have

14  confidence in Irving Oak and maybe to construct the project

15  based on the testimony that Your Honor heard at the last

16  hearing.  G4's view is that they are inexperienced.  They're

17  in over their heads, and they're not the right people to

18  complete this project.

19          By contrast, SME, the movant here, has said that

20  it will continue to work with Cauldwell Wingate and Higher

21  Ground, and one of the things that impressed me personally

22  about the prior testimony was the level of knowledge that

23  Mr. Cecora displayed on the stand.

24          Mr. Cecora will not have a learning speed curve to

25  get up to.  He knows his building.  He's lived it for years.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 108 of 209

Page 104

1   We don't believe the Debtor's plans for switching to

2   complete the building, even if they're motivated by an

3   understandable desire to save money, makes sense for this

4   project at this time.

5           And again, that's part of the reason why we

6   support this motion, but fundamentally, we believe that SME

7   has the money, has the vision, and has the patience to

8   support this.

9           Now, I want to talk about the plan for just a

10  couple of minutes.  We do not believe this plan is

11  confirmable, Your Honor.  This is a plan as Mr. Bauer

12  pointed out that has negative amortization.  The Debtor's

13  proposed that the creditors stand on the sidelines for two

14  years or more with no payment.  The proposed interest rate

15  is actually less than the current non-default rate that my

16  client is being paid.  That hardly seems fair and equitable.

17          Mr. Bauer has already talked about the case law on

18  negative amortization plans.  The cases also talk about

19  shifting the risk of the reorganization back onto the risks

20  of creditors.

21          You heard -- you heard very knowledgeable

22  testimony from Mr. Cirz today about the risks that are

23  present in this market right now.  The market is weak.  The

24  Chelsea sub-market is particularly weak.  There's an 18-

25  percent vacancy rate in this property -- in this sub-market.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 109 of 209

Page 105

1    Based on Mr. Cirz's uncontested testimony, the Debtors have

2    no equity in this -- in this project.

3              As Mr. Bauer pointed out, the Debtors have no

4    committed source of funding.  And as Mr. Cirz's appraisal

5    report showed, there's a fair amount of additional capital

6    that's going to be required to complete this project, and

7    there's certainly no evidence in the Debtor's plan that they

8    have anything like the amount of capital that they need.  It

9    is disturbing to say the least to talk about the hide-and-

10   go-seek experience with the funding that Mr. Bauer just

11   described to this Court.

12             But fundamentally, and I think this is an

13   important question that I asked Mr. Cirz, if interest rates

14   continue to rise, the building is likely to decline in

15   value, not increase in value.  And so, that exposes my

16   client to the risk of diminution in the -- in the

17   collateral.  And of course, it's not even being offset by

18   adequate protection payments in the form of current

19   interest.

20             There's no question about it.  This project is

21   going to take a while to finish.  It's going to take a while

22   to lease up.  That's what Mr. Cirz told us.  But what the

23   Debtor's plan really wants is literally a free option at the

24   -- at the expense of the creditors.  It's heads I win, tails

25   you lose.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 110 of 209

Page 106

1           Your Honor, respectfully, the Debtors do not

2     believe that this is -- I mean, excuse me, G4 does not

3     believe that that's a fair and equitable plan.  We do not

4     believe that they've done anything in this case to justify

5     continuing their exclusivity or frankly staying in control

6     of this property.

7           This is exactly the kind of case that Congress was

8     thinking of when it imposed the SRA -- RE requirements back

9     in the mid-'90s, a Debtor who's using exclusivity to string

10    the lenders along when they have no equity in the property.

11          Your Honor, I think the evidence fully supports

12    granting the relief from stay that Mr. Bauer and SME have

13    requested and we fully support that position.  Thank you.

14          THE COURT:  Would anybody else like to be heard in

15    support of the motion?

16          MR. NASH:  Your Honor, Your Honor.  Just briefly,

17    Kevin Nash for Higher Ground, and I'm making my statements

18    on behalf of Higher Ground as a creditor.  We have filed a

19    claim.  I think we have a relatively substantial claim.

20          Now, listening to the testimony, you know, my

21    major view of this is that we're fortunate from a creditor

22    perspective that the mezzanine lender has the willingness

23    and financial wherewithal to stay with the project.

24          And you know, it's somewhat heartening to

25    creditors that the mezzanine lender realizes that he's last

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A - Declaration of Morris S. Bauer   Pg 111 of 209

Page 107

1    in line on the corporate side, but they have a substantial

2    investment here and they don't want to forfeit that, and

3    that desire not to forfeit that investment, you know, will

4    rebound positively for the creditors in this case.

5              The only path forward, Judge, is to have a

6    solvent, viable entity take over the lead in the Chapter 11

7    case.  We talked about feasibility and I think the evidence

8    is clear that feasibility isn't there on the Debtor's plan.

9    We can debate the concept of negative amortization, but I

10   think we can't forget the fact that if this plan ever went

11   out for vote, I don't think any credits are voting for this

12   plan.  So, I don't think feasibility alone is the big issue.

13   I think acceptance of creditors is a larger issue.  You

14   don't even get to feasibility unless you have -- have

15   certain votes and at least one class of creditors voting,

16   and I can't see on this plan any creditor voting for this

17   plan.

18             So, from our perspective as a creditor, I would

19   ask the Court, actually I would urge the Court, to grant the

20   motion of the mezzanine lender.  Let the process really

21   begin in earnest of a viable entity taking control of the

22   Debtor, and that's the only way creditors will see any

23   recovery here.

24             I appreciate Mr. Selbst, but his client is the

25   first mortgagee, and the rest of us are -- are behind the

1    first mortgagee, and we're very vulnerable to any further

2    delay.  We're very vulnerable to an extended transition

3    period, and if -- if this is going to have any success, it

4    can't be delayed any further.  I think Mr. Bauer made a very

5    convincing case as to the grounds necessary to -- to lift

6    the stay from his perspective and certainly Higher Ground

7    joins in that.

8                THE COURT:  Okay.  Any other -- I guess anybody

9    else wish to be heard in support of the motion?

10               MS. ZOURIGUI:  Yes, Your Honor.  Jennifer Zourigui

11   on behalf of Cauldwell Wingate.  I'm not going to be

12   repetitive.  Like -- as Mr. Nash just said, speaking on

13   behalf of Cauldwell as a creditor, very serious concerns

14   about the proposed plan, that it's not realistic, won't be

15   approved, creditors won't get paid.  We're also hopeful by

16   SME potentially taking over, getting us all the way there,

17   and we fully support their motion.

18               THE COURT:  Okay.  All right.  Mr. Markowitz?

19               MR. MARKOWITZ:  I guess I'm outnumbered.

20               THE COURT:  You are again.  Sorry.

21               MR. MARKOWITZ:  Okay.  Judge, Scott Markowitz,

22   Tarter Krinsky & Drogan, counsel for the Debtor and Debtor

23   in possession.

24               I think we have to look, first of all, at what the

25   motion is and what grounds they're seeking.  The motion is

Page 109

1    the motion to lift the stay under 362-D-1 and 362-D-2.  This

2    is a motion filed by the mezzanine lender.  The mezzanine

3    lender put in an appraisal that appraises the real estate at

4    $48 million, and based upon the senior debt, the mezzanine

5    lender under 506 of the Bankruptcy Code is an unsecure

6    creditor.

7            They're -- the value -- they said it's negative.

8    (Indiscernible) they have an unsecure claim.  It's

9    (indiscernible) bankruptcy law that unsecured creditors are

10   not entitled to adequate protection.  I can cite you many

11   cases to that effect.  I can cite you a simple one, In re:

12   Sunedison, 562 B.R. 243 by Judge Bernstein from this court

13   where he says, "Adequate protection must be provided to

14   protect the decline in value of a non-Debtor's interest in

15   the property resulting from imposition of the automatic

16   stay.  Unsecured creditors do not have an interest in the

17   property of the estate that merits adequate protection, and

18   there is no expressed statutory requirement that unsecure

19   creditors receive adequate protection," citing other case,

20   Judge Bernstein, Sunedison, 562 B.R. 243.

21           If you accept their appraisal at $48 million, and

22   we all know appraisals, obviously an appraisal is just the

23   best guesstimate of what the value of the property is,

24   obviously if you marketed the property -- and we all

25   acknowledge that the market is challenging right now.

1        So, they're not entitled to adequate protection.

2    Then they move under 362-D-2.  Again, there's case law that

3    says 362-D-2 applies to a secured creditor.  An unsecured

4    creditor doesn't make a motion under 362-D-2 to lift the

5    automatic stay.  That's not what the ordinary motion is.

6    And plus, even if you give an unsecured credit like they are

7    based upon their evaluation standing to move to lift the

8    automatic state under 362-D-2, which is not the norm, then

9    they still have to (indiscernible) the property is not

10   necessary for effective reorganization.  This property is

11   necessary for reorganization -- necessary for effective

12   realization, because it's the only property that the Debtor

13   has.

14        And now we get into the -- whether the plan is

15   confirmable.  I don't -- I don't think at this stage we're

16   going to have a disclosure statement hearing on the 28th.  I

17   -- with respect to the deposition, I asked if they could do

18   the deposition by Zoom.  They said no.  Mr. Bodek, a

19   holocaust survivor who was a young child when he left the

20   Holocaust, is in his mid-eighties, is not that healthy.  His

21   son-in-law has stepped in to help him to take over, to help

22   him get this thing in the -- in the right direction, and he

23   will be prepared to testify at the June -- he will be

24   available for a deposition before the June 28th hearing on

25   the disclosure statement, that they can take -- take his

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 115 of 209

Page 111

1   deposition, because he's the one that's going to be

2   arranging the funding to fund the plan and to carry the

3   property under the Debtor's plan.  He's at this hearing

4   today.

5           And the plan is not patently unconfirmable.  The

6   plan is very similar to their plan.  You heard testimony

7   from Mr. Silverberg that their plan is to fix up the

8   property, didn't say -- didn't put up the money in escrow or

9   anything.  Their plan is to fix up the property, sell the

10  property, and pay creditors.  That's exactly what the

11  Debtor's plan is.  It's the same plan.

12          And we can get into -- we can argue about the

13  negative amortization.  We're going to probably try to

14  tighten that up a little bit.  There's a real estate tax

15  payment due July 1st.  I think that the -- the disclosure

16  statement hearing is June 28th.  So, I think that if the

17  Debtor raises the money to pay the real estate taxes, then

18  that -- this is not a motion by the senior lender to lift

19  the automatic stay.  They didn't make a motion, and you

20  heard testimony from Mr. Silverberg and you heard testimony

21  from the appraiser -- strike that, you heard testimony from

22  the appraiser the property is not declining in value.  The

23  appraiser said the property is worth $48 million today,

24  probably worth $52 million in less than a year, and it'll be

25  worth 80-something million dollars in a few years when the

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 116 of 209

Page 112

1    property is stabilized.

2           The plan, the mezzanine lender doesn't like the

3    plan.  We cite this case, Trans West Resort from the 9th

4    Circuit.  I don't know if Your Honor had a chance to look at

5    that case, but that case was a case where the 9th Circuit

6    affirmed confirmation of a plan where the mezzanine lender's

7    equity interest was totally wiped out and received nothing,

8    and the senior lender -- that's not -- and the senior lender

9    was crammed down.  the senior lender had bought the mezz

10   loan in that case, so they were the same parties, and it

11   makes the argument on -- the argument that they've been --

12   the argument that the mezz lender is making here, that we

13   won't be able to confirm a plan because they're the only

14   creditor that gets to vote against the Mezz entity, and we

15   cite the case.  The 9th Circuit is I think the only circuit

16   court that's ruled on the issue the per plan versus the per

17   Debtor issue.  And the 9th Circuit ruled that the per -- per

18   plan issue, I think Judge (indiscernible) in another case in

19   this district had ruled on that, too.  I believe it was a --

20   it wasn't a Tribune case, but it was another case --

21           THE COURT:  (Indiscernible) Enron.

22           MR. MARKOWITZ:  Yeah, yeah, (Indiscernible) Enron.

23   So, with respect to the plan, we recognize that the Debtor

24   is the underdog in this plan fight, and obviously we need to

25   get some creditor impaired class to vote for the plan.  We

Page 113

1    cite cases.  They don't dispute those cases that secured tax

2    claims can be treated as impaired classes under the

3    Bankruptcy Code, even cited a case in our papers, a Judge

4    Duberstein case, where the city voted in favor of a plan.

5    It was a small hotel case cited in our -- in our papers.

6              There's no reason to believe that the city may not

7    vote for our plan.  It's their pre-petition claim.  They --

8    they say in their papers that it's unfair for the city to

9    vote for the plan.  If the city does vote for the plan, then

10   you have an impaired class.  The Debtor would have to pay

11   the post-petition and post-confirmation real estate taxes as

12   they come due.  But we're talking about the pre-petition

13   real estate taxes, and that can be an impaired class.

14             And Mr. Nash says I don't think any creditors are

15   going to vote for the plan.  I don't think that should be

16   enough to say that the plan can't be confirmed because Mr.

17   Nash says I don't think any creditors will vote for the

18   plan.  There's -- there's mechanics lien creditors.  There's

19   other unsecure creditors.

20             And so, while I recognize that the Debtor is the

21   underdog here, but the Debtor has filed the plan during the

22   exclusivity period.  It gets another 60 days automatically

23   to solicit it.  We may need to get an extension on that.  We

24   have a hearing on the disclosure statement, June 28th.

25             So, based upon that, based upon the testimony you

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 118 of 209

Page 114

1   heard today that the property is not declining in value, in

2   fact, it's an increase in value, we can't -- we can't

3   predict the interest rates, what the Fed's going to do.  No

4   one can predict that.

5           So, we think, you know, from the Debtor's

6   perspective, the Debtor should be given the opportunity to

7   try to get its plan confirmed and continue to negotiate.  We

8   had negotiations.  I know they're not admissible before Your

9   Honor, but we met for hours on Friday with back and forth

10  proposals.  We would make some substantial progress and then

11  they put a deadline on it.  You must have an answer by

12  sundown on Friday or no deal.  So, we go through that kind

13  of a -- of a negotiation tactic.

14          I don't believe that they've met their standard

15  because I believe under 506, by their own admission, if you

16  accept this appraisal, they're under -- they have a totally

17  unsecured claim, not under secured, they're totally

18  unsecured because the -- according to the proofs of claim,

19  there's a dispute as to how much the senior lenders owe, but

20  it's between 50 and 55 million.  We agree with that, okay?

21  So, based upon the senior mortgage on the property,

22  forgetting the mechanics liens, forgetting anything else,

23  they're a wholly unsecured creditor.  They're similar to

24  like, like those cases, like the Pond case in the Chapter 13

25  In re: Pond where you have a wholly unsecured mortgage.  We

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 119 of 209

Page 115

1    -- they're in a similar position kind of as if they had a

2    junior mortgage behind the senior lender and the junior --

3    and the senior mortgage is more than the value of the

4    property.

5              They're a wholly unsecure creditor, not entitled

6    to adequate protection under 362-D-1.  They're not entitled

7    to relief under 362-D-2 either.  They haven't demonstrated

8    that the property is not necessary for effective

9    reorganization.  The Debtor's timely filed its plan.  It's a

10   single asset real estate case.

11             Congress amended the laws for the single asset

12   real estate cases like Mr. Selbst said because there was

13   some perceived abuse of real estate cases.  The Debtors

14   complied, filed their plan within the 90-day period,

15   promptly scheduled a hearing on the disclosure statement.

16             The Debtor has been maintaining the property.  The

17   Debtor has been trying to move it forward, and I understand

18   Your Honor seems inclined to deny the motions that were

19   filed, but we can try to address those.  I'll ask you to

20   hold off on that decision.

21             But based upon this record, based upon the law,

22   based upon the fact that, you know, citing the Trans West

23   Resort case, that this mezzanine lender is by their own

24   admission out of the money, I think Your Honor should deny

25   the lift stay motion at this point.  And if they want to

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 120 of 209

Page 116

1    make a motion under 1121 to terminate exclusivity or we

2    fight the exclusivity fight at some point as Your Honor

3    mentioned, then we can have the fight then.

4         But we have a hearing on June 28th on the

5    disclosure statement.  We are going to make some changes to

6    it.  We did get an appraisal.  I just got our appraisal.

7    It's a little bit different than their appraisal, but we

8    didn't have it in time to put it into evidence and get ready

9    for this hearing today, but we will have it and amend our

10   disclosure statement to provide -- to lay out our appraisal.

11        I don't think we need to get into the battle of

12   appraisers here.  That's a very unscientific thing.  I think

13   that Your Honor should deny the motion.  There's no

14   prejudice for them waiting a few more weeks.  We'll give

15   them a deposition on feasibility from Herschel Klein before

16   the June 28th disclosure statement hearing if they want to

17   take feasibility discussions.  But as Mr. Nash said, it's

18   not only feasibility at issue.  Obviously, we have to

19   demonstrate that, but we need to get an impaired class and

20   the only way we're going to know whether we have it an

21   impaired class voting for the plan is to let the plan go out

22   and let creditors vote for it.

23        The disclosure statement we can amend to whatever.

24   I don't believe that they're right that there's not adequate

25   information.  Their adequate information is based upon under

1    1125, you know, a flexible standard based upon the Debtor's

2    books and records, based on the situation.  I think there's

3    adequate information here, and I would request that Your

4    Honor either deny the motion without prejudice based upon

5    that or carry the motion to the hearing on the disclosure

6    statement, which is only -- less than three weeks away.

7            THE COURT:  Okay.  Mr. Markowitz, I do have some

8    questions for you.  I --

9            MR. MARKOWITZ:  I figured you would.

10           THE COURT:  My problem with this is not, you know,

11   some -- look, some of your arguments are right.  There are

12   things that I have to decide as confirmation or on the

13   disclosure statement hearing and maybe aren't things that

14   definitively decide today or that I could definitively

15   decide today make your plan unconfirmable, patently

16   unconfirmable as the case law says, or inability to do it

17   within a reasonable period of time.

18           But what I do have a problem with, and Mr. Bauer

19   did raise this issue, but it's been the thing that I've been

20   having the hardest time grappling with myself and

21   considering this, is money.  And why do I say money?  Well,

22   Mr. Bauer pointed out that there's a payment that's due July

23   1st for taxes, and I don't have any evidence that there's

24   money for that.  Okay.  It's not July 1st.  I get that.

25   That's a future problem.  It's not my problem today, but

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 122 of 209

Page 118

1    it's there.

2          Then I've got -- you have a plan that you're

3    proposing to send out for a vote that assumes that things

4    are going to happen and a sale isn't going to take place

5    until sometime remotely close to two years from now.  Well,

6    how is that going to be paid for?  I don't have any

7    information about that whatsoever.  And those -- there's

8    real costs.  I mean, there's not just the cost of the TCO.

9    There's definitely the cost we've heard of probably a

10   leasing agent, possibly some build-out, the fact that you

11   still have to have electricity, you have to have security,

12   you have to have insurance, you have to have all kinds of --

13   so those have to be paid, and that doesn't even go to the

14   fact that what Mr. Bauer's plan is trying to -- has

15   suggested is that in addition to the fact that they can pay

16   all those costs and say they have the money to do it, that

17   they will also be paying the senior lender during that time

18   period, and that's what they're proposing to do in their

19   plan, which is even more cash, like some type of payments.

20   I don't know what they are.  There's no plan in front of me,

21   but I'm just saying.

22          So, I look at this appraisal and you're right.

23   Look, there are things about that appraisal that I have

24   questions about myself.  And you're certainly right that

25   there can be differences in appraisals, especially here

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 123 of 209

Page 119

1    where we're talking about not just what it looks like today

2    but maybe longer.

3             But the problem that I have is I -- based on the

4    evidence I have today, there's no way that somebody is going

5    to provide exit financing here that is anybody other than

6    the Bodeks or the existing lenders.  It's just not going to

7    be possible.  You can't prime them.  The secure -- the

8    evidence today shows that's impossible.  So, the idea that

9    there's going to be exit financing from some mysterious

10   third party is not going to happen.

11            MR. MARKOWITZ:  No, we didn't say -- yeah, but --

12            THE COURT:  Unless that person is going to lend on

13   an unsecured basis or an equity basis, and realistically in

14   this market with these interest rates and this climate of

15   the commercial real estate, what third party is ever going

16   to do that?  It's not going to --

17            MR. MARKOWITZ:  No, we -- no, we --

18            THE COURT:  No, let me finish, please.

19            MR. MARKOWITZ:  I'm sorry.  I'm sorry.  I didn't

20   mean to interrupt you.

21            THE COURT:  Yeah.  You have to let me finish.

22            MR. MARKOWITZ:  I'm sorry.

23            THE COURT:  So, the evidence I have before me

24   today from the appraiser is clear to me that there cannot be

25   exit financing from a third party.  And I have heard that,

Page 120

1   yes, Mr. Bauer's client is willing to provide financing to

2   carry this project under certain circumstances.  For all I

3   know, depending on where -- how things went, maybe under

4   worst circumstances, Mr. Selbst (indiscernible) I have no

5   idea.

6           What I know is that they're not going to finance

7   your plan.  They've been very clear about it.  So, they

8   aren't going to be the source of your plan.  Just clear

9   right now.  They've said no, isn't happening, okay?  And

10  can't finance around that.

11          So, that leaves your client.  I don't -- I

12  understand why Mr. Bauer wanted to take their depositions,

13  because your plan says it's either going to be exit

14  financing from third parties or your client's family.

15  There's no evidence in this record for me today that your

16  clients have the money.  In fact, there's probably evidence

17  about that $400,000 that came from Mr. Klein that he said in

18  prior testimony, so I'm going by that, that he

19  (indiscernible), that that's not from your clients

20  themselves.  It's from their son-in-law who is not the --

21  are not the shareholders.  That doesn't mean your son-in-law

22  couldn't be the funding service.  I acknowledge that.

23  That's possible but I have no commitments, no information

24  whatsoever about that.

25          So, when I'm sitting here today, I'm sorry to say

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 125 of 209

Page 121

1    this, this looks like a fantasy to me, because I don't have

2    any evidence that this could happen in near term.  And

3    you're right, I have a disclosure statement in 22 days.  But

4    if you think I'm going to approve a disclosure statement

5    that doesn't have projections, that doesn't have a

6    liquidation analysis, that doesn't have a commitment for

7    financing, it's not going anywhere.

8             So, that's just the -- realistically under these

9    circumstances where I am.  So, when I'm looking at the case

10   law and trying to figure out does it fit in -- you know, how

11   far do I go in this?  Does it fit with the situation where

12   there's really a source of funding here, that people really

13   need to have the opportunity to explore this, I'm not seeing

14   it.  And the fact that your clients didn't show up for

15   depositions, if anything, it allows me legally to draw a

16   negative inference.  I'm not saying I'm doing that, but I'm

17   just telling you that's where my problem is.

18            So, you didn't show up here today with any

19   evidence of financing.  And I -- this is where my problem

20   is.  I honestly think there's certainly -- I doubt

21   personally that I would -- you know, I don't know what I

22   would do with a negative amortization plan.  I acknowledge

23   Mr. Bauer that I've -- to Mr. Bauer and you, I've never had

24   one that I was involved in a case in practice, never seen

25   one before.  It was interesting for me to read all those

Page 122

1    pieces.  I've read all of them.  Very few have been

2    approved, but it's not impossible.  I'll acknowledge you,

3    there's a test.  It's not impossible.

4          But the problem is that I wouldn't even get to

5    confirmation because I'm not going to get through a

6    disclosure statement hearing without all the things that I

7    don't see as adequate information in that disclosure --

8          MR. MARKOWITZ:  We have to -- we have to fix that

9    before the 28th.

10          THE COURT:  Well, you -- you might get that

11    opportunity, but my point to you is not showing up for

12    depositions for Mr. Bauer, who's asking the same questions

13    that I'm going to be asking on the 28th and requiring

14    evidence of, it's not a really good thing.

15          MR. MARKOWITZ:  Right.  I did ask him if he could

16    do Zoom and he said no.  So, that was an issue on that.

17          THE COURT:  I understand.  All right.  Well,

18    anyway, that's my -- that's my issue, Mr. Markowitz.

19          MR. MARKOWITZ:  I understand your issue, Your

20    Honor.

21          THE COURT:  I keep grappling with here.

22          MR. MARKOWITZ:  I understand your issue.

23          THE COURT:  Okay.  All right.

24          Mr. Bauer, do you have anything else?  Are you

25    finished, Mr. Markowitz?  Sorry, I don't -- I didn't

Page 123

1     (indiscernible).

2             MR. MARKOWITZ:  I am, Judge.  I am.

3             THE COURT:  Okay.

4             MR. BAUER:  As I led off the -- today, as I led

5     off my speech a few minutes ago, clearly Mr. Markowitz's

6     agenda is to continually kick the can down the road.  He's

7     saying -- you acknowledge, you saw it, Your Honor, the plan

8     has no meat to it whatsoever, no information.  He filed it

9     as a placeholder, figuring that he'll go get to the 28th and

10    somewhere between now and the 28th maybe he'll provide some

11    additional information.

12            You hit the nail on the head with the exit

13    financing.  As far as -- I mean, I still was hoping that the

14    exclusivity would be terminated, because I'd like to have

15    been in a position to file a plan.  I think we did lay it

16    out --

17            THE COURT:  File a motion and attached it.  No

18    one's stopping you.

19            MR. BAUER:  I think -- I think, Your Honor, we did

20    in our initial motion for stay relief, we alluded in a

21    footnote that we also request that the exclusivity period --

22            THE COURT:  You did, but you did not move under

23    the proper standard, and it's not articulated in the motion.

24            MR. BAUER:  I thought it was articulated in the

25    motion under 1121.  And then Mr. Markowitz addressed it and

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 128 of 209

Page 124

1    then we responded to it in our supplement going through the

2    --

3            THE COURT:  Okay.  Well, I'm not ruling based on

4    that because --

5            MR. BAUER:  That's fine.

6            THE COURT:  -- in my opinion, you haven't filed a

7    proper motion for that.

8            MR. BAUER:  That's fine, Your Honor.

9            THE COURT:  But let me ask you a couple of

10   questions that -- that I have about your situation.

11           MR. BAUER:  Sure.

12           THE COURT:  You mentioned at the beginning that

13   it's not 60 days, and I understand that.  I think 60 days is

14   what you and I were probably both thinking of as an Article

15   9 sale, which is not exactly your situation.  Then you do

16   need the 60 days.

17           What I'm grappling with, Mr. Bauer, is what you

18   had offered me at the first hearing, which is maybe let you

19   get yourself started on this, put the notice out, get to a

20   date, and have to come back to me before I let you actually

21   take over the shares of this -- you know, the membership

22   interest.  And that's what I'm grappling with on my side,

23   because I think that if I'm going to let you go forward on

24   this, I'm not going to let you do it on 10 days or 15 days'

25   notice.  That does not seem commercially reasonable for me

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 129 of 209

Page 125

1    in the context of a bankruptcy case, especially because we

2    have a lot of other creditors, too, and you'll have to

3    decide if you're going to notice them.  You certainly, I

4    think, are going to be required to notice all the credits

5    that are creditors of the entity that you are going to be

6    seeking to take your, you know, foreclosed membership

7    interest in.

8            So, I don't think that I would find 10 or 15 days

9    to be reasonable about that.  So, what I've been grappling

10   with myself is whether what I should be doing is putting

11   this out for some period of time, like 30 days, 60 days, for

12   you to actually exercise your rights.

13           That gives Mr. Markowitz his disclosure statement

14   hearing, which I'm just telling you right now unless it's --

15   everything's perfect, it's not happening, but I've been

16   clear about my problems, and if we don't get through that,

17   then, you know, maybe that's when I'm going to let you

18   foreclose on your shares and you'll be the Debtor at that

19   point and you can do whatever you want with respect to the

20   plan.

21           MR. BAUER:  It's your call, Your Honor.

22           THE COURT:  I know.  I'm just telling you.

23           MR. BAUER: I hear you loud and clear.

24           THE COURT:  And another question (indiscernible)

25   ask for you, though, that's another thing I've been

Page 126

1    grappling with, which is confirmation issue, and this is an

2    issue for you, I think, if I -- if you go there.  Your own

3    disclosure statement, your own appraiser says that they

4    think that this could be worth X amount in the future.

5    That's not my problem for today.  I readily admit that.  My

6    problem for today is what it's worth today.  It's not what

7    it's worth in the future.

8         But what I have been grappling with is, well, what

9    happens if -- if I grant your motion and then you end up

10   filing your own plan, and your plan is to do what your

11   client said?  What does that mean for that fact that there

12   might be future value out there that goes beyond your claim

13   maybe when you add in all the additional money?  I don't

14   know, not saying I know, but possibly.  It goes beyond

15   everyone's claim.  What happens with that?

16        In a regular -- in a different situation where

17   it's not a single asset real estate case, and I grant you,

18   we have three Debtors here, but one thing people often do is

19   some kind of provision for payment in that circumstance

20   going back to the equity, if they ever get to that point.

21   And sometimes that's hope certificate, we call them.

22   Sometimes it's a -- it's a -- you know, it's an out of the

23   money warrant.  It's a payout later on.

24        But I think, you know, based on your own

25   appraiser's valuation for what this would be if it's

Page 127

1    stabilized, you might have an issue with that.  And so, it's

2    not an issue for today for me, but I'm just noting it for

3    the record, because it's been something that I -- when I

4    read your appraiser's analysis, I thought, well, that's

5    interesting because while today there's no value and there's

6    really no value if there's the TCO, you know, maybe in a

7    stabilized situation, which no one knows because no one

8    knows what you're going to get in sale for the property and

9    no one knows what the market's going to be and no one even

10   knows if that's the right estimate of the stabilized value,

11   but what happens then?

12          So, anyway, that's something I've been grappling

13   with and trying to figure out myself, how I deal with that.

14   Again, don't think it has anything to do with today's

15   problem, but just it's a problem down the road there

16   potentially.

17          MR. MARKOWITZ:  I hear you loud and clear on it.

18   I'm not sure I agree with you, because if somebody were to

19   buy this property for $49 million today through a --

20          THE COURT:  Yeah, they'll get whatever they get.

21   They're going to have to pay money.

22          MR. MARKOWITZ:  They get the building, they start

23   putting it in and stabilizing it, and they get all of the

24   upside.  Same thing --

25          THE COURT:  That's right.

1          MR. MARKOWITZ:  Same thing if somebody bought it

2    at a confirmation hearing.  It happens all the time in

3    business cases when somebody --

4          THE COURT:  True.

5          MR. BAUER:  -- comes in.  They get all of the

6    upside that -- that's -- so, I mean, I -- a lot of times in

7    single asset real estate cases, the equity gets canceled.

8    You got new value that comes in.  The new body that's

9    putting in all the money, they benefit and get the upside.

10         THE COURT:  All right.  Okay.

11         MR. MARKOWITZ:  But I hear you loud and clear.

12         THE COURT:  We should be discussing

13   (indiscernible) I'm just going to go ahead and issue my

14   ruling then.

15         Okay.  So, 541 West 21 SME, LLC filed a motion

16   seeking relief from the automatic stay on April 18, 2023,

17   ECF 54.  An initial hearing on the motion was held on May 4,

18   2023.  On May 5, 2023, this Court entered an order

19   scheduling a final hearing on the motion for June 6, 2023,

20   and setting certain final deadlines for filing additional

21   pleadings, ECF 78.

22         On May 22, 2023, SME filed a declaration of Eran

23   Silverberg in support of the motion, ECF 90, and a

24   supplement to the motion, ECF 89, which includes a

25   declaration of Raymond T. Cirz, in support of the appraisal

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 133 of 209

Page 129

1   prepared by Newmark Group, Inc., attached as Exhibit 1 to

2   Mr. Cirz's declaration and filed in support of the motion

3   and a declaration of Morris S. Bauer in support of the

4   motion.

5           On May 31, 2023, ERBO Properties, LLC, KOVA 521,

6   LLC, and Gold Mezz, LLC, collectively the Debtors, filed an

7   objection to the motion, ECF 93.

8           On June 2, 2023, SME filed a reply to the Debtor's

9   objection to the motion, ECF 96, which includes a

10  declaration of Morris S. Bauer in support of the reply.

11          On June 6, 2023, the Court held a final hearing on

12  the motion.  Mr. Cirz and Mr. Silverberg testified at the

13  hearing.  I also note that obviously there were 41 exhibits

14  admitted into evidence before me.

15          SME moved for relief from the automatic stay under

16  Section 362-D-1 and 362-D-2 of the Bankruptcy Code.  The

17  Court notes that the motion does not expressly seek to

18  dismiss the cases, to convert the cases, to appoint a

19  Chapter 11 Trustee, and/or terminate exclusivity in its

20  perspective.  Since SME did not expressly move for such

21  relief as the Court views it, the Court will not address

22  such possible relief.

23          Section 362-D-1 authorizes relief for cause,

24  including the lack of adequate protection of an interest in

25  property of -- sorry, of an interest in property of such

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 134 of 209

Page 130

1    party in interest.

2          Section 362-D-2 authorizes relief if, A, the

3    Debtor does not have an equity in such property, and B, such

4    property is not necessary to an effective reorganization.

5          With respect to cause, SME argues that cause

6    exists because the Debtors were past due on the loan as of

7    the filing date and have failed to make payments under the

8    mezzanine loan documents post-filing.  However, the

9    testimony by Mr. Cirz, SME's appraiser, and the appraisal

10   prepared by Newmark Group, Inc., and for this purpose I note

11   I'm citing to Exhibit 2, the updated appraisal, demonstrate

12   that Mr. -- that it is Mr. Cirz's opinion that the value of

13   the building real estate property is less -- in an amount

14   less than the amount that G4 asserts is owed to it in its

15   proof of claim.

16         When one also considers the amount owed for taxes

17   and mechanics liens which are secured by statutory liens,

18   the value of the building and real property as of the date

19   of the filing of the bankruptcy proceeding was likely less

20   than the value of all the secured claims that have priority

21   over SME's claim since the filing was on February 13, 2023,

22   which is a little less than four months ago.

23         This would effectively mean that the value of the

24   equity in ERBO, which owns the building real property, was

25   likely zero as the filing date and is zero today or

Page 131

1    negative, depending on someone's perspective.

2            Accordingly, the equity held by KOVA 521, LLC and

3    ERBO, which was pledged to SME to secure its mezzanine loan

4    also does not have any positive equity value.  Thus, SME

5    loans -- SME's loan, mezzanine loan, would not be entitled

6    to accrue post-petition interest under the Bankruptcy Code.

7    It appears that G4's loan was also likely under-secured as

8    of the filing date and thus no interest would accrue post-

9    petition on that loan either.

10           The Court notes that since the filing, the Debtors

11   have made efforts to move forward with finishing up the

12   construction for the premises by rejecting contracts and

13   hiring a replacement construction manager and a replacement

14   general contractor.

15           SME raises the issue of property taxes that are

16   due in July and how there is no money to pay those taxes.

17   If they are not paid, SME's position would be behind

18   additional unpaid taxes and that would be a lack of adequate

19   protection, but those taxes are not yet due and payable.

20           The 2nd Circuit applies the Sonnax factors when

21   determining whether there is cause.  In re: Sonnax

22   Industries, Inc., 907 F.2d 1280, Page 1285 (2d Cir. 1990).

23   The Sonnax factors appear to -- that appear to be relevant

24   to the Court are 1, 10, and 12.

25           One, whether relief would result in a partial or

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 136 of 209

Page 132

1    complete resolution of the issues.  If the relief is

2    granted, it would transfer ownership and control over the

3    membership interest of KOVA 541 which in turn owes -- sorry,

4    owns the membership interest in ERBO.  This would partially

5    resolve the dispute between KOVA 41 -- 541 and SME.

6            With respect to test 10 -- prong 10 of the test,

7    the interest of judicial economy and the expeditious and

8    economical resolution of litigation, a UCC process to act on

9    the pledge of membership interest in KOVA 541 would

10   partially resolve the dispute between SME and the Debtors

11   and would be expeditious.  However, it would not resolve the

12   other creditors' claims against the Debtors.

13           And 12, the impact of the stay on the parties and

14   the balance of the harms.  The lifting of the automatic stay

15   and the consummation of the UCC proceeding would effectively

16   wipe out the shareholders' control over the Debtors if the

17   pledge was intended to -- the motion was granted and the

18   party was intended -- was allowed to proceed to actually

19   exercise its rights under the pledge.

20           SME -- the Court finds that as of today, SME has

21   not demonstrated a lack of adequate protection for itself or

22   cause under the Sonnax factors.  With respect to Section

23   362-D-2, SME has demonstrated that the Debtors do not have

24   any equity in the building or real property based upon the

25   Newmark appraisal.  Again, I'm citing to Exhibit 2, and the

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 137 of 209

Page 133

1    testimony of Mr. Cirz.

2         The appraisal and the testimony Mr. Cirz

3    demonstrate that, in his opinion, the property is worth 49

4    million today and would be worth 52.6 million if the

5    temporary certificate of occupancy were to be obtained in a

6    year.  In either case, the Debtors do not have any equity in

7    the building or property, nor does the equity of Gold Mezz

8    or KOVA have any value today or near term.

9         However, the Court notes that based upon the case

10   law, there's nothing about the case law that provides that

11   at that point that turns Mr. Bauer's client into an

12   unsecured claim.  It turns Mr. Bauer's client into a secured

13   creditor whose collateral may not be worth anything beyond

14   control of the Debtors or if the pledge is actually acted

15   upon, and that the actual value of those mezzanine shares

16   might be nothing other than the right to control the Debtor.

17   But it does not strip Mr. Bauer's client of a lien and does

18   not turn it into an unsecured creditor.  It turns it into an

19   unsecured creditor whose collateral is valued at zero, but

20   it doesn't strip its rights as a secured creditor.

21         Therefore, the Court finds that Mr. Bauer's client

22   has the right to bring this motion under 362-D-2, and that

23   Mr. Bauer's client has demonstrated under 362-D-2 that there

24   is in fact no equity that the Debtor has.

25         In United Savings Association of Texas v. Timbers

Page 134

1    of Inwood Forest Associates, Limited, 584 U.S. 365 at Pages

2    375 and 376, the -- in 1988, the Supreme Court held that

3    once a movant establishes that a Debtor has no equity in the

4    property, it is the burden of the Debtor to establish that

5    the collateral at issue is necessary to an effective

6    reorganization.

7           Accordingly, the burden shifts to the Debtors to

8    demonstrate that the collateral issue is necessary to an

9    effective reorganization.  In (indiscernible) the Supreme

10   Court held that the standard is whether the property is

11   essential for an effective reorganization that is in

12   prospect, this means that a reasonable probability of a

13   successful reorganization within a reasonable time.

14          The Debtors need not show that a plan is

15   confirmable but that the proposed plan had a realistic

16   chance of being confirmed and is not patently unconfirmable.

17   See In re: West White Plains Development Corp., 140 B.R. 948

18   at Page 950, Bankruptcy case, Southern District of New York,

19   1982.

20          SME argues that the plan filed by the Debtors does

21   not have a realistic chance of being confirmed and/or is

22   patently unconfirmable.  SME raises various issues about the

23   plan including negative amortization of the secured claims

24   not being fair and equitable, a free and -- a free and clear

25   sale cannot be achieved over the objection of the secured

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 139 of 209

Page 135

1    creditors, substantive consolidation is inappropriate, there

2    is no plausible source of finance -- funding available, the

3    continued management would not be in the interest of

4    creditors or other equity holders, that there is no

5    unimpaired class of creditors who will vote to confirm the

6    plan, and that the proposed treatment of the pledged

7    interest violates the absolute priority rule.

8            While this Court has not approved a negative

9    amortization plan, a handful of courts outside the 2nd

10   Circuit have approved negative amortization plans as cited

11   to in the Debtor's objection.

12           The 10-part test articulated in In re: Apple Tree

13   Partners, LP, 131 B.R. 380, 390 (Bkrtcy.W.D.Tenn. 1991)

14   would be the test that would have to be applied to the facts

15   surrounding the proposed plan.

16           While this Court is highly skeptical as to whether

17   the Debtors could satisfy the 10-part test, prior to

18   confirmation, this Court cannot definitively determine

19   whether the proposed plan violates the fair and equitable

20   test due to the plan's premise of negative amortization.

21           With respect to the sale free and clear, the sale

22   proposed in the plan is under Section 1123-A-5-D and not

23   under Section 363.  Section 1123-A-5-D provides for the sale

24   of all or any part of the -- of the property of the estate,

25   either subject to or free of any lien or the distribution of

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 140 of 209

Page 136

1    all or any part of the property of the estate among those

2    having an interest in such property of the estate.

3              If the plan is confirmable over the objection of

4    the secured lenders under Section 1129-B, then a sale free

5    and clear of liens is possible.  That would have to be

6    determined at confirmation or possibly the disclosure

7    statement herein.

8              Substantive consolidation is proposed as part of

9    the plan, and thus, whether it is appropriate or not would

10   be considered at confirmation or possibly at the disclosure

11   statement hearing.  The Court notes that the Debtor also

12   argued that the plan can be confirmed without substantive

13   consolidation.

14             The Court is going to come back to the argument

15   that there is no plausible source of funding available.  SME

16   argues that continued management would not be in the

17   interests of creditors or other equity holders.

18             While the owners may lack the experience to

19   oversee the construction of the office building, the Court

20   does not think that this is relevant as to whether the plan

21   is reasonably confirmable in a reasonable time period.  The

22   Court may have to consider whether this means that the plan

23   is not feasible, but the Court does not believe that this

24   makes the plan patently unconfirmed.

25             SME argues that there is no -- likely no impaired

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 141 of 209

Page 137

1    class of creditors who will vote to confirm the plan.  That

2    is not certain and cannot be determined unless and until the

3    plan is set out for a vote.  The Court accepts the plan --

4    the fact that clearly G4, SME, Cauldwell Wingate, and Higher

5    Ground will not vote in favor of the plan.

6            SME argues that the plan's proposed treatment of

7    the pledged interest violates the absolute priority rule.

8    The Court notes that the Debtor argues that the treatment of

9    the pledged interest is confirmable under the indubitable

10   equivalent provision of the -- of Section 1129.  While the

11   Court is skeptical about that, this issue would have to be

12   determined at confirmation or perhaps the disclosure

13   statement hearing.

14           The issue that the Court is struggling -- has

15   struggled with is the lack of any plausible source of

16   funding.  From the testimony given in connection with the

17   motion to enter into certain contracts, Mr. Bodek personally

18   borrowed funds from his son-in-law in order to have the

19   $400,000 to fund any additional work at the property to try

20   to obtain a temporary certificate of occupancy.

21           In the reply, SME notes that the money has been

22   deposited and withdrawn from the Debtor's counsel's escrow

23   account multiple times during the last month.  That funding

24   does not cover the cost of insurance, electricity, real

25   estate taxes, security, or any of the other costs of

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 142 of 209

Page 138

1    maintaining the property, nor do those funds cover those

2    costs for two years after confirmation.

3            The $400,000 in the escrow account does not cover

4    the cost of a leasing agent or the cost of any build-out

5    required by the tenants.  The disclosure statement does not

6    contain any projections of income or expenses for the two

7    years prior to the sale.  There is not any evidence in the

8    disclosure statement or otherwise of the ability of the

9    shareholders, the Bodeks, to pay for the cost of the

10   ownership of this property during the up to year -- two

11   years after confirmation of the plan, nor is there any

12   evidence in the disclosure statement or otherwise of the

13   likelihood of the Debtor obtaining sufficient exit financing

14   in the near term to pay for these costs.

15           The Court notes that the Bodeks decided not to

16   make themselves available for a deposition by SME regarding

17   their financial wherewithal to fund these costs.  The

18   testimony of Mr. Cirz and the appraisal submitted as Exhibit

19   2 demonstrates that it's extremely unlikely, virtually

20   impossible, that the Debtors would be able to find priming

21   exit financing without the consent of the secured parties.

22           Neither G4 nor SME have agreed to finance the

23   Debtor's plan.  Any exit financing would have to be junior

24   to all the secured creditors liens or be in the form of

25   unsecured financing or equity contributions.  There is no

1    evidence that such exit financing would be obtainable from a

2    third party or the shareholders or the related party to the

3    shareholders.

4            The Court notes that this situation reminds it of

5    this quote.  "The Court should not be left to speculate

6    about the important elements and key issues relating to the

7    likelihood of an effective reorganization."  The Debtor's

8    hopes and aspirations for reorganization, although well

9    intended, have not been supplemented by any showing that

10   reorganization is possible, let alone reasonably likely

11   within a reasonable period of time.  See In re: Diplomat

12   Electronics Corp., 82 B.R. 688, 693 (Bankr.S.D.N.Y. 1988).

13           The Court finds that in the absence of evidence of

14   financial wherewithal by the Bodeks and the absence of

15   evidence of the possibility of obtaining exit financing from

16   a third party, when coupled with the appraisal that claims

17   that exist based on all the filed claims and the claims

18   docket, testimony of Mr. Cirz, that that is sufficient for

19   this Court to find that it is not reasonably likely that the

20   Court -- that a plan can be confirmed by the Debtors within

21   a reasonable period of time.

22           Accordingly, the Court grants the motion under

23   Section 362-D-2 and will modify the automatic stay to allow

24   SME to proceed with taking all necessary respects -- steps

25   with respect to effectuating the transfer of the pledged

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 144 of 209

Page 140

1   membership interest to SME prior to the actual transfer

2   occurring.

3          The Court notes that it will require SME to

4   provide 30 days' notice to parties.  However, the Court

5   additionally will require SME to come back to the Court for

6   a final or further authorization prior to the actual

7   transfer of the pledged membership interest.  This will

8   allow the Debtors to proceed with the disclosure statement

9   hearing on June 28th, even though significant

10  supplementation of the disclosure statement appears to be

11  needed for the Court to determine that it provides adequate

12  information.

13         If the Court finds that it does not provide

14  adequate information at that hearing, I think the parties

15  all understand that the Court is going to allow the transfer

16  of the -- of the shares to proceed at that point.

17         MR. MARKOWITZ:  Your Honor, I just have one

18  question.  Thank you for your time and decision.  I just

19  have one question.

20         THE COURT:  Sure.

21         MR. MARKOWITZ:  If -- are you -- are you done with

22  the decision?  I didn't want to interrupt you.

23         THE COURT:  I'm done.

24         MR. MARKOWITZ:  Okay.  Are you staying -- is -- I

25  don't know if it was a request to stay.  Is it -- is it 4001

Page 141

1    -- what's the rule, 4001 -- Section -- stay Rule 4001-A-3?

2    Is that stayed for the 14 days before they can start sending

3    out the 30-day notice or are you waiving that?

4            THE COURT:  No.  No, I'm waiving it.

5            MR. MARKOWITZ:  Okay.

6            THE COURT:  They can proceed with sending out

7    their notice, their 30-day notice, and that -- and that

8    will, you know, set the hearing for that time.  They're

9    going to have to come back to me before I actually let the

10   actual transfer occur, but they can start the clock running.

11           MR. MARKOWITZ:  Okay.  I just wanted to be clear

12   on that.  Thank you.

13           THE COURT:  And you know, when we're here on the

14   28th, on your disclosure statement, you know, you obviously

15   understand that I have serious issues, and I know that the

16   legal issues that I highlighted in my -- in my -- in my

17   analysis, that were raised by Mr. Bauer in his papers, don't

18   mean -- many of them are things that could be issues about

19   why I couldn't approve the disclosure statement.

20           I just don't have the disclosure statement hearing

21   in front of me today.  So, some of the legal issues that

22   were raised, you know, there is always the issue about do

23   you send out a disclosure statement that's legally

24   unconfirmable?

25           And I will tell you, Mr. Markowitz, which will not

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 146 of 209

Page 142

1    make you feel any better, I'm one of those people as you

2    know that doesn't do that.  If I think that there's a legal

3    problem, I raise it at the disclosure statement hearing

4    myself.  I don't send things out.  I don't waste

5    solicitation.  I don't think it's useful.

6                MR. MARKOWITZ:  I understand.

7                THE COURT:  And so -

8                MR. MARKOWITZ:  We have work to do.

9                THE COURT:  -- there are quite a number of legal

10   issues that I highlighted that were raised that I am not

11   ruling on today, but they were all -- many of them are

12   issues that could be a problem for me approving a disclosure

13   statement as well.  So, I think that in addition to all of

14   the issues I've raised about the lack of adequate

15   information in that disclosure statement, I think you're

16   going to have to be prepared to address, and my assumption

17   is that they'll be raised in people's objections to the

18   disclosure statement, that -- that these -- that there are

19   these legal issues about your plan and that might make it

20   legally -- patently, you know, legally unconfirmable.

21                And so, I may have to, for example, at a

22   disclosure statement hearing have to determine at that

23   point, you know, based on the evidence that's in the

24   disclosure statement as it appears in front of me at that

25   point whether or not, for example, you know, it -- this plan

1    should be sent out because of the negative amortization

2    aspect.

3              And the fact Mr. Selbst pointed out something that

4    I already noted myself about the interest rates, that

5    they're not even the same interest rates that are in

6    people's contract.  So, there's issues about that.

7              I think Mr. Bauer has raised legitimate issues

8    about the proposed treatment you have for his client's class

9    of claims on a legal basis.  You know, is that indubitable

10   equivalency?  Is this something that could be a free and

11   clear sale, you know, under the circumstances?

12             You know, those are all --

13             MR. MARKOWITZ:  I understand.

14             THE COURT:  -- legal issues.  The substantive

15   consolidation issue, I mean, there's no evidence in your

16   disclosure statement as to why substantive consolidation is

17   appropriate, and it's your motion in essence for it.  It

18   lacks that.

19             I mean, these are all things that are going to

20   probably be brought before me at a disclosure statement

21   hearing and they're are all things that I would have to

22   consider before, in addition to my issues about whether this

23   provides for adequate information, for someone to make an

24   informed decision on the plan.

25             So, I just note that, that those are all there.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 148 of 209

Page 144

1    And that's not -- and again, you know, they're -- these are

2    not insignificant legal issues.  They're just not legal

3    issues that I could determine today without getting into

4    having a mini disclosure statement hearing or a mini

5    confirmation hearing, and that doesn't seem appropriate to

6    me, but there are real issues and they are all real issues

7    that could be a problem for a disclosure statement being

8    sent out.  So, I just note those for the record, that

9    there's another -- there were other problems, but --

10           MR. MARKOWITZ:  And I just have one more question.

11   I'm sorry to -- to keep asking questions.

12           THE COURT:  No, it's all right.

13           MR. MARKOWITZ:  Okay.  You mentioned earlier about

14   the noticing of the UCC sale.  Because this is in a Chapter

15   11 now, I thought you mentioned that they should be sending

16   notice out to all the creditors of the UCC sale, right?

17   Because they didn't do that before --

18           THE COURT:  All the creditors of their entity.

19           MR. MARKOWITZ:  Okay.  Not ERBO?

20           THE COURT:  No.  ERBO has nothing to do with this,

21   unfortunately.  This is an issue where the stock of an

22   entity is going to change hands.  So, KOVA, the parties who

23   are going to be affected by this potentially are creditors

24   who are now going to have someone else potentially owning --

25   owning KOVA.

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 149 of 209

Page 145

1              MR. MARKOWITZ:  Got it.

2              THE COURT:  And so, to me that requires -- I don't

3      think commercially reasonable notice in the context of a

4      Chapter 11 situation where you're -- you're taking -- you're

5      exercising your rights under UCC -- your UCC and a pledge

6      agreement to step into the shoes of the Debtor and take over

7      the shares of the -- of the stock and particularly control

8      of them, et cetera, that that does require parties who are -

9      - who are going to be affected by that, and the parties who

10     would be affected by that for sure are KOVA creditors.

11     Whether that indirectly impacts creditors of ERBO, yes, but

12     I don't think it directly impacts them.

13             You know, we don't -- you don't have to have a

14     substantively consolidated plan here.  You know, one of the

15     other issues I had decided here that I wasn't even going to

16     address, but that had occurred to me here is, you know, this

17     is a -- you know, I don't -- you're moving for substantive

18     consolidation in your -- in your arrangements.

19             Mr. Bauer's situation when he proposes a plan, I

20     mean, they might propose something completely different.  I

21     don't know what the plan will look like if that ever

22     happens.  So -- if they take over, so I'm not assuming that

23     it impacts other parties, but it does -- I do think that

24     creditors who would otherwise be above in terms of the

25     priority field (indiscernible) priority rule of -- of the

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 150 of 209

Page 146

1    equity, I guess I'll just put it that way, the membership

2    interest that Mr. Bauer's client would be foreclosing on, do

3    deserve notice so that they are aware of it.  So, I am

4    requiring that he serve notice on the KOVA creditors.  It's

5    not a huge list of people.

6            MR. MARKOWITZ:  No.  The whole list is not huge

7    anyway.  I just was wondering even if they --

8            THE COURT:  Yeah, no.  That's what I'm requiring,

9    that he serve that on the KOVA creditors.  He obviously has

10   to serve it on the Debtors, parties to his agreements.  It's

11   in the agreements themselves, pledge agreements, but --

12           MR. MARKOWITZ:  And advertise it --

13           THE COURT:  And advertise it.  That's up to him.

14   Whatever's in the agreement he's going to have to comply

15   with.  But I'm -- I'm -- you know, I -- I don't see how --

16   you know, there's no requirement -- he's -- he is right that

17   there's no requirement for 60 days' notice --

18           MR. MARKOWITZ:  No, it's commercially reasonable.

19   I get that.  It's a (indiscernible) sale.

20           THE COURT:  Commercially reasonable, and I also

21   note that a lot of times in loan agreements when this is a

22   different situation and it's personal property or something

23   else, there is a requirement for periods of time, but I

24   looked at the agreements and I agree that it's commercially

25   reasonable.  So, I -- it's a question of what's commercially

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 151 of 209

Page 147

1    reasonable, and I'm effectively determining that

2    commercially reasonable --

3                MR. MARKOWITZ:  The 30 days, I got it.

4                THE COURT:  -- is 30 days.  So --

5                MR. MARKOWITZ:  I understand.  I have no other

6    questions.

7                MR. BAUER:  Go ahead -- are you done your

8    questions?

9                MR. MARKOWITZ:  No, I think I'm done with my

10   questions.

11               THE COURT:  All right.

12               MR. BAUER:  Your Honor, it's 30 days from when we

13   send the notice out.  I -- so, are you going to so order the

14   record, prepare the order, or how --

15               THE COURT:  No, you need to submit an order to me

16   in support of this, and I'm not saying it's 30 -- it's 30

17   days.  You have to provide 30 days' notice.  That's correct.

18   You can obviously get your notice out tomorrow if you can

19   get me an order.

20               MR. BAUER:  Mm-hmm.  Got it.

21               THE COURT:  So --

22               MR. BAUER:  Judge Beckerman's quick on orders.

23               THE COURT:  It's probably because I used to do

24   your job.

25               MR. BAUER:  We appreciate that seriously.  No, all

1    kidding aside, we really do.

2              THE COURT:  I try.  It's one of my rules.

3              MR. BAUER:  I know you do.

4              THE COURT:  I try very hard to make sure that I

5    issue prompt orders and that also I try to rule on anything

6    that I don't really have to write an opinion on, even though

7    obviously I have to write an opinion -- a lot of it before

8    hearings, but those things.

9              MR. BAUER:  Right.

10             THE COURT:  That's part of it.  Okay.

11             Mr. Markowitz, your other two motions, what do you

12   want me to do with them?

13             MR. MARKOWITZ:  I want you to hold off until the

14   disclosure statement hearing.

15             THE COURT:  Okay.  You want to adjourn them to

16   that date?

17             MR. MARKOWITZ:  I want to adjourn them to the

18   28th.

19             THE COURT:  That's fine.  I'm going to allow you

20   to adjourn them to the 28th.

21             MR. BAUER:  Your Honor, since it's a -- an order

22   that modifies the stay relief, allows me to proceed but come

23   back to the Court before I actually take the possession.

24             THE COURT:  The last step.

25             MR. BAUER:  The last step.  I don't want to have

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 153 of 209

Page 149

1    to file another motion.  Do I just put it --

2              THE COURT:  No, that's right.  I think we just --

3              MR. BAUER:  -- the hearing date -- (indiscernible)

4    for you to put a hearing date in the -- for --

5              THE COURT:  Yeah, that's fine.  Have you -- I

6    think -- I don't think you need to put a date in.  I think

7    we could schedule it.  Well, let's see.  Let's just talk

8    about it now.

9              Assume you send me an order and you get your

10   notice out tomorrow.  Is that hypothetically true --

11   possible, Mr. Bauer?

12             MR. BAUER:  I hope.

13             THE COURT:  Okay, you're hoping.  Okay.  So, the

14   7th, then that would be 30 days.  So, that would take you --

15   it's June, so that would take you to July 7th, which I think

16   is -- sorry, a weekend, Friday, sorry.

17             MR. SELBST:  Friday, Your Honor.

18             THE COURT:  Friday.  Okay.  So, do you -- I -- I

19   think that would probably mean that I'd have to -- sorry,

20   I'm just going in my calendar here.  I'd have to have your

21   hearing on the 10th.  I don't normally do Mondays, but if

22   you want to put it for the 10th, that's fine.  I will.  I'm

23   going to be here physically in New York.  I'm not going

24   anywhere, so.

25             MR. BAUER:  That's fine.  What time on the 10th?

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 154 of 209

Page 150

1            THE COURT:  10:00.  How about that?

2            MR. BAUER:  That's fine.

3            THE COURT:  Let's do that.

4            MR. MARKOWITZ:  That will be the further hearing

5    to --

6            THE COURT:  July 10th.

7            MR. MARKOWITZ:  That'll be the further hearing to

8    authorize the last step in the -- in the UCC sale process.

9            THE COURT:  Correct.

10           MR. MARKOWITZ:  Okay.

11           THE COURT:  Yeah.  Yeah.  And I mean, I think you

12   all (indiscernible) miraculously we get through the

13   disclosure statement hearing --

14           MR. MARKOWITZ:  Exactly, if we --

15           THE COURT:  -- and I approve it on the 28th, I

16   think you know I'm not going to grant your -- probably not

17   going to grant your motion, Mr. Bauer, Because I'll have to

18   jump through like 85 hoops.

19           MR. BAUER:  I hear you.

20           THE COURT:  But we'll see.

21           MR. BAUER:  We'll see.  I like that.  We'll see.

22           THE COURT:  We'll see.  I -- you never know.  I

23   mean, you know, I just -- I feel you have to give people

24   some reasonable amount of notice, Mr. Bauer.  So, that's my

25   situation.

1          MR. BAUER:  I'm fine -- fine with that, Your

2   Honor.

3          THE COURT:  All right.  Is there anything else

4   that we need to discuss today?

5          All right.  If not, I wish you all a good day,

6   rest of the day, and court is now adjourned and I will see

7   you all on June 28th.

8          MR. SELBST:  Thank you, Your Honor.

9          MR. MARKOWITZ:  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MS. ZOURIGUI:  Thank you, Your Honor.

12          THE COURT:  Okay.  Mr. Bauer --

13          MR. BAUER:  Thank you, Your Honor.

14          THE COURT:  -- I'll just keep an eye out for your

15   document.

16          MR. BAUER:  Yes, thank you.

17          MR. MARKOWITZ:  And send me a copy of it, just so

18   I can take a quick look at it before you submit it.

19          MR. BAUER:  I will.

20          MR. MARKOWITZ:  Okay.

21          THE COURT:  Thank you.

22          MR. BAUER:  All right.  Thank you.

23          (Whereupon these proceedings were concluded.)

24

25

Page 152

1                           I N D E X

2

3                          RULINGS

4                                              Page        Line

5    Motion to Modify Stay, GRANTED            139         22

6    Transfer of Shares, GRANTED               140         15

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 153

1                C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 12, 2023

[& - 2.5]                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   4:3 108:22

**0**

**07102**   4:21

**1**

**1**   14:16 19:8
23:17 42:9,14
109:1 115:6
129:1,16,23
131:24
**1,000**   39:21,25
41:3
**1.2**   13:13
**1/2**   37:8 38:17
39:25
**1/4**   37:9 38:13
38:17 39:19,22
**10**   74:16,23
77:23 81:18
84:25 87:22
124:24 125:8
131:24 132:6,6
135:12,17
**100**   11:22
26:17 30:10,12
40:15 41:1
47:11 52:22
59:3,11 60:12
67:2 92:20
**10004**   1:13
5:12
**10017**   5:4
**10018**   4:6
**101**   25:15,18
25:19 28:12
46:1 53:13

**1037**   4:20
**105**   53:2
**10:00**   1:16
150:1
**10:57**   42:23
**10th**   149:21,22
149:25 150:6
**11**   15:7 62:10
65:1 67:9
81:13 86:23
87:1,22 107:6
129:19 144:15
145:4
**1121**   116:1
123:25
**1123**   135:22,23
**11249**   4:13
**1125**   101:10
117:1
**1129**   136:4
137:10
**11501**   153:23
**11:45**   62:15
**11th**   4:5
**12**   31:17 62:12
87:3,22 131:24
132:13 153:25
**120**   23:9 24:2,9
31:18 47:9
59:2,6
**12151**   153:6
**123**   36:6
**125**   30:2
**1280**   131:22
**1285**   131:22
**13**   2:16 58:8,22
66:20 71:9

87:3,18,23
114:24 130:21
**130**   60:11
**131**   135:13
**1350**   4:5
**139**   152:5
**13th**   47:19
**14**   24:25 87:9
87:23 88:1
141:2
**140**   60:9
134:17 152:6
**142**   20:10
**147**   20:10
23:18 25:15,18
25:19 28:12
36:6 44:11,20
46:1 53:2
56:16
**149**   38:23
**15**   15:11 25:1,5
25:21 29:13
90:8,20 91:9
124:24 125:8
152:6
**150**   5:3
**16**   25:5,21 87:9
87:23 88:1
**160**   98:16
**17**   68:18 87:9
87:23 88:1
**18**   88:3,16
104:24 128:16
**18.2**   56:23 57:1
**18.8**   56:4
**18.8.**   56:24

**1800**   4:20
**18190**   4:11
102:14
**19**   65:24 69:4,6
**190**   6:15
**1982**   134:19
**1988**   134:2
139:12
**1990**   131:22
**1991**   135:13
**1993**   98:16
**19th**   5:3
**1st**   22:8,13,22
29:11 45:21
47:15 48:14
53:13 95:8
111:15 117:23
117:24

| 2 | | | |
|---|---|---|---|

**2**   4:12 14:16
20:3 23:19
42:9,14 52:23
68:19,19 73:11
73:15,22 97:14
97:17 109:1
110:2,3,4,8
115:7 129:8,16
130:2,11
132:23,25
133:22,23
138:19 139:23
**2,553,629**
53:22
**2.2**   13:11
**2.5**   53:21 54:6
74:9

23-10210-lgb  Doc 104-1  Filed 06/21/23  Entered 06/21/23 16:41:22  Exhibit A -
Declaration of Morris S. Bauer  Pg 159 of 209

[2.75 - 48]

Page 2

**2.75** 72:25
73:11 97:12
**20** 15:11 30:2
62:11,14 69:4
**20/20** 51:12
**200,000** 40:24
**2021** 65:24
77:8
**2022** 30:22
66:13,20
**2023** 1:15 19:9
19:18,25 23:3
23:18 37:22
38:24 47:15,19
53:14 56:23
64:23 71:9
74:25 128:16
128:18,18,19
128:22 129:5,8
129:11 130:21
153:25
**2024** 22:22
48:14
**2027** 22:13
46:21,23
**2028** 45:21
**21** 2:2 3:1 4:18
6:19 11:9
23:18 64:24,25
69:4,6 103:8
128:15
**21st** 2:15 19:9
19:18 23:3
**22** 39:16 40:13
41:9 64:23
69:9,21,23
103:8 121:3

128:22 152:5
**22nd** 99:20,24
**23** 36:23 38:5
39:10,17
**23-10210** 1:3
6:8
**243** 109:12,20
**25** 62:10
**26th** 99:25
**28** 46:14 66:13
**28th** 95:1
110:16,24
111:16 113:24
116:4,16 122:9
122:13 123:9
123:10 140:9
141:14 148:18
148:20 150:15
151:7
**29** 69:9,21,23
**2d** 131:22
**2nd** 19:25
20:19 68:10
131:20 135:9

| 3 |
| --- |

**3** 86:24 87:22
88:1 141:1
**3.3** 38:9
**30** 70:5,11,13
81:3 95:21
98:12 125:11
140:4 141:3,7
147:3,4,12,16
147:16,17
149:14
**300** 153:22

**300,000** 25:7
47:5
**30th** 100:1
**31** 69:25 70:11
70:13 91:18
129:5
**32** 91:10
**33** 60:7 88:17
88:19 89:4
**330** 153:21
**34** 88:17,19
89:4
**35** 90:7,9,19
**36** 88:17,21
89:4
**362** 14:7,16
65:2 109:1,1
110:2,3,4,8
115:6,7 129:16
129:16,23
130:2 132:23
133:22,23
139:23
**363** 135:23
**365** 134:1
**37** 88:17,21
**375** 134:2
**376** 134:2
**38** 88:18,21
89:4
**380** 135:13
**39** 89:8
**390** 135:13
**3rd** 99:14

| 4 |
| --- |

**4** 46:14 71:15
74:5,6 87:18
87:22 128:17
**4,500,000**
71:11
**4,750,000**
71:14
**4.3** 72:2
**4.5** 72:3
**4.55** 97:10
**4.7** 85:1
**4.75** 71:18
97:10
**4.9** 33:5 46:14
46:15,17
**40** 81:3 87:23
88:1
**400,000** 67:25
88:21 95:7,10
99:12,13
120:17 137:19
138:3
**4001** 140:25
141:1,1
**41** 12:14,15
13:15 89:21
90:5 129:13
132:5
**42nd** 5:3
**455,000** 95:10
**47** 53:13
**48** 24:12 25:10
59:15,22,24
75:12,21 109:4
109:21 111:23

23-10210-lgb    Doc 104-1    Filed 06/21/23    Entered 06/21/23 16:41:22    Exhibit A -
Declaration of Morris S. Bauer    Pg 160 of 209

[48,385,000 - able]    Page 3

**48,385,000** 34:1

**48,728,000** 35:4

**49** 12:25 14:4
22:9 24:13,13
25:12 28:17
35:4,23 41:16
48:2,6,7,24
75:12 93:16
127:19 133:3

**4th** 14:21
99:16

---

**5**

**5** 39:2 73:6
74:5,6,8 76:1
86:24 87:22
128:18 135:22
135:23

**5.1** 46:16

**5.5** 33:17,17,23
37:5

**50** 114:20

**506** 109:5
114:15

**52** 13:3 14:3
48:9 49:2
111:24

**52,600,000** 22:23

**52.6** 133:4

**521** 129:5
131:2

**533** 71:16

**534** 5:11

**54** 128:17

---

**541** 2:2,7,15,20
3:1 4:18 6:19
11:9 64:24,25
128:15 132:3,5
132:9

**543** 37:13

**55** 37:6,7,11
114:20

**56** 56:19,22

**56.8** 102:25

**562** 109:12,20

**57** 13:5

**584** 134:1

**59** 15:6,8

**5th** 97:25 98:1

---

**6**

**6** 1:15 39:19,22
39:25 58:7
86:25 87:22
128:19 129:11

**6,000,360** 24:5

**6.3** 33:1

**60** 15:1,13
100:24 113:22
124:13,13,16
125:11 146:17

**600** 38:19

**61** 13:18 93:21

**62,000** 24:3

**62,000,000** 24:9

**63** 93:20

**63.5** 13:20,21
14:2,3

**64,000** 23:10

**647** 39:12

---

**660** 35:23
37:14 38:19
39:13

**688** 139:12

**69** 53:1

**693** 139:12

**6th** 101:21

---

**7**

**7** 37:8,9 38:12
38:13,16,17,17
79:19 87:22

**7,582,000** 71:8

**7.25** 35:5,6

**7.5** 12:4 37:6
93:3

**70,000** 81:6

**74,000** 29:21

**78** 128:21

**79** 40:12

**7th** 149:14,15

---

**8**

**8** 23:18 86:25
87:22

**80** 30:3 31:20
111:25

**800** 13:7 41:2,6

**82** 22:17 49:5
139:12

**822,000** 13:8

**83** 38:5,15

**84** 39:18,22

**85** 73:14
150:18

**86** 56:16

**89** 3:3 128:24

---

**89th** 94:13

---

**9**

**9** 75:22 77:21
87:1,22 124:15

**9.2** 57:1

**90** 30:4 31:20
31:22 43:22
44:2,4,7,16,17
44:19 85:23
86:3 94:12
115:14 128:23

**907** 131:22

**90s** 106:9

**91** 56:16

**92** 29:8,8

**93** 129:7

**948** 134:17

**95** 44:11,20

**950** 134:18

**96** 24:23 25:1
25:14,17 28:11
31:25 34:17,20
45:24 129:9

**9th** 112:3,5,15
112:17

---

**a**

**aaron** 11:11

**ability** 85:8
138:8

**able** 8:17,19
14:22,23 47:23
73:13 76:5
92:21 95:3
96:13 112:13
138:20

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 161 of 209
[above - affiliations]                                                    Page 4

above  145:24
absence  139:13
  139:14
absolute  135:7
  137:7
absolutely
  81:25 82:8
  83:9,17 86:7
absorption
  57:11
abuse  115:13
accept  17:25
  109:21 114:16
acceptable
  52:15 83:20,23
acceptance
  107:13
accepts  137:3
access  63:6
  72:17
accomplish
  84:17
account  53:17
  82:4 95:12,13
  95:15 96:6
  99:13,15
  137:23 138:3
accrue  131:6,8
accurate  24:8
  153:4
achievable
  29:18,25
achieved
  134:25
acknowledge
  109:25 120:22
  121:22 122:2

123:7
acknowledges
  83:5
acquire  92:23
acquisitions
  36:21
act  132:8
acted  133:14
active  30:9,15
activity  59:9
actual  8:11
  11:13 133:15
  140:1,6 141:10
actually  7:8
  12:17 13:15
  20:7,9 31:3
  34:12 45:15
  56:10 57:10
  60:2 64:1
  71:13 75:18
  79:3 85:18
  87:16 89:22
  96:21 104:15
  107:19 124:20
  125:12 132:18
  133:14 141:9
  148:23
add  29:21
  41:18 83:11
  92:3 126:13
addenda  33:21
  35:8
addendum
  35:14,16 36:5
  36:7,8
addition  83:10
  118:15 142:13

143:22
additional  73:4
  74:4 84:15
  99:4 105:5
  123:11 126:13
  128:20 131:18
  137:19
additionally
  140:5
address  28:19
  115:19 129:21
  142:16 145:16
addressed
  123:25
adequate  78:21
  105:18 109:10
  109:13,17,19
  110:1 115:6
  116:24,25
  117:3 122:7
  129:24 131:18
  132:21 140:11
  140:14 142:14
  143:23
adjourn  10:10
  62:14 148:15
  148:17,20
adjourned  7:9
  7:11 151:6
adjournment
  10:20,20 11:1
adjusted  37:5
adjustment
  34:13
admissible
  114:8

admission  70:8
  91:14 114:15
  115:24
admit  41:20
  61:24 85:22
  126:5
admitted  12:15
  31:7 42:5,7,14
  69:3,21 70:11
  85:19 86:2
  87:20 88:8,14
  90:4 129:14
admitting
  41:24 42:2
  87:12
adopts  11:13
advance  67:25
  73:2 74:21
advanced
  71:17,19 72:2
  72:25 73:4,6
advances  71:21
  72:4,7 74:9
advertise
  146:12,13
advise  84:24
advised  14:25
  82:20
advising  90:21
affairs  87:1
affected  144:23
  145:9,10
affidavit  89:8
  89:12,15,18
affiliations
  20:25

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 162 of 209
[affirmed - appears]                                                      Page 5

**affirmed** 98:1
112:6
**afternoon**
42:18 70:24
**agenda** 123:6
**agent** 118:10
138:4
**agents** 30:14
82:16
**aggregate**
13:18,19 14:1
14:2 93:19,20
**ago** 123:5
130:22
**agree** 57:21
78:16 114:20
127:18 146:24
**agreed** 73:25
138:22
**agreeing** 98:10
**agreement** 2:6
2:8,20,21 8:10
65:14,25 66:1
66:13 69:9,10
69:11 75:1,4,7
76:19,20,22,23
76:25,25 77:2
77:15,16,22
79:5 85:4
98:10 145:6
146:14
**agreements**
2:13 11:17
65:14 146:10
146:11,11,21
146:24

**aha** 77:7
**ahead** 6:3
37:19 56:6,6
71:25 74:22
84:11 128:13
147:7
**albeit** 98:16
**alexander** 5:10
**allocation**
73:16
**allow** 24:19
78:25 139:23
140:8,15
148:19
**allowance** 60:3
60:10
**allowances**
27:23 40:7
59:17 60:1,4,5
60:8,17
**allowed** 17:11
24:24 73:2
132:18
**allows** 121:15
148:22
**alluded** 91:10
123:20
**alternative**
27:6 100:17
**amend** 116:9
116:23
**amended** 45:23
115:11
**amending** 95:2
**amendment**
66:12,14 69:10
73:1 74:2,2

**amortization**
95:17 97:22
98:8,9,13
104:12,18
107:9 111:13
121:22 134:23
135:9,10,20
143:1
**amount** 12:5
13:5,7,8,11,13
15:9 24:14
34:12 54:3
57:17 59:7
60:15 67:17
71:7,11,17,19
80:4 92:17
93:2 103:3
105:5,8 126:4
130:13,14,16
150:24
**amounts** 53:15
53:21
**analysis** 13:15
23:15 24:2
27:1,2,5,6,7,10
27:12 28:4,14
29:11 35:11
49:7 52:23
56:12,18 60:3
60:16 76:8
78:24 80:20
93:19 121:6
127:4 141:17
**analyzed** 84:21
**analyzing**
24:16

**anchor** 40:22
**answer** 19:16
114:11
**answered**
77:13
**answering**
85:11
**answers** 54:20
**anticipate**
27:24 33:10
51:2
**anticipated**
49:18
**anticipating**
54:16
**anybody** 28:18
29:14 89:2
102:7 106:14
108:8 119:5
**anybody's** 57:5
**anyway** 122:18
127:12 146:7
**apart** 8:4
**apologies**
18:25
**apologize**
55:17 79:4
**appear** 28:19
90:10,12,16,17
131:23,23
**appearances**
6:5,9 7:6
**appearing** 63:3
63:10
**appears** 22:8
31:21 91:2
131:7 140:10

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 163 of 209
[appears - associated]                                                      Page 6

142:24
**apple** 135:12
**applied** 24:9
  33:25 135:14
**applies** 110:3
  131:20
**appoint** 129:18
**appraisal**
  12:18,19,24,24
  15:15 17:13,14
  18:20 19:7,9
  19:15,21,25
  20:5,18 23:1,1
  23:18 25:15,17
  26:6,9 36:5,15
  37:24 43:10,19
  43:20,22,23
  44:4,7,17,19
  45:6,7,20,23
  45:24 46:3,5
  47:15 50:18
  58:14,17,17,20
  59:1,2 93:12
  105:4 109:3,21
  109:22 114:16
  116:6,6,7,10
  118:22,23
  128:25 130:9
  130:11 132:25
  133:2 138:18
  139:16
**appraisals**
  36:21 42:10
  47:4 109:22
  118:25
**appraise** 30:12
  43:14 59:10

**appraiser**
  12:23 21:8
  78:6 111:21,22
  111:23 119:24
  126:3 130:9
**appraiser's**
  126:25 127:4
**appraisers**
  58:11 61:3
  116:12
**appraises**
  109:3
**appraising**
  26:8
**appreciate**
  11:7 61:11,12
  86:9 107:24
  147:25
**approach** 26:8
  26:9,9,10,13
  26:25 27:2
  28:8 35:14,19
  49:21 52:24
  53:6
**approached**
  99:19 100:1
**appropriate**
  26:11,24 28:8
  101:14 136:9
  143:17 144:5
**approve** 121:4
  141:19 150:15
**approved**
  83:21 108:15
  122:2 135:8,10
**approving**
  142:12

**approximate**
  13:5,8,11,12
**approximately**
  12:25 13:20
  15:6 48:15,24
  54:6 67:23,25
  71:8 77:20
  81:3 93:3
**april** 37:22
  38:4 101:20,20
  128:16
**area** 29:22
**arguably** 76:17
  76:18
**argue** 90:16
  111:12
**argued** 136:12
**argues** 130:5
  134:20 136:16
  136:25 137:6,8
**argument** 7:10
  79:1 92:11
  112:11,11,12
  136:14
**arguments**
  10:3,13 92:14
  117:11
**arrangement**
  83:22
**arrangements**
  145:18
**arranging**
  111:2
**array** 81:16
**arrears** 97:12
**article** 124:14

**articulated**
  102:6 123:23
  123:24 135:12
**aside** 148:1
**asked** 10:20
  22:18 49:11,13
  53:16 58:25
  72:18 73:22
  76:24 77:2,3
  77:12 96:15,19
  101:12 105:13
  110:17
**asking** 51:13
  59:4 64:8,9
  79:11 96:5,6,6
  97:17 100:11
  100:12 122:12
  122:13 144:11
**aspect** 143:2
**aspirations**
  139:8
**assert** 76:17
**asserting** 66:10
**asserts** 71:7
  130:14
**assess** 76:2
**assessed** 76:8
**asset** 93:4
  94:11,12
  115:10,11
  126:17 128:7
**assets** 92:20,23
**assist** 80:20
**associate** 90:21
**associated**
  26:21,23 82:25

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 164 of 209
[associates - basement]                                                    Page 7

**associates**
45:15 134:1
**association**
133:25
**assume** 27:18
28:2 41:20
53:23,24 149:9
**assumed** 23:8
31:16,18,18
32:22
**assumes** 42:8
50:18 118:3
**assuming** 40:5
84:2 145:22
**assumption**
9:23 22:20
33:16 142:16
**assumptions**
29:2,9,17 30:7
31:12 33:22
35:10 36:2
41:12
**attach** 96:12
**attached** 12:20
13:14 18:20
19:21,25 20:19
42:9 123:17
129:1
**attaches** 22:25
22:25
**attempted**
90:10
**attempting**
82:19
**attend** 68:13
68:14

**attendance**
68:10
**attention** 14:20
55:23
**attorneys** 4:4
4:11,18 5:2,9
6:4,6
**attract** 82:22
83:2
**atypical** 24:18
**audience** 81:5
83:2
**authenticate**
91:3
**authorities**
84:10
**authorization**
140:6
**authorize** 2:12
150:8
**authorizes**
129:23 130:2
**automatic** 3:2
65:1 109:15
110:5,8 111:19
128:16 129:15
132:14 139:23
**automatically**
113:22
**availability**
56:1 99:6
**available**
110:24 135:2
136:15 138:16
**avenue** 4:12
37:21 38:4,23
40:12

**avoid** 23:12
32:14 77:4
**await** 86:15
**aware** 11:10
30:10 146:3
**axis** 60:7

**b**

**b** 1:21 2:7,21
5:6 14:12 36:5
36:8 130:3
136:4
**b.r.** 109:12,20
134:17 135:13
139:12
**back** 16:7,16
30:22 31:24
38:24 45:22
48:22 49:15
62:11,14,22,24
63:13 73:17
96:20 98:2,3
99:18,20 100:1
102:16,18
104:19 106:8
114:9 124:20
126:20 136:14
140:5 141:9
148:23
**backed** 103:7,7
**background**
20:24
**balance** 71:15
71:21 72:4
73:11 83:13
132:14
**ballpark** 39:15
40:2

**balls** 8:25
**bank** 40:20
95:12,13,14
96:6
**bankr.s.d.n.y.**
139:12
**bankruptcy**
1:1,11,23 81:8
81:9 83:24
86:24 95:16
109:5,9 113:3
125:1 129:16
130:19 131:6
134:18
**bar** 2:9,22 90:1
**base** 28:23
32:25
**based** 21:16
28:5 30:8 34:2
38:21 45:4
47:22 49:18,20
51:24 54:5
59:8 60:16
66:22 72:5,6
82:21 101:19
103:15 105:1
109:4 110:7
113:25,25
114:21 115:21
115:21,22
116:25 117:1,2
117:4 119:3
124:3 126:24
132:24 133:9
139:17 142:23
**basement**
29:19 30:1

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 165 of 209
[basically - born]                                                      Page 8

**basically** 24:8
27:11 93:24
98:17
**basics** 83:16
**basis** 22:16
24:17 30:4
82:23 119:13
119:13 143:9
**battle** 116:11
**bauer** 2:2 4:23
6:18,18,21,22
9:9,13,14 11:5
11:7,8 13:23
13:25 16:10
17:10,16,22
18:7,10,15,23
19:2,5,6,20
21:15,19 22:3
25:13,24 26:2
26:4,5 31:23
34:6,23 35:2
35:12 41:18,22
58:3,4,6 60:20
61:14,19,21,24
62:2,6,8,20,23
62:23,24 63:1
63:6,10,12,15
64:16,18,20,21
68:16,23 69:7
69:24 70:5,14
72:16 73:1
77:25 78:4,16
78:19 79:3,10
85:12,14,17,21
86:4,11,12,15
86:17,23 87:16
87:24 88:3,17

89:8,15,21
90:6,9,20
91:10,19,23,24
92:1,12,13
101:8 102:19
104:11,17
105:3,10
106:12 108:4
117:18,22
120:12 121:23
121:23 122:12
122:24 123:4
123:19,24
124:5,8,11,17
125:21,23
128:5 129:3,10
141:17 143:7
147:7,12,20,22
147:25 148:3,9
148:21,25
149:3,11,12,25
150:2,17,19,21
150:24 151:1
151:12,13,16
151:19,22
**bauer's** 9:24
10:24 118:14
120:1 133:11
133:12,17,21
133:23 145:19
146:2
**beckerman**
1:22 6:2,10
**beckerman's**
147:22
**beginning** 32:4
56:14 124:12

**behalf** 2:2 11:8
12:2 64:23,24
67:15 106:18
108:11,13
**belief** 103:7
**believe** 12:11
19:11 35:9
37:9 38:6
39:25 40:16
44:20 46:2,24
48:13,19 49:16
52:22,25 63:7
63:15,17 67:18
70:1 74:4 76:6
104:1,6,10
106:2,3,4
112:19 113:6
114:14,15
116:24 136:23
**believed** 103:6
**belinsky** 5:22
62:8 63:2,12
**beneficial**
79:22
**benefit** 128:9
**bernstein**
109:12,20
**bertolotti** 5:1
**best** 16:5 18:2
51:8 109:23
**better** 15:22
38:25 142:1
**betting** 94:24
**beyond** 85:5
126:12,14
133:13

**big** 25:2 74:11
107:12
**bigger** 50:8
**biggest** 102:24
**bill** 88:5,9
95:10
**binder** 18:24
19:4,9 20:4,11
69:5
**bit** 7:5 8:8 9:5
34:13 39:8
56:22 111:14
116:7
**bits** 68:22
**bkrtcy.w.d.te...**
135:13
**bleecker** 98:16
**blow** 34:21
**blown** 86:19
**blue** 34:1,16
**bodek** 12:9,10
12:10,11,11,12
12:12 65:23
68:2,5,13
94:15 96:7,23
97:6,17 100:9
110:18 137:17
**bodek's** 97:3
**bodeks** 12:9,9
88:20 89:9
90:10 96:2,4,5
119:6 138:9,15
139:14
**body** 128:8
**books** 117:2
**born** 55:14,20

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 166 of 209

[borne - case]                                                           Page 9

borne  98:25
borrowed
  137:18
borrower
  73:11,13,17
borrowing
  39:5
bottom  33:25
  44:19
bought  39:11
  39:12 112:9
  128:1
boulevard  4:20
bov  30:18
bowling  1:12
  5:11
box  8:11 34:16
  50:8
branch  40:20
break  62:4,7
brief  62:21
briefed  14:17
briefly  36:14
  55:24 102:10
  106:16
bring  14:20
  89:17 133:22
bringing  39:7
broadway  4:5
broke  7:24
broker's  30:19
  30:22
brokerage
  30:20
brokerages
  82:21

brokers  30:15
  33:19 59:10
brought
  143:20
budget  54:1,1
build  23:9
  31:19 51:15
  52:10,13 54:10
  82:22 83:1
  118:10 138:4
building  8:11
  26:18 29:22
  30:9 32:9,20
  32:22 38:14,23
  39:11 40:17,21
  40:22,25 41:5
  43:14,15,16
  45:14 46:20,25
  49:9,25,25
  50:10 51:2,3
  51:15,16,17
  52:5,6,10
  53:18 54:3
  61:4,4,6 80:17
  81:6 82:25
  83:4,7 84:6
  88:24 97:15,19
  102:22,23
  103:25 104:2
  105:14 127:22
  130:13,18,24
  132:24 133:7
  136:19
building's
  32:16
buildings
  30:10 32:7

41:11,11 59:11
buildout  31:18
  47:8 58:25
  59:7 60:15
builds  52:14
built  29:9 52:7
burden  14:8
  94:2,4 134:4,7
burned  40:6
business  128:3
buttress  97:5
buy  27:17
  49:25 127:19
buyer  27:1
  50:19 51:1,2,4
  75:16,18
buying  28:18
  33:10

**c**

c  4:1 6:1 8:12
  153:1,1
calendar  9:22
  149:20
calibrated  32:5
call  6:3 12:22
  20:9 28:12
  63:8 74:8
  125:21 126:21
called  62:21
  77:18
calling  8:25
  61:20,21
camera  15:25
  61:14 62:17
canceled  128:7
cap  27:11
  33:13 41:7,9

capital  27:25
  53:20,22 54:1
  54:1,6 105:5,8
capitalization
  27:6,10,14
  33:12,17,23
  37:5 52:24
capitalize  28:6
  28:7
care  32:18
carefully  74:20
carroll  5:1
carry  66:3
  69:14 73:18
  76:4 85:3 95:7
  96:18 111:2
  117:5 120:2
carrying  83:4
carve  66:2
  69:13
case  1:3 6:4,8
  12:5,6 14:19
  30:18 55:15,21
  68:6,19,19,20
  81:13 89:3
  94:12 95:4,12
  95:16 98:3,4,7
  98:9,13,15,17
  98:17,18,20,24
  99:1,3 101:15
  102:17,25
  103:2 104:17
  106:4,7 107:4
  107:7 108:5
  109:19 110:2
  112:3,5,5,5,10
  112:15,18,20

23-10210-lgb  Doc 104-1  Filed 06/21/23  Entered 06/21/23 16:41:22  Exhibit A -
Declaration of Morris S. Bauer  Pg 167 of 209

[case - city]

Page 10

112:20 113:3,4
113:5 114:24
115:10,23
117:16 121:9
121:24 125:1
126:17 133:6,9
133:10 134:18
**cases** 67:9 68:6
98:6,11 101:15
104:18 109:11
113:1,1 114:24
115:12,13
128:3,7 129:18
129:18
**cash** 24:22
25:11,17 26:25
27:4,9 28:13
28:20,23 29:9
29:12,13 31:21
31:25 32:2
33:22 34:2
45:25 46:6
49:21 52:23
53:10,15 84:15
118:19
**cauldwell** 2:8
2:22 5:2 7:2
8:9 11:17
13:10 65:15
87:7 103:20
108:11,13
137:4
**cause** 14:15
78:7 79:1
129:23 130:5,5
131:21 132:22

**cecora** 5:23,24
8:8 103:23,24
**cell** 63:17,22
**center** 33:25
**certain** 31:12
32:5,14 107:15
120:2 128:20
137:2,17
**certainly**
103:13 105:7
108:6 118:24
121:20 125:3
**certificate**
22:20 126:21
133:5 137:20
**certifications**
97:5
**certified** 21:8
153:3
**cetera** 145:8
**challenging**
81:7,9 109:25
**chance** 112:4
134:16,21
**change** 23:23
24:14 25:6
41:5 47:1,12
50:1 59:3 72:3
144:22
**changed** 34:3
**changes** 116:5
**chapter** 15:7
67:9 81:13
86:23 107:6
114:24 129:19
144:14 145:4

**characterize**
37:18 40:4
**charles** 58:10
**chart** 31:11
33:25 59:16,25
60:19
**checking** 72:16
**chelsea** 36:18
36:19 55:25
56:2,17,22
104:24
**child** 110:19
**chime** 78:12
**choices** 102:22
**choose** 59:6
**chose** 10:1
94:13
**christopher**
5:19
**cir** 131:22
**circuit** 97:25
98:1 112:4,5
112:15,15,17
131:20 135:10
**circumstance**
126:19
**circumstances**
50:17 120:2,4
121:9 143:11
**cirz** 9:16 12:21
12:23 13:3
14:12 15:16,19
15:22,24 16:2
16:6,10,15,17
16:20,23 17:2
17:4,6,10,15
17:18,23 18:1

18:4,6,14,16
19:7,14 20:5
20:20 21:16,22
21:24 22:2,4
23:20 25:14,24
26:6 31:5
34:25 36:7
42:19 43:2,4,6
43:7 52:19
55:1,3 56:7,10
58:2,5,7 60:21
61:1,3,11
82:14 93:13,16
104:22 105:13
105:22 128:25
129:12 130:9
133:1,2 138:18
139:18
**cirz's** 23:19
25:20 41:19
42:5 105:1,4
129:2 130:12
**cite** 101:13,14
101:15 109:10
109:11 112:3
112:15 113:1
**cited** 97:25
98:4,6,15
113:3,5 135:10
**citibank** 40:19
40:19
**citing** 109:19
115:22 130:11
132:25
**city** 13:6 30:9
30:21 32:7,15
32:23 87:7

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 168 of 209
[city - complete]                                                    Page 11

88:3,6 95:9
113:4,6,8,9
**claim** 11:20,25
12:2,2,4 13:5,6
13:8,10,13
66:10 67:8,11
67:14 68:18,18
68:19,19,25
71:1,7,16
74:10,15,15
87:6,7,7,8,18
87:18 93:2,5
102:25 103:7
106:19,19
109:8 113:7
114:17,18
126:12,15
130:15,21
133:12
**claims** 2:9,23
13:15,17,17,19
13:21,22,23,24
13:25 14:1,1
67:15,17 68:17
80:3 87:4
89:23,23,25
90:1 93:17,19
93:20,21 113:2
130:20 132:12
134:23 139:16
139:17,17
143:9
**class** 52:13
57:11 107:15
112:25 113:10
113:13 116:19
116:21 135:5

137:1 143:8
**classes** 113:2
**classified** 72:1
**cleaning** 32:12
32:13 53:19
**clear** 98:21
107:8 119:24
120:7,8 125:16
125:23 127:17
128:11 134:24
135:21 136:5
141:11 143:11
**clearly** 123:5
137:4
**client** 14:6
48:19 51:23
54:5 78:23
79:12 100:22
102:20,24
104:16 105:16
107:24 120:1
120:11 126:11
133:11,12,17
133:21,23
146:2
**client's** 120:14
143:8
**clients** 33:20
120:16,19
121:14
**climate** 119:14
**clock** 141:10
**close** 8:2,3 39:6
60:9 70:23
118:5
**closed** 10:19
36:24 73:10

95:15
**closer** 55:18
81:3
**coach** 40:19
**code** 83:24
101:14 109:5
113:3 129:16
131:6
**coincides** 29:11
34:1
**collateral**
105:17 133:13
133:19 134:5,8
**collectively**
129:6
**come** 30:7
33:11 35:19
48:16,16,18
57:18 59:7
66:16 83:19
96:17 99:2
100:7 102:18
113:12 124:20
136:14 140:5
141:9 148:22
**comes** 9:5
95:18 98:22
128:5,8
**coming** 17:22
32:4 38:15
61:11,12 83:22
86:5 95:8
**comment**
100:23
**commenting**
82:15

**commercial**
30:20 55:11
119:15
**commercially**
15:9 100:24
124:25 145:3
146:18,20,24
146:25 147:2
**commissions**
27:20
**commitment**
94:20 100:4,8
121:6
**commitments**
120:23
**committed**
85:1 105:4
**committee**
84:22
**common** 26:8
31:13 83:12
**commonly**
6:19
**company** 2:8
2:22 32:18
**compare** 25:19
53:11
**comparison**
35:14,16,18
**comparisons**
36:4,11
**competing**
93:12,12
**complete** 2:14
76:4 82:5
84:21 85:2
102:23 103:18

23-10210-lgb    Doc 104-1    Filed 06/21/23    Entered 06/21/23 16:41:22    Exhibit A -
Declaration of Morris S. Bauer    Pg 169 of 209
[complete - control]                                                    Page 12

| | | | |
|---|---|---|---|
| 104:2 105:6 132:1 | **confer** 33:19 33:20 | **congress** 106:7 115:11 | 131:13 136:19 |
| **completed** 13:1 46:25 | **confidence** 30:24 103:13 103:14 | **connection** 10:17 74:1,2 82:18 83:16 137:16 | **consummation** 132:15 |
| **completely** 145:20 | **confident** 85:8 | **consensual** 101:3 | **contacted** 45:17 |
| **completing** 51:2 82:2 | **confidential** 37:4 | **consent** 66:1 69:12 138:21 | **contain** 138:6 |
| **completion** 66:3 69:14 79:25 102:21 | **confirm** 93:5 112:13 135:5 137:1 | **consider** 78:22 136:22 143:22 | **context** 125:1 145:3 |
| **complied** 115:14 | **confirmable** 94:5,6 102:19 104:11 110:15 134:15 136:3 136:21 137:9 | **consideration** 83:1 | **continually** 123:6 |
| **comply** 146:14 | | **considered** 136:10 | **continue** 31:11 40:10 55:8,10 77:2 97:1 103:20 105:14 114:7 |
| **computer** 20:9 | | **considering** 49:20 51:15 117:21 | |
| **concentrate** 31:14 | | | |
| **concept** 107:9 | **confirmation** 94:8 96:24 98:5,8 112:6 113:11 117:12 122:5 126:1 128:2 135:18 136:6,10 137:12 138:2 138:11 144:5 | **considers** 130:16 | **continued** 99:19 135:3 136:16 |
| **concerned** 86:10 | | **consolidated** 87:2 145:14 | |
| **concerns** 108:13 | | **consolidation** 135:1 136:8,13 143:15,16 145:18 | **continuing** 78:18 106:5 |
| **concession** 60:4 | | | **continuously** 77:22 79:6 |
| **concessions** 60:3 | | **constantly** 30:11 | **contract** 36:24 36:25 76:21 90:22 143:6 |
| **conclude** 57:4 | **confirmed** 14:10,14 83:23 84:5 97:24 113:16 114:7 134:16,21 136:12 139:20 | **construct** 103:14 | |
| **concluded** 151:23 | | **construction** 2:7,14,21 6:16 32:20 51:2,21 52:1 54:2 61:5 88:23,23 97:1 99:11 131:12 | **contractor** 7:22 131:14 |
| **conclusion** 15:14 56:17 | | | **contracts** 2:10 2:23 131:12 137:17 |
| **condition** 26:15,16 27:17 27:21 48:24 50:19 | **confirming** 98:13 | | **contrast** 103:19 |
| | **confused** 77:9 77:10 | | **contributions** 138:25 |
| **conduct** 14:23 | **confusion** 23:12 | | **control** 75:2 80:7 92:24,25 99:22 102:3 |

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 170 of 209

[control - court]                                                   Page 13

106:5 107:21
132:2,16
133:14,16
145:7
**conversation**
68:7 80:19
**conversations**
68:5
**convert** 26:18
33:12 49:8
129:18
**converted**
26:19
**convincing**
108:5
**convincingly**
99:6
**cooperating**
59:17
**cooperative**
98:25
**copy** 151:17
**corner** 63:16
**corp** 134:17
139:12
**corporate**
107:1
**correct** 18:21
18:22 19:10,19
19:22 20:1,12
21:4,5,19
25:24 28:17
45:11,18 46:21
46:23 47:6,9
47:16 48:24
49:5,14 51:21
53:22 55:15,21

56:20 57:7,19
58:14,24 61:8
66:8 67:20
68:4 71:8,12
76:10,12 77:18
80:10 84:18
87:24 92:1
147:17 150:9
**corrected**
12:19,24 15:3
17:14 19:25
20:5,18 23:1
34:5,7,11 35:3
36:5 58:8
**correction** 23:3
**correctly** 43:5
**cost** 8:11 26:9
32:20 47:8
48:11 53:17
54:2,9 73:24
82:5 83:4 84:3
84:21 85:2
118:8,9 137:24
138:4,4,9
**costs** 32:8 39:5
54:12 58:25
73:13,21 82:16
82:17,25 83:5
118:8,16
137:25 138:2
138:14,17
**counsel** 6:9,11
64:21,22
108:22
**counsel's**
137:22

**counterparties**
2:9,23
**country** 153:21
**counts** 40:11
**couple** 15:20
23:5 99:18
101:22 104:10
124:9
**coupled** 139:16
**course** 105:17
**court** 1:1,11
6:2,3,13,17,21
6:25 7:3 8:23
9:2,8,20,22
10:7,16,23
11:4 15:1,18
15:23 16:4,7
16:11,19,22,24
17:3,5,7,20,25
18:7,23 19:3,7
19:14 21:18,20
21:22 22:4
25:22 26:3
29:3,7 31:2
32:1 34:22,24
41:20,24 42:2
42:7,13,15,20
42:23 44:2,10
44:13,20 52:18
53:2,5 54:8,14
54:18,22,25
56:6 57:25
60:22,25 61:10
61:18,23 62:1
62:4,7,13,22
62:25 63:5,9
63:11,14,19,23

63:25 64:3,7
64:12,17 68:15
68:21,24 69:3
69:17,20 70:2
70:4,8,11,17
71:3 78:3,19
79:4,10,15
81:8,9,21 82:1
82:9,11 83:3
83:14,18 84:1
84:8,14,19
85:10,16,24
86:1,4,9,14,22
87:10,15,20,25
88:11,14,25
89:7,14,19
90:3,6,14,18
90:24 91:2,14
91:17,21,24
92:2,7,9 93:7
93:11 98:1
101:8 102:12
105:11 106:14
107:19,19
108:8,18,20
109:12 112:16
112:21 117:7
117:10 119:12
119:18,21,23
122:10,17,21
122:23 123:3
123:17,22
124:3,6,9,12
125:22,24
127:20,25
128:4,10,12,18
129:11,17,21

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 171 of 209

[court - days]                                                        Page 14

129:21 131:10
131:24 132:20
133:9,21 134:2
134:10 135:8
135:16,18
136:11,14,19
136:22,23
137:3,8,11,14
138:15 139:4,5
139:13,19,20
139:22 140:3,4
140:5,11,13,15
140:20,23
141:4,6,13
142:7,9 143:14
144:12,18,20
145:2 146:8,13
146:20 147:4
147:11,15,21
147:23 148:2,4
148:10,15,19
148:23,24
149:2,5,13,18
150:1,3,6,9,11
150:15,20,22
151:3,6,10,12
151:14,21
**courthouse**
7:17,18
**courts** 135:9
**cover** 137:24
138:1,3
**crammed**
112:9
**create** 100:10
**creates** 99:8

**credible** 35:20
93:14
**credit** 110:6
**creditor** 75:4,7
77:3,7 92:19
92:19 98:3,25
106:18,21
107:16,18
108:13 109:6
110:3,4 112:14
112:25 114:23
115:5 133:13
133:18,19,20
**creditors** 79:22
80:2 84:8,9,10
95:20 100:12
101:3 102:22
104:13,20
105:24 106:25
107:4,13,15,22
108:15 109:9
109:16,19
111:10 113:14
113:17,18,19
116:22 125:2,5
132:12 135:1,4
135:5 136:17
137:1 138:24
144:16,18,23
145:10,11,24
146:4,9
**credits** 107:11
125:4
**cross** 9:25
41:19 42:16
43:2,8 52:16
55:1 60:23

61:1,25 70:15
70:17,20
**cure** 97:12
**current** 22:6
26:14,16 27:17
35:10 37:22,25
38:5,21,23,25
39:10 48:23
49:8 50:11
51:14 56:1
104:15 105:18
**cursor** 59:18
**cursor's** 59:13
**curve** 103:24
**custom** 5:10
**customary**
52:9
**cv** 20:7,21,23
21:16
**cvs** 58:13
**cycle** 68:1

**d**

**d** 6:1 14:16,16
109:1,1 110:2
110:3,4,8
115:6,7 129:16
129:16,23
130:2 132:23
133:22,23
135:22,23
139:23 152:1
**darn** 38:23
**data** 33:18
36:2,22 50:20
54:3
**database** 30:12

**date** 2:9,22
12:3 15:6
19:16 21:7
22:14 26:20
29:10,12 39:7
39:18 45:5,21
46:23 47:15
48:14,18 67:19
71:8,9 80:5
90:1 93:3
103:10 124:20
130:7,18,25
131:8 148:16
149:3,4,6
153:25
**dated** 19:9,25
20:19 23:2,18
39:8 65:24
66:13,19
**dates** 19:11
101:19
**day** 8:4 9:9
15:8 45:7
94:13 95:18
99:14,24
115:14 141:3,7
151:5,6
**days** 7:10 15:1
15:6,11,13
21:3 94:13
99:10,18
100:24 101:22
113:22 121:3
124:13,13,16
124:24,24
125:8,11,11
140:4 141:2

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 172 of 209
[days - deposition]                                                        Page 15

146:17 147:3,4
147:12,17,17
149:14
**dcf** 28:8 35:21
**deadline** 8:18
114:11
**deadlines**
128:20
**deal** 8:2,6,16
25:2 78:11
83:22 103:5
114:12 127:13
**debate** 107:9
**debt** 13:4 76:4
83:11 109:4
**debtor** 1:9 2:5
2:18 14:13
15:7 43:8 75:2
80:8 93:17
94:4,12 95:24
102:3 103:13
106:9 107:22
108:22,22
110:12 111:17
112:17,23
113:10,20,21
114:6 115:16
115:17 125:18
130:3 133:16
133:24 134:3,4
136:11 137:8
138:13 145:6
**debtor's** 11:17
65:15,22 87:1
95:16 99:1
104:1,12 105:7
105:23 107:8

109:14 111:3
111:11 114:5
115:9 117:1
129:8 135:11
137:22 138:23
139:7
**debtors** 2:12
2:14 3:1 4:4
6:12,12 11:16
11:22 14:8
65:13 66:7,10
66:14,17,23
67:12,15 68:3
69:1 78:9
91:12 93:10
94:11 95:11
96:20 97:11,12
99:21,22 101:4
102:23 105:1,3
106:1 115:13
126:18 129:6
130:6 131:10
132:10,12,16
132:23 133:6
133:14 134:7
134:14,20
135:17 138:20
139:20 140:8
146:10
**decide** 10:23
10:25 79:7
101:11 117:12
117:14,15
125:3
**decided** 138:15
145:15

**decision**
115:20 140:18
140:22 143:24
**decisions** 38:2
84:23
**declaration**
11:11,12 12:21
17:11,12 18:8
18:12,16,17,19
19:22,24 20:20
20:20 22:25
61:24 64:24
65:11,12,17,18
65:21 79:19
85:19,22
128:22,25
129:2,3,10
**declarations**
9:14 10:1
41:21,25 42:5
42:10
**decline** 105:14
109:14
**declined** 55:14
**declining** 49:16
111:22 114:1
**decoration**
86:2
**decreasing**
48:5
**default** 66:17
66:22,22 70:6
70:7,9 73:5,5
73:21 74:7
76:10,10,17
77:4,20 90:22
104:15

**deferential**
78:15
**definitely**
118:9
**definitively**
117:14,14
135:18
**degree** 16:2
**delay** 108:2
**delayed** 108:4
**deleted** 23:12
24:7
**deliver** 20:11
**delved** 7:22
**demonstrate**
116:19 130:11
133:3 134:8
**demonstrated**
115:7 132:21
132:23 133:23
**demonstrates**
138:19
**denied** 98:5,8,9
**deny** 115:18,24
116:13 117:4
**department**
5:8 87:8 88:4,6
**depending**
10:12,14 30:4
50:22 120:3
131:1
**deposited**
88:22 137:22
**deposition**
91:12 96:11
97:3 110:17,18
110:24 111:1

23-10210-lgb  Doc 104-1  Filed 06/21/23  Entered 06/21/23 16:41:22  Exhibit A -
Declaration of Morris S. Bauer    Pg 173 of 209
[deposition - dollars]                                                      Page 16

116:15 138:16

**depositions**
88:20 90:10
96:2,3 120:12
121:15 122:12

**depth** 93:14

**derived** 28:22
45:2

**describe** 22:7
26:16

**described** 26:7
105:11

**description**
52:4

**deserve** 146:3

**designated**
73:16

**desirable** 40:25

**desire** 104:3
107:3

**desk** 17:1,3
34:25

**details** 8:21
24:20

**determine**
15:14 49:7
135:18 140:11
142:22 144:3

**determined**
136:6 137:2,12

**determining**
26:13 27:2
39:23 131:21
147:1

**development**
2:6,20 134:17

**dial** 63:4,7

**dialing** 63:13

**diamond** 36:25

**diem** 90:22

**difference** 25:7
47:5

**differences**
118:25

**different** 28:19
30:1 35:9
36:12 39:9
46:4 50:3
80:24 81:16
87:5 116:7
126:16 145:20
146:22

**diminished**
55:19

**diminution**
105:16

**diplomat**
139:11

**dire** 18:14

**direct** 18:12
22:2 27:6,9,11
55:5,23,24
58:5 64:19
65:9

**direction** 16:9
86:15 97:16
101:2 110:22

**directly** 71:6
145:12

**disbursed**
73:10 74:3

**disclosure** 87:2
89:25 94:14,22

94:25 95:2
96:12 110:16
110:25 111:15
113:24 115:15
116:5,10,16,23
117:5,13 121:3
121:4 122:6,7
125:13 126:3
136:6,10
137:12 138:5,8
138:12 140:8
140:10 141:14
141:19,20,23
142:3,12,15,18
142:22,24
143:16,20
144:4,7 148:14
150:13

**discount** 33:11
33:24 35:5
37:6,8 38:12
38:16 39:19,22
40:1 41:10
60:14

**discounted**
26:25 27:4,9
28:13,23 49:21

**discuss** 151:4

**discussing**
128:12

**discussion**
76:13 82:6

**discussions**
116:17

**dismiss** 129:18

**displayed**
103:23

**dispute** 8:13
113:1 114:19
132:5,10

**distress** 37:1

**distressed**
36:17,19 37:2

**distribution**
135:25

**district** 1:2
37:1 97:25
112:19 134:18

**disturbing**
105:9

**docket** 46:2
85:23 86:3
139:18

**document** 2:16
3:3 31:7 44:9
53:5 65:3,5,8
69:24 151:15

**documents**
16:15 17:10,16
17:23 25:20
31:6 63:23
65:21,23,23
66:4,6,9 69:4,6
69:7,15,20,21
69:23 71:22
72:5,6 96:10
97:13 130:8

**doing** 16:11
121:16 125:10

**dollar** 24:14
67:17 72:3

**dollars** 25:9
46:11 72:2,25
74:16 84:25

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 174 of 209

[dollars - erbo]                                                                    Page 17

85:5 111:25
**door** 16:13
**doubt** 121:20
**doug** 58:10,12
**downloaded**
    88:6
**dragging** 95:4
**dramatically**
    56:25
**draw** 121:15
**drawer** 16:24
    16:25 17:1,3,5
**drilled** 100:18
**driver** 28:16
**drogan** 4:3
    6:11 108:22
**duane** 4:17
    6:19 11:8
**duberstein**
    113:4
**due** 67:18
    74:22 95:8
    111:15 113:12
    117:22 130:6
    131:16,19
    135:20

**e**

**e** 1:21,21 4:1,1
    6:1,1 88:18
    89:3 90:20
    91:3,7,11
    152:1 153:1
**earlier** 13:9
    22:24 45:23
    76:24 97:22
    144:13

**earnest** 107:21
**ease** 25:16
**east** 5:3
**easy** 63:21
**ecf** 44:8 128:17
    128:21,23,24
    129:7,9
**economical**
    132:8
**economy** 132:7
**ecro** 1:25
**educational**
    20:24
**effect** 34:11
    109:11
**effective**
    110:10,11
    115:8 130:4
    134:5,9,11
    139:7
**effectively**
    130:23 132:15
    147:1
**effectuating**
    139:25
**effort** 100:19
**efforts** 88:19
    89:9 96:15
    131:11
**eight** 35:9
    36:12 37:23,24
    50:21 57:12
    75:22
**eighties** 110:20
**either** 14:3
    36:21 61:13,23
    83:20,23 115:7

117:4 120:13
    131:9 133:6
    135:25
**electricity** 83:6
    118:11 137:24
**electronic**
    17:19
**electronics**
    139:12
**elements** 31:21
    139:6
**eliezer** 5:18
**email** 20:15
**emailed** 20:13
**emails** 20:17
**ended** 87:17
    97:17
**enlarge** 32:3
**enron** 112:21
    112:22
**enter** 2:13
    66:13 137:17
**entered** 65:22
    69:6,23 70:13
    86:3 88:1,16
    89:4 90:5,19
    91:9,18 128:18
**entire** 76:6
    82:25
**entities** 12:7,10
    92:17
**entitled** 76:17
    109:10 110:1
    115:5,6 131:5
**entity** 12:8
    100:7 107:6,21
    112:14 125:5

144:18,22
**entry** 2:5,19
**envelope** 14:21
**environment**
    50:16 51:14
**envisions** 13:2
**equal** 24:25
**equitable** 98:2
    104:16 106:3
    134:24 135:19
**equity** 14:5,7
    78:5 93:11,23
    93:24 94:1,4
    99:1,21 105:2
    106:10 112:7
    119:13 126:20
    128:7 130:3,24
    131:2,4 132:24
    133:6,7,24
    134:3 135:4
    136:17 138:25
    146:1
**equivalency**
    143:10
**equivalent**
    137:10
**eran** 11:11
    64:19,24 70:20
    128:22
**erbo** 1:7 2:5,18
    6:8 11:23,23
    12:6 13:4,19
    14:2 68:19
    70:24 71:1,2,6
    84:13 92:18,25
    93:17,21,23
    94:12 129:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 175 of 209

[erbo - exit]

Page 18

130:24 131:3
132:4 144:19
144:20 145:11
**eric** 5:20
**erno** 12:9,11
12:12 65:22
68:2,5,13
96:23 100:9
**ernst** 40:16,16
**escrow** 111:8
137:22 138:3
**especially**
118:25 125:1
**essence** 143:17
**essential**
134:11
**essentially**
69:15 84:23
**establish** 134:4
**establishes**
134:3
**estate** 13:6
21:8 24:16
32:15 55:11
76:3 83:12
87:8 94:12
95:8 98:23,24
109:3,17
111:14,17
113:11,13
115:10,12,13
119:15 126:17
128:7 130:13
135:24 136:1,2
137:25
**estimate** 22:17
22:18,19,22

59:8 80:16
127:10
**estimated** 32:8
45:3,4 48:6,8
**estimates** 28:6
29:25 30:23
**et** 145:8
**evaluation**
21:25 110:7
**evening** 70:22
70:23
**everybody**
17:24 20:4,9
23:16 28:11
39:1 55:20
62:15 83:5
**everyone's**
126:15
**everything's**
125:15
**evidence** 12:16
18:9 31:7
41:21,25 42:6
42:8,10,14
67:5 68:17
69:4,6,15,22
69:23,25 70:6
70:12,13 75:11
85:19,23 86:2
86:3,20 87:12
87:21 88:2,8
88:15,16 89:5
90:5,13,19
91:9,18 92:15
99:6 105:7
106:11 107:7
116:8 117:23

119:4,8,23
120:15,16
121:2,19
122:14 129:14
138:7,12 139:1
139:13,15
142:23 143:15
**evidentiary** 2:4
9:17 10:3,18
91:25 92:3,5
**exact** 72:21
80:21,23
**exactly** 9:6
34:23 52:11
72:11 106:7
111:10 124:15
150:14
**examination**
22:2 42:16
43:2,8 52:17
55:1 58:5 61:1
64:19 65:9
70:16,18,20
**examine** 9:25
**example** 32:12
32:17 46:25
53:18 142:21
142:25
**excel** 13:16
89:22
**exception** 98:7
**excess** 73:14
74:8,16,23
**exclusivity**
14:18 95:3
100:25 101:7,9
101:19,23

106:5,9 113:22
116:1,2 123:14
123:21 129:19
**excuse** 14:1
20:11 78:13
106:2
**excused** 61:17
86:11
**execute** 65:5
79:20
**executed** 17:12
18:16,17 65:22
66:6 67:14
**exercise** 92:23
125:12 132:19
**exercising**
145:5
**exhibit** 13:14
19:8 20:3,14
23:17 52:22
70:7 86:19
93:20 129:1
130:11 132:25
138:18
**exhibits** 12:14
12:16,17 13:14
42:9,9,14
70:11,13 87:22
88:1 129:13
**exist** 139:17
**existing** 38:8
119:6
**exists** 130:6
**exit** 96:16
119:5,9,25
120:13 123:12
138:13,21,23

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 176 of 209

[exit - filed]                                                                    Page 19

139:1,15
**expect** 80:25
81:2 101:18
**expedient**
82:23
**expeditious**
82:23 132:7,11
**expend** 84:3
**expenditure**
53:20
**expenditures**
27:25 53:23
54:7
**expense** 27:19
32:13 105:24
**expenses** 32:5
32:6,9,11,14
32:17,22 138:6
**experience**
47:22 105:10
136:18
**experienced**
58:12
**expert** 21:17
21:23,24 51:7
**expires** 21:3
**expiring** 37:12
**explain** 31:25
**explaining**
31:8
**explore** 121:13
**exposed** 50:18
**exposes** 105:15
**exposure** 38:10
**expressed**
109:18

**expressly**
129:17,20
**extend** 73:24
75:1 101:18,24
**extended** 103:9
103:10 108:2
**extension**
73:20 113:23
**exterior** 58:23
61:7
**extremely**
56:11 79:9
138:19
**eye** 151:14

**f**

**f** 1:21 153:1
**f.2d** 131:22
**facility** 71:18
73:2,12 85:6
**fact** 57:5 78:20
78:23 82:4
84:11 90:17
107:10 114:2
115:22 118:10
118:14,15
120:16 121:14
126:11 133:24
137:4 143:3
**factoring** 76:9
**factors** 83:11
131:20,23
132:22
**facts** 135:14
**failed** 130:7
**fair** 57:17
60:16 80:22
98:2 103:3

104:16 105:5
106:3 134:24
135:19
**faith** 97:5
**fallen** 8:3
**familiar** 65:2
66:3
**family** 94:15
96:7 120:14
**fancifully** 99:4
**fantasy** 121:1
**far** 9:4 22:16
39:17 83:15
86:10 121:11
123:13
**father** 100:9
**favor** 65:23
66:7 113:4
137:5
**feasibility** 78:8
98:19 107:7,8
107:12,14
116:15,17,18
**feasible** 49:8
100:15 136:23
**february** 38:24
39:10 47:19
48:2 71:9
101:20 130:21
**fed** 40:13
**fed's** 114:3
**federal** 39:1
80:19
**fee** 7:24
**feel** 142:1
150:23

**fees** 73:20
**feet** 23:10 24:3
24:9 29:22
40:24
**feinstein** 4:10
6:15 78:14
102:10,14
**field** 145:25
**fifth** 40:12
**fight** 102:21
112:24 116:2,2
116:3
**fighting** 57:6,6
**figure** 121:10
127:13
**figured** 117:9
**figuring** 123:9
**file** 14:19 20:10
20:14 67:8
68:8 94:13,14
95:25 123:15
123:17 149:1
**filed** 2:1 12:2,4
13:6,10,12
14:13 15:7
18:20 44:12,20
64:23 65:13
67:11 68:17,25
70:1 71:1,1
74:14 87:5
89:23 93:7,21
102:18,25
106:18 109:2
113:21 115:9
115:14,19
123:8 124:6
128:15,22

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 177 of 209

[filed - former]                                                          Page 20

129:2,6,8
134:20 139:17
**filing** 15:5 71:8
95:15 126:10
128:20 130:7,8
130:19,21,25
131:8,10
**final** 9:10,12
9:18 128:19,20
129:11 140:6
**finalize** 8:17
**finalizing**
88:23
**finally** 33:4
103:10
**finance** 87:8
88:4,7 99:1
120:6,10 135:2
138:22
**financial** 87:1
96:19 102:24
106:23 138:17
139:14
**financing** 67:5
69:25 96:16
119:5,9,25
120:1,14 121:7
121:19 123:13
138:13,21,23
138:25 139:1
139:15
**find** 24:21
41:15 52:20
53:7,10 56:4
56:15 57:13
96:7 97:3
125:8 138:20

139:19
**finder** 12:14
**finding** 27:18
**finds** 132:20
133:21 139:13
140:13
**fine** 16:14 17:9
17:20 19:2
62:14 78:24
89:21 92:10
102:12 124:5,8
148:19 149:5
149:22,25
150:2 151:1,1
**finish** 24:19
85:3 97:13,19
105:21 119:18
119:21
**finished** 22:15
122:25
**finishes** 51:20
**finishing**
131:11
**firm** 30:21
88:22
**first** 10:24
12:22 15:20,23
25:8,10,23
32:4,10 33:8
34:2,4 35:18
36:10 43:9,22
45:24 46:3,5
46:11,17 51:10
53:11 55:16
56:23 66:12
69:10 70:25
72:7 82:4,10

83:16 92:12,16
96:4 97:12
107:25 108:1
108:24 124:18
**fit** 61:14 80:1
97:14 100:11
121:10,11
**fitting** 90:21
**five** 28:5 32:25
33:4,8 40:5
44:10 46:7,14
73:5 74:1,10
**fix** 50:14 111:7
111:9 122:8
**fixing** 2:8,22
**flexible** 117:1
**flexocraft**
100:5,7
**floor** 4:5 5:3
29:20 30:5
73:15
**floors** 30:5
40:17 49:9
**flow** 24:22
25:11,17 27:1
27:5,9 28:14
28:20,23 29:10
29:12,13 31:21
31:25 32:2
33:22 45:25
46:6 49:21
52:23 53:10,15
**flows** 34:3
**focus** 8:14
11:20 20:5
**follow** 37:19

**following**
53:16 57:9
**foot** 23:10 24:3
24:9 29:24
30:2,3,4 31:18
31:20 35:24
37:13,14,14
38:19,19,20
39:12,13,21,25
41:2,3 47:9,11
59:2,3,7 60:9
60:11,12,17
73:15 81:6
**footnote**
123:21
**foreclose**
125:18
**foreclosed**
125:6
**foreclosing**
146:2
**foregoing**
153:3
**foremost** 82:10
92:16
**forest** 134:1
**forfeit** 107:2,3
**forget** 107:10
**forgetting**
114:22,22
**forgot** 31:22
**form** 47:18
48:11 51:24
105:18 138:24
**formal** 79:5
**former** 26:17

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 178 of 209

[forth - go]                                                                    Page 21

**forth** 11:10
65:11,18 93:2
114:9
**fortunate**
106:21
**forward** 9:11
9:18 10:8,24
79:7 100:20
107:5 115:17
124:23 131:11
**found** 98:6
**four** 17:18
20:17 24:24
25:4 33:4
46:18 47:23
68:1 74:19,21
97:2 102:17
130:22
**frankly** 106:5
**free** 31:12,13
31:17 33:2
40:6,19 61:25
105:23 134:24
134:24 135:21
135:25 136:4
143:10
**friday** 7:16
8:17 68:9
114:9,12
149:16,17,18
**fried** 5:18
**front** 16:15,21
17:11 31:6
63:21 118:20
141:21 142:24
**fulfill** 81:5

**full** 32:11
60:15 71:19
80:4 86:19
**fully** 82:24
84:20,20 85:7
106:11,13
108:17
**fund** 79:25
84:24 94:16
96:8,8,13,14
111:2 137:19
138:17
**fundamentally**
104:6 105:12
**funding** 82:4
94:20 99:4,7,9
99:18 105:4,10
111:2 120:22
121:12 135:2
136:15 137:16
137:23
**funds** 36:22
79:20 80:1
82:2 84:17
137:18 138:1
**further** 11:1
57:23 58:1
60:20 73:19
86:16 103:9,9
108:1,4 140:6
150:4,7
**future** 80:6
94:16,18 98:22
117:25 126:4,7
126:12

**g**

**g** 1:22 6:1,15
**g4** 4:11 13:4
55:4 56:11
66:23 67:21,24
70:7 72:7,10
73:3,20,25
74:3,8,18,24
75:1,5 76:9
77:2,13,15,16
78:11,14,16
79:7 81:11,12
81:15 83:11,22
83:23 90:23
95:7 96:17
97:13,18
102:14 103:6
103:12 106:2
130:14 137:4
138:22
**g4's** 13:8 87:7
103:16 131:7
**gainen** 5:1
**gather** 30:13
**general** 21:8
55:12 57:16
131:14
**generally** 81:8
**generate** 32:24
**generating**
32:25
**gentleman's**
76:20,22
**gentlemen's**
58:13
**george** 90:21

**germane** 78:17
**getting** 13:2
14:22 40:13
41:8 48:11
60:8,15 63:13
70:23 81:5
83:15 108:16
144:3
**give** 10:21
14:15 18:23
22:18 25:22
31:13 53:8,11
54:19 56:4
59:19 62:10
72:21,23 73:6
92:24 96:13
110:6 116:14
150:23
**given** 48:20
65:9 84:16
114:6 137:16
**gives** 95:18
125:13
**giving** 24:1
**gladly** 41:19
69:8
**glass** 34:25
**global** 7:22 8:2
8:6,15
**go** 6:3 9:8,11
10:24 14:22
15:13 16:24
23:25 27:14,19
28:4 29:8,16
30:14 31:24
34:9 35:24
37:19 40:14,23

[go - guess]

41:6 43:12,15
43:23 45:24
46:7 48:22
49:15 52:4
53:12 56:6,6
59:14,21,23
61:4 62:14
71:25 72:18
78:25 79:7
82:12 86:19
92:12 97:1,2
100:19,21
105:10 114:12
116:21 118:13
121:11 123:9
124:23 126:2
128:13 147:7
**goes** 9:4 13:16
59:14 126:12
126:14
**going** 6:3 7:5
8:10 9:11,24
10:3 11:5 15:3
15:11,19,20
16:8,12,12,12
17:25 18:24
19:14 20:4,7
27:22,24 28:10
28:19 29:1,5
31:4 32:3,10
32:11,13 33:15
33:15 37:11
38:7 40:14
43:8 46:8
52:12 54:2
55:6,10 57:22
60:13,14 64:8

64:10 68:21,22
70:24 76:1,9
76:20 77:25
78:22 79:10
83:14,18 92:11
92:12,14 94:24
95:1,2,10 96:8
96:20 101:16
101:18,23,24
102:5,18 105:6
105:21,21
108:3,11
110:16 111:1
111:13 113:15
114:3 116:5,20
118:4,4,6
119:4,6,9,10
119:12,15,16
120:6,8,13,18
121:4,7 122:5
122:13 124:1
124:23,24
125:3,4,5,17
126:20 127:8,9
127:21 128:13
136:14 140:15
141:9 142:16
143:19 144:22
144:23,24
145:9,15
146:14 147:13
148:19 149:20
149:23,23
150:16,17
**gold** 11:24,25
12:8 68:20
71:12 92:18,19

93:3,5 129:6
133:7
**gomez** 12:4
**good** 6:2,10,14
6:17,18,21,22
6:23,25 7:1,3
16:7 30:24
40:16,18 41:1
42:17,18,18,19
42:20 52:6
55:3 70:22
89:7 122:14
151:5
**gorrepati** 5:25
**gotten** 20:14
39:4 51:10
83:15
**grant** 101:11
101:17 102:2,5
107:19 126:9
126:17 150:16
150:17
**granted** 79:24
79:24 100:22
101:6 132:2,17
152:5,6
**granting** 2:10
2:24 106:12
**grants** 139:22
**grappling**
117:20 122:21
124:17,22
125:9 126:1,8
127:12
**grateful** 103:4
**great** 8:21
15:23 18:10

21:11,14 24:11
26:4 27:14
29:4 36:22
41:17 62:6
64:16 70:14
98:5
**green** 1:12
5:11
**gridlocked**
34:22
**gritty** 8:5
**gross** 30:4
**ground** 2:7,20
6:24 7:21
11:17 13:12
29:20 65:14
87:19 103:21
106:17,18
108:6 137:5
**grounds** 108:5
108:25
**group** 2:14
12:19,20 129:1
130:10
**grow** 33:8
46:16
**guarantee** 66:2
66:2,3 69:13
69:13,14
**guess** 7:12 9:14
10:8,12,14
36:10 52:23
53:14,24 61:13
62:11 63:20
64:9 70:23
82:1,1,23
88:25 91:24

23-10210-lgb Doc 104-1 Filed 06/21/23 Entered 06/21/23 16:41:22 Exhibit A - Declaration of Morris S. Bauer Pg 180 of 209

[guess - holding]

Page 23

92:10 101:21
101:22 102:7
108:8,19 146:1
**guesstimate**
109:23
**guide** 30:16
**guy** 97:7
**guys** 23:2

**h**

**halfway** 46:7
**halm** 5:19
**hamilton** 5:10
**hand** 18:3
21:10 29:13
41:19 64:9
**handful** 135:9
**hands** 144:22
**hang** 72:11
96:1
**happen** 96:18
118:4 119:10
121:2
**happened** 7:19
24:23 25:9
90:7 94:11
**happening**
41:5 120:9
125:15
**happens** 11:22
34:16 62:9
81:9 96:1
126:9,15
127:11 128:2
145:22
**happy** 78:24
86:16

**hard** 73:23
148:4
**hardest** 117:20
**harms** 132:14
**he'll** 123:9,10
**head** 72:19,22
94:8 123:12
**heads** 103:17
105:24
**healthy** 110:20
**hear** 8:21 10:3
14:11 15:21
16:25 17:8
55:16 71:3
79:3 100:16
101:24 125:23
127:17 128:11
150:19
**heard** 7:9 9:5
11:15 22:24
79:9 92:15,15
95:6,7 100:16
101:4 102:8
103:15 104:21
104:21 106:14
108:9 111:6,20
111:20,21
114:1 118:9
119:25
**hearing** 2:1,4,4
2:12,18 3:1 7:5
9:10,11,12,12
9:17,18 12:16
20:3 78:10,17
88:20 93:15
94:25 99:14,16
99:19,24 100:2

100:4 103:16
110:16,24
111:3,16
113:24 115:15
116:4,9,16
117:5,13 122:6
124:18 125:14
128:2,17,19
129:11,13
136:11 137:13
140:9,14 141:8
141:20 142:3
142:22 143:21
144:4,5 148:14
149:3,4,21
150:4,7,13
**hearings** 148:8
**hearsay** 31:1,2
**heartening**
106:24
**held** 73:3
128:17 129:11
131:2 134:2,10
**help** 30:16
33:21 110:21
110:21
**helpful** 29:3
37:15,20 39:13
39:23 40:15
41:12 62:13
**helps** 39:14
59:12
**herrick** 4:10
6:15 78:14
102:9,14
**herschel** 99:20
116:15

**hershel** 5:21
**hi** 62:23,24
**hide** 105:9
**high** 36:17
40:14,20
**higher** 2:7,20
6:24 7:21
11:16 13:12
30:5,6 34:13
34:17 36:18
39:4,5,5 54:12
65:14 87:19
103:20 106:17
106:18 108:6
137:4
**highlighted**
141:16 142:10
**highly** 135:16
**hindsight's**
51:12
**hire** 7:21
**hiring** 131:13
**history** 88:5
**hit** 94:7 123:12
**hmm** 147:20
**hold** 13:17
44:5 50:14
59:18 78:3
95:1 115:20
148:13
**holder** 72:8
**holders** 135:4
136:17
**holding** 24:25
25:2,3 33:14
47:3

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 181 of 209
[holocaust - increasing]                                           Page 24

**holocaust**
110:19,20
**hon** 1:22
**honestly** 79:14
121:20
**honor** 6:14,18
6:22,23 7:1,15
8:20,22 9:6
11:7,10,15
12:13 14:15
15:14,17,22
16:2,18 17:23
18:10 19:2,18
21:15 25:13
31:1,12 41:18
41:22 42:1,17
44:6 54:11,24
57:24 58:4
60:20 61:16
62:20,24 64:16
68:16 69:2,8
69:19,24 70:3
70:14,15,19
77:25,25 79:14
81:20 85:15,21
85:25 86:18,21
88:13,17 89:21
89:25 90:15
91:5,6,20 92:1
92:13 94:8,24
95:25 98:18
99:12,25 102:9
102:13,16
103:6,15
104:11 106:1
106:11,16,16
108:10 112:4

114:9 115:18
115:24 116:2
116:13 117:4
122:20 123:7
123:19 124:8
125:21 140:17
147:12 148:21
149:17 151:2,8
151:9,11,13
**honor's** 14:20
103:3
**hood** 96:25
97:9
**hoops** 150:18
**hope** 9:16 99:1
126:21 149:12
**hopeful** 108:15
**hopefully** 7:18
35:1 95:3
**hopes** 139:8
**hoping** 79:7
123:13 149:13
**horrible** 38:6
**hostage** 95:1
**hotel** 113:5
**hours** 114:9
**house** 5:10
**huge** 30:11
146:5,6
**huh** 64:6
**hundreds** 32:7
**hyde** 3:25
153:3,8
**hypothetical**
51:7 55:7
**hypothetically**
149:10

**i**
**ica** 77:12,18
**idea** 7:18 24:7
97:18 119:8
120:5
**identify** 6:6
**ii** 2:8,22
**iii** 2:10,24
**immediately**
101:1
**impact** 39:3
47:2 55:5,9,11
132:13
**impacts** 145:11
145:12,23
**impaired**
112:25 113:2
113:10,13
116:19,21
136:25
**impermissible**
97:22
**import** 13:20
14:2
**important** 79:3
83:11 105:13
139:6
**importantly**
84:22
**imposed** 106:8
**imposition**
109:15
**impossible**
119:8 122:2,3
138:20
**impressed**
103:21

**improvement**
73:13,23 82:15
82:24
**improvements**
54:9,13
**inability**
117:16
**inappropriate**
135:1
**inclined** 115:18
**include** 35:15
54:9 65:17,24
**included** 33:21
36:1 40:19
55:12 58:13
70:7 74:5,6
87:16
**includes** 42:3
128:24 129:9
**including** 80:3
129:24 134:23
**income** 24:24
24:25 26:8,10
26:25 27:13
28:7 33:3,5,9
39:20 40:9
46:8 49:21
52:23 138:6
**incorrect** 23:7
71:13
**increase** 46:13
47:6,13 56:25
105:15 114:2
**increased** 41:7
48:4
**increasing**
60:17

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 182 of 209
[incrementally - involved]                                                      Page 25

**incrementally**
74:21
**incur** 32:11
**incurred** 32:16
54:7
**indefinite**
77:22
**indicated** 7:4
**indication**
95:19 96:13
**indirectly**
92:25 145:11
**indiscernible**
6:15 8:23 10:5
16:23 17:2,6
17:15 19:13
34:20 35:17
39:13 42:4,22
44:6 46:22
47:23 53:9
56:18 62:3,12
64:11 65:16
69:20 74:13
76:14 88:13
109:8,9 110:9
112:18,21,22
120:4,19 123:1
125:24 128:13
134:9 145:25
146:19 149:3
150:12
**individuals**
89:10
**indubitable**
137:9 143:9
**industrial**
26:18 52:6

**industries**
131:22
**inevitably**
96:16
**inexperienced**
103:16
**inference**
121:16
**information**
24:1 30:13
35:7 37:22
38:1 45:13,15
45:16,17 54:5
56:9 59:11
72:17 93:14
94:15 96:6,20
97:4 116:25,25
117:3 118:7
120:23 122:7
123:8,11
140:12,14
142:15 143:23
**informative**
56:12
**informed**
143:24
**ingram** 5:1 7:2
**initial** 9:10
18:19 19:22
44:19 72:25
85:6,6 123:20
128:17
**initially** 43:23
73:10
**inside** 51:18,19
61:4

**insignificant**
144:2
**inspected**
58:23
**installation**
27:23 40:7
59:17 60:1
**installments**
74:21
**instant** 79:21
**insurance**
32:17,18 83:6
83:12 118:12
137:24
**insure** 32:17
32:19
**intend** 34:23
80:7,9,10
**intended**
132:17,18
139:9
**intending**
61:20,21 62:18
**intends** 79:24
**inter** 75:4,7
77:3,7
**interest** 11:21
14:6,24 38:22
38:25 39:2,5
55:6,8,10,13
55:18 65:25
67:1,3,6 69:11
73:3,19,24
74:3 77:4,20
90:22 93:8,25
94:1 99:22
100:13,23

104:14 105:13
105:19 109:14
109:16 112:7
114:3 119:14
124:22 125:7
129:24,25
130:1 131:6,8
132:3,4,7,9
135:3,7 136:2
137:7,9 140:1
140:7 143:4,5
146:2
**interesting**
121:25 127:5
**interests** 12:1
136:17
**international**
100:6
**interrupt**
119:20 140:22
**invest** 85:5
**invested** 84:24
**investment**
50:21 84:23
107:2,3
**investor** 26:13
27:17,24 32:23
33:9 37:25
38:13 39:3
50:3 76:3
**investor's** 50:4
**investors** 33:20
39:4
**invoices** 88:5
**involve** 84:2
**involved** 51:10
121:24

23-10210-lgb Doc 104-1 Filed 06/21/23 Entered 06/21/23 16:41:22 Exhibit A -
Declaration of Morris S. Bauer Pg 183 of 209
[inwood - know] Page 26

**inwood** 134:1
**irony** 95:14
**irrelevant**
    96:22
**irving** 2:13
    7:22 11:18
    65:16 103:14
**israel** 62:10
**issuance** 22:19
**issue** 8:23
    11:24 78:15
    102:1 107:12
    107:13 112:16
    112:17,18
    116:18 117:19
    122:16,18,19
    122:22 126:1,2
    127:1,2 128:13
    131:15 134:5,8
    137:11,14
    141:22 143:15
    144:21 148:5
**issued** 66:16,19
    66:23 70:6,7
    88:9 89:10
**issuer** 66:1
    69:12
**issues** 7:20
    28:19 78:21
    132:1 134:22
    139:6 141:15
    141:16,18,21
    142:10,12,14
    142:19 143:6,7
    143:14,22
    144:2,3,6,6
    145:15

**it'll** 18:12 22:7
    48:8 49:2
    52:14 76:6
    85:7 111:24
**item** 87:18
    88:3,16 89:8
    89:21 90:5,19
    90:20 91:9,10
    91:18
**items** 18:11
    65:17 68:17
    69:9 86:24,25
    87:1,3,8 88:17
    88:21 89:4
**i'm** 119:22

**j**

**january** 39:17
    41:9
**jennifer** 5:6
    7:1 108:10
**jll** 30:20
**job** 147:24
**join** 91:7
**joinder** 69:12
**joins** 108:7
**joint** 66:1
    69:11 87:2,2
**jonathan** 1:25
**jones** 30:19
**judge** 1:23 6:2
    6:10 98:17
    107:5 108:21
    109:12,20
    112:18 113:3
    123:2 147:22
**judicial** 86:21
    88:7 132:7

**july** 95:8
    111:15 117:22
    117:24 131:16
    149:15 150:6
**jump** 150:18
**june** 1:15
    19:25 20:19
    22:8,13,22
    29:11 40:13
    45:21 46:20,23
    47:15 48:14
    53:13 66:13
    68:10 88:9
    95:1 101:21
    110:23,24
    111:16 113:24
    116:4,16
    128:19 129:8
    129:11 140:9
    149:15 151:7
    153:25
**junior** 115:2,2
    138:23
**justice** 5:8
**justify** 106:4

**k**

**keep** 16:8,12
    59:18 79:11
    95:4 122:21
    144:11 151:14
**kevin** 5:17 6:23
    106:17
**key** 29:2,9,17
    31:20 139:6
**khayut** 5:20
**kick** 94:24
    123:6

**kidding** 148:1
**kind** 7:19 8:6
    12:7 14:21
    24:19 36:14
    51:13 52:11
    60:14 83:22
    86:19 95:21
    96:24 97:20
    106:7 114:12
    115:1 126:19
**kinds** 118:12
**klein** 5:21
    99:20,21 100:3
    116:15 120:17
**knew** 17:22
    37:24 40:14
**know** 7:4,9,18
    8:5,22 10:2,10
    10:18,23 22:15
    24:20 25:3
    26:17 29:5,14
    31:5,10 32:8
    32:12,15 33:7
    35:6,7,22
    38:17,20 39:8
    39:9,14 40:9
    43:15 45:8
    50:17 51:13,13
    51:15,20,21
    52:5,11 53:23
    54:5 59:13
    60:13 62:9
    63:1,3 68:1
    70:24 72:4,12
    72:18 73:4,17
    73:18 74:8,24
    76:2,3,7 77:10

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A - Declaration of Morris S. Bauer   Pg 184 of 209

[know - letter]                                                    Page 27

78:21 79:7
82:5,15,19,20
83:7,9,10,12
84:4,25 85:3,4
85:6,7,8,18
89:7 95:8
98:15 101:10
101:12,13
102:1,2,4
106:20,24
107:3 109:22
112:4 114:5,8
115:22 116:20
117:1,10
118:20 120:3,6
121:10,21,21
124:21 125:6
125:17,22
126:14,14,22
126:24 127:6
140:25 141:8
141:13,14,15
141:22 142:2
142:20,23,25
143:9,11,12
144:1 145:13
145:14,16,17
145:21 146:15
146:16 148:3
150:16,22,23
**knowledge**
30:8 37:15
45:12,19 49:18
57:16 67:4
103:22
**knowledgeable**
104:21

**knows** 39:1
103:25 127:7,8
127:9,10
**kova** 11:21,22
11:24 12:1,5
67:1 68:19
92:18,20,20,24
92:24 93:4,5
93:18,24,25
94:2 97:11
129:5 131:2
132:3,5,9
133:8 144:22
144:25 145:10
146:4,9
**krinsky** 4:3
6:11 108:22

**l**

**lack** 93:11
129:24 131:18
132:21 136:18
137:15 142:14
**lacks** 143:18
**laid** 92:16
**landlord** 57:6
**lang** 30:19
**laptop** 16:3
**larger** 107:13
**larson** 58:10
**lasalle** 30:20
**laser** 12:10,11
100:6
**lastly** 33:24
**late** 7:5
**latitude** 78:1
**law** 100:9
101:15 104:17

109:9 110:2,21
115:21 117:16
120:20,21
121:10 133:10
133:10 137:18
**laws** 115:11
**lay** 116:10
123:15
**lead** 57:4 107:6
**learning**
103:24
**lease** 24:3,21
25:4 31:17
32:22 38:6,8
45:6 76:6
82:19 105:22
**leased** 22:16
24:10 32:16
37:6,11 38:15
39:18,22 40:6
40:15,17,24
41:1
**leases** 30:13
37:12 38:9,11
45:5,6,9 59:9
73:14
**leasing** 26:21
27:20 29:17
30:14,14 51:3
56:12 59:9
82:13,16,16,21
118:10 138:4
**leave** 61:13
85:17
**leaves** 120:11
**led** 123:4,4

**ledanski** 3:25
153:3,8
**left** 29:13,23
110:19 139:5
**lefthand** 29:16
46:7 59:25
60:7
**legal** 141:16,21
142:2,9,19
143:9,14 144:2
144:2 153:20
**legally** 121:15
141:23 142:20
142:20
**legitimate**
143:7
**lend** 119:12
**lender** 6:16,20
7:23,24 11:9
36:21 45:16
55:4 75:24
80:4,4 98:9
106:22,25
107:20 109:2,3
109:5 111:18
112:2,8,8,9,12
115:2,23
118:17
**lender's** 11:9
112:6
**lenders** 33:20
106:10 114:19
119:6 136:4
**lent** 97:10
**letter** 22:6 23:6
24:1 66:17,19
66:22,23 70:6

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A - Declaration of Morris S. Bauer   Pg 185 of 209

[letter - made]                                                                     Page 28

70:7,9
**letting**  31:9
**level**  28:1
  30:24 33:2
  40:6 43:16
  51:20,25 84:2
  84:4,12,13
  103:22
**levels**  27:13
  36:17,19
**lgb**  1:3
**license**  21:3,6,7
  21:9,10
**licensed**  12:23
**licenses**  21:11
**lien**  13:10,13
  14:7 75:25
  84:9 113:18
  133:17 135:25
**lienholders**
  96:18
**liens**  114:22
  130:17,17
  136:5 138:24
**lift**  10:14 108:5
  109:1 110:4,7
  111:18 115:25
**lifting**  132:14
**likelihood**
  138:13 139:7
**likely**  105:14
  130:19,25
  131:7 136:25
  139:10,19
**limitation**  16:3
**limited**  32:13
  72:2 99:4

134:1
**line**  23:25
  30:23 34:1
  78:18 85:4
  107:1 152:4
**lines**  54:12
**liquidated**
  75:19
**liquidation**
  121:6
**lisa**  1:22
**list**  86:19 87:4
  87:5,6,17
  89:25 146:5,6
**listen**  86:13
**listened**  74:20
**listening**
  106:20
**literally**  99:24
  105:23
**litigation**  132:8
**little**  8:8 9:5
  34:12,17 39:8
  41:8 53:21
  56:21 111:14
  116:7 130:22
**lived**  103:25
**llc**  1:7 2:2,7,8
  2:21,22 4:11
  4:18 6:8,15,19
  64:25,25
  102:15 128:15
  129:5,6,6
  131:2
**llcs**  2:5,19 3:1
**llp**  4:3,10,17
  5:1 6:15

**loan**  65:21,23
  65:24 66:1,6
  66:13,14,25
  69:9,10,12,15
  71:2,6,11,20
  71:22 72:5,6
  73:1,18,25,25
  74:2,2 75:2
  76:11 77:20
  90:23 97:13
  100:9 103:9
  112:10 130:6,8
  131:3,5,5,7,9
  146:21
**loaned**  80:5
**loans**  76:16
  80:6 131:5
**locate**  98:13
**located**  2:15
  36:25 40:25
**location**  41:1
**long**  15:4 21:11
  28:3 42:24
  62:7
**longer**  103:12
  103:12 119:2
**look**  13:21
  19:16 24:22
  25:1,16,23
  28:12 34:7
  35:24 37:13
  38:18 42:21
  46:4,6,13 56:7
  59:23 61:4,4,5
  94:9 95:9,11
  96:3,25 100:6
  108:24 112:4

117:11 118:22
  118:23 145:21
  151:18
**looked**  24:15
  25:23 100:18
  146:24
**looking**  14:17
  15:11,13 17:24
  20:8 23:4
  30:21 36:4
  46:1 50:4
  52:21 53:3
  59:13 60:2
  83:2 97:9
  98:19 121:9
**looks**  119:1
  121:1
**looney**  58:10
**loop**  80:18
**lose**  105:25
**lot**  35:7 37:3,7
  38:15 92:13
  93:14 125:2
  128:6 146:21
  148:7
**loud**  125:23
  127:17 128:11
**lower**  63:15
**lp**  135:13

| m |
| --- |

**mabe**  2:14
  11:18
**made**  8:1,1,16
  8:18 12:6
  23:23 31:12
  34:13 47:5
  71:12 72:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 186 of 209
[made - mean]                                                    Page 29

78:16,23 96:15
99:16 100:23
108:4 131:11
madison  38:23
magnifying
  34:25
mail  90:20
  91:3,11
mails  88:18
  89:3 91:7
maintain  81:17
maintaining
  53:18 95:3
  115:16 138:1
major  8:14
  30:20 106:21
make  7:17 12:7
  22:22 25:5
  47:23 71:2,6
  75:8 77:6
  86:19 102:2
  110:4 111:19
  114:10 116:1,5
  117:15 130:7
  138:16 142:1
  142:19 143:23
  148:4
makes  84:23
  104:3 112:11
  136:24
making  79:6
  106:17 112:12
male  21:21
management
  2:6,7,13,20,21
  135:3 136:16

manager
  131:13
managing  12:9
  68:3 96:23
manhattan
  57:11,18 59:16
  82:21
march  101:20
  101:20
market  24:11
  24:13 26:22
  27:13 29:17,19
  29:24,25 30:8
  30:11,15,17
  31:13 35:21,21
  35:21,24 36:3
  36:16 38:10
  39:9 40:6 41:5
  41:5,6,13 45:4
  47:23 49:8,19
  50:2,11,19
  52:15 56:15,23
  57:7,17,18
  59:8,15 82:12
  99:2 104:23,23
  104:24,25
  109:25 119:14
market's  127:9
marketed
  109:24
markowitz  4:8
  6:10,11,13
  7:12,15 8:25
  9:3,21 10:9,12
  10:22 11:3
  12:6 30:25
  42:1,3,12,15

42:17,21,25
43:3,7 44:2,4,7
44:11,14,17,22
44:23 52:16
53:16 55:7
58:25 60:23,24
61:2,9 68:24
69:2,17,19
70:2,3,10,17
70:19,21,22
71:5 72:20
78:1,15 79:3
79:11,13,16,17
81:19 85:25
87:11,14 88:11
88:13,18,25
89:2,6,11,17
89:24 90:15,25
91:1,4,7,11,16
92:2,5,8 96:21
97:23,25 98:4
98:6,11 99:16
108:18,19,21
108:21 112:22
117:7,9 119:11
119:17,19,22
122:8,15,18,19
122:22,25
123:2,25
125:13 127:17
127:22 128:1
128:11 140:17
140:21,24
141:5,11,25
142:6,8 143:13
144:10,13,19
145:1 146:6,12

146:18 147:3,5
147:9 148:11
148:13,17
150:4,7,10,14
151:9,17,20
markowitz's
  88:22 99:13,15
  123:5
master  100:6
match  23:11
math  24:6
matter  1:5
  32:15
matters  7:7
mature  76:16
maturity
  103:10
max  5:22
mcclain  89:9
mean  9:3 10:13
  10:15,16,16
  11:1 13:22,23
  13:25 22:12
  34:10 47:22
  52:13 63:5
  72:11,12 78:1
  82:4 86:18,20
  89:19,25 94:7
  106:2 118:8
  119:20 120:21
  123:13 126:11
  128:6 130:23
  141:18 143:15
  143:19 145:20
  149:19 150:11
  150:23

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 187 of 209
[meaningful - month]                                                    Page 30

**meaningful**
103:2,5
**means**  14:5,7
22:8 61:13
93:25 94:1
134:12 136:22
**meat**  123:8
**mechanic's**
13:10,12
**mechanics**
84:9 113:18
114:22 130:17
**meet**  7:16,16
**meeting**  7:19
7:23 8:14 68:9
68:11,13,14,15
**member**  12:10
68:3 96:23
**membership**
65:25 67:2
69:11 124:21
125:6 132:3,4
132:9 140:1,7
146:1
**memory**  40:23
**mentioned**
54:10 73:1
74:20,23 82:2
83:13 116:3
124:12 144:13
144:15
**merits**  109:17
**met**  7:18 114:9
114:14
**method**  26:11
26:24 49:22

**methodologies**
26:7,8
**mezz**  11:24,25
12:8 45:16
68:20 71:12
92:18,19 93:3
93:5 112:9,12
112:14 129:6
133:7
**mezzanine**
6:20 7:23 11:8
11:9 65:24
66:1,13 69:9
69:10,12
106:22,25
107:20 109:2,2
109:4 112:2,6
115:23 130:8
131:3,5 133:15
**mic**  55:18
**mid**  106:9
110:20
**midtown**  56:24
56:24 60:9,10
**million**  12:4,25
13:3,5,11,13
13:19,20,21
14:2,3,3,4 22:9
22:17 24:12,13
25:9,10,12
28:17 33:1,5
35:5,23 41:16
46:11,14,15,15
46:16,17 48:2
48:6,7,9,24
49:2,5 53:21
54:6 71:16,18

72:3,25 73:4,6
73:11,12,15,22
74:1,5,6,8,9,10
74:16,16,23
75:12,21,23
76:1 81:18
84:25 85:1,5
93:3,16,20,22
97:10,11,12,14
97:17 102:25
109:4,21
111:23,24,25
114:20 127:19
133:4,4
**millions**  72:24
72:24,24
**mind**  9:6,9
57:22 94:10
98:11
**mine**  45:15
53:2
**mineola**  153:23
**mini**  144:4,4
**minor**  23:5
25:6
**minus**  14:3
**minute**  29:6
43:25 52:25
56:3,5
**minutes**  62:11
62:14 104:10
123:5
**miraculously**
150:12
**mistake**  45:8
**mlas**  29:16

**mm**  147:20
**mmm**  63:9
**mo**  6:18 11:8
64:21
**model**  29:10
**modified**  30:4
32:21
**modifies**
148:22
**modify**  139:23
152:5
**moment**  77:7
81:6
**mondays**
149:21
**money**  49:1,4
50:13 72:10
73:2 74:18
75:25 76:4,7
93:18 95:12,13
96:16,25 97:2
99:17,20,23,23
100:5,10,18,19
103:7 104:3,7
111:8,17
115:24 117:21
117:21,24
118:16 120:16
126:13,23
127:21 128:9
131:16 137:21
**monies**  80:5
**month**  67:21
67:23 68:1,6
74:18,21 75:24
76:15 81:11
137:23

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 188 of 209
[monthly - negotiations]                                                    Page 31

**monthly** 74:19
95:12
**months** 31:17
47:23 74:4
81:3 95:21
102:17 130:22
**morning** 6:2
6:10,14,17,18
6:21,22,23,25
7:1,3 42:17,18
42:19,20 55:3
**morris** 2:1
4:17,23 6:19
11:8 129:3,10
**mortgage** 6:16
55:4 72:8
114:21,25
115:2,3
**mortgagee**
107:25 108:1
**motion** 2:1,4,5
2:5,12,12,13
2:18,18,19 3:2
7:21,21 8:6 9:9
9:10,11,12,15
9:24 10:15,19
10:24 11:6,9
11:12,13,14,17
14:17 64:22,25
65:13,15,20
78:4,7 79:9
88:24,24 92:11
98:19 99:10,11
101:9,13,18,24
102:2,6,8,11
104:6 106:15
107:20 108:9

108:17,25,25
109:1,2 110:4
110:5 111:18
111:19 115:25
116:1,13 117:4
117:5 123:17
123:20,23,25
124:7 126:9
128:15,17,19
128:23,24
129:2,4,7,9,12
129:17 132:17
133:22 137:17
139:22 143:17
149:1 150:17
152:5
**motions** 7:9,13
10:10 11:15
82:7 115:18
148:11
**motivated**
104:2
**motivation**
50:23
**movant** 103:19
134:3
**move** 10:8
15:12,15 16:4
21:16 29:23
68:16 69:14,24
70:5 90:12
92:11 101:13
110:2,7 115:17
123:22 129:20
131:11
**moved** 45:21
97:16 129:15

**moving** 9:17
18:8,9 55:17
68:25 101:9
145:17
**multiple** 85:5
137:23
**mute** 15:21
62:18
**mysterious**
119:9

**n**

**n** 4:1 6:1 152:1
153:1
**nail** 94:8
123:12
**name** 43:4,4
55:3
**name's** 43:7
**nash** 5:17 6:23
6:23,25 106:16
106:17 108:12
113:14,17
116:17
**nature** 43:16
61:6
**near** 121:2
133:8 138:14
**nearest** 25:8,9
**necessarily**
52:13 100:24
**necessary** 80:1
108:5 110:10
110:11,11
115:8 130:4
134:5,8 139:24
**need** 15:25
24:20 25:23

29:14 34:20
35:1 39:4 62:4
85:3 89:17,19
96:24 97:3
100:21 105:8
112:24 113:23
116:11,19
121:13 124:16
134:14 147:15
149:6 151:4
**needed** 54:7
73:18,19,20
140:11
**needs** 33:24
79:4 86:16
94:9 100:25
**negative** 14:5,6
46:11 55:8,11
57:10 93:24,25
95:16 97:21
98:7,8,13
104:12,18
107:9 109:7
111:13 121:16
121:22 131:1
134:23 135:8
135:10,20
143:1
**negotiate** 80:2
101:2 114:7
**negotiated**
85:6
**negotiation**
114:13
**negotiations**
114:8

23-10210-lgb    Doc 104-1    Filed 06/21/23    Entered 06/21/23 16:41:22    Exhibit A -
Declaration of Morris S. Bauer    Pg 189 of 209

[neighborhood - occasions]    Page 32

**neighborhood**
38:18,20
**neither** 93:4,5
138:22
**net** 33:5 46:8
53:15
**never** 51:18
57:22 97:6
121:23,24
150:22
**new** 1:2,13
2:15 4:6,13 5:4
5:12 7:21 13:5
21:7,10 24:8
24:12 25:16
30:21 32:7,23
40:22,24 43:20
45:4 70:1 87:7
88:3,6 95:9
98:23 99:11,21
128:8,8 134:18
149:23
**newark** 4:21
**newmark**
12:19,20,23
17:13,14 23:2
26:6 28:24
30:8,14 58:11
58:14,17 59:1
61:3 129:1
130:10 132:25
**news** 22:6
**nice** 97:15
**ninety** 31:23
31:24 44:10
**nitty** 8:5

**nj** 4:21
**non** 66:2 69:13
76:10 77:19
104:15 109:14
**nope** 91:16
**norm** 110:8
**normally** 64:8
83:7 149:21
**note** 21:3 26:6
57:15 65:11
66:2,12 69:12
78:19,25 101:8
129:13 130:10
143:25 144:8
146:21
**noted** 65:20
143:4
**notes** 16:21
19:11 29:5
129:17 131:10
133:9 136:11
137:8,21
138:15 139:4
140:3
**notice** 2:4,12
2:18 15:5
86:21 88:4,7
96:3 100:22
124:19,25
125:3,4 140:4
141:3,7,7
144:16 145:3
146:3,4,17
147:13,17,18
149:10 150:24
**noticed** 15:6
96:2

**notices** 91:12
**noticing**
144:14
**noting** 127:2
**november**
65:24 77:8
**number** 6:8
13:15 14:4,4
20:8 23:7,11
23:11,13,22
24:4,5,6,7,8,12
31:22 34:16
36:6 38:4,16
38:22 59:19,23
63:10,15,17
68:18 72:3,21
72:23 74:5,23
87:18 142:9
**numbers** 8:10
28:22,25 56:21
73:8
**numerous**
84:21
**ny** 1:13 2:15
4:6,13 5:4,12
153:23

**o**

**o** 1:21 6:1 8:12
153:1
**oak** 2:13 7:22
11:18 65:16
103:14
**oath** 64:12
**object** 30:25,25
78:1,17 89:11
89:13,15

**objection** 3:1,1
31:4 41:24
42:11 68:25
69:18 70:2
85:24,25 87:11
88:11 89:2,24
90:2,14,15
91:4,14 129:7
129:9 134:25
135:11 136:3
**objections**
21:20 70:8
83:21 89:1
90:24 142:17
**obtain** 15:12
79:25 96:15
137:20
**obtainable**
139:1
**obtained** 92:21
92:22 133:5
**obtaining**
138:13 139:15
**obviously** 9:5
9:24 10:17,18
45:8 53:17
62:15 82:11
83:18 86:6
87:12 92:12,21
103:1 109:22
109:24 112:24
116:18 129:13
141:14 146:9
147:18 148:7
**occasions**
84:21

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 190 of 209

[occupancy - ordinary]                                                            Page 33

**occupancy**
22:20 133:5
137:20
**occupy** 27:22
**occur** 54:12
141:10
**occurred** 57:1
145:16
**occurring** 35:8
37:10 38:8
40:8 54:16
140:2
**october** 30:22
66:19
**offer** 60:11
**offered** 124:18
**offers** 15:8
**office** 18:25
23:9,10 24:3
24:10 26:19
29:20 30:3,9
30:10 31:14,16
31:19 47:10
52:7,14 56:17
57:11 58:12
59:11 62:8
81:6 136:19
**offices** 68:10
**offline** 96:21
**offset** 105:17
**oh** 32:6 37:22
50:7,7 53:5
60:4 71:19
72:13
**okay** 7:4,7 9:8
9:19 10:6,12
10:22 11:3,4

15:19,23,23
16:7,7,8,13,14
16:17,19,22,23
17:5,9,20,25
18:4,7,19 19:4
19:17,24 20:3
20:6,16 21:2,9
21:14,22 22:24
23:16,22 25:22
28:21 29:7
31:2,11 32:1
35:22 36:4,14
39:16 41:20,24
42:2,13,17,25
43:1,12,14,25
44:13,22 45:10
45:13,20,20
46:1,1,3,19,25
47:8,15,21
48:22 49:7,20
49:20,24 50:7
50:7,8,9 51:12
51:18,24 52:16
52:18,21,25
53:4,9,13 54:8
54:18,18,19,25
55:13,23 56:14
57:9,21,25
58:3,9,10,13
58:22 59:23
60:4,22,25
61:9,10,15,19
62:7,14,22,25
63:23,25 64:3
64:3,7 66:12
66:16,25 67:4
68:13,23 69:3

69:17,20 70:4
70:8 71:15,23
72:15,21 73:7
73:10,11 75:1
75:4 77:6,14
77:23,24 79:13
79:16 80:24
81:4,11,19
82:9 83:3 84:1
84:14,19 85:10
85:16,24 86:1
86:9,14 87:15
87:25 88:11,25
89:7,14 90:3,6
90:18 91:14,21
91:21 92:2,7,9
92:9 108:8,18
108:21 114:20
117:7,24 120:9
122:23 123:3
124:3 128:10
128:15 140:24
141:5,11
144:13,19
148:10,15
149:13,13,18
150:10 151:10
151:12,20
**old** 26:17 43:19
43:21 52:5
98:12 153:21
**older** 40:13
**once** 22:15
49:6 134:3
**one's** 38:7
123:18

**open** 17:5
19:15
**operate** 32:8
**operating** 32:6
32:6,9,21 46:8
**opined** 22:11
93:16
**opinion** 9:13
22:5 30:19,22
46:20 47:18
48:11 51:24
52:3 55:9
124:6 130:12
133:3 148:6,7
**opportunity**
9:25 114:6
121:13 122:11
**opposed**
102:22
**opposition**
65:13,15
**optimum** 80:17
**option** 105:23
**options** 10:10
81:16
**order** 2:6,19
3:2 23:9 28:1
31:19 33:12
35:19 59:18
65:1 128:18
137:18 147:13
147:14,15,19
148:21 149:9
**orders** 147:22
148:5
**ordinary** 110:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 191 of 209

[oriented - patience]                                                    Page 34

oriented   36:3
  41:13
original   12:18
  17:13 19:7,9
  19:15,21 23:1
  23:18 24:11,23
  25:15 45:20
  71:11
originally   25:5
  73:16
outdoors   64:1
  64:3,4
outlined   14:16
outnumbered
  108:19
outset   95:11
  100:24
outside   135:9
overall   25:6
  39:20 56:24,24
  59:15
overhang   33:2
overlooked
  87:17
oversee   136:19
overtures   12:6
overview   44:18
  44:24 56:15
owe   114:19
owed   12:4
  75:22,22 95:20
  130:14,16
owes   132:3
owing   67:18
own   10:1 11:22
  14:19 36:22
  48:17 51:5

79:12 91:3
  114:15 115:23
  126:2,3,10,24
owned   12:8
owner   11:24
  45:5,6,10,17
  50:10 51:5,6
  57:5
owners   136:18
ownership
  11:21 132:2
  138:10
owning   144:24
  144:25
owns   11:23
  92:25 130:24
  132:4

### p

p   4:1,1 6:1
pad   16:20 17:7
page   20:8,10
  23:6,18,19,23
  24:22,23 25:1
  25:14,15,17,18
  25:19 28:10,11
  28:12,13 29:1
  29:5,8,8 31:22
  34:17,20 36:5
  36:6,9 43:22
  44:4,7,16,17
  44:19,20 45:24
  46:1 52:21,22
  52:22 53:3,9
  53:13 56:16,16
  56:19,19,22
  57:15 58:7
  59:14,18,19,22

59:23,24,24
  131:22 134:18
  152:4
pages   34:10
  134:1
paid   67:24
  72:10 74:7,10
  74:15 81:15
  88:22 104:16
  108:15 118:6
  118:13 131:17
pan   15:25
paper   52:20
papers   11:14
  113:3,5,8
  141:17
paragraph
  23:6,25 58:8
  79:19
paragraphs
  65:11
park   4:12
  37:21 38:4
parse   73:8
part   14:12
  55:16 65:20
  66:22,24 78:7
  78:25 98:18
  104:5 135:12
  135:17,24
  136:1,8 148:10
partial   13:2
  48:8,12,15
  131:25
partially   132:4
  132:10

participants
  35:24
particular
  27:16 32:9
  37:9 40:15
particularly
  56:12 104:24
  145:7
parties   8:13
  9:15 19:8
  21:15 55:15
  83:20 87:5
  112:10 120:14
  132:13 138:21
  140:4,14
  144:22 145:8,9
  145:23 146:10
partner   91:11
partners
  135:13
party   33:15
  99:5 119:10,15
  119:25 130:1
  132:18 139:2,2
  139:16
passes   60:18
past   68:6 98:14
  100:21 130:6
patently   111:5
  117:15 134:16
  134:22 136:24
  142:20
path   14:22
  97:7 107:5
patience
  103:10,12
  104:7

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 192 of 209

[patient - plan]                                                    Page 35

patient 103:8
pause 99:8
  100:10
pay 26:14 27:2
  32:5,19 38:2
  50:2,3,20,22
  73:20 75:17
  76:9,20 77:4
  77:19,22 80:4
  80:5 81:11
  83:3 85:8
  97:18 111:10
  111:17 113:10
  118:15 127:21
  131:16 138:9
  138:14
payable 131:19
paying 27:19
  67:21 74:18,19
  74:20 75:24
  76:14,15 77:2
  81:17 118:17
payment 80:3
  88:5 104:14
  111:15 117:22
  126:19
payments
  71:21 72:7
  74:22 75:8
  78:16,23 79:6
  84:4 94:16
  95:17 105:18
  118:19 130:7
payout 126:23
pays 74:23
pco 48:12

pdf 20:10
  23:17 25:15,18
  28:12 36:6
  44:3,16 53:1
  56:22
pdf's 59:17
pdfs 17:19
peaceable
  80:13
peek 29:5
pension 36:22
people 16:1
  40:19 103:17
  121:12 126:18
  142:1 146:5
  150:23
people's
  142:17 143:6
perceived 38:9
  115:13
percent 11:22
  33:23 35:5,6
  37:5,6,6,7,11
  38:5,12,15,16
  39:3,18,22
  40:15 41:1
  56:4,24 57:1,2
  60:7 67:2
  77:21 92:20
  104:25
perfect 125:15
perfected 93:8
  93:9
performing
  27:13
period 14:10
  14:18 15:8

24:17 25:1,2,4
  25:21 28:2
  33:14 47:4
  84:5 101:23
  108:3 113:22
  115:14 117:17
  118:18 123:21
  125:11 136:21
  139:11,21
periods 146:23
permissible
  101:16
person 99:11
  119:12
personal
  146:22
personally
  103:21 121:21
  137:17
perspective
  102:24 103:2
  106:22 107:18
  108:6 114:6
  129:20 131:1
peter 5:24
petition 12:3
  67:18 68:8
  71:9 72:12,12
  72:14 80:5
  93:3 113:7,11
  113:12 131:6,9
petitions 86:23
phone 63:17,22
photographs
  51:22,25
physical 24:20
  52:4

physically
  22:15 27:21
  149:23
pick 16:13
  28:24
piece 52:20
pieces 122:1
place 38:11
  45:9 51:11
  118:4
placed 64:12
placeholder
  123:9
plains 134:17
plan 14:9,12,19
  78:8 80:2,10
  80:13,15 83:19
  83:19 84:4
  87:2 93:6 94:5
  94:9,10,13,14
  94:18,21 95:16
  95:17,25 96:9
  96:14,24 97:8
  97:24 98:9,14
  98:19,21 99:3
  100:15,20
  101:1,3 102:18
  102:19,19
  103:5 104:9,10
  104:11 105:7
  105:23 106:3
  107:8,10,12,16
  107:17 108:14
  110:14 111:2,3
  111:5,6,6,7,9
  111:11,11
  112:2,3,6,13

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 193 of 209

[plan - priming]                                                              Page 36

112:16,18,23
112:24,25
113:4,7,9,9,15
113:16,18,21
114:7 115:9,14
116:21,21
117:15 118:2
118:14,19,20
120:7,8,13
121:22 123:7
123:15 125:20
126:10,10
134:14,15,20
134:23 135:6,9
135:15,19,22
136:3,9,12,20
136:22,24
137:1,3,3,5
138:11,23
139:20 142:19
142:25 143:24
145:14,19,21
**plan's** 135:20
137:6
**plans** 104:1,18
135:10
**plausible** 135:2
136:15 137:15
**plaza** 4:19
**pleadings**
78:20 128:21
**please** 6:4,9
15:24 18:3
56:6 119:18
**pledge** 11:21
12:1 15:10
65:25 67:1,6

69:11 92:20
93:4,8,25
132:9,17,19
133:14 145:5
146:11
**pledged** 14:6
14:24 67:2
92:23 100:23
131:3 135:6
137:7,9 139:25
140:7
**plus** 24:24
81:18 84:25
98:12 110:6
**podium** 11:6
**point** 13:3
29:15 45:25
57:9 58:8
73:18 94:18
101:25 102:3
115:25 116:2
122:11 125:19
126:20 133:11
140:16 142:23
142:25
**pointed** 21:2
53:19 97:23
98:11 99:3
104:12 105:3
117:22 143:3
**pointing** 23:22
**pond** 114:24
114:25
**pose** 55:7
**position** 14:19
79:8 81:17
106:13 115:1

123:15 131:17
**positive** 131:4
**positively**
107:4
**possession** 6:12
108:23 148:23
**possibility** 14:9
14:13 82:13
139:15
**possible** 15:12
39:7 119:7
120:23 129:22
136:5 139:10
149:11
**possibly**
118:10 126:14
136:6,10
**post** 72:12
96:24 113:11
113:11 130:8
131:6,8
**posture** 102:17
**potential** 50:1
**potentially**
49:24 68:1
82:14 108:16
127:16 144:23
144:24
**practice**
121:24
**pre** 52:14
72:12,14 83:1
113:7,12
**predict** 114:3,4
**prefer** 28:11
**prejudice**
116:14 117:4

**premise** 135:20
**premises**
131:12
**premium**
50:22
**preparation**
88:20
**prepare** 43:9
79:20 147:14
**prepared** 7:10
10:4,7,19,21
13:15 17:13,14
23:2,2 30:19
31:8 89:22
100:19 110:23
129:1 130:10
142:16
**present** 5:16
104:23
**presented**
37:23 93:14
**presumably**
83:21
**presume** 82:3
84:1
**pretty** 30:23,24
37:15 38:22
41:4
**prevents** 33:3
**previously**
73:1
**price** 37:13
38:18
**prime** 56:1
119:7
**priming**
138:20

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 194 of 209

[principal - property]                                                    Page 37

**principal** 71:15
72:2
**printed** 43:20
44:15
**prior** 7:9 11:15
15:5 29:1
65:12,18 80:5
103:22 120:18
135:17 138:7
140:1,6
**priority** 130:20
135:7 137:7
145:25,25
**probability**
134:12
**probably** 12:15
41:6 47:2,13
84:1,2 111:13
111:24 118:9
120:16 124:14
143:20 147:23
149:19 150:16
**problem** 16:19
27:15 50:9
117:10,18,25
117:25 119:3
121:17,19
122:4 126:5,6
127:15,15
142:3,12 144:7
**problems** 37:3
38:17 125:16
144:9
**proceed** 9:24
12:14 42:16
64:16 65:9
79:24 132:18

139:24 140:8
140:16 141:6
148:22
**proceeding**
130:19 132:15
**proceedings**
79:21 151:23
153:4
**process** 15:2
82:12 89:12,16
89:18,20
107:20 132:8
150:8
**processing**
38:1
**procure** 73:14
**produce** 89:17
89:20
**produced**
96:10,22
**professional**
20:24
**progress** 8:1
8:16 79:21
103:2 114:10
**project** 2:15
79:25 80:3
85:3 97:13
103:1,6,8,14
103:18 104:4
105:2,6,20
106:23 120:2
**projection**
25:17
**projections**
94:19 121:5
138:6

**prompt** 148:5
**promptly**
115:15
**prong** 132:6
**pronouncing**
43:4
**proof** 12:2,4
13:4,6 67:8,11
67:14,15 71:1
71:1,7,16
74:10,14,15
102:25 130:15
**proofs** 13:16
13:17 67:17
68:17,25
114:18
**proper** 123:23
124:7
**properly** 93:8
102:6
**properties** 1:7
2:5,19 6:8
11:23,23 14:2
30:12 33:18
38:3 92:25
129:5
**property** 11:24
12:24 13:1,3,7
13:9,11,18
14:4 15:16
21:18,19,23,25
22:5,14,15
24:16,18 26:13
26:14,19,25
27:3,12,12,15
27:17 28:9,18
32:18 33:10,14

36:22,23,25
37:1,2,9 38:5,9
39:15,19 40:5
40:8,15,25
41:15 43:12
45:8 47:18,21
48:1,4,23
49:16 50:18,18
50:25 51:8
52:7 55:4,9,12
55:14,19 58:23
72:8 73:14
75:11,12,17,18
75:21 76:4,6,6
78:5 80:1
84:12 88:4,4
93:1,15,21,23
94:2,19,20
95:18,19 96:18
100:13,18
104:25 106:6
106:10 109:15
109:17,23,24
110:9,10,12
111:3,8,9,10
111:22,23
112:1 114:1,21
115:4,8,16
127:8,19
129:25,25
130:3,4,13,18
130:24 131:15
132:24 133:3,7
134:4,10
135:24 136:1,2
137:19 138:1
138:10 146:22

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 195 of 209

[proposal - range]                                                        Page 38

proposal 8:2
100:17
proposals
114:10
propose 79:24
83:19 101:1
145:20
proposed
11:16 78:9
94:9 104:13,14
108:14 134:15
135:6,15,19,22
136:8 137:6
143:8
proposes
145:19
proposing
118:3,18
prospect
134:12
protect 109:14
protection
78:21 105:18
109:10,13,17
109:19 110:1
115:6 129:24
131:19 132:21
protective
71:21,23 72:4
72:7 74:9
provide 15:4
45:7,10 80:1
80:15 87:6,6
116:10 119:5
120:1 123:10
140:4,13
147:17

provided 20:4
31:3 45:5
48:19 51:23
53:25 54:5
97:4 99:5
109:13
provides 95:17
99:4 133:10
135:23 140:11
143:23
provision
126:19 137:10
prudent 50:15
pull 18:24
34:14 100:10
pulled 34:24
purchased
33:19
purpose
130:10
purposes 11:19
12:16 20:3
pursuant 65:1
pushed 14:21
put 6:5 10:1
15:10,16 16:24
17:7 50:13
61:5 62:18
75:11 76:7
78:6 80:10
89:20 90:11,11
95:3 97:11
100:10,19
109:3 111:8
114:11 116:8
124:19 146:1
149:1,4,6,22

putting 15:15
51:1,6 89:3
95:4 125:10
127:23 128:9

**q**

qualifications
20:23
qualified 21:23
21:24
quality 26:19
40:16,18,20
43:16 51:20,25
52:7,14 61:5
quarter 56:23
74:25
quarterly 88:5
question 10:9
17:22 19:16
48:22 49:15
50:9 51:7 53:7
53:14,16,24
55:16 57:22
58:25 59:4
60:24 70:25
71:4 72:18
77:24 78:18
81:23 82:1
84:19 90:7
93:10 105:13
105:20 125:24
140:18,19
144:10 146:25
questions 10:5
15:17 18:9
28:21 43:9
52:17,19 54:20
54:22 57:24

58:1 60:21
61:9 63:20
70:25 79:11,14
81:19,22 85:11
96:11 97:20
117:8 118:24
122:12 124:10
144:11 147:6,8
147:10
quick 58:4
99:16 147:22
151:18
quicker 47:1,1
quickly 15:12
quiet 64:4,5
quite 81:5
142:9
quote 139:5
quotes 98:20

**r**

r 1:21 4:1 6:1
153:1
rachel 12:10
12:11
raise 18:3 64:8
78:20 117:19
142:3
raised 141:17
141:22 142:10
142:14,17
143:7
raises 111:17
131:15 134:22
raising 39:1
40:13
range 30:3
95:10

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 196 of 209

[rate - reflects]

Page 39

**rate** 33:11,12
33:13,17,24,24
35:5 37:5,6,8
38:12,16 39:19
39:22 40:1
55:18,25 76:10
76:10,17,21
90:22,23
104:14,15,25
**rates** 38:25
39:2,4,5 40:14
41:7,10,10
55:6,8,10,13
105:13 114:3
119:14 143:4,5
**raymond** 4:20
5:23 12:21
18:14 21:24
22:2 42:5 43:2
55:1 58:5 61:1
128:25
**reach** 8:15
62:4 63:2
**read** 10:7 32:3
34:21 79:19
121:25 122:1
127:4
**readily** 126:5
**reading** 53:22
**ready** 9:21
116:8
**real** 13:6 21:8
21:18,19,23,25
24:16 25:16
32:14 55:11
58:4 72:8
75:12 76:3

83:11 87:8
94:12 95:8
98:23,24 109:3
111:14,17
113:11,13
115:10,12,13
118:8 119:15
126:17 128:7
130:13,18,24
132:24 137:24
144:6,6
**realistic** 108:14
134:15,21
**realistically**
119:13 121:8
**realization**
110:12
**realize** 36:16
101:12
**realizes** 106:25
**reallocate**
73:22
**really** 8:4,10
8:14,22 11:1
11:19 14:12
15:4 25:3 28:6
33:1 34:11
46:6,7 73:7
81:23 84:16
94:15 96:3
99:8 101:10
105:23 107:20
121:12,12
122:14 127:6
148:1,6
**reason** 9:23
26:12 35:20

50:6 81:17
97:9 104:5
113:6
**reasonable**
14:9,10,13
15:9 28:2
41:12 100:25
117:17 124:25
125:9 134:12
134:13 136:21
139:11,21
145:3 146:18
146:20,25
147:1,2 150:24
**reasonably**
94:5 136:21
139:10,19
**reasons** 101:5
**rebound** 107:4
**recall** 14:21
59:4 85:19
**receive** 109:19
**received** 45:2
93:18 112:7
**recent** 30:13
35:25 98:13
**recess** 62:21
**recognize**
112:23 113:20
**record** 6:5,7
10:3,18 25:13
62:15,22 67:5
87:13,21,22
91:25 92:3,5
102:14 115:21
120:15 127:3
144:8 147:14

153:4
**recording**
62:16
**records** 90:11
117:2
**recouping** 99:1
**recourse** 66:2
69:13
**recover** 80:4
**recovery**
107:23
**redirect** 58:3
85:12,14
**reduced** 59:2
**reducing** 25:20
**redundant**
92:15
**refer** 28:10
43:19
**reference**
22:24 29:1
65:12,21
**referenced**
13:9 23:11,19
27:4 35:15
97:21
**references** 12:3
**referencing**
23:23 25:14
**referred** 6:19
**referring** 34:3
**reflect** 26:21
39:5
**reflecting**
38:13
**reflects** 90:12

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer    Pg 197 of 209

[regard - resort]

Page 40

**regard** 11:15
25:25 97:20,21
**regarding**
30:13 45:13
68:6 78:5
138:16
**regardless** 83:7
**register** 90:1
**regular** 126:16
**reject** 2:4,18
65:13
**rejected** 2:9,23
**rejecting** 2:6
2:19 131:12
**rejection** 7:20
8:5 11:16,16
88:24 99:10
**relate** 23:8
88:19,21
**related** 2:10,16
2:24 3:3,3 65:2
139:2
**relating** 82:16
84:3 88:22
96:20 139:6
**relatively**
106:19
**relevant** 79:9
79:12 96:22
131:23 136:20
**relied** 66:9
**relief** 2:1,10,24
3:3 11:10,12
11:19 14:15,22
14:25 15:12
64:22 65:2
78:4,7,8 79:23

92:22,22 98:18
100:21 101:6
102:5 106:12
115:7 123:20
128:16 129:15
129:21,22,23
130:2 131:25
132:1 148:22
**reliefs** 14:24
**remaining** 38:8
**remains** 23:15
**remember**
92:17 100:23
**remind** 62:15
**reminds** 139:4
**remotely** 118:5
**renewed** 21:9
**renovate** 52:10
54:3
**renovated** 52:5
52:6
**renovation**
52:1
**rent** 22:17
29:24 30:6
31:13,13,17
33:2 36:19
44:18,24 45:4
60:13
**rent's** 40:6
**rentable** 29:22
**rental** 28:23
45:3
**renting** 57:5
**rents** 31:20
**reorganization**
80:2,10,13,14

80:15 93:6
104:19 110:10
110:11 115:9
130:4 134:6,9
134:11,13
139:7,8,10
**repetitive**
108:12
**replacement**
131:13,13
**replenish** 73:3
73:19,24 74:3
**reply** 129:8,10
137:21
**report** 12:18
12:20 16:21
22:6 23:4 24:8
24:11,12,15,23
33:21 34:2,4,7
34:11 35:3,9
35:16 40:24
51:22 52:21
56:3,11 57:10
57:14 58:7,8
59:12 62:11
84:23 105:5
**reported** 58:16
**reports** 19:4
56:9 95:13
**represent** 43:7
55:4 57:15
70:24
**representative**
41:4 65:8,22
**representatives**
8:9

**request** 11:1
101:5 117:3
123:21 140:25
**requested**
45:15 47:20
79:23 106:13
**require** 75:7
84:15 140:3,5
145:8
**required** 35:19
77:4 94:16
105:6 125:4
138:5
**requirement**
109:18 146:16
146:17,23
**requirements**
39:3 82:15
106:8
**requires** 145:2
**requiring**
122:13 146:4,8
**research** 48:18
**resell** 33:14
**reserve** 39:1
73:3,19,24
74:3 80:19
**residential**
49:9 98:23,24
**resolution**
132:1,8
**resolve** 132:5
132:10,11
**resolved** 8:6
**resort** 112:3
115:23

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 198 of 209

[respect - running]                                                    Page 41

**respect** 7:13
  10:9 58:16,19
  92:11 102:8
  110:17 112:23
  125:19 130:5
  132:6,22
  135:21 139:25
**respectful**
  103:4
**respectfully**
  78:18 106:1
**respects**
  139:24
**responded**
  124:1
**responsive**
  11:14
**rest** 57:7 91:23
  107:25 151:6
**restricted**
  12:18,19
**result** 131:25
**resulted** 25:6
**resulting**
  109:15
**retail** 29:19,20
  30:2 40:18,18
**retain** 11:18
  65:16 99:11
**retention** 88:24
**return** 39:4
**returns** 96:5
**revenue** 32:4
  32:24 33:1
  45:2,3
**revenues** 28:23

**reversed** 97:25
  98:1
**reversion**
  33:11,13
**riding** 97:7
**right** 7:7 9:16
  11:5 13:23
  15:19 16:14,17
  17:25 18:2,3,7
  19:4,5 21:20
  21:22 23:14
  25:13 29:23
  36:9,17 37:2
  38:18,20 39:14
  39:14,24 40:2
  41:14 42:15
  45:11 46:12
  47:11,24 48:5
  48:7,9 49:22
  50:5 51:8,12
  51:14 52:9,19
  52:20 53:9
  54:8,14,19,19
  59:14 61:10,15
  61:18 63:11,14
  63:19,19 64:7
  64:9 69:21
  70:17 71:9,10
  72:5 73:13
  74:1,5,7 75:15
  76:2,11,16
  77:5,21 78:19
  79:6,8,10,15
  80:11 81:10,21
  81:22 82:7,11
  82:17,18 83:24
  83:25 84:6,7

  84:13,19 85:10
  85:12,16 86:1
  86:4,14,17
  87:15,20 88:14
  89:19 90:3
  91:17,21,22,25
  92:6,9,10
  103:17 104:23
  108:18 109:25
  110:22 116:24
  117:11 118:22
  118:24 120:9
  121:3 122:15
  122:17,23
  125:14 127:10
  127:25 128:10
  133:16,22
  144:12,16
  146:16 147:11
  148:9 149:2
  151:3,5,22
**righthand**
  63:16
**rights** 92:23
  125:12 132:19
  133:20 145:5
**rise** 55:8,10
  105:14
**rises** 99:2
**rising** 55:6
**risk** 26:21,22
  27:18,25 37:8
  38:10,14 55:14
  55:20 98:25
  104:19 105:16
**riskier** 41:11

**risking** 75:24
**risks** 104:19,22
**riverfront** 4:19
**road** 94:18,25
  95:20,21,22
  123:6 127:15
  153:21
**roll** 44:18,24
  45:4
**rollover** 37:10
  38:7 40:8
**room** 5:11
  15:25 16:1
  18:1 63:25
**rooms** 7:25
**rose** 55:13,19
**rough** 72:23
**rounded** 25:8,9
  25:10,12 46:14
**rounds** 35:4
**rule** 7:10 10:4
  10:10,13,14,19
  10:25 135:7
  137:7 141:1,1
  145:25 148:5
**ruled** 112:16
  112:17,19
**rules** 148:2
**ruling** 10:21
  124:3 128:14
  142:11
**rulings** 152:3
**run** 21:11
  36:14 101:23
**running**
  103:11 141:10

23-10210-lgb Doc 104-1 Filed 06/21/23 Entered 06/21/23 16:41:22 Exhibit A - Declaration of Morris S. Bauer Pg 199 of 209

[runs - selbst]

Page 42

**runs** 58:12

**s**

**s** 2:1,16 3:3 4:1
6:1 64:21
129:3,10
**safer** 39:20,20
**sale** 14:23 15:5
15:11 37:16,21
38:4,16,18,22
38:24 39:10,16
40:12 50:22
59:9 100:22
118:4 124:15
127:8 134:25
135:21,21,23
136:4 138:7
143:11 144:14
144:16 146:19
150:8
**sales** 26:8
33:21 35:9,13
35:15,16,18
36:4,11,12
37:17,19,23
40:11 41:8
50:21,21,23
**satisfied** 93:18
**satisfy** 135:17
**save** 104:3
**savings** 133:25
**saw** 25:2 63:1
123:7
**saying** 9:16
24:8 30:1 44:3
48:7 84:16
94:15 95:24
97:6 102:5

118:21 121:16
123:7 126:14
147:16
**says** 20:18 24:2
29:24 44:24
45:2 54:12
59:25 60:2,2,4
79:20,23 94:17
96:7 109:13
110:3 113:14
113:17 117:16
120:13 126:3
**scenarios** 25:7
**schedule** 95:11
149:7
**scheduled** 9:10
9:20 10:8
89:23 115:15
**schedules**
86:25 95:14
**scheduling**
128:19
**school** 40:22
40:24
**scope** 72:2
**scott** 4:8 6:11
43:7 70:22
108:21
**screen** 17:19
17:21 61:22
63:3,16
**se** 97:22
**second** 18:23
19:1 22:13
23:5,6,25
25:11,22,23
37:21 52:21

53:5,8,10,11
53:12 54:19
68:21 78:7
87:10
**section** 65:2
101:14 129:16
129:23 130:2
132:22 135:22
135:23,23
136:4 137:10
139:23 141:1
**secure** 28:3
119:7 131:3
**secured** 11:20
11:25 13:4,7,8
13:10,12,18
66:25 93:21
98:3,25 110:3
113:1 114:17
130:17,20
131:7 133:12
133:20 134:23
134:25 136:4
138:21,24
**securing** 27:19
**security** 65:25
69:11 118:11
137:25
**see** 9:6,15
15:25 20:21
24:1,4 25:5,20
29:10,12,16
31:12 32:3,24
33:7,25 34:19
35:4 41:9
43:12,15 44:24
44:25 46:4,8,9

46:16 50:7
56:19,25 60:8
62:2,23 63:15
64:10 73:8
75:10 78:11
82:13 86:17
96:1 100:11,14
100:14,14
101:16 107:16
107:22 122:7
134:17 139:11
146:15 149:7
150:20,21,21
150:22 151:6
**seeing** 61:22
62:2 63:2,8
121:13
**seek** 12:15
45:17 79:25
105:10 129:17
**seeking** 11:18
108:25 125:6
128:16
**seem** 8:12
124:25 144:5
**seemed** 8:3
**seems** 8:13
42:25 104:16
115:18
**seen** 16:13
51:15,16
121:24
**sees** 23:24
61:14
**selbst** 4:15
6:14,15,17
54:24,25 55:2

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 200 of 209
[selbst - situation]                                                    Page 43

55:3 56:10,11
56:16,20 57:3
57:23 78:12,13
78:14,24 79:4
90:20 91:2,6,6
102:9,9,12,13
102:14 107:24
115:12 120:4
143:3 149:17
151:8
**sell** 33:15,16
50:13 80:3,17
80:25 81:2
84:6 111:9
**sells** 95:18
**send** 118:3
141:23 142:4
147:13 149:9
151:17
**sending** 91:12
141:2,6 144:15
**senior** 73:25
75:24 80:4
109:4 111:18
112:8,8,9
114:19,21
115:2,3 118:17
**sense** 102:2
104:3
**sent** 20:17
63:12 98:1,3
143:1 144:8
**separate** 7:24
72:13,13
**series** 65:21
69:7

**serious** 108:13
141:15
**seriously**
147:25
**seriousness**
51:14
**serve** 89:9
146:4,9,10
**served** 96:4
**server** 89:12
89:16,18,20
**service** 76:5
83:11 89:12
120:22
**session** 6:3
**set** 11:10 65:17
67:17 93:2
137:3 141:8
**sets** 65:11
**setting** 128:20
**settlement** 7:23
8:3,20 68:14
**seven** 37:24
**several** 27:15
28:4 99:10
**shape** 8:11
**shared** 93:6
**shareholders**
120:21 132:16
138:9 139:2,3
**shares** 102:20
124:21 125:18
133:15 140:16
145:7 152:6
**sheet** 100:6
**shift** 14:8

**shifting** 104:19
**shifts** 94:3,4
134:7
**shoes** 51:1,6
145:6
**short** 38:11
**shortened**
21:16 25:11
47:4
**shorter** 25:3
47:3
**show** 14:8 28:4
44:5 78:6 88:8
94:4 95:13
96:10 97:4
121:14,18
134:14
**showed** 54:4
93:11 94:3
105:5
**showing**
122:11 139:9
**shows** 36:2
50:20 60:19
93:7 94:20,20
95:14 119:8
**shut** 16:25 17:7
**side** 16:8,13
29:14,16 46:8
59:25 92:4,5
107:1 124:22
**sidelines** 95:23
100:13 104:13
**sign** 31:17
**signature**
153:6

**significant**
27:23,25,25
37:10 38:7,10
38:14 140:9
**significantly**
60:12 99:2
**silverberg**
11:11,11 61:22
63:2,3,18,19
63:22,24 64:1
64:6,7,11,15
64:19,21,24
65:20 70:20,22
71:3 72:16
78:11 79:18
81:22,23 85:17
86:5,12 95:6
97:10 100:17
111:7,20
128:23 129:12
**silverberg's**
62:9 63:16
86:2
**similar** 43:21
111:6 114:23
115:1
**simple** 109:11
**simply** 78:17
**single** 94:11,12
115:10,11
126:17 128:7
**sit** 16:15
**sitting** 48:22
49:15 120:25
**situation** 81:7
117:2 121:11
124:10,15

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 201 of 209
[situation - stabilized]                                                    Page 44

126:16 127:7
139:4 145:4,19
146:22 150:25
**situations** 81:9
**six** 31:23,24
37:14 46:5
74:4
**skeptical**
135:16 137:11
**small** 113:5
**smaller** 50:9
**sme** 2:2 3:1
4:18 6:19 11:9
11:20,25 12:3
12:3 14:17,23
64:22,24,25
65:23 66:7,9
66:13,16,25
67:5,8,18,21
67:21 68:18
69:1,16 70:6
71:2 78:16
79:20,22,24
80:5 92:19,22
93:25 94:2
103:19 104:6
106:12 108:16
128:15,22
129:8,15,20
130:5 131:3,4
131:15 132:5
132:10,20,20
132:23 134:20
134:22 136:15
136:25 137:4,6
137:21 138:16
138:22 139:24

140:1,3,5
**sme's** 64:22
130:9,21 131:5
131:17
**sold** 37:4 38:19
39:12,18,18,21
41:2 94:19
95:19
**solicit** 113:23
**solicitation**
142:5
**solutions**
153:20
**solvent** 107:6
**somebody**
26:21 31:8,16
48:17 119:4
127:18 128:1,3
**someone's**
131:1
**somewhat**
106:24
**son** 12:11
110:21 120:20
120:21 137:18
**sonnax** 131:20
131:21,23
132:22
**sonya** 3:25
153:3,8
**sophisticated**
76:3
**sorry** 13:22
16:8,11,16
17:9 19:4,15
26:3 53:6,6,8
55:17,17 57:15

63:5 71:25
72:3 83:15
87:21 108:20
119:19,19,22
120:25 122:25
129:25 132:3
144:11 149:16
149:16,19
**sort** 7:22 76:19
**source** 99:19
105:4 120:8
121:12 135:2
136:15 137:15
**south** 56:24
60:10
**southern** 1:2
134:18
**space** 23:9,10
24:4,10 26:19
26:22 27:21
29:19,20,21
30:1,2,3 31:16
31:19 47:10
51:3 52:7,14
54:10,17 56:2
56:2 57:5,11
57:17 82:14,19
**spaces** 82:22
83:1
**speak** 91:8
102:10
**speaking** 6:6
108:12
**specifically**
79:23
**specifications**
52:8,11

**speckled** 87:4
**speculate**
139:5
**speculation**
98:22,24
**speech** 123:5
**speed** 103:24
**spend** 23:9
49:1,4 76:4
**spent** 8:15 54:4
**spoke** 8:18
58:19
**spot** 16:17
**spotted** 23:5
**spread** 74:11
**spreadsheet**
13:16 89:22
**square** 23:10
23:10 24:3,3,9
24:9 29:21,24
30:2,3,4 31:18
31:20 35:23
37:13,14,14
38:19,19,20
39:12,13,21,25
40:24 41:2,3
59:2,3,7 60:9
60:11,12,17
73:15 81:6
**sra** 106:8
**stabilization**
28:5 33:8
45:21 97:16
**stabilize** 76:5
**stabilized**
22:14,16 24:17
24:24,25 27:12

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 202 of 209
[stabilized - submissions]                                            Page 45

27:15,16 28:1
33:1,3,5,6
39:24,24 40:1
40:2,3,4,9 41:3
41:4,10 45:22
46:5,17,20,23
47:1 49:6 53:6
112:1 127:1,7
127:10
**stabilizing**
127:23
**stack**   35:25
**stage**   94:7
98:18 110:15
**stake**   102:24
**stale**   41:9
**stand**   7:13 15:3
15:16 89:6
91:7 100:13
103:23 104:13
**standalone**
20:14 93:6
**standard**
114:14 117:1
123:23 134:10
**standing**   95:23
110:7
**standpoint**
50:5
**start**   29:10
32:24 54:17
127:22 141:2
141:10
**started**   40:13
124:19
**starts**   33:7
46:13,16

**state**   22:11
70:1 110:8
**stated**   100:5
**statement**
25:24 67:5
69:25 86:25
87:2 89:25
93:7 94:14,22
94:25 95:2
96:12 99:16
110:16,25
111:16 113:24
115:15 116:5
116:10,16,23
117:6,13 121:3
121:4 122:6
125:13 126:3
136:7,11
137:13 138:5,8
138:12 140:8
140:10 141:14
141:19,20,23
142:3,13,15,18
142:22,24
143:16,20
144:4,7 148:14
150:13
**statements**
32:7 88:5
90:11 106:17
**states**   1:1,11
5:8 58:22
**status**   9:4
**statutory**
109:18 130:17
**stay**   2:1 3:3
10:15 11:10,12

11:19 14:15,22
14:25 15:12
39:6 64:22
65:1 78:4,7,8
79:18 86:13
92:22,22 98:18
100:21 101:6
106:12,23
108:6 109:1,16
110:5 111:19
115:25 123:20
128:16 129:15
132:13,14
139:23 140:25
141:1 148:22
152:5
**stayed**   141:2
**staying**   106:5
140:24
**stays**   23:15
**steady**   27:13
**step**   61:12
102:16 145:6
148:24,25
150:8
**stephen**   4:15
6:14 55:3
56:10 78:14
91:6 102:9,14
**stepped**   110:21
**steps**   139:24
**stock**   144:21
145:7
**stop**   29:14
35:13 68:21
87:10

**stopping**
123:18
**stops**   62:16
**strange**   24:4
**strategy**   79:20
**stream**   27:14
33:3,9 39:20
40:9
**street**   2:15 5:3
98:16
**strictly**   50:4
**strike**   65:7
80:15 111:21
**strikes**   9:1
**striking**   31:9
**string**   106:9
**strip**   133:17,20
**struggled**
137:15
**struggling**
137:14
**stumbled**   99:9
**sub**   104:24,25
**subject**   11:23
22:5 24:18
37:2 41:14
92:25 135:25
**subleased**   56:2
**submarket**
36:18,19 56:1
56:2,17
**submarkets**
56:13
**submission**
92:14 93:13
**submissions**
95:9 97:23

23-10210-lgb Doc 104-1 Filed 06/21/23 Entered 06/21/23 16:41:22 Exhibit A - Declaration of Morris S. Bauer Pg 203 of 209

[submit - tax] Page 46

submit 14:14 147:15 151:18
submitted 9:14 12:13,13,21 13:4 43:24 64:23 65:12 93:19 94:10,21 95:11 97:6 99:12 138:18
subpoenas 89:10 91:13 96:4,5
subsequently 33:7
substantial 8:1 8:16 106:19 107:1 114:10
substantially 43:21
substantive 135:1 136:8,12 143:14,16 145:17
substantively 145:14
succeed 103:1
success 108:3
successful 134:13
successfully 79:21
succotash 12:7
sufficiency 99:7
sufficient 138:13 139:18

suggest 19:14
suggested 68:15 118:15
suite 4:20 153:22
summarize 20:23 29:2
summarized 36:13
summarizes 29:9 89:23
sundown 8:17 8:18 114:12
sunedison 109:12,20
supplement 3:2 11:14 18:11 64:25 124:1 128:24
supplemental 17:12 18:17 19:24 20:20 22:25,25
supplementa... 140:10
supplemented 139:9
support 9:15 11:12 33:18,22 35:10 59:9,12 64:25 102:8,10 104:6,8 106:13 106:15 108:9 108:17 128:23 128:25 129:2,3 129:10 147:16

supporting 41:12
supports 99:6 106:11
supposed 9:17 73:12 96:23
supreme 134:2 134:9
sure 8:20 57:8 57:13 77:6 86:20,22 90:7 101:10,22 124:11 127:18 140:20 145:10 148:4
surprisingly 64:4
surrounding 50:17 135:15
survivor 110:19
sustain 31:4
swear 18:4 64:13
switches 59:24
switching 104:1

**t**

t 128:25 153:1 153:1
tactic 114:13
tail 87:17
tails 105:24
take 14:3 15:1 15:21,24 19:15 22:21 28:3 29:6,7 37:16

37:19 48:17 54:2 56:3 62:4 62:11 69:8 73:6 85:7 86:21 88:7 97:3 102:16 105:21,21 107:6 110:21 110:25,25 116:17 118:4 120:12 124:21 125:6 145:6,22 148:23 149:14 149:15 151:18
taken 82:3,25 99:22
takes 53:17 74:16
talk 8:8 30:13 102:16 104:9 104:18 105:9 149:7
talked 7:20 37:25 55:5,24 55:25 59:10 104:17 107:7
talking 10:15 23:8 31:3,5 59:15 62:18 84:9 101:19 113:12 119:1
talks 44:18
tara 5:14
tarter 4:3 6:11 108:22
tax 87:8 88:4,9 95:9 96:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 204 of 209

[tax - think]                                                             Page 47

111:14 113:1
**taxes** 13:6
32:15,15 83:6
83:12 95:8
111:17 113:11
113:13 117:23
130:16 131:15
131:16,18,19
137:25
**taxing** 84:10
**tco** 13:2 48:8
48:15 49:2
79:25 82:5,6
118:8 127:6
**team** 30:9
58:12
**technically**
84:11 101:9
**teleconference**
68:12
**tell** 15:5 16:6
18:4 22:4
36:10 39:14
48:17 64:13
72:11 75:19
141:25
**telling** 41:2,3
121:17 125:14
125:22
**tells** 40:1
**temporary**
8:12 22:19
133:5 137:20
**ten** 15:11 24:17
24:25 25:4
31:17

**tenant** 27:22
27:22 40:7,8
40:22 44:18,24
45:3 47:8 52:8
52:10 54:9,10
54:12 57:6
59:16,25 60:5
73:12,23 80:1
82:15,24 97:14
**tenant's** 60:14
**tenants** 24:21
27:18,19 28:3
31:14 32:12
37:12 40:16,18
40:18,20 47:9
49:5 52:12,15
53:19 54:17
57:7 79:25
82:22 83:8
138:5
**term** 38:8,11
121:2 133:8
138:14
**terminal** 33:23
**terminate**
101:9 116:1
129:19
**terminated**
14:18 101:1
123:14
**terminating**
3:2 65:1
**termination**
101:6
**terminology**
15:8

**terms** 16:15
145:24
**test** 31:8 122:3
132:6,6 135:12
135:14,17,20
**testament** 80:6
**testified** 25:21
73:9 93:13
97:10 100:3
129:12
**testify** 61:12
65:7 110:23
**testimony** 7:10
14:11 18:13
21:17 23:17,19
25:20 27:4
28:16 31:1,9
41:19 46:19
55:5,24 65:8
65:17 84:16
86:10 95:6
97:19 100:17
103:15,22
104:22 105:1
106:20 111:6
111:20,20,21
113:25 120:18
130:9 133:1,2
137:16 138:18
139:18
**texas** 133:25
**text** 63:12
**thank** 6:13,17
6:21,22,25
7:15 11:7
18:10 22:1
24:11 26:2,3

40:10 44:1
54:20 57:24
61:10,15 62:18
62:20 64:18
70:14 85:10,13
85:16 86:5,7
102:13 106:13
140:18 141:12
151:8,9,11,13
151:16,21,22
**theoretically**
15:10
**thing** 15:23
18:24 35:23
50:15 51:8
110:22 116:12
117:19 122:14
125:25 126:18
127:24 128:1
**things** 7:13
15:20 23:5
28:4 43:16
53:20 61:6
72:9 77:8,10
83:6 86:21
103:21 117:12
117:13 118:3
118:23 120:3
122:6 141:18
142:4 143:19
143:21 148:8
**think** 10:11
12:14 14:14
27:6 28:16
29:3 31:1 36:5
37:15 41:11
44:12 47:21

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 205 of 209

[think - trans]                                                    Page 48

48:1,3,4,23
50:15,20,25
51:8 52:4 53:8
53:15,21 54:20
55:10 56:4,16
57:23 59:12,15
75:15 79:2,2,4
79:8 80:16,18
81:16 82:20
83:5,10 84:22
85:17 86:21
88:7 91:2,10
91:19 93:13
94:23,23 95:9
95:15,24
100:20,20,21
100:25 102:1
105:12 106:11
106:19 107:7
107:10,11,12
107:13 108:4
108:24 110:15
111:15,16
112:15,18
113:14,15,17
114:5 115:24
116:11,12
117:2 121:4,20
123:15,19,19
124:13,23
125:4,8 126:2
126:4,24
127:14 136:20
140:14 142:2,5
142:13,15
143:7 145:3,12
145:23 147:9

149:2,6,6,6,15
149:19 150:11
150:16
**thinking** 29:18
30:16 38:1
106:8 124:14
**third** 22:18
23:25 33:15
74:24 99:5
119:10,15,25
120:14 139:2
139:16
**thought** 26:11
38:1 54:14
56:11 123:24
127:4 144:15
**three** 7:8 12:7
12:10 26:7,7
32:25 38:22
47:23 54:16
68:1,17,25
74:21 86:23,24
90:9 92:17
97:2 117:6
126:18
**thrown** 98:21
**throws** 95:21
95:22,22
**tiantian** 5:14
7:4
**tier** 82:21
**tighten** 111:14
**timbers** 133:25
**time** 8:15 9:5
14:10 15:9
24:19 25:8,10
25:11 28:2

29:7 49:4
59:21,23 60:18
63:7 66:16
74:4,22 76:5,8
76:8,14,15
77:4 80:17
83:4 84:5
96:20 100:11
103:3,4 104:4
116:8 117:17
117:20 118:17
125:11 128:2
134:13 136:21
139:11,21
140:18 141:8
146:23 149:25
**timeline** 15:4
80:23
**timely** 115:9
**times** 23:10
128:6 137:23
146:21
**today** 7:7,11
9:4,6,12,23
10:8,13,14
14:5,25 17:24
22:5 26:20
28:7 34:11
48:23 49:15
61:11 65:9
74:17,22 75:11
75:13,15,16,19
75:20 79:9
86:5 93:15
100:15,21
101:17 104:22
111:4,23 114:1

116:9 117:14
117:15,25
119:1,4,8,24
120:15,25
121:18 123:4
126:5,6,6
127:2,5,19
130:25 132:20
133:4,8 141:21
142:11 144:3
151:4
**today's** 29:19
29:25 41:6
49:18 50:19
101:21 127:14
**told** 105:22
**tomorrow**
147:18 149:10
**took** 48:20
**top** 20:10
28:13 46:4
72:19,22 82:20
**total** 13:19,20
13:22,23,23,25
13:25 14:1
54:2 93:20
**totally** 26:20
112:7 114:16
114:17
**towards** 73:23
73:23 79:21
**towel** 95:21,22
**tower** 37:21
38:4
**trans** 112:3
115:22

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 206 of 209

[transaction - understand]                                                        Page 49

**transaction**
36:2,23 37:4
37:25 84:25
**transactions**
35:8,25 36:20
38:21 39:6
**transcribed**
3:25
**transcript**
153:4
**transcripts**
90:9
**transfer** 132:2
139:25 140:1,7
140:15 141:10
152:6
**transition**
108:2
**transmittal**
22:6 23:6 24:2
**treated** 113:2
**treatment** 98:2
135:6 137:6,8
143:8
**tree** 135:12
**tribune** 112:20
**tried** 8:19
**true** 27:8 128:4
149:10 153:4
**truncated**
18:12
**trust** 99:13,15
**trustee** 5:9
129:19
**truth** 18:4,5,5
64:13,13,14

**try** 14:21 23:16
29:1 88:19
95:1,2 111:13
114:7 115:19
137:19 148:2,4
148:5
**trying** 8:15
40:23 63:7
74:11 77:6
82:12 89:9
115:17 118:14
121:10 127:13
**turn** 11:5 18:7
20:7 28:10
35:22 43:22
58:7 61:13
62:17 70:15
132:3 133:18
**turned** 7:20
**turnover** 38:15
**turns** 133:11
133:12,18
**twice** 85:9
**two** 7:7,8,9
9:14 12:17
21:3,13 22:10
25:7,19 32:24
38:4,21 40:17
41:21,25 42:5
47:4 52:19
54:16 81:2
94:18 95:19,21
96:1 97:8 98:5
100:14 104:13
118:5 138:2,6
138:10 148:11

**type** 118:19
**types** 45:3
**typical** 26:12
27:1 32:8 33:9
43:14,17 50:19
51:1,1,4 60:8
**typically** 21:11
24:15

**u**

**u.s.** 1:23 5:9
134:1
**ucc** 14:23 15:3
15:9 67:5
69:25 92:23
93:7 132:8,15
144:14,16
145:5,5 150:8
**uday** 5:25
**uh** 16:10
**ultimately**
97:24
**un** 24:24
**unanimously**
102:22
**unchanged**
23:15
**unconfirmable**
111:5 117:15
117:16 134:16
134:22 141:24
142:20
**unconfirmed**
136:24
**uncontested**
105:1
**under** 14:7,15
36:24,24 44:19

59:13 64:12
71:17,22 73:2
76:10 77:20
83:23 96:24,25
97:8,9,13
101:9,14 109:1
109:5 110:2,4
110:8 111:3
113:2 114:15
114:16,17
115:6,7 116:1
116:25 120:2,3
121:8 123:22
123:25 129:15
130:7 131:6,7
132:19,22
133:22,23
135:22,23
136:4 137:9
139:22 143:11
145:5
**underdog**
112:24 113:21
**understand**
10:17 16:5
34:24 48:6
54:18 68:9
73:7 74:11
77:11,17,19
79:5 81:7 82:3
82:24 84:14
85:2,7 115:17
120:12 122:17
122:19,22
124:13 140:15
141:15 142:6
143:13 147:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 207 of 209

[understandable - vote]                                          Page 50

**understandable**
104:3
**understanding**
15:1 68:2,4
81:12
**understands**
23:16,24
**understood**
54:18 85:10
**unfair** 113:8
**unfortunately**
7:16 43:20
56:8 144:21
**unidentified**
21:21
**unika** 89:8
**unimpaired**
135:5
**united** 1:1,11
5:8 133:25
**unleased** 32:16
**unnamed** 99:5
**unpaid** 131:18
**unscientific**
116:12
**unsecure** 109:5
109:8,18
113:19 115:5
**unsecured**
13:19,21,23
75:25 84:10
109:9,16 110:3
110:6 114:17
114:18,23,25
119:13 133:12
133:18,19
138:25

**unsophisticat...**
97:6
**unsure** 75:17
**upcoming** 88:9
**updated**
130:11
**upside** 127:24
128:6,9
**urge** 107:19
**usc** 65:2
**use** 25:3,4
26:12 27:5,9
27:11 33:23
49:21,25
**used** 24:2 26:6
26:10 27:7
36:3 37:8,9
38:13,16,17
39:25 46:5,23
47:8 48:14
73:12 97:18,18
147:23
**useful** 142:5
**user** 49:24 50:2
50:22,22,23,23
**using** 35:20
106:9
**utilities** 83:12
**utilized** 36:15

**v**

**v** 133:25
**vacancy** 36:17
36:18 37:3,7
38:6 55:25
56:23,25
104:25

**vacant** 24:18
26:20 32:19
37:2 38:14
39:11,12,21
45:9
**vacating** 37:12
37:12
**valuation**
21:17,23 28:9
28:17 29:3,12
29:18 30:9
39:6,15,18
50:1 58:12
75:10 94:21
126:25
**value** 14:5,6
15:15 22:5,8
22:13,19 24:12
24:13,16 26:20
26:24 30:19
31:15 33:12
34:1 35:20,22
36:1 39:24,24
40:1,2 41:14
47:1,2,12,14
47:18 48:5
49:16,20 55:9
55:14,19 59:3
75:15,20 88:4
93:15,24 94:1
105:15,15
109:7,14,23
111:22 114:1,2
115:3 126:12
127:5,6,10
128:8 130:12
130:18,20,23

131:4 133:8,15
**value's** 35:4
**valued** 12:24
75:12 133:19
**values** 13:3
22:7,10,11
98:23
**valuing** 26:13
**various** 45:3
134:22
**ventured** 97:6
**veritext** 153:20
**version** 20:8
44:9
**versus** 112:16
**vested** 100:12
**viable** 107:6,21
**view** 8:14 45:4
49:8 61:7
81:12 102:20
103:16 106:21
**views** 129:21
**violates** 135:7
135:19 137:7
**virtual** 11:6
**virtually**
138:19
**vision** 104:7
**voice** 62:17
**voir** 18:14
**vote** 95:4
107:11 112:14
112:25 113:7,9
113:9,15,17
116:22 118:3
135:5 137:1,3
137:5

23-10210-lgb   Doc 104-1   Filed 06/21/23   Entered 06/21/23 16:41:22   Exhibit A -
Declaration of Morris S. Bauer   Pg 208 of 209
[voted - worth]                                                              Page 51

voted   113:4
votes   107:15
voting   107:11
 107:15,16
 116:21
vp   99:21
vulnerable
 108:1,2

**w**

w   2:2 3:1 4:18
 6:19 11:9
 64:24,25
wait   100:13,14
waiting   95:23
 116:14
waiving   141:3
 141:4
walk   43:15
want   8:21
 10:25,25 11:20
 31:24 37:16
 39:6 41:20
 43:19,19,22
 55:23 60:14
 62:17 72:11
 73:6,21 77:6
 77:10,11,17
 78:22 89:20
 92:3 102:4,7
 102:16 103:1
 104:9 107:2
 115:25 116:16
 125:19 140:22
 148:12,13,15
 148:17,25
 149:22

wanted   7:12
 49:25 79:19
 120:12 141:11
wants   12:7
 32:15 86:12
 105:23
warrant
 126:23
waste   142:4
way   11:21
 27:14 28:8
 37:23 42:25
 80:24 107:22
 108:16 116:20
 119:4 146:1
we've   14:17
 82:6,19,20,25
 84:20,24 92:16
 94:3 102:18
 103:3 118:9
weak   104:23
 104:24
wealth   33:18
website   88:7
wee   14:14
week   101:23
weekend
 149:16
weeks   116:14
 117:6
weighed   92:13
welcome   54:21
went   8:17 15:6
 29:2 31:21
 33:22 35:11
 38:2 57:1 60:7
 96:25 99:13,14

99:15,17,18,23
 99:25 103:9
 107:10 120:3
west   2:15
 112:3 115:22
 128:15 134:17
western   98:5
whatever's
 146:14
whatsoever
 118:7 120:24
 123:8
wherewithal
 96:8 106:23
 138:17 139:14
white   8:11
 134:17
wholly   114:23
 114:25 115:5
whoops   53:9
wife   12:12
willing   73:22
 120:1
willingness
 106:22
win   105:24
window   16:13
wingate   2:8,22
 5:2 7:2 8:9
 13:10 103:20
 108:11 137:4
wingate's   87:7
wipe   79:8
 132:16
wiped   112:7
wish   108:9
 151:5

withdraw
 57:22
withdrawn
 137:22
witness   12:22
 19:18 21:23,24
 22:1 26:1 29:8
 31:11,24 32:2
 35:1,3 44:6,16
 44:21 52:25
 53:4,25 54:11
 54:15,21,23
 56:8,14,19,21
 61:15,17 70:15
 79:2 81:25
 82:8,10,18
 83:9,17,25
 84:7,13,18,20
 85:13 86:7,15
witnesses   9:25
 10:2 61:19
 86:18
wondering
 146:7
words   55:13
work   60:5,8,10
 60:17 82:5,14
 101:2 103:20
 137:19 142:8
working   59:14
worst   120:4
worth   48:1,24
 49:5 75:21
 76:7 111:23,24
 111:25 126:4,6
 126:7 133:3,4
 133:13

23-10210-lgb    Doc 104-1    Filed 06/21/23    Entered 06/21/23 16:41:22    Exhibit A -
Declaration of Morris S. Bauer    Pg 209 of 209
[write - zourigui's]                                                    Page 52

**write** 76:1
  81:18 148:6,7
**writing** 76:23
  76:25 77:15,16
  79:5
**written** 92:14
  98:10 100:4,8
**wrong** 53:3

**x**

**x** 1:4,10 126:4
  152:1

**y**

**yeah** 16:4 19:3
  22:13 34:15
  35:18 36:8,12
  37:18,19 38:8
  40:23 44:11
  46:3 50:7
  53:25 56:19,21
  59:20 60:19
  61:21,23 70:19
  83:14 84:14
  89:17 112:22
  112:22 119:11
  119:21 127:20
  146:8 149:5
  150:11,11
**year** 22:9,21
  24:17,25 25:1
  25:12 26:17
  29:11 30:11
  31:17 32:4,10
  32:24,24,25
  33:4,4,8,8 39:2
  39:8 40:5
  45:22,22 46:5

46:5,7,11,13
46:15,17 48:15
48:17 49:1,17
53:18,22 54:16
55:6,20 57:1
59:11 80:25
88:10 95:15,19
111:24 133:6
138:10
**years** 21:13
  24:24,25 25:4
  25:4,21 27:16
  28:5,5 29:13
  38:9 46:4,18
  50:14 57:12,18
  77:23 81:2
  94:18 95:19,22
  96:1 97:2,8
  98:12 99:2
  100:14 103:25
  104:14 111:25
  118:5 138:2,7
  138:11
**yep** 16:6 34:18
  34:20 47:25
  54:15 60:6
**yesterday** 8:18
  21:2
**york** 1:2,13
  2:15 4:6,13 5:4
  5:12 13:5 21:7
  30:21 32:7,23
  70:1 87:7 88:3
  88:6 95:9
  98:23 134:18
  149:23

**young** 40:17
  110:19
**yuzek** 5:1 7:2

**z**

**zero** 28:7
  130:25,25
  133:19
**zoom** 12:21
  17:24 63:6,8
  110:18 122:16
**zouri** 7:3
**zourigui** 5:6
  7:1,2 9:19 10:6
  13:22 108:10
  108:10 151:11
**zourigui's**
  68:10