HERRICK, FEINSTEIN LLP
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com

*Attorneys for G4 18190, LLC*

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT | Hearing Date and Time: |
| SOUTHERN DISTRICT OF NEW YORK | July 12, 2023 at 10:00 a.m. |

--------------------------------------------------------x

In re                                                                    Chapter 11

ERBO PROPERTIES, LLC, et al.,                    Case No. 23-10210 (LGB)
                                                                         (Jointly Administered)
            Debtors.

--------------------------------------------------------x

**OBJECTION OF G4 18190, LLC TO THE APPLICATION OF THE DEBTORS
SEEKING TO EXTEND THE DEADLINES SET FORTH IN THE COURT'S
JUNE 28, 2023 SCHEDULING ORDER**

G4 18190, LLC ("G4"), by its counsel, Herrick, Feinstein LLP, submits this objection (the

"Objection") to the Application of the Debtors Seeking to Extend the Deadlines Set Forth in the

Court's June 28, 2023 Scheduling Order (the "Application")[1] and represents as follows:

**PRELIMINARY STATEMENT**

1.      The Application seeks relief from this Court's order dated June 28, 2023 (the "June

28 Order"), which set a deadline of July 6, 2023 for the filing of an amended plan of reorganization

and disclosure statement.[2] In support of that request, the Debtors argue that their new proposal to

convert their building at 541 West 21st Street (the "Property"), into a transient migrant shelter (the

---

[1] Dkt. No. 119; hereinafter cited as the "Application".
[2] Dkt. No. 110.

"Proposal") can be completed, and that the Property will be occupied and a tenant will be paying rent, by October 1, 2023.[3]

2.      The Proposal is an entirely new development concept, subject to all the risks of any new project, including timing, construction, permitting and financing. The proposed priming lien for the new financing to be provided by Hershel Klein cannot be approved over the objection of G4. The timeline set forth in the Proposal is wildly unrealistic in every aspect; even if this new Proposal were approved and moved forward, completion and commencement are unlikely until mid-2024.

3.      The Debtors rely on a series of unsupported and unrealistic assumptions regarding regulatory approvals and construction. Not only are those assumptions unachievable, but the Debtors' track record in completing construction of the Property was marked by millions of dollars in cost overruns and lengthy schedule delays.[4] Yet the Application simply ignores those issues with its blithe assurances about speedy approvals and construction timelines.

4.      This is a single-asset real estate case. The Debtors failed to propose a plan that is reasonably likely to be confirmed within a reasonable amount of time in accordance with section 362(d)(3) of the Bankruptcy Code. This Court has already ruled that these Debtors are out of the money.[5] What they now seek is a free option to pursue an entirely new plan whose success is uncertain, but which leaves G4 and other creditors exposed to the risk that their project fails, and that the collateral securing G4's loan diminishes in value. Notably, the Debtors' proposal is utterly silent on the payment of any adequate protection to G4 during the pendency of the development

---

[3] Application at ¶ 25.
[4] Debtor's Motion to Enter into Agreements with Irving Oak Management and Mabe Group Inc. to Complete Construction of the Debtor's Project Located at 541 West 21st Street, New York, NY, Dkt. 57, at 3.
[5] Transcript of hearing of June 6, 2023 ("June 6 Hearing") at 133:21-24.

process. On these facts, the Debtors have failed to establish cause for extending the deadlines set forth in this Court's June 28 Order.

## **BACKGROUND**

5.      On February 13, 2023 (the "Petition Date"), ERBO Properties LLC, Gold Mezz LLC and KOVA 521, LLC (collectively, the "Debtors") each commenced its Chapter 11 case (the "Cases") by filing a voluntary petition for relief in this Court under Chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate as debtors-in-possession. By order dated February 14, 2023, the Cases have been jointly administered.[6] No trustee, examiner or official committee of unsecured creditors has been appointed.

6.      The Application requests that the Court give the Debtors until July 20, 2023 to file a revised plan and disclosure statement.[7] Despite the fact that this is an entirely new plan, the application asks for objections to be filed by July 24, 2023 and for a disclosure statement hearing to be held by July 26, 2023.[8]

7.      The Proposal outlines the core terms of the proposed development, under which the Property would be converted into a migrant shelter under a three-year lease.[9] HipHoticHelps, Inc. ("HHH"), which is identified as a non-profit agency but about which there is no other disclosure, would operate the Property as a migrant shelter under a proposed three-year agreement with the New York City Department of Social Services ("DSS").[10]

---

[6] Dkt. No. 8.
[7] Application at ¶ 32.
[8] *Id.*
[9] Application at ¶¶ 21-25.
[10] *Id.*

8.     The Application argues that HHH has issued a proposed letter of intent to an entity named Uline Holdings LLC ("Uline"), under which HHH would sublease the Property from Uline, which would be the prime tenant.[11] HHH would enter into a three-year contract with DSS for the operation of the migrant shelter.[12] No background information is provided about Uline.

9.     Uline has submitted an unsigned letter of intent for a lease with the Debtors with the following terms: a) three-year term; b) annual rent of $10.5 million plus payment of real estate taxes and insurance expense; c) lease term commencing October 1, 2023; d) Property rebuilt in accordance with HHH's specifications; and e) lease contingent on temporary certificate of occupancy and DSS final inspection after buildout.[13]

## ARGUMENT

## II.    THE TIMETABLE FOR CONSTRUCTION AND OCCUPANCY OF THE PROPERTY IS UNREALISTIC

### A.    The Debtors' timetable is unrealistic.

10.     Before construction can begin, the New York City Department of Buildings (the "DOB") will need to approve a new building plan for the Property.[14] The Debtors allege that they expect to be able to file an application for a new building plan by July 11, 2023, and that they expect DOB approval will be obtained by July 20, 2023.[15]

11.     These claims alone are reason for skepticism. The Application states that HHH walked through the Property in late June and provided the Debtors with the construction requirements that are incorporated into the Application.[16] Based on those requirements, the

---

[11] Application at ¶¶ 23-25.
[12] Application at ¶ 24.
[13] Application at Exhibit B.
[14] Declaration of Frank Graczyk at Exhibit A.
[15] Application at ¶¶ 28-29.
[16] Application at ¶¶ 17-18.

"Debtors provided HHH with a sketch showing how the requirements could be met."[17] But a sketch is hardly the level of detail required to be submitted to the DOB in a building plan, which typically takes several months – if not longer – to prepare.[18]

12.    Attached to this Objection is the Declaration of Frank Graczyk of Project Control Associates, Inc. (the "Declaration"), which has provided construction monitoring and related services to G4 in connection with the Property since construction began.[19] In the report dated July 10, 2023 (the "PCA Report") that is attached to his Declaration, Mr. Graczyk explains why the Debtors' proposed timeline cannot be met.[20]

13.    According to the PCA Report, as of July 10, 2023, no application related to the Proposal has been submitted to the DOB.[21] Construction cannot begin until DOB grants approval of the filed plans and the associated work permits are issued.[22] Current DOB service levels in Manhattan for Alteration CO applications are reported as ~20 days for the application review by DOB, 25 days for the applicant to resolve DOB objections and at least two submissions to obtain DOB approval.[23] The PCA Report notes that the original plan for conversion of the Property to an office building took more than eight months for approval by the DOB; that plan was submitted on March 26, 2019 and approved on December 13, 2019.[24]

---

[17] Application at ¶ 22.
[18] Declaration of Frank Graczyk at Exhibit A.
[19] Mr. Graczyk has more than 30 years of financial and construction experience. He holds a BS in mechanical engineering, an MS in civil/environmental engineering and an MBA. Mr. Graczyk has received formal commercial real estate underwriter training from the American Institute of Banking and holds construction code licenses as a Building Code Inspector, Mechanical Code Inspector and Fire Prevention Code Inspector.
[20] PCA Report at 2-4.
[21] *Id*. at 3.
[22] *Id*. at 3-4.
[23] *Id.* at 3.
[24] *Id*.

14.     The proposed use of the Property as a migrant shelter also must meet New York City Construction Code and Multiple Dwelling Law requirements relating to light, air, ventilation and life safety.[25] In Mr. Graczyk's opinion, "it is not anticipated that such an application to the NYC DOB would be approved quickly or with its initial submission."[26]

15.     The PCA Report further notes that although the Property is in AE flood zone, as defined by the Federal Emergency Management Agency, and the Proposal calls for work to be done below the Base Flood Elevation, there does not appear to be any recognition of this issue in the letter of intent documents.[27] The build-out specification in the Proposal calls for a laundry room in the cellar of the Property, which is below the FEMA base flood elevation.[28]

16.     The PCA Report states that the existing elevator at the Property does not extend to the cellar level, and that the Proposal also includes plans for a resident storage room on that level.[29] The PCA Report notes that the accessibility requirements of the Americans with Disabilities Act (the "ADA") may apply; those regulations require that any public rooms or facilities be made accessible to persons with disabilities.[30] Without elevator access to the cellar level, the location of the laundry and storage rooms does not appear to comply with ADA requirements.[31]

17.     The property adjacent to the Property at 551 West 21st Street is a high-end residential condominium.[32] Because the Proposal contemplates a change in the planned use for the Property, a statutory zoning challenge period of 45 days (plus a 15-day appeal period) applies and

---

[25] *Id*. at 3.
[26] *Id*. at 3.
[27] *Id*. at 4. An "AE" flood zone is defined by FEMA as having a 1% chance of flooding in any individual year. *See, e.g.*, FEMA FLOOD ZONE DEFINITIONS, https://pw.lacounty.gov/wmd/floodzone/docs/FZD_Legend.pdf (last accessed July 10, 2023).
[28] PCA Report at 4.
[29] *Id.*
[30] *Id*. *See also* ADA Standards for New Construction of Alterations, 28 C.F.R. § 35.151 *et seq.* (2010).
[31] PCA Report at 4.
[32] *Id.*

has not yet begun.[33] The PCA Report states that a zoning challenge to the proposed change of use can be filed on-line with the DOB and opines that "Objections emanating from 551 West 21st seem likely."[34]

18.     The PCA Report also analyzes the construction process, noting that the planned construction requires completion of certain remaining work at the Property and revisions to the existing life safety, mechanical, electrical, and plumbing systems and new work.[35] The PCA Report advises that the procurement of the necessary materials and equipment have very long lead times in the current marketplace.[36] Once complete, the work will require inspection by the DOB and the New York City Fire Department, along with other third-party certifications per the New York City Building Code, and that there are currently long wait times for Fire Department inspections.[37]

19.     In Mr. Graczyk's opinion, the bid, contract procurement, construction, and inspection process would take at least six months after DOB approval of the building plan.[38] Once work is completed, the TCO process would take several additional weeks, at best.[39]

20.     Moreover, there are other questions about whether the Property can be built to accommodate the requirements of the Proposal, which requires a minimum of 30 separate residential units on each floor above the ground floor.[40] The NYC Building Code requires that every "living room" in a residential unit must have a legal window, i.e., a window through which

---

[33] Id.
[34] Id.
[35] Id.
[36] Id.
[37] Id.
[38] Id.
[39] Id.
[40] Application at ¶¶ 17-18.

required light and air is provided.[41] Each bedroom in a dwelling unit must have a window.[42] Given the configuration of the Property, it is unclear how residential units in the rear of the Property will meet that requirement. The PCA Report also notes that the build-out requirements for the eighth floor of the Property appear to exceed the available floor area.[43]

21.     Nor does the Application provide sufficient detail to support the Debtors' claims that construction can be completed within 4-6 weeks, or that construction can be completed at a cost of approximately $4 million.[44] The Application provides no proposed construction budget, so G4 and other creditors have no way to assess the reasonableness of the budget. Yet, the Debtors' admitted prior history with both construction estimates and timetables[45] is reason to be skeptical of these aggressive claims. That history gives rise to several related concerns: 1) what happens if the budget is exceeded; and 2) what happens if the Debtors' proposed schedule cannot be met?

22.     Thus, even if the Debtors could prepare a full building plan for submission to DOB by July 11, which G4 does not believe is realistic,[46] there is no evidentiary basis to support the Debtors' claim that DOB approval can be obtained by July 23. To the contrary, for the reasons set forth in the PCA Report, the combination of the regulatory approval process, construction and inspection means that occupancy of the Property is unlikely before mid-2024.

**B.      The Proposal unreasonably exposes G4 to the risk of failure.**

23.     There are other execution risks embedded in the Proposal, which provides that the Property will be leased by Uline and subleased to HHH, which will have a three-year contract with

---

[41] New York City Admin. Code, Title 27, Construction and Maintenance, §27-258.f (2019).
[42] *Id.*
[43] PCA Report at 4.
[44] Application at ¶ 26.
[45] Dkt. No. 75 at ¶¶ 6-8.
[46] PCA Report at 3-4.

the DSS.[47] In addition, the Proposal contemplates that Mr. Klein will make a loan to the Debtors of approximately $4.5 million to fund construction costs, which will be secured by a senior lien on the Property.[48]

24.     Before a revised plan of reorganization and disclosure statement could be approved by this Court, many agreements would have to be drafted and negotiated among the parties, including the following:

- Lease agreement between the Debtors and Uline;
- Sublease agreement between Uline and HHH;
- Services agreement between DSS and HHH;
- Loan agreement between Mr. Klein and the Debtors; and
- Collateral assignment of sublease between Uline and the Debtors or a recognition agreement between HHH and the Debtors whereby the Debtors step into the shoes of Uline and serve as direct landlord to HHH.

25.     The Application merely attaches proposed letters of intent; not even these preliminary documents are final. It defies belief to think that by July 20, the Debtors would be able to prepare and file a plan of reorganization and a disclosure statement and finalize all those agreements so that they could be submitted to the court. And if the Debtors are unable to meet their self-imposed deadline, it is predictable that they will yet again seek another extension of time.

26.     But even if the Debtors achieved the impossible and filed all those agreements and documents, the Application proposes that ***creditors would have just four days*** in which to digest this enormous mass of new information, take discovery if necessary, and be in a position to file objections.[49]  As G4 has argued above, this is an entirely new plan; the only possible explanation for seeking to impose such a manifestly unreasonable deadline is to deprive creditors of an

---

[47] Application at ¶¶ 22-25.
[48] Application at ¶¶ 27-28.
[49] Application at Exhibit D, ¶ 1(c).

9

opportunity to be able to take discovery and be adequately prepared to for a disclosure statement hearing. Although G4 has no desire to prolong this proceeding, this Court should not approve such transparent litigation gamesmanship. If the Proposal moves forward (which it should not), due process requires that G4 and other creditors be given sufficient time for discovery and objections.

27.    Even if the Debtors were successful in completing the Proposal and leasing the Property to Uline, there is still no assurance that G4 and other creditors will benefit. Although the Debtors allege that "with the Migrant Shelter Lease in place, the Property would be worth well in excess of all of the Debtors' obligations"[50] they have provided no evidentiary support for that claim.[51] The Application further alleges that: "A 100% payout to creditors through a sale or refinance of the Property could be speedily achieved."[52] But although the Debtors promise to file a new plan of reorganization by July 20, the Application does not state how G4 or other creditors would be paid under the new plan.

28.    As with so many other allegations in the Application, there is no evidentiary support these claims, and good reason to doubt them. First, even if the Proposal were implemented, it only provides for a three-year lease of the Property.[53] The Application asserts that during those three years, the Debtors could attempt to re-zone the Property or prepare it for other uses if DSS does not renew its contract with HHH.[54]

29.    But as Mr. Cirz testified at the hearing before this court on June 28, "when you value real estate, you're analyzing a property on a stabilized basis over a ten-year period," not the

---

[50] Application at ¶ 38.
[51] If the Debtors intend to introduce valuation testimony in support of the Proposals, G4 reserves the right to seek appropriate discovery prior to any hearing at which such testimony would be adduced.
[52] Application at ¶ 39.
[53] Application at ¶ 23.
[54] Application at ¶ 37.

three years of income provided by the proposed lease.[55] Thus, Mr. Cirz's testimony refutes the Debtors' claim that the Property can easily be sold or refinanced, a risk clearly heightened if DSS does not renew its proposed agreement with HHH. As an experienced real estate lender, G4's position is that a building with only a three-year lease cannot be sold or financed by a new lender because the guaranteed income stream is too attenuated.

30.    There can be no assurance that either HHH or Uline will stand by if the Debtors cannot rebuild the Property on time or for the proposed budget. But what is clear is that G4 and the Debtors' other creditors face grave risk if the Debtors embark on the Proposal but cannot complete it. If the Debtors embark on implementing the Proposal, but fail to complete it, G4 and other creditors will have suffered further delay. If construction of the shelter begins, but is not completed, the value of G4's collateral may be impaired, a risk it should not be required to bear.

### C.    The Debtors cannot prime G4's loans.

31.    The Proposal provides that the loans to be provided by Hershel Klein to the Debtors will be secured by a senior lien on the proceeds from the lease.[56] That element of the Proposal is unacceptable to G4, which holds a perfected mortgage on the Property and an assignment of the leases and rents. To prime G4's loan, the Debtors would have to meet their burden of establishing that G4's interests were adequately protected after giving effect to the priming. As noted above, the Proposal does not provide for the Debtors to make cash interest payments to G4 during the pendency of construction, and now provides for an effective subordination of its right to receive cash flow even after the lease commences.

---

[55] Transcript of Hearing, June 28, 2023, at 24:15-17.
[56] Application at ¶ 27.

32.     Although unacknowledged by the Application, a priming lien in a chapter 11 case constitutes extraordinary relief and should only be granted as a last resort.[57] The existence of an equity cushion is the preferred test in determining whether priming of a senior lien is appropriate under section 364.[58] This Court has already found that the Debtors are out of the money, and that the Property's value is less than the amount of G4's claim; thus, there is no equity cushion.[59]

**D.     The Debtors' disclosure with respect to HHH and Uline is inadequate.**

33.     The Application provides no meaningful information about HHH. Among the most basic of questions are these:

- Does HHH operate any similar shelters?
- How long has HHH been in the shelter business?
- Who are HHH's principals?
- What is HHH's financial position?
- Who will manage facility on day-to-day basis?

34.     There are similar questions about Uline:

- Does Uline operate any similar shelters as prime tenant?
- Who are Uline's principals?
- What is Uline's financial position?

**E.     The Debtors have not established cause for the requested extensions.**

35.     The June 28 Order cautions that "this order may not be modified, or the dates herein extended, except by further order of this Court for good cause shown."[60] When seeking to modify a scheduling order, the movant bears the burden of showing that "good cause" exists, a burden

---

[57] *In re YL West 87th Holdings I LLC*, 423 B.R. 421 (Bankr. S.D.N.Y. 2010).
[58] *In re Strug-Div., LLC,* 380 B.R. 505, 513 (Bankr. N.D. Ill. 2008). *See also  In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088-90 (4th Cir. 1986); *In re Reading Tube Indus., Inc.,* 72 B.R. 329, 333-44 (Bankr. E.D. Pa. 1987) (holding that where there is no equity cushion, section 364(d)(1)(B) is not satisfied.); *In re Dunes Casino Hotel,* 69 B.R. 784, 795-96 (Bankr. D. N.J. 1986).
[59] Transcript of Hearing, June 6, 2023, at 133:21-24.
[60] Dkt. No. 110 at ¶ 9.

which requires the movant to show that they acted with sufficient diligence.[61] If the movant was not diligent, the good cause inquiry should end.[62] In their Application, the Debtors cite *In re Adelphia Communications Corp.*, where the court explained that "[e]xamples of a party's failure to act with sufficient diligence include basing a proposed amendment on information that the party *knew*, or should have known, *in advance of the deadline*."[63]

36.     Here, not only did the Debtors know of the new development proposal before the deadline, but they also knew of the proposal before the June 28 Order was entered, and yet now seek an extension of the court-imposed deadline. Information about the proposed migrant shelter lease was known to the Debtors as early as June 2023.[64] In fact, the Binding Letter of Intent between Uline and HHH was signed on June 26, 2023.[65] Two days later, this Court held a hearing – at which Debtors' counsel was present – and consulted with the parties before setting the June 28 Order. At no time during that hearing did Debtors' counsel advise the Court or the parties of the Binding Letter of Intent that was signed two days earlier or explain that a potential new development proposal was in the works. Instead, the Debtors waited until July 6, 2023 – the very last day on which they were required to submit an Amended Plan and Disclosure Statement – to ask for an extension.

37.     Additionally, the Debtors have been on notice since June 6, 2023, that their current Plan and Disclosure Statement are inadequate.[66] The Debtors had 32 days between that hearing and the July 7, 2023 deadline to prepare and file an amended plan of reorganization and disclosure statement. Yet there is no evidence in their Application that the Debtors acted with sufficient

---

[61] *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).
[62] *See Rent-A-Ctr. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003).
[63] *In re Adelphia Communications Corp.*, 452 B.R. 484, 492 (Bankr. S.D.N.Y. 2011) (emphasis added).
[64] Application at ¶ 22.
[65] Application at Ex. A.
[66] Transcript of June 6 Hearing at 117:18-119:10.

diligence during that timeframe to develop an Amended Plan and Disclosure Statement. Instead, over the past month, the Debtors have proffered half-baked proposals that the parties and this Court have time and time again treated with skepticism. This proposal is no different and the Debtors should not be allowed to cling to this to a last-minute, unrealistic proposal as evidence of their "diligence" to obtain an extension.

38.    In sum, the Debtors have not satisfied their burden of showing that they exercised sufficient diligence in attempting to comply with the deadlines. Because the Debtors have not exercised sufficient diligence, they have not satisfied their burden of proving that "good cause" exists and their request to modify the June 28 Order should be denied.

## CONCLUSION

39.    The Proposal is an incomplete jumble, raising far more questions than it answers. At best, it's a starting point for a complex business deal, with substantial work remaining to be done on the financing, regulatory approvals, legal documentation and construction. G4 has shown why the proposed schedule cannot be achieved. When the schedule inevitably fails, the Debtors will undoubtedly again plead for more time, promising yet again that this will be the last extension they will ask for…until the next time.

40.    But this is not the only option for a plan of reorganization in these chapter 11 cases. Mr. Silverberg, the principal of 541 W 21 SME LLC ("SME"), testified at the June 28 hearing that he was prepared to fund completion of construction of the Property for its original intended use as an office building, and that he would propose a plan of reorganization that would repay creditors in full. At the June 28 hearing, counsel for G4, Cauldwell-Wingate LLC, and Higher Ground LLC,

14

all advised the court that their respective clients supported granting SME's motion for relief from the automatic stay and its proposed plan.[67]

41.      Granting the Application would be expressly contrary to the wishes of G4 and all other creditors in this case, who long ago lost faith in the Debtors and their failed schemes. Even if the Proposal moves forward, it will simply set up a cram-down fight that the Debtors cannot win. The equities of this case require that this Court not allow the Debtors' false beacon of hope to be pursued at the expense of creditor interests.

WHEREFORE, G4 18190, LLC respectfully submits that (1) approval of the Application should be denied, and (2) the Court grant such further relief as may be just and proper.

Dated:      New York, New York
                July 11, 2023

                                                HERRICK, FEINSTEIN LLP

                                                By: */s /*Stephen B. Selbst_____
                                                      Stephen B. Selbst

                                                2 Park Avenue
                                                New York, New York 10016
                                                (212) 592-1400
                                                (212) 592-1500 (fax)
                                                sselbst@herrick.com

                                                *Attorneys for G4 18190, LLC*

---

[67] Transcript of June 28 Hearing at 102:9-108:17.